IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BENNIE STARKS ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 09 CV 348 |
| v. ) | Hon. Judge Feinerman |
| ) | |
| CITY OF WAUKEGAN, et al. ) | |
| ) | |
| Defendants. ) | |

**DEFENDANT DR. RUSSELL SCHNEIDER'S
STATEMENT OF MATERIAL FACTS IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

NOW COMES Defendant, DR. RUSSELL SCHNEIDER, by and through his attorneys, BOLLINGER CONNOLLY KRAUSE, LLC, and submits the following Statement of Material Facts in Support of his Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1:

### DESIGNATION OF EXHIBITS

Ex. 1:  Curriculum Vitae of Dr. Russell Schneider;

Ex. 2:  Curriculum Vitae of Dr. Carl Hagstrom;

Ex. 3:  Collected Waukegan Police Department Reports, dated January 19, 1986 to January 22, 1986, Bates Stamped LB1 through LB95 ("WPD Rpt.");

Ex. 4:  Transcript of the criminal trial of Bennie Starks, *People v. Starks*, 86 CF 106, on September 23–24, 1986, during examination of witnesses MG, W. Genell, N. Tench, M. Urbanic, H. Pratt, K. Sinclair, B. Bones, D. Deprez, Dr. Schneider, Dr. Hagstrom, S. Boyd, H. Boyer, M. McCain, and J. McCain ("Trial Testimony");

Ex. 5:  Transcript of Sentencing Hearing of Bennie Starks in *People v. Starks*, 86 CF 106, conducted by Hon. Christopher C. Starck on October 24, 1986 ("Transcript of Sentencing");

Ex. 6:  Plaintiff's Rule 26(a)(2)(B) Disclosures;

Ex. 7:  Statement of Pretty and Senn Regarding the Bitemark Evidence in the matter of The People of the State of Illinois vs. Bennie Starks (Revised) May 10, 2010 ("Senn Report");

Ex. 8: Deposition of Dr. Russell Schneider, with all exhibits ("Schneider Dep.");

Ex. 9: Deposition of Dr. Carl Hagstrom, with all exhibits ("Hagstrom Dep.");

Ex. 10: Deposition of William Biang, with all exhibits ("Biang Dep.");

Ex. 11: Deposition of Steven Anderson, with all exhibits ("Anderson Dep.");

Ex. 12: Deposition of Luis Berrones, with all exhibits ("Berrones Dep.");

Ex. 13: Deposition of Dr. David R. Senn, with all exhibits ("Senn Dep.");

Ex. 14: Deposition of Roger A. Clark, with all exhibits ("Clark Dep.");

Ex. 15: Deposition of Plaintiff, Bennie Starks, with all exhibits ("Plaintiff Dep.");

Ex. 16: Deposition of Gary Harmor, with all exhibits ("Harmor Dep.");

Ex. 17: Deposition of David Deprez, with all exhibits ("Deprez Dep.");

Ex. 18: Deposition of Michael Mermel, with all exhibits ("Mermel Dep.");

Ex. 19: Affidavit of Lake County State's Attorney Michael Nerheim, dated June 18, 2014 ("Nerheim Affidavit");

Ex. 20: Lake County State's Attorney's Official Statement on the Bennie Starks Case, dated December 5, 2012 ("Press Release"); and

Ex. 21: Victory Memorial Hospital Records of treatment of MG, dated January 22, 1986, filed under seal.

### JURISDICTION AND VENUE

1. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Plaintiff also alleges state law claims arising out of the same facts, for which this court has supplemental jurisdiction under 28 U.S.C. § 1367. (Fourth Amended Complaint, Doc. 259, ¶¶ 1–2).

2. The Northern District of Illinois is the proper venue for this action under 28 U.S.C. § 1391(b). (Fourth Amended Complaint, Doc. 259, ¶ 2).

3. Plaintiff Bennie Starks is a resident of the City of Chicago and Cook County. (Fourth Amended Complaint, Doc. 259, ¶ 3).

### DESCRIPTION OF THE PARTIES

4. Defendant Dr. Russell Schneider, D.D.S., ("Dr. Schneider") is a dentist licensed to practice in Illinois, who was qualified, without challenge in 1986, as an expert in the field

of forensic odontology during the criminal trial of Plaintiff. (Schneider Dep., Ex. 8, pp. 82, 280–81; Schneider CV, Ex. 1; Trial Testimony of Dr. Schneider, Ex. 4, pp. 554–57).

5. Defendant Dr. Carl Hagstrom, D.D.S., ("Dr. Hagstrom") is a dentist licensed to practice in Illinois, who was qualified, without challenged in 1986, as an expert in the field of forensic odontology during the criminal trial of Plaintiff. (Hagstrom Dep., Ex. 9, pp. 5, 44–45; Hagstrom CV, Ex. 2; Trial Testimony of Dr. Hagstrom, Ex. 4, pp. 622–25).[1]

6. Defendants William Biang, Miguel Juarez and David Deprez (collectively "Police Defendants") are present or former Waukegan Police officers, detectives and supervisors who were involved in the investigation and prosecution of Bennie Starks. (Fourth Amended Complaint, Doc. 259, ¶ 4). Defendant M. Juarez is deceased and this suit is brought against his Special Representative. (Fourth Amended Complaint, Doc. 259, ¶ 4).

7. Defendant Sharon Thomas-Boyd, who was employed by the Northern Illinois Police Crime Laboratory, is a person who represented herself as an expert in serology and who was involved in the investigation which led to the prosecution of Plaintiff. (Fourth Amended Complaint, Doc. 259, ¶ 6).

8. Defendant City of Waukegan is an Illinois municipal corporation which is responsible for the policies, practices and customs of the Waukegan Police Department and which is or was the employer of each of the Defendant police officials and is also liable for the actions of, and responsible to pay any liabilities of, the Northern Illinois Police Crime Laboratory and its successor organization, the Northeastern Illinois Regional Crime Laboratory and the employees of these organizations. (Fourth Amended Complaint, Doc. 259, ¶ 7).

9. Defendant Northeastern Illinois Regional Crime Laboratory, formerly known as Northern Illinois Police Crime Laboratory was the employer of Defendant Sharon Thomas-Boyd at all times relevant to this matter. (Fourth Amended Complaint, Doc. 259, ¶ 9).

**THE JANUARY 18, 1986 ATTACK ON THE VICTIM, "MG"**

10. On the night of January 18, 1986, victim "MG" was attacked next to and in a ravine near the corner of Utica Street and Lake Street in Waukegan, Illinois. (WPD Rpt., Ex. 3, pp. 4–8; Trial Testimony of MG, Ex. 4, pp. 431–43).

11. MG reported to WPD officers Martinez and Genell that, at approximately 11:00 p.m., on the evening on January 18, 1986, she was walking towards her home at 200 S. Utica Street, located near a ravine, when she was approached and attacked by a black male. (WPD Rpt., Ex. 3, pp. 4–5).

12. MG reported to police that, although she tried to run away, the attacker ran toward her, grabbed her neck from behind, threw her down on the grass, and repeatedly punched her all over her face. (WPD Rpt., Ex. 3, pp. 4–8). The attacker then pulled her feet-first

---

[1] Dr. Schneider and Dr. Hagstrom are collectively referred to as "the Dentist Defendants."

down to a ravine, hitting her all over her body as she struggled to get up. (WPD Rpt., Ex. 3, pp. 4–8).

13. MG told police that her attacker bit her on her left shoulder at some point during the attack, and also testified that her attacker bit her during Plaintiff's criminal trial. (WPD Rpt., Ex. 3, p. 5; Trial Testimony of MG, Ex. 4, p. 447).

14. MG was attacked by one individual, who she described, both to police and at trial, as a tall, skinny black man, with no facial hair. (WPD Rpt., Ex. 3, pp. 2–5; Trial Testimony of MG, Ex. 4, p. 444).

15. MG reported to police the attacker was wearing white pants, a dark sweater, a black coat, and a silver watch that she pulled off the man during the attack. (WPD Rpt., Ex. 3, pp. 2–5). MG also told police and testified at Plaintiff's criminal trial that the attacker was carrying a red bag. (Trial Testimony of MG, Ex. 4, p. 443; WPD Rpt., Ex. 3, pp. 2–5).

16. When the attack was over, MG told police, and testified at trial, that she saw her attacker run into the apartment located at 300 Lake Street, in Waukegan, Illinois, still carrying the red bag. (Trial Testimony of MG, Ex. 4, p. 442–43). MG then went to an ambulance near that location, which was responding to a different call. (Trial Testimony of W. Genell, Ex. 4, p. 346; WPD Rpt., Ex. 3, p. 3).

**INVESTIGATION BY WAUKEGAN POLICE DEPARTMENT**

17. In the early morning hours of January 19, 1986, WPD Officer William Genell and WPD Evidence Technician Newton Tench made two searches of the ravine area where the attack took place. (Trial Testimony of W. Genell, Ex. 4, p. 353–54; WPD Rpt., Ex. 3, p. 9, 12, 15–18).

18. During the first search, Officer Genell observed two slippers which were located half-way down the ravine area, next to a guard rail toward Utica Street. (WPD Rpt., Ex. 3, p. 6; Trial Testimony of W. Genell, Ex. 4, p. 353).

19. During the second search, which took place after daylight had arrived, Officers Genell and Tench observed the following items:

    a. One black knee-length leather trench coat with blood on the left sleeve and brown stains;

    b. One scarf with blood and hair;

    c. One watch with a broken and separated watch band;

    d. One pair of black leather gloves;

    e. One pair of white underwear;

    f. One 36-inch piece of conduit pipe;

4

g.  Several hypodermic needles; and

   h.  One pack of Newport cigarettes and one pack of matches.

(Trial Testimony of W. Genell, Ex. 4, p. 354; Stipulated Trial Testimony of N. Tench, Ex. 4, pp. 515–16; WPD Rpt., Ex. 3, pp. 9, 12, 15–18).

20. Officer Tench reported that the coat, hair samples from the coat, the scarf, hair samples from the scarf, and underwear were tagged, collected, and sent to the crime lab. (WPD Rpt., Ex. 3, p. 16).

21. On January 19, 1986, WPD Lt. Michael Urbanic observed the black trench coat recovered from the ravine and found a dry cleaning ticket in the pocket, which was determined came from Mr. Sinclair's One Hour Dry-cleaning, located at 27 S. Genesee Street in Waukegan. (WPD Rpt., Ex. 3, pp. 17, 46).

22. On January 21, 1986, at 10:30 a.m., WPD Detective Meadie and Officers Howard Pratt visited the dry cleaners and interviewed the owner, Kenneth Sinclair, and were able to determine that the tag belonged to "Starks, 414 McKinley." Police made a determination that the black trench coat found in the ravine belonged to Plaintiff, Bennie Starks. (Trial Testimony of M. Urbanic, Ex. 4, pp. 382–84; Trial Testimony of H. Pratt, Ex. 4, pp. 385–88; Trial Testimony of K. Sinclair, Ex. 4, pp. 391–98; WPD Rpt., Ex. 3, pp. 17, 46; Mermel Dep., Ex. 18, p. 36).

23. At or around 2:15 p.m. on January 21, 1986, Detective Meadie and Officer Pratt went to Regent Clothiers and Jewelers at 21 S. Genesee St. in Waukegan and spoke to employee Benjamin Bones. The officers showed Mr. Bones a photograph of Plaintiff and asked if Mr. Bones could recall him being in the store on January 18, 1986. (WPD Rpt., Ex. 3, p. 48).

24. Mr. Bones stated that he did remember the individual shown, and that he purchased a tan/off white sweater that evening. He also stated that the individual was given a red plastic bag upon purchasing the sweater, and that the individual was wearing a black trench coat. (WPD Rpt., Ex. 3, p. 48; Trial Testimony of B. Bones, Ex. 4, pp. 469–75).

25. At or around 9:35 p.m. on January 21, 1986, MG was shown a photographic array of black males at Victory Memorial Hospital in an attempt to identify the offender. (WPD Rpt., Ex. 3, p. 71).

26. According to the police report, MG "immediately" pointed to "photo 321," which was a photograph on record of Plaintiff, and "stated that she was positive that this subject [Starks] was the offender and that he should pay for what he did to her." (WPD Rpt., Ex. 3, p. 71).

27. On January 21, 1986, police contacted Plaintiff, who complied with police requests to come to the police station on that date. At around 6:50 p.m. on that date, he was interviewed by Officer David Deprez and Sgt. Biang after waiving his *Miranda* rights. (WPD Rpt., Ex. 3, pp. 49–50, 72–76; Trial Testimony of D. Deprez, Ex. 4, pp. 677–79).

28. During the January 21, 1986 interview, Plaintiff was shown the black coat which was found in the ravine, which he admitted belonged to him. Plaintiff denied that the scarf, gloves, or watch were his during this interview. (WPD Rpt., Ex. 3, p. 73; Trial Testimony of D. Deprez, Ex. 4, pp. 685–87).

29. Plaintiff denied having anything to do with MG and told Deprez and Sgt. Biang that on the evening of January 18, 1986, he had been drinking at the Genesee Inn in Waukegan until he decided to walk home at about 10:30 p.m. He also stated that he had purchased a beige sweater from Regents Clothiers earlier that evening. (WPD Rpt., Ex. 3, pp. 49–50, 72–76; Trial Testimony of D. Deprez, Ex. 4, pp. 681–688).

30. During the January 21, 1986 interview, Plaintiff also told Deprez and Biang that, after leaving Genesee Inn that evening, he walked south on Genesee Street, until he turned and walked west on Water Street. While walking on Water Street, approaching County Street, Plaintiff stated that he was approached from behind by two subjects, a black male and a Hispanic male. One of the subjects reportedly stated, "This is a robbery, give us all your money." (WPD Rpt., Ex. 3, pp. 49–50, 72–76; Trial Testimony of D. Deprez, Ex. 4, pp. 681–688).

31. During the January 21, 1986 interview, Plaintiff stated that the two men took approximately $80.00 in cash, Starks' trench coat, a pair of gloves, and a wristwatch. The only description Starks could give the officers of the subjects is that the Hispanic male was short, and the black male was tall. (WPD Rpt., Ex. 3, pp. 49–50, 72–76; Trial Testimony of D. Deprez, Ex. 4, pp. 681–88).

32. During the January 21, 1986 interview, Plaintiff stated that after the robbery, he went back to his mother's home at 300 Lake Street which was across the street from the ravine were MG was attacked. With regard to the red bag, Plaintiff initially told police he had it with him the whole night, then later told police he had dropped it off at his mother's apartment at some point during that evening. (WPD Rpt., Ex. 3, pp. 49–50, 72–76; Trial Testimony of D. Deprez, Ex. 4, pp. 681–688).

33. Arresting officers, believing there was probable cause that Plaintiff had committed the attack against MG, placed Plaintiff under arrest at or around 11:45 p.m. on January 21, 1986. (Trial Testimony of D. Deprez, Ex. 4, p. 686).

### Bite Mark Analysis Performed by Dr. Schneider and Dr. Hagstrom

34. In January 22, 1986, the day after Plaintiff was arrested, Dr. Schneider was contacted by the WPD and asked to observe and evaluate a presumed bite mark that was left on the left shoulder of MG. (Schneider Dep., Ex. 8, p. 77).

35. On the afternoon of January 22, 1986, the Dentist Defendants arrived at Victory Memorial Hospital, where MG was receiving treatment for injuries sustained in the attack. (Trial Testimony of Dr. Schneider, Ex. 4, p. 558; Schneider Dep., Ex. 8, pp. 77–79; Hagstrom Dep., Ex. 9, p. 22; Victory Memorial Hospital Records dated January 22, 1986, Ex. 21).

6

36. Neither Dr. Schneider nor Dr. Hagstrom had any involvement in the MG investigation prior to January 22, 1986, at which point Plaintiff had already been placed under arrest the day prior. (Schneider Dep., Ex. 8, pp. 81; Trial Testimony of Dr. Schneider, Ex. 4, p. 606; Hagstrom Dep., Ex. 9, p. 22).

37. Dr. Schneider was not at any time an employee of the Waukegan Police Department or any other public entity involved in this matter. (Schneider Dep., Ex. 8, p. 84, 133–35).

38. Neither Dr. Schneider nor Dr. Hagstrom were, at any time, empowered to make any investigatory or prosecutorial decisions with respect to the prosecution of Plaintiff, and did not participate in the investigation or prosecution of Plaintiff, outside their role of reviewing the bite mark on MG to determine whether it could be matched to Plaintiff, within a reasonable degree of forensic odontology, under the standards of forensic odontology as they existed in 1986. (Schneider Dep., Ex. 8, pp. 297–98; Hagstrom Dep., Ex. 9, p. 164–65, 169; Berrones Dep., Ex. 12, p. 49–50).

39. On January 22, 1986, at Victory Memorial Hospital, Dr. Schneider and Dr. Hagstrom observed the bite mark on MG in person. Dr. Schneider also assisted Officer Anderson in taking photographs of the bite mark, wherein Anderson took the photographs and Dr. Schneider held a ruler adjacent to the bite mark. (Trial Testimony of Dr. Schneider, Ex. 4, pp. 559–62; Trial Testimony of Dr. Hagstrom, Ex. 4, pp. 625–26).

40. On February 19, 1986, the Dentist Defendants met with Plaintiff to take records of his teeth, which included photographs and taking impressions of his upper and lower teeth, using an impression material called "Impregnum." This procedure was photographed. (Trial Testimony of Dr. Schneider, Ex. 4, pp. 562–76; Trial Testimony of Dr. Hagstrom, Ex. 4, pp. 626–27).

41. These impressions were then used to make models, or casts, of Plaintiff's teeth, which Dr. Schneider testified were, within a reasonable degree of odontological certainty, exact impressions of Plaintiff's teeth. (Trial Testimony of Dr. Schneider, Ex. 4, pp. 562–76; Trial Testimony of Dr. Hagstrom, Ex. 4, pp. 626–27).

42. Dr. Schneider and Dr. Hagstrom used these casts to evaluate the type of bite marks Plaintiff's teeth would make by pressing the casts into a flat wax surface to make indentations with the front teeth. (Trial Testimony of R. Schneider, Ex. 4, pp. 578–84; Trial Testimony of C. Hagstrom, Ex. 4, pp. 626–27).

43. The Dentist Defendants then compared "acetate" images of those indentations, created with x-rays, with photographs of MG's bite mark they had taken on January 22, 1986, to see if they matched. (Trial Testimony of R. Schneider, Ex. 4, pp. 578–84; Trial Testimony of C. Hagstrom, Ex. 4, pp. 626–27).

44. Dr. Schneider and Dr. Hagstrom, independently of each other, reached the same opinion: that the bite mark on MG matched Plaintiff, within a reasonable degree of forensic odontological certainty. (Schneider Dep., Ex. 8, pp. 52–53, 209).

45. After reaching the opinion that the bite mark on MG matched Plaintiff within a reasonable degree of forensic odontological certainty, Dr. Schneider did not change his opinion, at any time, to conform to non-odontological evidence. (Schneider Dep., Ex. 8, pp. 173, 176, 188, 191, 276–77).

46. Dr. Schneider's representations to police officers and prosecutors, throughout his investigation and during the criminal trial, reflected his honest opinion within a reasonable degree of forensic odontological certainty. (Schneider Dep., Ex. 8, p. 204).

47. The entirety of Dr. Schneider's analysis and opinion with respect to Bennie Starks was independent. No public official directed Dr. Schneider's work or encouraged him to arrive at a false opinion, exaggerate his opinion, or withhold his honest opinion. (Schneider Dep., Ex. 8, pp. 297–98; Biang Dep., Ex. 10, pp. 232–33; Mermel Dep., Ex. 18, pp. 46–47, 151).

48. William Biang testified that he had no knowledge that the Dentist Defendants arrived at their dental opinions in this case other than based upon their own forensic dental evaluation as licensed professionals, and that "there was no joint, concerted action on the part of Waukegan police officers and dentists Dr. Hagstrom and Dr. Schneider to arrive at the dental opinions in this case." (Biang Dep., Ex. 10, pp. 232–33).

49. Biang further testified that he had no "knowledge that any person from the City of Waukegan or its police force intentionally entered into an agreement with either Dr. Hagstrom or Dr. Schneider to fabricate dental evidence or dental forensic opinions against Mr. Starks." (Biang Dep., Ex. 10, pp. 233).

50. WPD officer David Deprez testified that he never met, spoke to, or had any interaction with Dr. Schneider or Dr. Hagstrom at any time. (Deprez Dep., Ex. 17, pp. 71–72).

51. Luis Berrones, the Assistant State's Attorney who prosecuted Starks in 1986, and who is now an associate judge in the 19th Judicial Circuit Court of Lake County, Illinois, testified at his deposition that the Dentist Defendants acted alone with respect to their evaluation and opinions. (Berrones Dep., Ex. 12, p. 49).

52. Berrones also testified that the decision to prosecute Plaintiff was made by the State's Attorney's Office, and specifically by him. (Berrones Dep., Ex. 12, p. 49–50).

53. Berrones testified that he believed in 1986 there was probable cause to charge Mr. Starks with the crimes for which he was ultimately convicted. (Berrones Dep., Ex. 12, p. 50).

54. Dr. Schneider did not receive any communication at any time from any public official expressing an expectation that he and/or Dr. Hagstrom arrive at a conclusion during their bite mark analysis that favored the prosecution, nor had any inference or understanding of such an expectation by any public official involved in the prosecution of Plaintiff. (Schneider Dep., Ex. 8, pp. 297–98; Mermel Dep., Ex. 18, p. 47).

## CRIMINAL TRIAL OF PLAINTIFF

55. The Dentist Defendants testified at Plaintiff's criminal trial. Dr. Schneider testified in detail regarding his and Dr. Hagstrom's collection of evidence, evaluation, and conclusion. (Trial Testimony of Dr. Schneider, Ex. 4, pp. 578–94). Specifically, he testified: "My opinion is that Mr. Starks bit [MG] in the shoulder." (Trial Testimony of Dr. Schneider, Ex. 4, pp. 585–86).

56. Dr. Schneider testified at his deposition that the opinion he offered during Plaintiff's criminal trial was within a reasonable degree of "forensic odontological certainty," which he expressed at the 1986 trial as a "reasonable degree of dental and odontological certainty." (Schneider Dep., Ex. 8, pp. 279–80; Trial Testimony of Dr. Schneider, Ex. 4, p. 585).

57. All of the evidence upon which the Dentist Defendants relied in formulating their conclusion was made available to the prosecution and Starks' defense counsel. (Berrones Dep., Ex. 12, p. 49).

58. Criminal defense counsel for Plaintiff, T. Lee Boyd, did not retain a bite mark expert or forensic odontologist to testify at trial to contradict the opinions of Dr. Schneider and Dr. Hagstrom. (Senn Dep., Ex. 13, pp. 335–36; Plaintiff Dep., Ex. 15, pp. 269).

59. On cross-examination of Dr. Schneider and Dr. Hagstrom, T. Lee Boyd did not ask the Dentist Defendants whether it was possible another individual could have inflicted the bite mark. (Trial Testimony of Dr. Schneider, Ex. 4, pp. 595–606; Trial Testimony of Dr. Hagstrom, Ex. 4, pp. 630–32).

60. MG testified at Plaintiff' criminal trial regarding what happened during the attack and identified Plaintiff Starks as the attacker. MG testified that she was hit in the face several times and raped during the attack, bitten on the left shoulder during the attack, saw her attacker carrying a red bag, and saw him run to 300 Lake Street following the attack. (Trial Testimony of MG, Ex. 4, pp. 433–49).

61. Co-defendant Sharon Thomas-Boyd, a forensic serologist for the Northern Illinois Police Crime Lab, testified at Plaintiff's criminal trial that she viewed samples of a vaginal swab obtained from MG, the white panties recovered from the scene of the attack (that MG testified were hers), a blood sample obtained from MB, a blood sample obtained from Starks, a saliva swab obtained from Starks, hair standards obtained from both Starks and MG, and hair samples recovered from the scarf found at the scene of the attack by Officer Genell. (Trial Testimony of S. Boyd, Ex. 4, pp. 647–56). Thomas-Boyd's testing showed evidence of semen in MG's underwear and vaginal swab. (Trial Testimony of S. Boyd, Ex. 4, pp. 647–48).

62. Thomas-Boyd gave two opinions at trial after reviewing these samples: First, based on blood-type characteristics of Starks and the semen samples, Bennie Starks could not be excluded as the source of the semen, and second, that the hairs removed from Starks' head were similar to the hairs obtained from the scarf found at the scene. (Trial Testimony of S. Boyd, Ex. 4, pp. 650–51, 655–66).

63. Benjamin Bones, Harry Boyer, Melody McCain, and John Patrick McCain were witnesses that all testified at Plaintiff's criminal trial that they saw Plaintiff on the evening of January 18, 1986 wearing a black trench coat in the area near the attack. (Trial Testimony of B. Bones, H. Boyer, M. McCain, and J. McCain, Ex. 4, pp. 467–99).

64. John Patrick McCain and Harry Boyer also testified at Plaintiff's criminal trial that they remembered seeing Plaintiff carrying a red bag that evening. (Trial Testimony of H. Boyer and J. McCain, Ex. 4, pp. 490, 495).

65. Officer Deprez testified at Plaintiff's criminal trial regarding his interview with Plaintiff prior to his arrest on January 21, 1986. He testified that Plaintiff told him he had been robbed by two individuals on the night of January 18, 1986 while walking home to his mother's apartment at 300 Lake Street. Deprez also testified that Plaintiff admitted the coat found in the was his. (Trial Testimony of D. Deprez, Ex. 4, pp. 681–87).

66. Officer Urbanic testified at Plaintiff's criminal trial that he was able to trace the black trench coat to Bennie Starks through the dry cleaning tag he found in the coat. (Trial Testimony of M. Urbanic, Ex. 4, pp. 381–84).

67. The owner of the dry cleaners, Kenneth Sinclair, also testified at Plaintiff's criminal trial regarding the tagging procedures he used at his dry cleaners and identified Plaintiff as the individual who brought the black trench coat found in the ravine to his dry cleaners. (Trial Testimony of M. Urbanic, Ex. 4, pp. 391–98).

68. At the conclusion of the trial, Plaintiff was convicted on all counts and sentenced to 60 years' imprisonment for the two aggravated criminal sexual assault convictions, 30 years' imprisonment for attempted aggravated criminal sexual assault, and 10 years' imprisonment for aggravated battery, to run concurrently. (Transcript of Sentencing, Ex. 5, p. 851).[2]

## POST-TRIAL AND CIVIL PROCEEDINGS

69. Following the conclusion of Plaintiff's criminal trial, Dr. Schneider did not conduct any additional analysis of the bite mark evidence, reconsider the case in light of new techniques in forensic odontology, or change or update his analysis or opinion reached in 1986 regarding the bite mark. (Schneider Dep., Ex. 8, pp. 173, 176, 188, 191, 276–77, 320–21).

70. Plaintiff was released from prison on October 4, 2006. (Fourth Amended Complaint, Doc. 259, ¶ 49).

71. On January 20, 2009, Plaintiff initiated the present lawsuit. (Complaint, Doc. 1).

---

[2] On appeal, one count of aggravated criminal sexual assault was vacated, the sentence for attempted aggravated criminal assault was reduced to 15 years' imprisonment, and the sentence for aggravated battery was reduced to 5 years' imprisonment. In the process, the appellate court affirmed the convictions on the other counts. *See People v. Starks*, 850 N.E.2d 206, 596 (2006) (discussing post-conviction appellate history).

72. On May 15, 2012, the State dismissed *nolle prossequi* Plaintiff's aggravated assault charges. (Fourth Amended Complaint, Doc. 259, ¶ 51). On January 7, 2013, the State dismissed nolle prossequi Plaintiff's aggravated battery charge. (Fourth Amended Complaint, Doc. 259, ¶ 26).

73. Newly-elected Lake County State's Attorney, Michael Nerheim, issued a press release on December 5, 2012, regarding his decision to dismiss the Plaintiff's aggravated battery charge, which stated:

    > Lake County State's Attorney's Official Statement on the Bennie Starks Case
    >
    > I have also considered the fact that Mr. Starks has served approximately 20 years in the Department of Corrections.
    >
    > A Lake County jury previously found Mr. Starks guilty of Aggravated Battery. They the jury considered all of the evidence in the case including the victim's identification of the defendant, some property of Mr. Starks that was found at the crime scene, some scratches located on Mr. Stark's body, and a bite-mark comparison of oral impressions left on the victim's body.
    >
    > The Appellate Court has since issued an opinion showing concern regarding bite-mark technology utilized in 1986. Additionally, the victim has died and a court ruling has been issued preventing her previous trial testimony from being admitted in any subsequent hearing or trial.
    >
    > Though there would be additional evidence to present to a judge or jury in any subsequent evidentiary hearing, I have decided to dismiss the Aggravated Battery charge. This decision does not reflect any opinion as to whether I believe Mr. Starks is guilty or not guilty.
    >
    > Rather, in considering the history of this case, its evidence, any limited benefit in proceeding with this charge, and the fact that Mr. Starks has served more time than he could receive after any subsequent trial, the interests of justice are best served by a dismissal at this time.

    (Press Release, Ex. 20).

74. Nerheim swore in an affidavit that this press release was the only document he recalled being written, either by him or by the Lake County State's Attorney's Office, as the result of his decision to dismiss Plaintiff's aggravated battery charge. (Nerheim Affidavit, Ex. 19, ¶¶ 2–3).

**OPINIONS OF PLAINTIFF'S EXPERT IN FORENSIC ODONTOLOGY, DR. DAVID R. SENN**

75. Plaintiff has retained one expert in forensic odontology, Dr. David R. Senn. (Plaintiff's Rule 26(a)(2)(B) Disclosures, Ex. 6). Dr. Senn was not a forensic odontologist in 1986,

as he first became involved in evaluating bite mark evidence in 1992. (Senn Dep., Ex. 13, pp. 116–18, 138–139).

76. Dr. Senn co-authored (with Dr. Iain Pretty) a report regarding the bite mark analysis performed by the Dentist Defendants, and has given a deposition. (Senn Report, Ex. 7; Senn Dep., Ex. 13).

77. During his deposition, Dr. Senn testified that, "based on the dental evidence" he reviewed, he could "neither include nor exclude" Plaintiff as the individual who left the bite mark on MG. (Senn Dep., Ex. 13, p. 40).

78. No one, including Dr. Senn, testified that the Dentist Defendants fabricated physical evidence, intentionally were incorrect in their analysis, or intentionally arrived at false or exaggerated opinions. (Senn Dep., Ex. 13, pp. 76–78). Similarly, Dr. Senn did not state any of these opinions in his reports. (Senn Report, Ex. 7).

79. Dr. Senn testified that, in his opinion, the Dentist Defendants, "made errors in evidence collections, they made errors in analysis, and they made conclusion[s] that reached beyond the scope that the evidence allowed." (Senn Dep., Ex. 13, pp. 76–80).

80. Dr. Senn testified that he faults the Dentist Defendants "for not doing a thorough enough analysis of this case and for overstating their opinions in this case." (Senn Dep., Ex. 13, p. 80).

81. Dr. Senn testified that he never opined the Dentist Defendants "fabricated physical bitemark evidence." (Senn Dep., Ex. 13, p. 77).

82. No one, including Dr. Senn, offered the opinion that the Dentist Defendants "intentionally and deliberately misread physical bite mark evidence" (Senn Dep., Ex. 13, p. 78), "intentionally fabricated any of their communications with any of the defendants in the Starks civil case" (Senn Dep., Ex. 13, pp. 78–79), "intentionally changed or altered any communications they had with any of the defendants" (Senn Dep., Ex. 13, p. 79), "intentionally fabricate[d] testimony that was detrimental to Mr. Starks . . . on purpose" (Senn Dep., Ex. 13, p. 80), or "did this intentionally to harm anyone" (Senn Dep., Ex. 13, p. 81).

83. Dr. Senn also testified:

> I don't think they lied. I think they believed what they said. . . . When the Innocence Project contacted Ian Pretty and myself and asked us to review that, and we . . . almost instantly found problems with the [Dentist Defendants'] analysis, but we agreed that they -- that in 1986 the standards and the guidelines were different than they are at the time that we were doing the reevaluation – or that we were looking at the material. And we both felt bad for Dr. Schneider and Hagstrom that they were coming under this scrutiny. I mean, you know, we believed that they did what they did in 1986 in good faith. And now, here, some almost 30 years later, comes to this case.

(Senn Dep., Ex. 13, pp. 82–83).

84. Dr. Senn testified, "I have no reason to think there was a conspiracy." (Senn Dep., Ex. 13, p. 213–14).

**DEPOSITION OF PLAINTIFF**

85. Plaintiff was deposed on January 22, 2014 and did not testify in his defense at his criminal trial. (Plaintiff Dep., Ex. 15, p. 1).

86. Plaintiff testified that the black trench coat found in the ravine and introduced at the criminal trial belonged to him, and that he was wearing said coat on the evening of January 18, 1986. (Plaintiff Dep., Ex. 15, p. 62).

87. Plaintiff also admitted that the gloves and scarf found in the ravine by the police belonged to him as well. (Plaintiff Dep., Ex. 15, p. 63–65).

88. Plaintiff stated that he was robbed on the evening of January 18, 1986 at around 10:00 or 11:00 p.m., while on his way to 300 Lake Street, where his mother lived and where he slept that evening. (Plaintiff Dep., Ex. 15, pp. 32–35).

89. Plaintiff testified the alleged robbery occurred while he was walking South on County Street, and that he had not told the Police the robbery had occurred on Water Street, as the Police reports indicated. (Plaintiff Dep., Ex. 15, pp. 32–35).

90. Plaintiff testified that the he didn't know how his coat, gloves, watch, and scarf ended up in the ravine where MG was attacked, and would have testified as to the same at his criminal trial. (Plaintiff Dep., Ex. 15, pp. 204–05).

91. Plaintiff testified that, at his criminal trial, he wanted his lawyer to establish that MG had consensual sex prior to attack, which could have been the source of semen, rather than him, and that it was possible the person who was the source of the semen was not necessarily the same person who attacked MG. (Plaintiff Dep., Ex. 15, pp. 254–59).

**DEPOSITION OF ROGER CLARK**

92. Roger A. Clark, Plaintiff's expert in police identification procedures, testified that the police had probable cause to arrest Plaintiff, which occurred before the Dentist Defendants' involvement in the case. (Plaintiff's Rule 26(a)(2)(B) Disclosures, Ex. 6; Clark Dep. Ex. 14, pp. 39–40, 207).

93. Mr. Clark testified that only thing he was critical of in the police investigation of Plaintiff's case pertained to the six pack of photographs used in the photographic line-up identification of Plaintiff and the destruction of the mug shot books that contained the

photographs of Plaintiff that may have been used in the photographic line-up. (Clark Dep. Ex. 14, pp. 209).

## DEPOSITION OF GARY HARMOR

94. Gary Harmor, Plaintiff's serological expert, testified that if, MG had had consensual sex with a third person prior to the attack, that Plaintiff still could have sexually assaulted MG, despite the fact that Plaintiff was not identified as the source of semen recovered from MG. (Harmor Dep., Ex. 16, pp. 276–80).

95. Specifically, Harmor testified that it was possible that Plaintiff did sexually assault MG if one of three circumstances had occurred: (1) "if [Plaintiff] did not ejaculate"; (2) if semen from a third individual masked Plaintiff's semen, which he testified was a possibility; or (3) if Plaintiff had worn a condom. (Harmor Dep., Ex. 16, pp. 276–80).

96. Harmor was unable to provide any testimony or opinion that Plaintiff did not sexually assault and/or batter MG, or that Plaintiff was not the rapist and/or attacker. (Harmor Dep., Ex. 16, pp. 276–83).

## ANSWER AND AFFIRMATIVE DEFENSES

97. On September 18, 2014, Dr. Schneider and Dr. Hagstrom filed their respective Answers and Affirmative Defenses to Plaintiff's Fourth Amended Complaint, each denying all material allegations. (Defendant Dr. Carl Hagstrom's Answer and Affirmative Defenses to Plaintiff's Fourth Amended Complaint, Doc. 263; Defendant Dr. Russell Schneider's Answer and Affirmative Defenses to Plaintiff's Fourth Amended Complaint, Doc. 264).

Dated this 2nd day of March, 2015.

        Respectfully Submitted
        BOLLINGER CONNOLLY KRAUSE LLC

        /s/ Michael D. Krause
        One of the Attorneys for the Defendants, Dr. Carl Hagstrom and Dr. Russell Schneider

Michael D. Krause, ARDC #6207328
Robert Tengesdal, ARDC # 6288650
Andrew S. Chestnut, ARDC # 6312527
BOLLINGER CONNOLLY KRAUSE, LLC
500 West Madison, Suite 2430
Chicago, Illinois 60661
Tel:   (312) 253-6200
Fax:  (312) 253-6201

## **CERTIFICATE OF SERVICE**

       I hereby certify that on the 2nd day of March, 2015, I electronically filed this document with the Clerk of the Court using the CM/ECF electronic system, and all counsel of record were served by CM/ECF – USDC.

       **/s/    Andrew S. Chestnut**