## Page 294

1  body and on the clothing of Maria Gonzalez?
2      A    No.
3      Q    And do you understand that DNA
4  evidence has the ability in certain situations to
5  definitively exclude someone as the donor of
6  biological substances?
7      A    Yes.
8      Q    Are you aware that in this case, the
9  victim, Maria Gonzalez, alleges that the same person
10 who -- or alleged at trial that the same person who
11 sexually assaulted her also bit her?
12     MR. KRAUSE:  Can I have that question read
13 again?
14             (WHEREUPON, the Record was read as
15              follows:
16             "Question: Are you aware that in
17              this case, the victim, Maria
18              Gonzalez, alleges that the same
19              person who -- or alleged at trial
20              that the same person who sexually
21              assaulted her also bit her?")
22     THE WITNESS:  I don't know about the trial. I
23 haven't read her transcript. But she told me that
24 the person who was assaulting her bit her.

## Page 295

1  BY MR. STAINTHORP:
2      Q    But when she told you that -- this was
3  when you saw her in the hospital and took the photos,
4  right?
5      A    That's the only time I saw her.
6      Q    Right.  Did she tell you that the
7  person who was attacking her had raped her?
8      A    No, she didn't say that to me.
9      Q    Did she say that he had sexually
10 assaulted her in any manner?
11     A    Did not tell any -- anything about a
12 sexual assault.  She was being assaulted.
13     MR. STAINTHORP:  Okay.  I think that's all I
14 have.
15     MR. KRAUSE:  Hooray.  Do you guys have
16 anything?  Don't be shy.
17     MR. TROBE:  I have just a couple of questions
18 of the witness.
19     MR. KRAUSE:  Okay.  Do you have anything?
20     MR. KARAVIDAS:  I have just a few.
21     MR. KRAUSE:  Okay.  Go ahead.
22             He represents the City.
23     MR. TROBE:  I represent the City of Waukegan
24 police officers.

## Page 296

1                  EXAMINATION
2  BY MR. TROBE:
3      Q    When you were taking the --
4  participating in taking the photos of Maria Gonzalez,
5  you held the ruler; is that correct?
6      A    Yes, I held the ruler.
7      Q    And you determined the position of
8  where the ruler was going to be held; is --
9      A    Yes, I did.
10     Q    -- that correct?  And you directed the
11 officer in what photographs you wanted taken; isn't
12 that correct?
13     A    Basically.
14     Q    All right.  You were in charge of
15 collecting the forensic evidence in this case for the
16 bite mark identification?
17     A    Well, I was kind of co-in charge with
18 the evidence technician taking the -- the --
19     Q    The photographs?
20     A    The photographs.  Yeah.  We worked
21 together to get the photos we needed with and without
22 rulers.
23     Q    The photographs, once they were
24 developed, were they of sufficient quality for you to

## Page 297

1  make your comparisons?
2      A    Yes.
3      Q    You didn't ask them to take other
4  photographs?
5      A    No.
6      Q    Did you ever ask Waukegan Police
7  Department after the initial taking of photographs of
8  Maria Gonzalez to provide you with any additional
9  photographs?
10     A    No.
11     Q    Did you feel you needed additional
12 photographs in order to make your comparisons?
13     A    No.
14     Q    The collection of the additional
15 forensic evidence, that being the cast, that was at
16 your direction; is that --
17     A    Yes, sir.
18     Q    -- correct?  Did the City of Waukegan
19 or the Waukegan Police Department advise you as to
20 how to perform your work in this case?
21     A    No.  I was completely independent.
22     Q    They had no role in advising you as to
23 how to conduct your investigation or as to what your
24 results would be; is that correct?

EXHIBIT 3

298

```
1    A    They had no role in what I did. They
2  didn't tell me what they wanted me to do. They had
3  no role whatsoever in what I did.
4         MR. TROBE: Thank you. I have no other
5  questions.
6         MR. KRAUSE: Do you have more questions?
7         MR. STAINTHORP: Nope.
8         MR. KRAUSE: I have some. I'm going to try to
9  rapidly go through this. Everybody looks tired.
10                EXAMINATION
11 BY MR. KRAUSE:
12   Q    How are you doing, Russ?
13   A    Okay.
14   Q    Dr. Schneider, how old are you today?
15   A    I'm 68. I'll be 69 in -- I'm 68
16 today.
17        MS. REPORTER: I'm sorry. You'll be 69 in? I
18 didn't hear you.
19        THE WITNESS: No. I didn't say.
20        MS. REPORTER: Oh. I'm sorry.
21        THE WITNESS: I just said, "I'll be 69 in --
22 I'm 68 today."
23             (WHEREUPON, there was laughter.)
24 BY MR. KRAUSE:
```

299

```
1    Q    What is your profession?
2    A    I'm a general dentist. I'm licensed
3  to practice dentistry in Illinois.
4    Q    How long have you held that licensure?
5    A    Since 1972.
6    Q    Do you specialize in any area of
7  dentistry?
8    A    No. I practice general dentistry.
9    Q    What does that include?
10   A    It includes all aspects of dentistry.
11 I'm entitled -- I'm licensed to perform anything and
12 everything in dentistry, including services that
13 specialists give.
14   Q    When you're treating patients, are you
15 treating pictures?
16   A    No.
17   Q    Do you have the patients in your chair
18 and you're looking at their teeth, live?
19   A    Yes.
20   Q    How important in forensic dentistry is
21 live visualization of bite marks and/or dentition?
22   A    I think it's essential. I think it's
23 important to see the person or the victim with the
24 bite mark, to look at it yourself, to look at
```

300

```
1  different angles, to get a three-dimensional look and
2  study of it, which you cannot do from two-dimensional
3  pictures.
4    Q    Is that why you went to the hospital
5  to see the victim?
6    A    That's one of the reasons. I wanted
7  to see the bite mark itself. That's important, I
8  believe, to actually look at the bite mark. Also, to
9  see if any information could be picked up from the
10 victim, see if that would help me with my evidence
11 collection and my analysis. I also went to the
12 hospital to feel sure that the photos were taken
13 correctly, that they are done with and without a
14 scale, the scale was in the right place, and that the
15 camera was in the right place when the photos were
16 being taken.
17   Q    Mr. Trobe asked you if anyone assisted
18 you in the development your opinions. Did anyone?
19   A    No. I made my opinions, my own,
20 independently. I did not consult with anyone for my
21 opinions. Those are my opinions made with a
22 reasonable degree of medical certainty after studying
23 all the materials and based on my knowledge and
24 training.
```

301

```
1    Q    So you're not a medical doctor,
2  correct?
3    A    Correct.
4    Q    I know a lot of people use the phrase
5  differently. When you use the phrase "reasonable
6  degree of medical certainty," is that, in your mind,
7  synonymous to a reasonable degree of either dental
8  certainty or odontology certainty?
9    A    I say so. It's used because that's
10 the recommended term in our guidelines now, to use
11 that qualifier.
12   Q    When you were asked to be engaged in
13 this case, how old were you?
14   A    Forty.
15   Q    At any time during the time period
16 that you testified as a forensic odontologist in a
17 criminal proceeding, have you ever been disqualified
18 or found unqualified to be a forensic expert?
19   A    No.
20   Q    Do you recall in the criminal trial of
21 Bennie Starks whether or not the defense had engaged
22 a counter --
23   A    There was no --
24   Q    -- expert on forensic odontology --
```