1      Q.      Did you ever see any study published
2  by Dr. Blake with respect to blood group typing that
3  was issued in 1980 from what has been termed the
4  Berkeley Group, including Dr. Sensabaugh and another
5  gentleman?
6      A.      Not that I recall.
7      MR. KARAVIDAS:  If, at any time -- strike
8  that.
9              I don't have any other questions.
10     MR. TROBE:  Are you serious this time?
11     MR. KARAVIDAS:  This time I'm serious.
12     MR. TROBE:  I just have a few questions.
13                    EXAMINATION
14 BY MR. TROBE:
15     Q.      When you were employed back in 1986,
16 were you a salaried employee?
17     A.      I didn't punch a clock, so I guess so.
18 I don't remember.
19     Q.      Did you get a W-2?
20     A.      Oh, yeah.
21     Q.      Who was that issued by?  Do you
22 recall?
23     A.      The crime lab.
24     Q.      Your understanding was you were



EXHIBIT 5

1   employed by the Northern Illinois Crime Lab?
2       A.      Yes.
3       Q.      Who interviewed you for the job?
4       A.      Andy Principe.
5       Q.      Anyone else?
6       A.      I believe I talked to another
7   serologist there.
8       Q.      Did you have annual reviews?
9       A.      I believe so.
10      Q.      Was that done by Mr. Principe?
11      A.      I believe so. Yes.
12      Q.      Now, when I was listening before, you
13  said that evidence would be dropped off at the crime
14  lab by various police departments; is that correct?
15      A.      Yes.
16      Q.      Sometimes you would receive it;
17  sometimes somebody else would receive it?
18      A.      The policy was whoever was available.
19      Q.      In this case, you're not the one that
20  received the evidence; is --
21      A.      No.
22      Q.      -- that right? And whoever received
23  the evidence, would that generally be your only
24  contact with the -- direct contact with the police

1  department?
2      A.   Yes.
3      Q.   Did the police department generally,
4  or in this case specifically, have any input into how
5  you did your work?
6      A.   No.
7      Q.   Did they have any input in the
8  procedures that you employed?
9      A.   No.
10     Q.   Did they have any input into your
11 conclusions?
12     A.   No.
13     Q.   So at the lab, you were free to work
14 as a scientist independently of the police
15 department; is that correct?
16     A.   Yes, that's correct.
17     Q.   And in this case, you don't recall
18 having any direct contact with the City of Waukegan
19 or the City of Waukegan Police Department; is that
20 correct?
21     A.   No, I don't.
22     Q.   You didn't review your findings with
23 police officers; is that --
24     A.   No.

1     Q.     -- correct? And generally, or
2  specifically in this case, you never reviewed your
3  findings prior to making them; is that correct, with
4  police departments?
5     A.     No. We didn't do that.
6     MR. TROBE: I don't have any other questions.
7     MR. KRAUSE: Just a few.
8                    EXAMINATION
9  BY MR. KRAUSE:
10    Q.     Other than what you've learned from
11 your attorneys or what you may have read in any of
12 the legal proceedings, are you aware of any other
13 witnesses specifically who testified in Bennie
14 Starks' case?
15    A.     No. I was brought in, testified, and
16 then I left. I heard no other part of the trial.
17    Q.     In this case, the Bennie Starks case,
18 you testified to a reasonable degree of certainty as
19 to the opinions that you offered; is that accurate?
20    A.     Yes.
21    Q.     What does "reasonable degree of
22 certainty" mean to you?
23    A.     It means that I had what I needed to
24 make the decision, or I didn't have. Remember, you