This Order Is Not Precedential
And Not To Be Published

FILED

JUN 2 1988

LOREN J. STROTZ, CLERK
APPELLATE COURT, 2nd DISTRICT

No. 2-86-1021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County, Illinois. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 86 CF 106 |
| BENNIE STARKS, | ) ) | |
| Defendant-Appellant. | ) ) | Honorable William D. Block, Judge Presiding. |

ORDER PURSUANT TO SUPREME COURT RULE 23

The defendant, Bennie Starks, appeals from his convic-
tions and sentencing following a jury trial in the circuit court
of Lake County. The charges in the five-count amended indictment
filed against him all arose from the January 18, 1986, assault
upon complainant, a 69-year-old resident of Waukegan. The charges
were as follows:

    Count    I - Aggravated criminal sexual assault (caused
                 bodily harm [placed penis in victim's
                 vagina by force]) Ill. Rev. Stat. 1985, ch.
                 38, par. 12-14(a)(2)

    Count   II - Aggravated criminal sexual assault (victim
                 60 years of age or older) Ill. Rev. Stat.



EXHIBIT
6

86-1021

-2-

1985, ch. 38, par. 12-14(a)(5)

Count III - Attempted aggravated criminal sexual
assault (caused bodily harm [choked, hit
and knocked victim to the ground] and
attempted to place penis in victim's mouth)
Ill. Rev. Stat. 1985, ch. 38, par.
12-14(a)(2), par. 8-4(a)

Count IV - Aggravated battery (caused bodily harm to
victim over 60 years of age [choked, hit,
knocked victim to the ground and bit her])
Ill. Rev. Stat. 1985, ch. 38, par.
12-4(b)(10)

Count V - Unlawful restraint. Ill. Rev. Stat. 1985,
ch. 38, par. 10-3.

The jury found the defendant guilty on all five counts.
The court vacated the defendant's unlawful restraint conviction
as a lesser included offense of aggravated criminal sexual
assault, and it imposed concurrent extended terms of 60 years'
imprisonment for each of the two aggravated criminal sexual
assault convictions, 30 years for attempted aggravated criminal
sexual assault and 10 years for aggravated battery.

In this appeal, the defendant contends: (1) he was not
proved guilty beyond a reasonable doubt; (2) the per se applica-
tion of the rape shield statute denied him the right of confron-
tation; (3) his multiple convictions for aggravated criminal
sexual assault based on one act of intercourse, and his convic-
tion for aggravated battery based on the same element of force as

86-1021

-3-

the sexual assault cannnot stand; (4) it was error for the court
to impose extended term sentences on him for all his convictions;
and (5) the statute upon which his aggravated criminal sexual
assault and attempted aggravated sexual assault convictions are
based is unconstitutional.

The State's first witness, Officer William Genell,
testified that he was on patrol duty the night of January 18,
1986. He received a radio dispatch at about 2 a.m. and proceeded
to the area of 300 Lake Street in Waukegan, Illinois. Complain-
ant was leaning against the wall to the doorway at 300 Lake when
Genell arrived at the scene. She was shaking and crying and
Genell noticed that she had numerous injuries on her arms and her
legs. She was wearing a nightgown and was covered with mud; her
face was swollen. Genell was able to talk with her a little in
English and Spanish with Officer Martinez translating.

After complainant had been taken to the hospital,
Genell searched the ravine area across the street from 300 Lake.
He found a pair of slippers located halfway down the ravine but
was unable to find any other evidence at that time due to dark-
ness. At daylight, after Martinez talked with complainant at the
hospital about 5:30 a.m., Genell returned to the ravine and found
a black trench coat, gloves, a scarf, a pair of underpants, a
watch and watchband, a pipe, some keys, hypodermic needles and
blood.

Waukegan fire department Lieutenant Robert Harvey
testified he responded to a call at 300 Lake Street in Waukegan
with firefighter paramedic Clifford Hook. A Waukegan fire

86-1021

-4-

department vehicle already on the scene had a female, who appeared to be battered, immobilized on a long board with a Philadelphia collar in place. She was moaning, had numerous contusions, abrasions and lots of swelling in her face; she appeared to be in shock because her body was trembling and shaking.

Waukegan police Lieutenant Michael Urbancic testified that he examined the black trench coat retrieved from the ravine and found a cleaning tag from Sinclair Cleaners pinned to the inside of the left sleeve.

Kenneth Sinclair, the owner of Sinclair Cleaners, testified that he checked the laundry tag found inside the sleeve of the coat against his business records. The records indicated the coat had been brought to the cleaners by an individual with the last name of Starks. Defendant stipulated to Sinclair's identification of him in court as the man who had the coat cleaned.

The complainant testified with the aid of an interpreter that about 8:30 or 9:00 on the evening of January 18, 1986, she went outside for some fresh air. She was wearing two robes, a pair of underpants and house slippers. She walked to the corner and was standing there, looking ahead toward 300 Lake Street. She heard a noise, turned and saw a crouched black man get up and come toward her. She started walking toward her house, but the man ran. He grabbed her from behind with his arm around her neck, threw her down on the grass, and repeatedly punched her all over her face. He pulled her by her feet and legs down into the ravine. She was moving around and trying to

86-1021

-5-

get up.  He continued to hit her all over her body as she strug-
gled to get up.

She testified that at the bottom of the ravine, he took
off her pants and raped her.  She said he "pushed down" and was
holding her whole body.  He had his pants unbuttoned.  Before he
raped her, he did not take any of her clothing off.  He was
pulling her.  He didn't do anything with her underwear; when he
took them off he just threw them down.  He didn't say anything to
her; he was just striking her and kicking her.  When he raped
her, she felt something was "touching [her] there" and she moved
back and forth.  She felt his penis in her vagina three or four
times because she kept moving around.  He kept hitting her and
hitting her with his closed fist.

After he raped her, he put his penis on her cheek and
told her three times to "give him pussy," demonstrating for her
the kissing movement he wanted her to do with her mouth.  She
testified she held his penis and pulled on it twice, causing him
to exclaim, "Oh."  He then left her.  During the attack, the man
bit her on her left shoulder and she tore off his watch.  As the
man was leaving the ravine, complainant saw him carrying a red
bag, but he was not carrying or wearing his black coat.  She saw
him climb up the ravine and go to the apartment building at 300
Lake.  She identified the defendant in court as the individual
who attacked her on January 18, 1986.

On cross-examination, complainant testified she did not
know how much time elapsed during the assault.  She denied she
told any Waukegan police officer at the scene that she had not

86-1021

-6-

been raped, stating, "My head wasn't right. I was hit." She stated that defendant took out his knife to hit her, but she had already been hit. She did not know if the defendant struck her with a metal pipe, or whether she had told this to an officer at the scene. She stated that defendant had no facial hair and was thin. She did not know anything about whether she told an officer at the scene that the man was about 18 years old. She testified she knew Blanca (Blanche) Gonzalez, her social worker. She denied having a conversation with Gonzalez after being released from the hospital in which she told Gonzalez that the man did not have sex with her and that the man was going to pay for beating her up so badly. She denied she told Gonzalez that she had seen the defendant before in the area. She did not tell the officer at the scene about the knife, but told officer Juarez the next day.

On redirect examination, she testified she couldn't recall talking to anybody at the scene because she was in the dark, couldn't see, and "couldn't feel [her] body."

Bliss O'Connor, a nurse in the Victor Hospital emergency room, testified that she treated complainant on the morning of January 19. She was brought into the emergency room at about 2 a.m. Her eyes were swollen, she was very dirty, she was badly beaten about her head, face and neck and she had quite a few abrasions on her body and arms. O'Connor stated complainant was very traumatized and upset. O'Connor testified they couldn't communicate with her too well because she spoke Spanish and they didn't so they had an interpreter. O'Connor and another nurse

86-1021

-7-

assisted Dr. Vugrincic in administering a Vitullo test kit about
5 a.m.  Between 2 and 5 a.m., the emergency room staff and Dr.
Vugrincic, who spoke some Spanish to complainant, questioned her
several times whether she had been sexually assaulted.  Part of
this questioning of complainant was in English and part was in
Spanish, with the doctor used as an interpreter; she denied she
had been sexually assaulted.

   After the nurses had bathed, treated, and prepared
complainant for admission to the hospital, they called down an
interpreter from the hospital, a registered nurse by the name of
Del Martinez, so that he could explain to complainant what was
happening to her.  O'Connor was not present during Martinez's
conversation with complainant.  Over the defendant's objection,
O'Connor testified that when Martinez came out of the room after
he talked with complainant, he told O'Connor and the other nurse
that she told him she had been sexually assaulted.  At that point
O'Connor got the doctor, and the Vitullo test kit was adminis-
tered as noted above.  Del Martinez was not permitted to testify
because the court found that complainant's statement to him was
hearsay which did not meet the standard for admission under the
"prompt complaint" rule.

   Dr. Vugrincic testified that when he examined complain-
ant in the emergency room she had tremendous swelling of the
face, neck and upper body.  Her entire body was covered with dirt
and numerous abrasions down to the knees and back.  There was a
bite mark and swelling over the area of the mark on the left
shoulder.  He performed the Vitullo rape test kit on complainant

86-1021

-8-

about 5:45 a.m.  When asked if he observed anything unusual about her vagina he responded that,"[a]bsolutely every cavity of her body was filled with dirt.  There was dirt in the entire vagina and those areas and even the rectum was full of dirt."  The doctor testified that due to her numerous contusions, lacerations, abrasions and hematomas, they did extensive X-ray work of her skull, spine, left shoulder and extremities.  Complainant was not unconscious and was aware of things around her, but she was not talking much and they could not establish many details of what she was going through.

On cross-examination, the doctor stated he found no sign of lacerations or abrasions or blood in the vagina.  Except for normal vaginal secretions and a tremendous amount of dirt, he observed no abnormal secretions in the vaginal area.  On redirect examination, the doctor stated the dirt did not impair his ability to see all the vaginal structures.

Sharon Thomas-Boyd, a forensic serologist, testified that she examined the evidence in the Vitullo collection kit.  These includes saliva standards and blood and hair samples from complainant and the defendant.  Boyd also examined the crotch of complainant's underpants which were found in the ravine, and a vaginal swab and smear obtained from her.  All tested positive for the presence of semen.  Upon performing further genetic marker typings, Boyd determined that complainant is a nonsecretor and that the defendant is a secretor.  After examining all of the evidence, Boyd's opinion was that she could not exclude the defendant as a possible source of the semen.

86-1021

-9-

On cross-examination, Boyd testified that approximately 14% of the population of the United States has the same blood type as the defendant, and that any B-type secretor in that percentage group could have been the possible source of the semen examined by her. It was stipulated that the population of Lake County on January 19 was in excess of 450,000 people. On redirect examination, Boyd testified she did not rely only on ABO typing, but performed red cell enzyme tests in order to be able to exclude more people as the possible source of the semen.

Russell Schneider, a dentist and forensic odontologist, testified that he examined a large bruised bite-mark on complainant's left shoulder on January 22. He photographed the bite-mark and had the print blown up to life-size. Schneider then took photos and impressions of the defendant's teeth and X-rayed his upper and lower bite. Upon comparing the defendant's bite to the photograph of the bite-mark on complainant's shoulder on a point system, Schneider found 62 similar characteristics. He found two highly unusual characteristics as well: the defendant's very small peg-shaped canine or "eyetooth" and his upper right central incisor which was chipped or broken. It was Schneider's opinion that it was the defendant who bit complainant on the shoulder.

On cross-examination, Schneider admitted that the instant case was the first time he had prepared a criminal work-up for bite-mark comparison and that he did not compare the X rays of the defendant's teeth against the model made of the defendant's teeth. Schneider also admitted that the bite-mark was four days old before he photographed it.

86-1021

-10-

Carl B. Hagstrom, also a forensic odontologist, testified that he worked with Dr. Schneider on this case. It was his opinion that the models obtained from the defendant are the models of the teeth that inflicted the bite-mark shown in the photograph of complainant's shoulder. It was also his opinion that it was the defendant who inflicted the bite-mark on complainant.

Benjamin Bones, an employee of Regent Clothiers and Jewelers at 21 South Genesee in Waukegan, testified that during the last hour of business on January 18, he sold a sweater to a black male customer. He identified the defendant in court as the man to whom he sold the sweater. He packaged the sweater for the defendant in a red bag that had the store's name on it.

Melody and John McCain both testified that they worked at the Genesee Inn, a bar, on January 18. The defendant was there from about 5:10 p.m. until 10:30 or 10:45 p.m. on the night of January 18. He was wearing a black trench coat and gloves with zipper-type straps, and was carrying a red bag. At one point during the evening, he left for about 20 minutes. When he returned, his clothes were neat and clean. The McCains did not recall whether he had any facial hair, nor did Calvin Williams, a Genesee Inn patron on January 18, who also testified.

Harry Boyer testified that defendant was at the Headquarters Tavern from about 10:45 to about 10:55 p.m. on January 18. He was wearing a stocking cap and black gloves with zippers on top. He was carrying a red plastic bag. Boyer observed that

86-1021

-11-

the defendant had a "scraggily," thin mustache.  Boyer did not notice any mud on the defendant's clothes.

Waukegan police officer David Du Prez testified the defendant signed a waiver form after being advised of his rights. Waukegan detective sergeant William Biang testified he took a statement from the defendant on the evening of January 21.  The defendant told Biang that he spent most of the day on January 18 drinking and that he was at the Genesee Inn until 10:30 p.m.  As he was walking home from the Inn, he was approached from behind by a black male and a male Hispanic who announced a robbery and took his coat, gloves, wristwatch and $80.  Afterward, the defendant stated he ran home to his mother's house at 300 Lake Street.  He did not call the police to report the robbery because he did not think they would do anything for him.  He did not tell his mother about the incident because she was sick and he did not want to upset her.  Biang stated the defendant admitted buying a sweater from Regent Clothiers, that it was in a red bag, and that he had the bag with him at the Genesee Inn.  He testified he did not have the package with him when he was robbed, however, because he dropped it off earlier at his mother's house.  Biang showed him the coat found in the ravine and the defendant stated it was his.

Biang testified that defendant was placed under arrest that evening.  Biang identified photos taken of the defendant's body which showed a scratch on the defendant's upper right shoulder, two scratch marks on the defendant's right wrist, and a scratch mark on the defendant's upper right buttock.

86-1021

-12-

The defendant did not testify at trial. His first witness was Blanche Gonzalez. Gonzalez testified that she works for the Illinois Department of Public Aid and that she met complainant in the course of her occupation. Some time after complainant's discharge from the hospital in January and before May 1986, Gonzalez had a telephone conversation with complainant. During this conversation, she told Gonzalez that she had accused a man of having sexual intercourse with her but that her accusation was not true. She told Gonzalez that the reason she was saying that the defendant had sexual intercourse with her was "because he was going to pay for beating her up." Complainant told her: "He didn't want to have any -- didn't want to rape me, he wanted oral sex." Complainant told Gonzalez she had seen the man in the area before.

Gonzalez testified on cross-examination that she did not inform the police about her conversation with complainant until the police came to interview her on May 13 because complainant told her not to say anything about this. Gonzalez told Sergeant Juarez about what complainant had told her because she did not "feel that a person should go to prison for something he did not do."

Waukegan sergeant Miguel Juarez testified that he interviewed complainant on January 19 at approximately 9:30 a.m. During this interview, she told Juarez that the alleged offender had no facial hair and that he was 18 or 19 years old.

The parties stipulated that if called to testify, Waukegan patrolman Martinez would testify that he spoke with

86-1021

-13-

complainant in Spanish on January 18, 1986 at 300 Lake Street. At that time, in response to his questions, she stated that she had not been raped but that she had been struck with a metal pipe. It was further stipulated that Bennie Starks was 26 years old at the time of the alleged occurrence.

The defendant contends he was not proved guilty beyond a reasonable doubt where there was no corroborative prompt complaint, and the victim's testimony was neither clear and convincing nor corroborated by other evidence. Specifically, defendant argues where complainant several times denied that a sexual assault had occurred, her later testimony to the contrary cannot be considered "clear and convincing," and the State did not meet its burden of corroborating it with other evidence.

Defendant points out that Dr. Vugrincic's vaginal examination of complainant failed to reveal any signs of blood, abrasions, lacerations or abnormal secretions despite the numerous other abrasions she suffered. Further, he argues, a reasonable doubt of his guilt exists where the State attempted to show that he could not be excluded as a possible source of the semen found on complainant's underpants and vaginal swab but the evidence showed the underpants were removed before the sexual assault. He contends this also raises doubt about the source of the semen on the vaginal swab because the semen found on the swab and the underpants was from the same blood group. Inasmuch as 14% of the general population shares the blood group found in both specimens, defendant contends the State's evidence

86-1021

-14-

establishes only that the defendant was one of 63,000 in Lake County who could have been the source of the semen.

Initially, the State points out complainant's first report that she had been sexually assaulted was not made at trial as the defendant asserts but, rather, was made at the hospital to nurse Del Martinez. Further, it argues complainant's testimony was clear and convincing and, standing alone, was sufficient to sustain defendant's convictions notwithstanding her denials that she had been sexually assaulted. As to the complainant's first two denials - one at the scene to officer Martinez and one later to the emergency room staff - it argues they occurred shortly after the attack while the complainant was in a state of shock and extreme trauma. As to the third denial during the complainant's phone conversation with Blanche Gonzalez, the State points out the complainant flatly denied the conversation occurred and, thus, a credibility question was presented, particularly where the evidence showed Gonzalez did not come forward with this information until the police came to her.

The State additionally argues the complainant's testimony was substantially corroborated by the discovery of the defendant's coat at the scene, and evidence that he had been seen earlier that evening wearing the coat and carrying a red bag holding the sweater he had purchased from Regent Clothiers. Further, the evidence showed defendant could not be excluded as the possible source of the semen found on complainant's underwear and vaginal swab, or of the hair found on a scarf discovered at the scene. Also, photographs of the defendant's body showed four

86-1021

-15-

scratches, including two on his wrist which coincided with complainant's testimony that she pulled off her assailant's watch. The State acknowledges defendant's argument that complainant's underpants were removed prior to the sexual assault, but argues complainant's testimony does not necessarily indicate the underpants were taken off completely at first, but that they may only have been pulled partially down during the sexual assault, come in contact with the semen, and then later come off completely during the struggle and, thus, were then found at the scene. Although admittedly not conclusive of the defendant's guilt, the State asserts the scientific evidence that the defendant could not be excluded as a source of the semen nevertheless is corroborative of the complainant's testimony.

The State's evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

In assessing the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (People v. Hernandez (1988), 121 Ill. 2d 293; People v. Yarbrough (1988), 166 Ill. App. 3d 825, 832.) The relevant inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (Jackson v. Virginia (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; People v. Sanchez (1986), 115 Ill. 2d 238, 261; People v. Collins (1985), 106 Ill. 2d 237, 261.) All of the evidence is to be considered in the light most favorable to the prosecution in

86-1021

-16-

order to preserve the fact finder's role of weighing all the evidence. <u>Jackson</u>, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

A conviction for aggravated criminal sexual assault will be upheld when there is either some corroboration of the testimony of the prosecuting witness or that testimony is otherwise clear and convincing. (<u>People v. Server</u> (1986), 148 Ill. App. 3d 888, 894.)

Evidence of complainant's pretrial denials, particularly the one made to Blanche Gonzalez when complainant was not under any extreme physical or mental stress, substantially impeached the truth of her testimony. As such, defendant's conviction cannot be sustained unless the complainant's testimony was sufficiently corroborated by other evidence. We believe it was.

Although evidence of a prompt complaint is one type of corroborating evidence (<u>Server</u>, 148 Ill. App. 3d at 895), the court here refused to allow evidence of the complainant's statement to nurse Del Martinez as evidence of a "prompt complaint." Rather, the evidence was admitted only to show why the Vitullo rape kit was administered three hours after complainant was brought to the emergency room. Ordinarily, evidence of a prompt complaint is permitted on the basis that it is entirely natural that the victim of a forcible rape or, as here, of criminal sexual assault, would speak out regarding it. (<u>People v. Damen</u> (1963), 28 Ill. 2d 464.) Although a prompt complaint may also fall within the "spontaneous declaration" exception to the

86-1021

-17-

hearsay rule, there is no fixed time limit within which a corrob-
orative prompt complaint must be made.  (<u>People v. Morrow</u> (1982),
104 Ill. App. 3d 995.)  The complaint sought to be admitted must
have been made without inconsistent or unexplained delay, however
(<u>People v. Fuelner</u> (1982), 104 Ill. App. 3d 340), and it must be
voluntary and not made as a result of a series of questions.
(<u>People v. Taylor</u> (1971), 48 Ill. 2d 91).  The court here appar-
ently felt this latter requirement was not met where the com-
plainant had been questioned at some length by the police and
hospital staff before she spoke to Del Martinez.  The State does
not rely on complainant's statement to Martinez and finds suffi-
cient other corroborative evidence as noted above.

We find no reasonable doubt was raised due to the lack
of actual physical trauma to the complainant's vagina, and, in
fact, this type of physical evidence is not necessary to sustain
a conviction.  (<u>People v. Du Pree</u> (1987), 161 Ill. App. 3d 951,
961; <u>People v. Wallace</u> (1986), 145 Ill. App. 3d 247, 252.)
Although neither party mentions it, we find particularly corrobo-
rative Dr. Vugrincic's testimony that the complainant's "entire
vagina and those areas and even the rectum [were] full of dirt."
We believe the jury could reasonably have inferred that defen-
dant's body also became covered with dirt during the assault and
that the dirt in the complainant's vagina could have been depos-
ited there by the defendant.

No reasonable doubt was raised based on the defendant's
assertion the complainant's underpants were removed before the
assault occurred, thus making it unlikely the semen found thereon

86-1021

-18-

was his. Complainant's testimony on this point at trial was
ambiguous where, on one hand, she testified the man took off her
pants and raped her and, on the other, that he did not take any
of her clothing off before he raped her. Based on complainant's
testimony, it is conceivable, as the State argues, that the
underpants were first simply pushed down and sometime later were
taken off completely. That complainant's testimony was ambiguous
is supported by reference to the parties' closing arguments at
trial. The defendant argued, without objection, that complain-
ant's underpants were off before the sexual assault; the State,
in rebuttal, also without objection, argued that the complainant
emphatically testified her underpants were removed after the
sexual assault. We can only assume both parties were arguing
reasonable inferences drawn from the evidence. The record of
complainant's testimony, given with the aid of an interpreter,
was poorly phrased in many instances and often seemed
nonresponsive. Moreover, complainant testified in many instances
by "indicating." Viewing the evidence in the light most favor-
able to the prosecution, we conclude the defendant cannot be
excluded as a possible source of the semen found on the complain-
ant's underpants.

Since the semen found on the underpants and the vaginal
swab were from the same blood group, evidence that the defendant
could not be excluded as a possible source was corroborative of
the complainant's testimony that she was sexually assaulted.
Although the mere fact defendant was included within the 14% of
the general population who could have been the source of the

86-1021

-19-

semen might be insufficient alone to establish guilt beyond a
reasonable doubt, as found in People v. Schulz (1987), 154 Ill.
App. 3d 358, 364-65, there was other evidence here linking the
defendant to the crime, particularly a positive identification by
the victim and testimony that the bite-mark on her shoulder
matched defendant's teeth. Thus, the scientific evidence pre-
sented here provided corroboration of the complainant's testimo-
ny. (People v. Hall (1985), 134 Ill. App. 3d 961, 967; People v.
Brown (1984), 122 Ill. App. 3d 452, 455.) Moreover, the com-
plainant testified her assailant fled the scene carrying a red
bag. According to defendant's statement, he had dropped this red
bag off at his mother's house before he was robbed. Thus,
defendant's statement to the police has little, if any,
exculpatory value.

In sum, viewing all the evidence in the light most
favorable to the prosecution, we conclude complainant's testimony
was corroborated and, thus, defendant's guilt of aggravated
criminal sexual assault was proved beyond a reasonable doubt.

The defendant next contends the court's strict applica-
tion of section 115-7 of the Code of Criminal Procedure of 1963
(the rape shield statute) denied him his right of confrontation.
Specifically, he claims that if he would have been permitted to
inform the jury of a possible relationship the complainant had
with another man it would have explained the presence of the
semen, and the jury would have acquitted him.

Prior to the trial the judge conditionally granted the
State's motion in limine to preclude the defendant from

86-1021

-20-

presenting any evidence concerning the complainant's prior sexual activity with anyone other than the defendant. The court's ruling was conditioned upon (1) the evidence to be submitted in the State's case-in-chief and (2) a specific offer of proof from the defendant as to what evidence he would adduce on cross-examination.

The court's conditional ruling cannot be viewed as the per se application of the rape shield statute the defendant claims. After the State presented evidence during its case-in-chief concerning the semen found on complainant's underpants and vaginal swab, the defendant never availed himself of the opportunity to make an offer of proof concerning complainant's prior sexual relationship with anyone else. The State maintains defendant's failure to make an offer of proof has waived his claim of error as to this issue. We agree. People v. Green (1983), 118 Ill. App. 3d 227.

Defendant next challenges his multiple convictions. He first contends one of his two convictions for aggravated criminal sexual assault must be vacated under the rule announced in People v. King (1977), 66 Ill. 2d 551, that "prejudice results when more than one offense has been carved from a single physical act." Here, he contends, there was only one act of sexual penetration and thus, he can only be convicted on one count of aggravated criminal sexual assault.

In King, it was stated:

"Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one

offense, some of which are, by definition, lesser included offenses. Multiple convictions and concurrent sentences should be permitted in all other cases where a defendant has committed several acts, despite the interrelationship of those acts. 'Act,' when used in this sense, is intended to mean any overt or outward manifestation which will support a different offense."

King, 66 Ill. 2d at 566.

"Included offense" is one which contains some, but not all of the elements of the greater offense and which contains no element not included in the greater. People v. Pumphrey (1983), 115 Ill. App. 3d 1031; Ill. Rev. Stat. 1985, ch. 38, par. 2-9; see also People v. Traufler (1987), 152 Ill. App. 3d 987, 990; People v. Smith (1987), 152 Ill. App. 3d 589.

The State argues this court should uphold defendant's multiple convictions on the basis that each of the "three or four times" the complainant felt the defendant's penis in her vagina constituted an individual act of penetration sufficient to support a separate conviction for aggravated criminal sexual assault. However, there was no evidence that each of the "three or four times" complainant felt the defendant's penis was a reinsertion or repenetration, thus distinguishing the instant cause from People v. Myers (1981), 85 Ill. 2d 281, People v. Harris (1985), 134 Ill. App. 3d 705 and People v. Dixon (1982), 91 Ill. 2d 346.

The evidence here does not support a finding of separate physical acts as in Myers, Harris, and Dixon, however, and

we conclude one of the defendant's convictions for aggravated criminal sexual assault must be vacated.

Defendant also contends his conviction for aggravated battery must be vacated where the "use of force" alleged in counts I and II charging aggravated criminal sexual assault against the complainant is the same conduct of choking, biting, hitting and knocking the complainant to the ground upon which the aggravated battery charge is based. He cites in support People v. Mormon (1982), 92 Ill. 2d 268 and People v. Hood (1974), 59 Ill. 2d 315.

The defendant in Mormon was convicted, inter alia, of rape and armed violence based on rape. At both levels on appeal, the court rejected the State's argument that the acts of committing rape and of carrying a weapon while committing the rape were two separate acts, finding that the use of the weapon constituted the element of force essential to both offenses. (97 Ill. App. 3d at 566; 92 Ill. 2d at 268.) In People v. Hood, the defendant was convicted of aggravated assault and rape. On appeal to the supreme court, the defendant's conviction for aggravated assault was vacated where the acts which gave rise to the aggravated assault, several blows struck to the victim and a knife threat, constituted the element of force in the rape charge as well. As the State suggests, Hood was decided prior to either People v. King or People v. Dixon and may well have been decided differently under those cases given the apparently separate acts of striking the victim and threatening her with a knife.

The defendant's aggravated battery conviction should not be vacated. The aggravated battery charge is the only one which alleged the defendant bit the complainant. According to the record, this bite to the complainant's left shoulder occurred sometime during the sexual assault and, thus, was a separate act from the force exerted by the defendant in accomplishing the sexual penetration. Further, applying the Dixon analysis, the State concludes the repeated beatings of the complainant by the defendant here, although closely related, were not one physical act and any one of the acts alleged in the indictment for aggravated battery was sufficient to support his conviction therefore. Moreover, as the State points out, the aggravated battery charge is not a lesser included offense of the aggravated criminal sexual assault conviction under count I since it includes the additional element that the complainant was "over the age of sixty (60) years."

Accordingly, the defendant's conviction for aggravated battery is affirmed.

Defendant next contends the trial court's imposition of extended terms of imprisonment on all four counts was improper. He notes the court in People v. Jordan (1984), 103 Ill. 2d 192, 206, relying on People v. Evans (1981), 87 Ill. 2d 77, and construing section 5-8-2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005-8-2(a)) found that:

"[W]hen a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the

most serious class and only if that offense was accompanied by brutal or heinous behavior."

Defendant's convictions here for aggravated criminal sexual assault were class X offenses (Ill. Rev. Stat. 1985, ch. 38, par. 12-14(c)); his conviction for attempted aggravated criminal sexual assault was a class 1 felony (Ill. Rev. Stat. 1985, ch. 38, par. 8-4(c)(2)); and his conviction for aggravated battery was a class 3 felony (Ill. Rev. Stat. 1985, ch. 38, par. 12-4(e)).

The State concedes that the 30-year and 10-year extended term sentences imposed, respectively, for attempted aggravated criminal sexual assault and aggravated battery were improperly imposed under Jordan and must be vacated. (See also People v. Holland (1987), 121 Ill. 2d 136, 161.) It disagrees, however, with the defendant's request for a remand for a new sentencing hearing, arguing the record supports the conclusion that the sentencing judge intended to impose severe penalties and requesting this court to use its authority under Supreme Court Rule 615 (107 Ill. 2d R. 615(b)(4)) to reduce the sentences to the maximum nonextended term possible for each of those two offenses.

We are persuaded that this is an appropriate exercise of the court's authority under Supreme Court Rule 615. A review of the sentencing judge's comments here show he was motivated to impose the extended terms based on the defendant's extremely brutal and heinous beating of the 69-year-old complainant; the defendant's past criminal history which revealed repeated criminal acts despite his having had the benefits of the criminal

86-1021

-25-

justice system; a significant escalation in the degree of vio-
lence which attended the present offense compared with his past
offenses; the lack of applicable mitigating factors; and the
defendant's minimal potential for rehabilitation. Accordingly,
the defendant's sentences for attempted aggravated criminal
sexual assault and aggravated battery are reduced, respectively,
to 15 years and five years.

The extended 60-year term imposed for each of the
defendant's two aggravated criminal sexual assault class X
convictions may stand, since Jordan applies only "when a defen-
dant has been convicted of multiple offenses of differing class-
es." Jordan, 103 Ill. 2d at 206-207; see also People v.
McFarland (1987), 161 Ill. App. 3d 163, 174.

Defendant's final contention is that section 12-14 of
the Code is unconstitutional on the basis it is overbroad and
ambiguous in its definitions and applications. He requests this
court adopt the position taken in People v. Haywood (4th Jud.
Cir. Oct. 7, 1985), No. 85CF29, wherein the court found unconsti-
tutional the Criminal Sexual Assault Law of 1984. (Ill. Rev.
Stat. 1984 Supp., ch. 38, pars. 12-12 through 12-18.)

We conclude (1) defendant has waived the issue and (2),
the issue is without merit. Defendant neither raised this issue
at trial nor in his post trial motion, thus waiving it. (People
v. Du Pree (1987), 161 Ill. App. 3d 951, 966-67.) Moreover, on
the merits, the Illinois Supreme Court has reversed the decision
of the circuit court in Haywood, finding that the statutes
defining the offenses of criminal sexual assault and aggravated

criminal sexual assault are not unconstitutionally vague, overbroad, or ambiguous so as to be in violation of the due process clauses of either the United States or Illinois Constitutions. (People v. Haywood (1987), 118 Ill. 2d 263.) Accordingly, no reversal of defendant's convictions on this basis are warranted.

The judgments of the circuit court of Lake County finding the defendant guilty of aggravated criminal sexual assault charged in count I, attempted aggravated criminal sexual assault charged in count III, and aggravated battery charged in count IV are affirmed. The court's judgment of conviction and sentence for aggravated criminal sexual assault charged in count II is vacated. The 30-year extended-term sentence imposed for attempted aggravated criminal sexual assault is reduced to 15 years, and the 10-year extended-term sentence imposed for aggravated battery is reduced to five years.

Judgment affirmed in part; judgment vacated in part; judgment modified in part.

UNVERZAGT, J., LINDBERG, P.J., and REINHARD, J.

