```
1    A.  That she identified him.
2    Q.  Where was that in the record?
3    A.  I think I put it in the report.  And as
4  I recalled from the record, she identified him in
5  trial and it was presented to the jury she
6  identified him when shown photographs at the
7  hospital.
8    Q.  Can you find that in the report?
9    A.  No, I can't, I'm sorry.  So I'm at a loss
10 on that one.
11   Q.  Assuming that the photographic lineup
12 was not produced at trial -- not introduced into
13 evidence --
14   A.  I know that for a fact.
15   Q.  It was not?
16   A.  Right, because it's not in the record as
17 being introduced.
18   Q.  You still have the opinion then that the
19 photographic lineup prejudiced the trial even though
20 it wasn't introduced into evidence?
21   A.  Yeah, because the jury was aware that
22 there was an identification made.
23   Q.  How did the jury become aware of that if
24 it wasn't part of the evidence?
                                            Page 53
```

```
1    A.  It was either in her testimony or
2  presented in the -- as part the case by the
3  prosecutor.
4    Q.  Wouldn't the prosecutor have to introduce
5  it into evidence to make it part of the case?
6    A.  Yeah, it's either through her or through
7  the detective that was called to the stand, so --
8    Q.  So your recollection --
9    A.  That's the way I remembered it.
10   Q.  Okay.  Assuming that the detective that
11 was called to the stand did not testify concerning
12 the photo lineup and also Maria Gonzalez did not
13 testify concerning the photo lineup at trial, do you
14 still have the opinion that the photo lineup somehow
15 prejudiced Mr. Starks at trial?
16   A.  Well, that's not at all what I remember,
17 so that -- the jury did know that, but you want me
18 to assume?
19   Q.  Just assume, let's call it a hypothetical
20 question.
21   A.  Yeah.  So if I took it as a hypothetical
22 absent any other facts, if the jury was never aware
23 that there was a photo lineup --
24   Q.  Correct.
                                            Page 54
```

```
1    A.  -- and the detectives never included it
2  as their recount of their investigation, then the
3  jury would not know and it would not be considered
4  as evidence.
5    Q.  Correct.
6    A.  And, therefore, it would be excluded from
7  their verdict.
8    Q.  So then in your opinion, it would not
9  have a prejudicial effect on the trial?
10   A.  As a hypothetical.
11   Q.  Okay.
12   A.  Taken that way.
13   Q.  Do you agree that in composing a photo
14 lineup, the investigators should include only one
15 photo of the suspect in a photo array?
16   A.  Yes.
17   Q.  Was that done in this case?
18   A.  Yes -- well, according to the record.
19   Q.  Well, do you have any other information
20 that more than one photo of the suspect was included
21 in the photo array?
22   A.  No.
23   Q.  That's all we have is the record, is that
24 correct?
                                            Page 55
```

```
1    A.  That's all we have is the record and what
2  they said.
3    Q.  Okay.  Do you agree that an appropriate
4  number of fillers should be used in the photo
5  lineup?
6    A.  Yes.
7    Q.  Can you define what a filler is?
8    A.  Similar -- subjects with similar
9  characteristics.
10   Q.  And you believe that an appropriate number
11 of fillers were used in this case?
12   A.  I only know the record says it was six
13 and that's an acceptable number.
14   Q.  Do you agree that the photos in the photo
15 lineup should all be the same format, in other
16 words, Polaroid, 35 millimeter, color, black and
17 white, they should all be the same?
18   A.  Yes.
19   Q.  Do you agree that that was done in this
20 case, the fillers were all the same format?
21   A.  Based on the record.
22   Q.  Do you agree that the fillers and the
23 suspect should be uniform as to general physical
24 appearance?
                                            Page 56
```

**Page 57**

1  A. Yes.
2  Q. Do you agree that that was done in this
3  case?
4  A. Oh, I don't know. But having -- we
5  don't have it, but it's been offered that that's
6  the case.
7  Q. Okay. So you don't have any opinions
8  that it was not done in this case, is that correct?
9  A. One way or the other, no.
10 Q. Do you agree that after a photo lineup,
11 police should do a written report concerning their
12 photo lineup, is that correct?
13 A. Yes.
14 Q. And that was done -- a written report was
15 done in this case?
16 A. Yes.
17 Q. Okay. And the written report should
18 contain the names of all persons who were present
19 for the photo lineup, is that correct?
20 A. Yes.
21 Q. And that was done in this case?
22 A. I can't recall if they all were listed.
23 Q. And you agree that the date and time and
24 location of the procedure, in other words, the photo

**Page 58**

1  lineup, should also be reflected in the report?
2  A. Yes.
3  Q. Was that done in this case?
4  A. Yes.
5  Q. Do you agree that the report should
6  include some identifier for the photos that were
7  used in this case?
8  A. Yes.
9  Q. And you agree that the photo numbers --
10 numbers of the photographs were put in the report
11 that the Waukegan Police Department did?
12 A. Yes.
13 Q. Do you agree that the documentation of
14 the report also contained Maria Gonzalez's own
15 words when she made the photo identification?
16 A. Yes, it should be recorded as such.
17 Q. And did they do that in this case?
18 A. No.
19 Q. They didn't put in the report what Maria
20 Gonzalez said?
21 A. I don't know, that's one of the problems,
22 it should be audio recorded.
23 Q. You're saying that in 1986, the standard
24 was to audio record photo lineups by the police

**Page 59**

1  departments?
2  A. Yes.
3  Q. And where was that standard contained?
4  A. Well, we don't know if it's in Waukegan's
5  standard because it's proffered that there were no
6  such procedures. But that was -- that is a standard
7  procedure used throughout the country and was used
8  by me in the 1970's.
9  Q. Okay. And do you know if it was used in
10 the State of Illinois in 1986?
11 A. I expected that it would be, but I don't
12 know for sure.
13 Q. So you don't know if it was a standard in
14 the State of Illinois in 1986 to audio record photo
15 lineups with victims, is that correct?
16 A. Whether it was done generally throughout
17 the state, no, I don't know.
18 Q. And that's not contained in your report
19 that an audio recording should have been made of the
20 photo lineup, is that correct?
21 A. Correct.
22 Q. Why not? If it's a standard, why didn't
23 you put it in your report?
24 A. As I said, my report is devoted towards

**Page 60**

1  the failure to keep adequate records of the
2  identification process and the failure to keep the
3  file.
4  Q. Would an audio recording be included in
5  your definition of keeping an adequate record of the
6  identification process?
7  A. Yes, it would.
8  Q. And you didn't include that in the
9  report?
10 A. No.
11 Q. Why not?
12 A. Because I didn't know if it was done
13 throughout the state at that time, but it is --
14 well, let me say it this way: It is a bullet proof
15 method to record what the identifier says, the
16 victim says.
17 Q. So is video record, is that correct?
18 A. Audio recording.
19 Q. Is video recording also a bullet proof
20 method for keeping a record of the identification?
21 A. Oh, yeah, it's a lot better.
22 Q. Did you do that when you were an
23 investigator?
24 A. Not in the '70s, later on, yes.

```
 1     Q.  So standards change as time goes on, is
 2  that correct?
 3     A.  That's right.
 4     Q.  And you don't have an opinion as to what
 5  the standard was in the State of Illinois in 1986 in
 6  recording photo lineups by police officers in the
 7  state, is that correct?
 8     A.  Not regarding the audio -- the use of an
 9  audio recording.
10     Q.  Okay.  You indicate in your report had
11  the identification procedure been adequately and
12  accurately preserved, Mr. Starks would have been
13  able to test the identification procedure, is that
14  correct?
15     A.  Yes.
16     Q.  Do you have any indication that Mr. Starks
17  did not try to test -- did test the identification
18  procedure or asked to test it?
19     A.  When?  I mean, at the trial or --
20     Q.  Before his trial.
21     A.  Test it before his trial?  No, I think he
22  left that entirely up to his attorney.
23     Q.  Okay.  In your experience, is that
24  normally when an identification procedure is tested
                                              Page 61
```

```
 1  by a defendant at a pretrial motion, a motion to
 2  suppress?
 3     A.  It's often done there.
 4     Q.  And it can be revisited at a trial, is
 5  that correct?
 6     A.  Yes.
 7     Q.  Was that done in this case?
 8     A.  He did not contest the -- through his
 9  lawyer, his lawyer did not contest the photo
10  identification.
11     Q.  Do you know --
12     A.  At the trial.  In fact, it was never even
13  introduced at the trial.
14     Q.  And did he --
15     A.  As far as the six pack.
16     Q.  Did he contest it prior to the trial or
17  attempt to?
18     A.  I don't know, I didn't see it in the
19  record.
20     Q.  In your experience, that's one method
21  defense lawyers would use to test the validity of
22  an identification procedure would be by a pretrial
23  motion and hearing?
24     A.  A good lawyer does that.
                                              Page 62
```

```
 1     Q.  If it's a suggestive lineup, is that
 2  correct, or if he feels it is?
 3     A.  If the lawyer -- if a good lawyer sees it,
 4  he does it.
 5     Q.  If he feels it's suggestive?
 6     A.  Well, you're asking me my opinion, that's
 7  what my experience is.
 8     Q.  Okay.  As you indicate in your report, a
 9  valid photo lineup can be a prosecution tool also,
10  is that correct?
11     A.  Yes.
12     Q.  So if a defense lawyer sees that it's a
13  valid photo lineup, he may not want to have it
14  introduced into evidence because it would be harmful
15  to his client, is that correct?
16     A.  The strategies, I think, would be -- if
17  it's -- if it harms your case, you don't bring it
18  up.
19     Q.  Do you know if Mr. Starks' defense lawyer
20  had the ability to look at the photos used in the
21  photo lineup?
22     A.  I don't know.
23     Q.  Do you remember Detective Biang saying
24  that they would routinely or if a defense lawyer
                                              Page 63
```

```
 1  asked to see the photos, they would produce them?
 2         MR. STAINTHORP:  Objection to form.
 3         MR. TROBE:  Q.  Do you recall that?
 4     A.  Yes.
 5     Q.  Do you have any reason to believe that
 6  those photos were not available to Bennie Starks'
 7  defense lawyer?
 8     A.  I don't know one way or the other.
 9     Q.  Do you have any reason to believe that
10  the detectives could not have produced the actual
11  photographs used in the photo lineup to Bennie
12  Starks' lawyer?
13     A.  At the time of the trial, I do have no
14  reason to believe.
15     Q.  That they could have?
16     A.  Could not have.
17     Q.  And they could have testified concerning
18  their procedures prior to the trial or at trial, is
19  that correct?
20     A.  Yes.
21     Q.  And Maria Gonzalez could have testified,
22  is that correct?
23     A.  Yes.
24     Q.  So nothing in the record that you've seen
                                              Page 64
```

```
 1   would lead you to believe that anything that the
 2   Waukegan police officers did would prevent Bennie
 3   Starks' attorney from testing the validity of the
 4   photo identification process in this case at the
 5   time or before the trial?
 6       A.  No.
 7       MR. KARAVIDAS:  Can you repeat that question
 8   and answer, please?
 9           (The requested portion of the record
10            was read.)
11       MR. TROBE:  Q.  So up until the trial and to
12   the conclusion of the trial, the Waukegan Police
13   Department's procedures, record keeping were
14   sufficient to allow Bennie Starks' attorney to test
15   the identification procedure?
16       A.  Yes.
17       MR. TROBE:  I have to move my car, can we take
18   five minutes, is that all right?
19       THE WITNESS:  That's a blessing.
20           (After a brief recess, the deposition
21            was resumed as follows:)
22       MR. TROBE:  Q.  Okay.  You have on your --
23   can I see the report -- the copy of the report
24   that you're looking at, I notice you have some
                                                 Page 65
```

```
 1   highlights on it.  Did you place these highlights
 2   on there?
 3       A.  Yes.
 4       Q.  You also have criticisms concerning the
 5   destruction or the loss of the mug book files, is
 6   that correct?
 7       A.  Yes.
 8       Q.  When was the first time that those photos
 9   were ever requested?
10       MR. STAINTHORP:  Objection to form.
11       THE WITNESS:  A.  I don't know when they were
12   requested, the date.  In this case, there was a
13   request on -- I have it indicated on page eleven and
14   twelve, I quoted the response.
15       MR. TROBE:  Q.  Do you know if the -- well,
16   you've already testified that to the best of your
17   knowledge, the photo identification process was not
18   challenged either prior to or at the trial of Bennie
19   Starks, is that correct?
20       A.  Correct.
21       Q.  And it was not an issue on appeal from
22   that conviction, did you read the appellate
23   decision?
24       A.  Yes, and I remember -- and I listed it,
                                                 Page 66
```

```
 1   it was centered around the DNA.
 2       Q.  So there was no issue raised on appeal
 3   as far as you're aware of concerning the photo
 4   identification, is that correct?
 5       A.  That I was aware of.
 6       Q.  Was the issue of the photo identification
 7   raised in the post-trial motions or in the -- that
 8   you know of?
 9       A.  Not that I know of.
10       Q.  Do you know if the issue of the photo
11   identification issue was raised in the post-
12   conviction proceeding?
13       A.  No, not that I know of.
14       Q.  So when is the first time that you're
15   aware of that the issue of the photo identification
16   was ever raised in this case?
17       A.  Well, the first time I'm aware of it is
18   during the litigation that we're here for.
19       Q.  So in this case is the first time that
20   the photo identification conducted by the Waukegan
21   Police Department was ever raised as an issue, is
22   that correct?
23       A.  That's my understanding.
24       Q.  You indicate in your report that "the
                                                 Page 67
```

```
 1   destruction of the mug shot book sometime after 1986
 2   deprived Starks of the ability when his conviction
 3   was undermined by DNA evidence to additionally
 4   argue his rights were violated by unfair I.D.
 5   procedures", is that correct?
 6       A.  Yes.
 7       Q.  When was his conviction undermined by DNA
 8   evidence?
 9       A.  I think that came out in the -- the
10   appeals on the DNA evidence.
11       Q.  Do you recall when that was?
12       A.  As I sit here, no, I didn't pay attention
13   to those dates.
14       Q.  So how did the destruction of the mug
15   shot books deprive Starks of his ability to argue
16   his rights were violated by unfair I.D.
17   procedures?
18       A.  Well, I'm not a lawyer, so I don't know
19   how that would -- in my opinion, the destruction
20   of the books would influence that, but exactly
21   how --
22       Q.  Well -- I'm sorry, I didn't realize you
23   were --
24       A.  I'll wait for the further question.
                                                 Page 68
```