**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| Bennie Starks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 348 |
| | ) | |
| City of Waukegan, et al. | ) | Judge Gary Feinerman |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS PURSUANT TO L.R. 56.1 (b)(3(C) IN RESPONSE TO THE MOTION FOR SUMMARY JUDGMENT OF THE WAUKEGAN DEFENDANTS**

1. Plaintiff Bennie Starks is completely innocent of any and all crimes committed against Maria Gonzalez, including aggravated criminal sexual assault, attempt aggravated sexual assault, aggravated battery and unlawful restraint. Exhibit 1, Bennie Starks Deposition, 74, 76-77, 114-15, 212-13, 278-79.

2. On January 18, 1986, at approximately 10:30 - 11:00 p.m., as he was walking from a bar to his mother's house at 300 Lake Street Waukegan, Bennie Starks, who was not intoxicated, was attacked by two men in the vicinity of Water and County Streets in the City of Waukegan, and was robbed of his black coat (which contained his gloves and scarf), watch, $80 and a red bag containing a sweater that he had purchased that afternoon, and in the course of the attack he sustained scratches to various parts of his body. Exhibit 1, Starks 31-32, 97-99, 112, 119-24, 128. At the time of the attack, Bennie Starks was 26 years old, 5-9 in height, and had short curly hair, a light beard and an established mustache. Exhibit 2, Arrest Card 1/21/86; Exhibit 3, photographs of Bennie Starks taken at time of arrest.

1

3.  On the night of January 18, 1996 Maria Gonzalez, who was 69 years old and lived at 200 Lake Street in Waukegan, left her home wearing only her night clothes, underpants and slippers and was attacked in the vicinity of Lake and Utica Streets in Waukegan, by a single black male who was 18-19 years of age with no facial hair who was carrying a red bag similar to the one that had been stolen from Starks, had Bennie Starks' black coat draped over his left arm and Starks' watch on his wrist. Exhibit 4, Tr. T/S 345, 430-31, 442, 443, 445, 713-14. The man hit Maria Gonzalez repeatedly in her face and forcibly raped her, placing his penis in her vagina three to four times, placing his penis on her face and attempting to force her to put his penis in her mouth and biting her on her left shoulder. Exhibit 4, Tr. T/S 440-41, 434-45, 447. Maria Gonzalez ripped off the watch from the attacker, who left the coat, containing the scarf and gloves, in the ravine. Exhibit 4, Tr. T/S 354, 448.

4.  At the scene, Maria Gonzalez stated to responding emergency personnel that she had been not raped during the attack, explaining at trial that she did not initially report this because "my head wasn't right. I was hit . . . I don't know [if I told a Waukegan Police Officer that I had not been raped] I don't know what happened. I wasn't well. " Exhibit 4, Tr. T/S 453-54.

5.  At 2 a.m. on January 19, 1986, Maria Gonzalez was admitted to Victory hospital where it was noted that she needed a translator and she was observed to be "very traumatized and very upset," "her face, her eyes were swollen. She had quite a few abrasions on her body, arms, legs, back. She was very dirty. And her clothing was very dirty. But she was badly beaten about the head, and the face, neck area." Exhibit 4, Tr. T/S 406, 410. At 5 a.m. on January 19, 1986, Maria Gonzalez stated to a Spanish-speaking hospital worker that she had been raped, and a Vitullo sexual assault kit was collected and turned over to the police. Exhibit 4, Tr. T/S 401-06.

2

6. Victim's statements often vary at different times and in this case "We had a statement initially, we had another statement. It happens all the time in criminal cases. Witnesses change their statement or victims change their statement as their memory gets better, or as things happen, things come back to them." Exhibit 5, Biang Deposition, 189.

7. On January 21, 1986, Starks voluntarily went to the Waukegan Police Department, signed a Miranda waiver and spoke to Defendant Biang and informed him that he had been attacked on his way home on the night of September 18, 1996, that his coat (containing his scarf and gloves) had been stolen, along with his watch, $80 and the red bag, and that he had not attacked Maria Gonzalez, but Biang prepared and filed a police report in which he falsely claimed that Starks was inconsistent in his accounts of the attack on him, had at one point denied that the red bag had been stolen from him in the robbery and that he had stated instead that he had taken it to his mother's house earlier that evening, claimed that the scarf and gloves found at the scene of the attack on Maria Gonzalez were not his, and in which Biang did not note that Starks denied that he had attacked Gonzalez "because it did not seem germane to the facts at the time." Exhibit 5, Biang, 15-23, 49; Exhibit 1, Starks, 181-189; Exhibit 6, Biang Report 1/21/86. There is no indication in the police report that a Polaroid photograph of Starks was taken at this time.

8. At trial, Biang testified to the fabricated statement that Starks had told him he did not have the red bag with him at the time he was robbed, the prosecutor used the claimed inconsistency about the red bag in his closing arguments to persuade the jury to find Starks guilty, and all the defendants are continuing to use this fabrication in their efforts to reverse Plaintiff's Certificate of Innocence and prove Plaintiff guilty in proceedings that are pending in

Lake County Circuit Court. Exhibit 1, Tr. T/S 684-85, 755-56; Exhibit 7, Brief in Support of 2-1401 Petition pp. 36-38, Thomas-Boyd, et al. v. Starks, 14 MR 2094 (Lake County Circuit Court).

9. Biang immediately refused to believe Starks' account of the robbery, stating "we knew it was a lie because he – he had gotten identified and he left his coat at the scene and he was identified as the offender, and he admitted it was his coat. I have – we were – I was 99 percent sure that was a lie . . we knew it was just a bunch of baloney," Exhibit 5, Biang, 52, and Biang and the Waukegan Police Department pursued the investigation based on the understanding that Starks' account of the robbery was "a false statement . . . we didn't think there was a a robbery that took place . . . Starks could give us absolutely no information about anything that happened in this robbery, no description that was worth a darn. . . . It was nonsense." Exhibit 5, Biang, 56-57; 62-63. At the time that Starks was telling Biang about being robbed Biang was very definite that the account of the robbery was a fabrication and that the presence of his clothing at the scene was "highly incriminating," and that it was highly likely that Starks had attacked Maria Gonzalez. Exhibit 5, Biang, 62.

10. Biang took no steps to investigate the robbery of Starks, and there are no police reports that indicate that any other officers did either, Exhibit 5, Biang, 58, even though the Waukegan Police Department would "document anything we did to try to debunk his alibi," Exhibit 5, Biang, 59, but in this case they did not need to "because we had his bite marks, we had his identification, we had his coat at the scene, we had an admission that it was his coat. We didn't need to debunk anything. It was a solid case. It wasn't based on a confession. We didn't have to get a confession; it wasn't critical. We got an admission that he was – you know, that he

4

admitted it was his coat and he admitted he was, you know, in the vicinity at the time." Exhibit 5, Biang, 59-60.

11.  In January 1986, the Waukegan Police Department had a book of Polaroid photographs that it would use in identification procedures.  These photographs were obtained when the WPD had contact with a person, either in the context of a formal arrest or otherwise, and would be placed in a pocket in the "mug shot" book. Any person who had a photo in that book would be assigned a number, and there was a list, separate from the mug shot book, that recorded the number assigned to that person. If a person had multiple contacts with the WPD in which Polaroids were taken, all the Polaroids of that person were placed in the same pocket and were assigned the same number. Thus, for example, if a person had four different contacts with the WPD over a several year period, and each contact generated a Polaroid (as it would normally do), all four of the photographs would be maintained in the same pocket in the mug shot book, and all four would be assigned the same number. If one of the photographs was then used in an identification procedure, either as a suspect or a filler, that photograph would be identified by the person's number alone, with no record made of which of the four different photographs was shown and no record generated of the photographs themselves, such as a Polaroid of the photos shown. Thus, while pursuant to the system and records as they existed then, it was possible to determine the identities of the persons whose photographs were shown, the system would not record which of the several photographs of the person was shown, nor the date of the photograph that was shown. Exhibit 8, Clark Report; Exhibit 5, Biang, 70.

12.  Immediately after this interview with Bennie Starks, at a time when Defendant Biang was convinced that Starks was the attacker of Maria Gonzalez, Biang obtained a photograph of

5

Starks from the mug shot book, but at his deposition was unable to say which of the several photographs of Starks in the mug shot book he took, though he has now, after the production of Clark's expert report criticizing the failure to keep an accurate record of what photographs were shown, sworn in an affidavit that he knows precisely what photograph he took - a Polaroid of Starks taken on January 21, 1986 that was not in the mug shot book, a photograph that at his deposition he denied he used. Exhibit 5, Biang, 65-71, 180-81; Biang Affidavit, Dkt.320-21.

13.  Biang and Defendant Juarez[1], who Biang had told about his interview with Starks, took the photograph of Starks and four other photographs to the hospital where Maria Gonzalez was hospitalized, and she identified Starks as the person who attacked her. The photo line-up was not preserved in the police file and was not introduced into evidence at the trial of Starks. Exhibit 5, Biang 71-73.

14.  At some point after the photographs were used in the identification procedure with Gonzalez all of the photographs in the "mug shot" book were destroyed, as well as all information identifying the persons whose photographs were shown. Clark Report at 9; Exhibit 9, Waukegan 30(b)(6) Deposition, 92, 94-95.

15.  Bennie Starks had had multiple contacts with the WPD prior to the attack on Ms. Gonzalez, including in February 1977, March 1977, 1978 and 1983. Starks was assigned the number 321 in the mug shot book, and the only record maintained of which photograph of Starks was shown was the number 321, with no record of the date on which the photograph was taken. Thus, it could have been a photograph taken when he was 18, 19 or 23. Similarly, with respect to the filler photographs shown to Ms. Gonzalez, only a number was used to identify the

---

[1]Juarez is deceased and is represented in this matter by his special representative.

6

photograph, so while it would have been possible, on January 21 1986, to determine the identities

of the persons whose photographs were used as fillers, it would not have been possible, even in

1986, to determine which of the photographs of those persons had been shown, if those persons

had had multiple contacts with the WPD. Exhibit 8, Clark report, pp. 8-10.

16. Testimony concerning the photo array was used in the Grand Jury proceedings to

obtain the indictment of Starks and establish that he was the attacker, though the actual array

itself was not placed into evidence. Exhibit 10, Grand Jury Proceedings, February 5, 1986.

17. The prosecutor would probably have introduced the photographic identification array

into evidence, if it had been available, since an in-court identification is not really a test of a

person's ability to identify the perpetrator. Exhibit 11, Berrones Deposition, 221-22.

18. Biang made the decision, along with other Waukegan Police Department officers, to

file charges against Starks. Exhibit 5, Biang, 154. After Starks was arrested, Biang observed

scratch marks on Mr. Starks, and immediately assumed that they had been inflicted when Maria

Gonzalez scratched him because "we assumed scratching would be part of that struggle" with her

attacker, though she never in fact said that she had scratched him, and had the scratches

photographed. and the photographs were later used at trial. Exhibit 5, Biang 162.

19. The next day, January 22, 1986, defendant Waukegan police officer Deprez

interviewed Starks and asked him about the scratches and Starks told him that he had received

them in the course of the attack on him on January 18, but Deprez falsely claimed in a report that

Starks denied getting the scratches in the attack on him and said that he did not know how he had

got them and "must've fell somewhere," but did not know where he had fallen. Exhibit 1, Starks

202-03; Exhibit 12, Deprez report 1/22/86. Deprez also falsely claimed that Starks called Maria

Gonzalez a "bitch" on multiple occasions, and denied that a scarf found at the scene was his. Exhibit 1, Starks 64, 204, 329-30; Exhibit 12, Deprez report 1/22/86.

20. In 1986, the Waukegan Police Department relied upon the Northern Illinois Police Crime Laboratory (NIPCL) to provide forensic services that it needed to conduct its criminal investigations; investigators from the police department would meet with technicians from the lab from time to time, and would not necessarily document those meetings. Exhibit 9, Waukegan 30(b)(6) Deposition, 201, 221-22.

21. Maria Gonzalez told the prosecutors in the case that she had not had sex with anyone other than her attacker for at least 72 hours prior to the attack, Exhibit 11, Berrones, 140-142, told Sergeant Juarez that she had not had sex for at least 2 weeks before the attack, and did not tell any other police officer that she had had consensual sex around the time of the rape. Exhibit 13, Juarez Report, 3/31/86; Exhibit 5, Biang, 193-94.

22. The tests performed by the NIPCL forensic scientist assigned to this case, Defendant Thomas-Boyd, showed that there was a concentrated semen stain on the underpants, that there were only H antigens in the semen in both Maria Gonzalez's vaginal swab and underpants, that Maria Gonzalez was a non-secretor, meaning she could not be the source of the H antigens on the swab and underpants, and that Starks was a B secretor, and therefore could not be the source of the semen and Thomas-Boyd should have reported and testified to these conclusions. Exhibit 14, Thomas-Boyd Deposition,161-66; Exhibit 15, Blake Deposition,170-76, 199-204, 230-33; Exhibit 16, Blake affidavit June 1, 2004; Exhibit 17, Harmor Deposition,160, 190, 193-94. In order to determine a blood group substance in semen it must have been deposited within 24 hours. Exhibit 17, Harmor 239.

23. In the reports and other documents that she authored and signed in the Maria Gonzalez case, Thomas-Boyd requested that Starks provide a semen sample, but never gave a reason as to why she needed a semen sample, could not explain this at her deposition, and Starks had no idea why he was being asked to masturbate in a cup, and if it had been explained he would have agreed to it. Exhibit 14, Thomas-Boyd 135, 137-38; Exhibit 1, Starks 248-51.

24. Defendant Thomas-Boyd did not inform the prosecutor that she was departing from conventional principles of serology in not excluding Starks as the source of the semen in Maria Gonzalez's vagina and on her underpants, did not tell the prosecutor, either through reports or orally, that Starks was excluded as the source of the semen unless he was an aberrant secretor and did not so testify "because nobody asked," did not tell anyone that aberrant secretors were, at most, 5% of the population, and it was the prosecutor's understanding of her reports and testimony that a B secretor such as Starks was not excluded as the source of the semen found in Maria Gonzalez's vagina and underpants. Exhibit 11, Berrones, 179-180, 193-94; Exhibit 14, Thomas-Boyd, 177, 187-89.

25. The Lake County States Attorney produced to defense counsel the entire file that it received from the Northern Illinois Police Crime Laboratory in the Starks case, and placed on the produced file the prosecutor's initials and the sequential page number of the production. Exhibit 11, Berrones, 69-70, 82, 99-100, 159-160.

26. Thomas Boyd testified at the Starks trial in a manner that led the Appellate Court to understand her testimony to be "that approximately 14% of the population of the United States has the same blood type as the defendant, and that any B-type secretor in that percentage group could have been the possible source of the semen examined by her." Exhibit 18, *People v. Starks*,

2-86-1021, Order Affirming Conviction, June 22, 1988, p. 9; Exhibit 16, Blake Affidavit June 1, 2004, pp. 15-21.

27.   Defendant Sgt. Biang, who was in charge of the investigation into the attack on Maria Gonzalez, contacted Defendant Schneider, who was his personal dentist at some point, to be a forensic dental consultant to evaluate a bite mark on the victim, Maria Gonzalez. Exhibit 9, Waukegan 30(b)(6) Deposition, 228-29; Exhibit 5, Biang 83-84. Biang may have got the contact information for the dentists from his colleague, Sgt Stevenson, who had Dr. Schneider's phone number in his phone book. Exhibit 5, Biang 87; Exhibit 19, Dr. Schneider Deposition, 77-78; Exhibit 20, Deprez, 34.

28.   Biang contacted Dr. Schneider and "I just explained that we had a victim  who had been beaten and bitten by the apparent offender, and we asked him if he could come out and look at the -- you know, identify the bite marks and  match them with the person that we had in custody." Exhibit 5, Biang 90. After a pause, and interrupting the next question, Biang then added, at his deposition, "Or tell us it wasn't his bite mark, for that matter." Exhibit 5, Biang 91. Biang gave Dr. Schneider information about the case before they went to the hospital. Exhibit 4,Tr. T/S 607.

29.   Photographs of the bite mark on Maria Gonzalez's left shoulder were taken by Officer Tench on January 19, 1986 at around 1:30 a.m., by Officer Anderson at Victory Hospital on January 22 at 11 a.m., and again on January 29 when he took 12 exposures, and Anderson turned these photographs  in to the evidence lab at the Waukegan Police Department, but these photographs were never produced in discovery in the criminal case and were not examined by the Defendant dentists. Exhibit 21, Anderson Deposition 23-24, 49-50, 87-88; Exhibit 22, Anderson

Report 1/29/86; Exhibit 19, Schneider 89-90, 106-07;  Exhibit 23, Stainthorp affidavit.

30.  Officer Anderson went to Victory Hospital with Sgt. Biang, Dr. Schneider and Dr. Hagstrom and took photographs of the bite mark on Maria Gonzalez, and determined himself how to take the photographs, with no instructions from Drs. Schneider and Hagstrom. Exhibit 21, Anderson at 37, 40. Although Drs. Schneider and Hagstrom subsequently claimed that these photographs were the ones they used to compare the bite mark to Bennie Starks dentitition, this is not correct. Exhibit 21, Anderson, 56, 94-95, 107. The date on the police report documenting this photography session has been altered, with a prior date on the report, that looks like 1/28/86, being changed to now appear to date the session as January 22. Exhibit 21, Anderson 34-35; Exhibit 19, Schneider 99-100.

31.  Biang had "lots of conversations" with Drs. Schneider and Hagstrom during the criminal prosecution of Starks but he did not prepare any reports about those conversations. Exhibit 5, Biang 156-57. Biang talked to Dr. Schneider and Dr. Hagstrom concerning their opinions with respect to who made the bite marks, with the dentists telling Biang that Bennie Starks, beyond any question, made those bite marks. Exhibit 5, Biang 101, 121-22. In the course of his work on the case, Dr. Hagstrom became aware of evidence tending to inculpate Starks, including that he lived across the street from the location of the attack, that police found scratches on Starks' back when he was examined by the police after the attack, and he was provided with and viewed a picture of scratches on Starks' back that had been taken by the police. Exhibit 24, Dr. Hagstrom Deposition, 158, 161, 176.

32.  Drs. Hagstrom and Schneider oriented the bite mark on Maria Gonzalez as to maxillary and mandibular aspects because that was the way it fit, and not in accordance with the

11

appearance of the bite mark. Exhibit 24, Hagstrom 37-38, 95; Exhibit 19, Schneider 152-54, 174-75. This orientation was 180 degrees wrong, and actually compared the mandibular (lower) portion of the bite mark with the models of Starks' maxillary (upper) dentition. In all persons, the maxillary jaw is wider than the mandibular. In addition, the photograph of the bite mark has the ruler used to establish scale out of focus, so the actual size of the bite mark cannot be established. Exhibit 25, Dr. Senn Report, May 10, 2010; Exhibit 26, Hagstrom and Schneider Faulty Orientation of Bite Mark; Exhibit 27, Dr. Senn Deposition, 39-40, 99-100; Exhibit 28, Dr. Senn Report 11/25/14.

33. Drs. Hagstrom and Schneider determined that Stark's mandibular dentition did not make the bite mark on Maria Gonzalez, but they did not report this to the prosecutor. Exhibit 24, Hagstrom 97; Exhibit 19, Schneider 173. Neither Dr. Hagstrom nor Dr. Schneider had any concerns that portions of the photographs of the bite mark that they used in their examination were out of focus. Exhibit 24, Hagstrom, 71; Exhibit 19, Schneider, 130-31.

34. Drs. Schneider and Hagstrom obtained a photograph from a photo lab which they claim was the exact same dimensions as the bite mark, so as to compare this photograph to the models they had made of Starks' dentition. Exhibit 19, Schneider, 119. This photograph, in which the ruler used to show scale was out of focus, was not identical to any photograph introduced into evidence at the criminal trial of Starks, was never produced to the prosecutor and has never been produced in this litigation. Exhibit 19, Schneider, 127-30; Exhibit 23, Stainthorp affidavit.

35. On May 13 1986 Hagstrom and Schneider sent to the prosecutor a report in which they stated that:

12

> We have completed examination of photos taken of the bites inflicted on Maria
> Gonzalez. We have examined and compiled analytical work ups from the models
> of Benny Starks Jr.'s teeth. We have done a detailed comparison of the bite marks
> with the models and have found a definite match.
> It is our conclusion that the bites on Maria Gonzalez were made by Benny Starks
> Jr.

Exhibit 29, Hagstrom and Schneider Report, May 13, 1986; Exhibit 19, Schneider, 197-98;

Exhibit 24, Hagstrom, 107. In fact, both Hagstrom and Schneider had not concluded that Starks

definitely made the marks, and held the opinion that another person could have left those marks,

and had concluded only that he could have made the bite, but they did not tell the prosecutor or

testify at trial to this, because the prosecutor and defense counsel did not ask. Exhibit 24,

Hagstrom 107-12; Exhibit 19, Schneider, 316-17.

36. On July 1, 1986, Defendants Schneider and Hagstrom submitted a supplemental

report to the prosecutor in the Starks case in which they described the work they had done on the

case involving "the bite mark inflicted on Maria Gonzalez September 22, 1985 [sic] and the

dentition of Bennie Starks Jr.," and stated that:

> The comparison of the models to the bite photo and the overlays to the bite photo
> indicated a very specific and unusual pattern leading us to the conclusion that the
> bite on Maria Gonzalez was inflicted by Bennie Starks Jr.

Exhibit 30, Hagstrom and Schneider Report, July 1, 1986. The level of certainty expressed by the

dentists in their reports was very important to the prosecutor and was extremely compelling

evidence of Starks' guilt of all the crimes he was accused of, and the dentists never advised the

prosecutor that expressing this level of certainty was inconsistent with national odontological

standards. Exhibit 11, Berrones 206-09; Exhibit 25, Dr. Senn Report, May 10, 2010.

37. DNA testing proved definitively that the semen on the vaginal swab taken from

Maria Gonzalez and from her underpants after the rape was from the same person and that person was not Bennie Starks. Exhibit 17, Harmor,120-21; Exhibit 16, Blake Affidavit June 1, 2004; Exhibit 31, Stipulations of various parties 11/19/2014.

38.   Based on the DNA exclusion of Starks as the source of the semen which established that the result on retrial would probably be different, the Appellate Court reversed the denial of Plaintiff's post conviction motion and petition and vacated his convictions for aggravated criminal sexual assault and attempted aggravated criminal sexual assault and remanded those cases for a new trial. Exhibit 32, *People v. Starks*, 365 Ill. App. 3d 592 (2006). Subsequently, the Appellate Court reversed the dismissal of Starks' Petition for Post Conviction Relief challenging his aggravated battery conviction, relying in large part on the fact that DNA excluded him as the source of the semen. Exhibit 33, *People v. Starks*, 2012 IL App (2d) 110324 (2012).

39.   The sexual assault charges against Starks were nolle prossed on  May 15, 2012, and the aggravated battery charges was nolle prossed on January 7, 2013. Exhibits 34 and 35. On September 25, 2013, Plaintiff was granted a Certificate of Innocence, establishing that he was factually innocent of all charges brought against him. Exhibit 36.

Dated: April 6, 2015                    Respectfully submitted,
                                        /s/ John L. Stainthorp
                                        John L. Stainthorp
                                        G. Flint Taylor, Joey Mogul
                                        People's Law Office
                                        1180 N. Milwaukee Ave.
                                        Chicago, IL 60642
                                        773 235 0070
                                        Attorneys for Plaintiff

14