Waukegan Exhibit List

1. Bennie Starks Deposition

2. Arrest Card 1/21/86

3. Photographs of Bennie Starks taken at time of arrest

4. Trial Transcript, People v. Starks, 86 CF 106

5. Biang Deposition

6. Biang Report, 1/21/86

7. Brief in Support of 2-1401 Petition, Thomas-Boyd, et al. v. Starks, 14 MR 2094 (Lake County Circuit Court)

8. Clark Report

9. Waukegan 30(b)(6) Deposition

10. Grand Jury Proceedings, February 5, 1986.

11. Berrones Deposition

12. Deprez report 1/22/86

13. Juarez Report, 3/31/86

14. Thomas-Boyd Deposition

15. Blake Deposition

16. Blake affidavit June 1, 2004

17. Harmor Deposition

18. *People v. Starks*, 2-86-1021, Order Affirming Conviction, June 22, 1988

19. Dr. Schneider Deposition

20. Deprez Deposition

1

21.    Anderson Deposition

22.    Anderson Report, 1/29/86

23.    Stainthorp Affidavit

24.    Dr. Hagstrom Deposition

25.    Dr. Senn Report, May 10, 2010

26.    Hagstrom and Schneider Faulty Orientation of Bite Mark

27.    Dr. Senn Deposition

28.    Dr. Senn Report 11/25/14

29.    Hagstrom and Schneider Report, May 13, 1986

30.    Hagstrom and Schneider Report, July 1, 1986

31.    Stipulations of various parties

32.    *People v. Starks*, 365 Ill. App. 3d 592 (2006)

33.    *People v. Starks*, 2012 IL App (2d) 110324 (2012)

34.    Order, May 15, 2012, dismissing sexual assault charges

35.    Order, January 7, 2013, dismissing aggravated battery charge

36.    Certificate of Innocence

# Exhibit 1

1        IN THE UNITED STATES DISTRICT COURT

      FOR THE NORTHERN DISTRICT OF ILLINOIS

2             EASTERN DIVISION

3

BENNIE STARKS,          )

4                  )

        Plaintiff,   )

5                  )

    vs.           )  No. 09 CV 348

6                  )  Judge Feinerman

CITY OF WAUKEGAN, and   )

7  PRESENT and FORMER WAUKEGAN )

    POLICE DEPARTMENT OFFICIALS, )

8  LIEUTENANT URBANIC, W.    )

    BIANG, P. STEVENSON, M.   )

9  JUAREZ, D. DEPREZ and DR.  )

    CARL HAGSTROM, DR. RUSSELL  )

10  SCHNEIDER and SHARON     )

    THOMAS-BOYD,         )

11                 )

        Defendants.  )

12

13        The deposition of BENNIE STARKS, taken

14  before Nicole Koziol, Certified Shorthand Reporter

15  and Notary Public, taken pursuant to the

16  provisions of the Illinois Code of Civil Procedure

17  and the Rules of the Supreme Court thereof

18  pertaining to the taking of depositions for the

19  purpose of discovery at 500 West Madison Street,

20  Suite 2430, Chicago, Illinois, commencing at

21  9:34 a.m. on January 22, 2014.

22

23

24

```
1    grandmother like twice a week.

2         Q.    Did you ever sleep there?

3         A.    Sometimes.

4         Q.    Was that at 300 Lake Street in Waukegan?

5         A.    Yes.

6         Q.    And what was your mother's name?

7         A.    Setrice (phonetic) Starks.

8         Q.    Is she still alive?

9         A.    No, she isn't.

10        Q.    And she lived there with your

11   grandmother?

12        A.    No, she had her own apartment.  My

13   grandmother had her own apartment.

14        Q.    Where was that?

15        A.    300 Lake.

16        Q.    In the same building?

17        A.    In the same building.

18        Q.    I got ya.  How often would you -- did

19   you say twice a week?

20        A.    2 times, 3 times a week.

21        Q.    And during those 2 to 3 times a week,

22   would you sleep there?

23        A.    Sometimes.

24        Q.    On January 18th in the evening of 1986
```

```
 1    were you staying at 300 Lake Street?

 2         A.   No.

 3         Q.   Did you go to that home?

 4         A.   Go to what home?

 5         Q.   300 Lake Street in Waukegan, Illinois?

 6         A.   I don't understand the question.  What

 7    do you mean, did I go to that home?

 8         Q.   That's okay, I'll ask a better question.

 9         A.   Okay.

10         Q.   At or about 10 or 11 p.m. on January 18,

11    1986 did you go to 300 Lake Street in Waukegan?

12         A.   I did.

13         Q.   Why did you go there?

14         A.   Because it was because I got robbed that

15    day, and I ran to my mom's house, yes.

16         Q.   You went to your mom's house because you

17    were robbed that day?

18         A.   Right, and I was planning -- normally I

19    would spend the weekends with her sometimes.  So I

20    was on my way there to go to sleep, yes.

21         Q.   I just want to make sure I understand

22    your answer.

23         A.   Okay.

24         Q.   So I will ask the question again, I
```

1          A.    They were.

2          Q.    Were those gloves to the best of your

3     knowledge as it was presented at that trial, at

4     your criminal trial, were those gloves found with

5     your coat in the ravine?

6          A.    That's what they said.

7          Q.    What else were you wearing besides what

8     you have identified thus far?

9          A.    There was a scarf.

10         Q.    What color was the scarf?

11         A.    I don't remember exactly what color it

12    was.  It might have been black or something like

13    that.  I don't remember.

14         Q.    At the criminal trial was the scarf

15    presented as a trial exhibit?

16         A.    Yes, it was.

17         Q.    And was that your scarf?

18         A.    It was.

19         Q.    Just so I'm clear, it was your election

20    at trial not to testify, correct?

21         A.    Un-hun.

22         Q.    "Yes"?

23         A.    Yes.

24         Q.    Meaning you didn't testify, correct?

```
 1        Q.    Have you ever been married?

 2        A.    No.

 3        Q.    When is the first time you met Maria

 4   Gonzalez?

 5        A.    Never met her.

 6        Q.    Never met her?

 7        A.    No.

 8        Q.    When is the first time you saw Maria

 9   Gonzalez?

10        A.    In court.

11        Q.    That was the first time?

12        A.    Yes.

13        Q.    Do you know where Maria Gonzalez lived

14   in relationship to the address where your aunt

15   lived?

16        A.    To my knowledge she lived across the

17   street from my mom's.

18        Q.    Where is that?  How many feet away would

19   you approximate?

20        A.    I don't know, 25, 50 feet.

21        Q.    But you never met her?

22        A.    No.

23        Q.    Do you know anybody related to Miss

24   Gonzalez?
```

1    your time -- this will be on the record -- that

2    you're wasting your time in this deposition.  If

3    you run out of time, that's your problem and the

4    problem of your cocounsel.  He is not answering a

5    question that presumes that he battered Maria

6    Gonzalez.

7            So ask a proper question, and you know

8    perfectly well how to ask those questions, and

9    then we can proceed.  But that question he is not

10   answering.  So move on.

11      MR. KRAUSE:  Are you done?  Are you done?

12   Any other objections?  I mean, not that those were

13   objections, but do you have any objections?

14      MR. STAINTHORP:  Why don't you move on.

15   BY MR. KRAUSE:

16      Q.   Sir, why did you batter Maria Gonzalez?

17      MR. STAINTHORP:  Okay, he's not answering

18   that question.  If you want to certify it, certify

19   it.  Ask the question:  Did you batter Maria

20   Gonzalez.  Ask it that way.

21      MR. KRAUSE:  Your counsel apparently has a

22   question he'd like to ask so why don't you answer

23   your counsel's question.

24      MR. STAINTHORP:  So the question is:  Did you

1     batter Maria Gonzalez?

2          THE WITNESS:  No.

3     BY MR. KRAUSE:

4          Q.   Do you know why she said you did?

5          A.   No.

6          Q.   Are you saying that she lied?

7          A.   She did.

8          Q.   Would you say you're very familiar with

9     the area where your mom's house was in

10    relationship to the ravine?

11         A.   I grew up in the area from a child.

12         Q.   So the answer to my question is, you

13    would be very familiar with it, correct?

14         A.   Yes, I would.

15         Q.   Let me show you what we will mark as

16    Exhibit 4.

17         MR. KRAUSE:  Correct, Nik?

18         THE REPORTER:  Un-hun.

19                    (Deposition Exhibit No. 4

20                    marked as requested.)

21    BY MR. KRAUSE:

22         Q.   Does this map look familiar to yourself?

23                    (Witness peruses document.)

24

```
 1    alcoholic nature, you'll defer to the testimony of

 2    the witnesses as to what specifically that was,

 3    yes?

 4         A.   Yes.

 5         Q.   Do you believe that you were intoxicated

 6    at any time during the evening of January 18,

 7    1986?

 8         A.   No.

 9         Q.   Do you have an estimate as to how much

10    alcohol you consumed that evening?

11         A.   No.

12         Q.   After you left one bar and went to

13    another bar -- after you got done with the bars,

14    for lack of a better word, where did you go?

15         A.   Home.

16         Q.   And did you stop anywhere from the time

17    that you left whatever the last bar was until the

18    time that you got home?

19         A.   No.

20         Q.   When you say you went home, what do you

21    mean?

22         A.   I went to my mother's house.

23         Q.   Okay.  So that's the address that we

24    identified on the maps that we looked at, one the
```

```
 1     satellite and the other one the drawing, correct?

 2         A.   Correct.

 3         Q.   And that's the address on 300 Lake,

 4     correct?

 5         A.   Yes.

 6         Q.   Across from the ravine, right?

 7         A.   Yes.

 8         Q.   All right.  I think you told me early on

 9     in our examination that you intended to go there

10     that evening no matter what; is that accurate?

11         A.   That's true.

12         Q.   Okay.  And you stopped nowhere from the

13     time you left the last bar until the time that you

14     got to 300 Lake, your mom's, right?

15         A.   Absolutely.

16         Q.   Was your mom up when you got there?

17         A.   I can't remember.

18         Q.   Is there a room that you sleep in?

19         A.   I would sleep on the couch.

20         Q.   And did you go home and sleep on the

21     couch?

22         A.   Yes.

23         Q.   Did anything occur at any time from the

24     time you walked into 300 Lake Street until the
```

1     time you went to sleep?

2        A.   I got robbed.

3        Q.   When did that occur?

4        A.   After I left the bar.

5        Q.   So I'd asked you earlier did anything

6     occur from the time that you left the last bar

7     until the time you got to your mom's and I'm

8     pretty sure your answer was no.

9     MR. STAINTHORP:  No, you didn't ask that

10    question.  So just to be clear, you didn't ask the

11    question.

12    MR. KRAUSE:  So why don't we take a minute

13    and let me just see the question.

14          Nikki, can you go back to that first

15    time I asked him where did he go?

16              (Record reviewed.)

17    BY MR. KRAUSE:

18       Q.   At some point in time you were robbed

19    from the time you left the last bar until the time

20    you got to 300 Lake Street; is that your

21    testimony?

22       A.   Yes.

23       Q.   Have you ever been robbed before?

24       A.   Yes.

1        Q.    What was her name?

2        A.    I don't remember.

3        Q.    Is there anybody who can corroborate

4  that you were attacked at any time after you left

5  the bar until the time that you got to your mom's?

6        A.    No.

7        Q.    Meaning, you are the only one who could

8  say you were attacked, right?

9        A.    Yes.

10       Q.    And you didn't complete any report,

11  correct?

12       A.    That's correct.

13       Q.    You didn't call the police?

14       A.    No.

15       Q.    You didn't even tell your mom, right?

16       A.    Correct.

17       Q.    Did you tell anybody?

18       A.    No.

19       Q.    Do you know why you were attacked?

20       A.    No.

21       Q.    What did they take, your attackers?

22       A.    They took $80, the watch, the gloves,

23  the coat and the bag.

24       Q.    Those are all the things that were found

```
1        A.    Down where?

2        Q.    When you were down in the ravine, did

3   you have those articles on?

4        MR. STAINTHORP:  Objection to form.  It's not

5   an answerable question.  Assumes fact not in

6   evidence.

7   BY MR. KRAUSE:

8        Q.    Sir, do you know how your articles of

9   clothing and your personal watch got to the bottom

10  of the ravine where Miss Gonzalez stated she was

11  attacked?

12       A.    No.

13       Q.    You have no idea?

14       A.    No idea.

15       Q.    And you didn't bring them down there,

16  right?

17       A.    No.

18       Q.    And you weren't down in that ravine,

19  right?

20       A.    Absolutely not.

21       Q.    In fact, you said you have never been in

22  that ravine ever?

23       A.    Absolutely not.

24       Q.    I'm correct?
```

```
1          A.    Absolutely not.

2          Q.    I'm correct?

3          A.    You are correct.  You are correct.

4          Q.    All right.

5                So they took your watch we identified --

6    Strike that.

7                They took your watch, they took your

8    coat, they took your scarf and gloves and red bag.

9    Did I miss anything that your attackers allegedly

10   took?

11         A.    You didn't.

12         Q.    Did they take your wallet?

13         A.    Didn't have a wallet.

14         Q.    All you had is cash?

15         A.    Yep.

16         Q.    So when you went to cash a check, you

17   didn't need an ID?

18         A.    I don't remember.

19         Q.    Do you know anyplace you could go in and

20   cash a check without an ID?

21         A.    I didn't remember whether I had an ID or

22   not.  I may have.  I don't know.

23         Q.    You don't carry an ID on you?

24         A.    Well, I do.
```

```
 1        A.   I got scratched up a little bit, busted

 2   lip, not nothing serious, kind of sore the next

 3   day.

 4        Q.   So somebody hit you?

 5        A.   Yes.

 6        Q.   Do you know which attacker hit you, the

 7   black individual or the Hispanic?

 8        A.   I don't remember.  We were just

 9   fighting, just tussling.

10        Q.   Tell me how the occurrence took place.

11   Did they jump out of somewhere or did they come

12   and try to talk to you?  Tell me the circumstances

13   of this.

14        A.   Um, they came up from behind.  I don't

15   know exactly what they said, but they came up from

16   behind and grabbed me.

17        Q.   And did you know they were behind you

18   before they grabbed you?

19        A.   I didn't.

20        Q.   So you were surprised when they grabbed

21   you?

22        A.   Yes.

23        Q.   And what did they say?

24        A.   I don't remember.
```

```
1        Q.    Did they have a weapon?

2        A.    No.

3        Q.    So one guy just grabbed you; what did

4   the other person do?

5        A.    We were tussling.

6        Q.    Okay.  And no one had a weapon?

7        A.    No one.

8        Q.    Did you have a weapon on you?

9        A.    No.

10       Q.    A knife?

11       A.    No.

12       Q.    And then what happened?  How did they

13  get your articles of clothing and your money?

14       A.    Wrestled me down and physically took it

15  out of my pocket.

16       Q.    So they went inside your pocket and

17  grabbed your cash?

18       A.    Uh-huh.

19       Q.    "Yes"?

20       A.    Yes.

21       Q.    And they ripped off the clothes, your

22  scarf, your gloves, your coat?  Yes?

23       A.    I don't remember them ripping off

24  anything.  The only thing I know is that the coat
```

```
 1    wasn't buttoned and it just came off.

 2         Q.   But your arms were in it, wasn't it?

 3         A.   Yes.

 4         Q.   And it was January, it was cold out,

 5    right?

 6         A.   Yes, it was.

 7         Q.   Do you know how cold it was?

 8         A.   No.

 9         Q.   Were they wearing coats?

10         A.   Yes.

11         Q.   So they took your coat from your body?

12         A.   Yes.

13         Q.   Even though they had coats on?

14         A.   Yes.

15         Q.   And they took your gloves from your

16    hands?

17         A.   My gloves were in my pocket.

18         Q.   So you were walking back from the

19    Genesee or whatever the bar was in the dead of

20    winter with no gloves on?

21         A.   That's right.

22         Q.   They were in your pocket of your coat?

23         A.   Right.

24         Q.   And you were walking.  Your scarf, was
```

1    that around your neck?

2        A.   My scarf was inside the loops of my

3    coat.

4        Q.   Okay.  So it was dangling on there?

5        A.   Coming from one end to the other.

6        Q.   Okay.  And so they took your coat, they

7    took your scarf, they took your red bag with the

8    beige sweater, right?

9        A.   Yes.

10        Q.   And then they took your watch?

11        A.   I mean, I guess it just popped off. I'm

12    not for sure.

13        Q.   Well, did they take your watch?

14        A.   Yeah.

15        Q.   The watch didn't just drop on the

16    ground, they took it, right?

17        A.   I don't know, sir, exactly word for

18    word, blow for blow how everything went.  That was

19    27 years ago.  So I couldn't tell you how they

20    snatched it off.  Did they -- you know, I mean,

21    the watch was gone.

22        Q.   If they didn't take it with them, how

23    did it get to the bottom of the ravine?

24        MR. STAINTHORP:  Okay, objection to form.

```
 1      Again, assuming a fact not in evidence.  He just

 2      said they did take it.  He said the watch was

 3      gone, his testimony.

 4      BY MR. KRAUSE:

 5          Q.   Sir, did your attackers take your watch?

 6          A.   My attackers took everything that I had.

 7          Q.   They didn't take your pants, did they?

 8          A.   No, they didn't.

 9          Q.   Were your pants on the entire -- you had

10      jeans on, right?

11          A.   Yeah.

12          Q.   Did your pants ever come off at any time

13      before you got to your mom's house?

14          A.   No, un-un.

15          Q.   And so how did you get scratches on your

16      body from the attackers if it was underneath your

17      jeans?

18          A.   We were fighting at a location on the

19      ground by some bushes, and I guess that's how I

20      got the scratches.  I didn't even know I had the

21      scratches on me until I was at the police station.

22          Q.   We can agree that you had fresh

23      scratches on your body when you were at the police

24      station, right?
```

1      A.   I guess.

2      Q.   Yes or no?

3      A.   Yes.

4      Q.   And it's your testimony that those

5   scratches came from your attackers when they

6   attacked you with your clothes on, right?

7      A.   Yes.

8      Q.   Those included scratches on your back

9   and your buttocks and your leg and your arm and

10  your wrist, right?

11     A.   If that's where the scratches was.

12     Q.   Well, you were there.

13     A.   Okay, yeah.

14     Q.   You were photographed, right?

15     A.   Okay.

16     Q.   And you saw fresh scratches on your body

17  in the areas that I just described, right?

18     A.   Yes.

19     Q.   And you're saying all of those scratches

20  came from your attackers while you were walking

21  back from the bar when they attacked you, right?

22     A.   That's what I'm saying.

23     Q.   That's your testimony?

24     A.   That's my testimony.

 1    BY THE WITNESS:

 2         A.   I have no idea.  I was walking on the

 3    same side of the street as my mother's building.

 4         Q.   Ah, so whatever side of the building

 5    your mom was on is the side of the street you were

 6    walking on?

 7         MR. STAINTHORP:  Hold on.  Objection to

 8    the "ah."

 9    BY THE WITNESS:

10         A.   Yes.

11         Q.   Okay.  So you were jumped and attacked

12    and then you were thrown into bushes?

13         MR. STAINTHORP:  Objection to form.

14    BY THE WITNESS:

15         A.   I can't remember.

16         Q.   I thought just a second ago you said you

17    got scratches because you got pulled into bushes?

18         MR. STAINTHORP:  Objection to form.

19    BY THE WITNESS:

20         A.   We were fighting.  I was on the ground.

21    We were by some bushes.  Was I directly in some

22    bushes fighting, I don't remember, sir.  I could

23    take you there.  Looking at this map is very

24    confusing to me.  I can physically take you there

1    point is truthful to the best of your knowledge?

2        A.   To the best of my knowledge, yes.

3        Q.   Even though you just testified

4    inconsistent to that a while ago?

5        MR. STAINTHORP:  Well, why don't you refer to

6    the inconsistency.

7        MR. KRAUSE:  Well, I will withdraw my

8    question.

9    BY MR. KRAUSE:

10       Q.   Everything up until that point is

11   accurate, correct, other than the reference to

12   west side of Waukegan?

13       A.   Right.

14       Q.   Okay, keep going.

15       A.   Okay.  Starks stated that the offenders

16   took $80 in U.S. currency notes -- I'm trying to

17   think U.S.

18       MR. STAINTHORP:  It means U.S. currency.

19    BY THE WITNESS:

20       A.   Okay, I see it.  On the back of the

21   glove to each glove.

22       Q.   I think you missed a sentence.

23       A.   I don't know where I'm at.  Okay.

24       Q.   It starts with his wrist watch.

1      A.   His wrist watch, black trench coat,

2   black driving gloves with -- I think, was that

3   holes or nose?

4      Q.   Holes.

5      A.   Holes, okay.  On the back of the

6   glove -- of each glove.  Reporting officer asked

7   Starks if anything else was taken and he stated

8   that there was nothing else taken.

9      Q.   Is that accurate?

10      A.   Well, the scarf was taken, so that's not

11  in there.

12      Q.   So you're saying that statement is

13  inaccurate --

14      A.   Right.

15      Q.   -- that nothing else was taken?

16      A.   Right.  The scarf was taken and the bag

17  was taken.  That's not in there.

18      Q.   Did you tell them the bag and the scarf

19  was taken?

20      A.   Yes.

21      Q.   Keep going.  Reporting officer.

22      A.   Reporting officer was then advised by

23  Starks that he did not call the police because he

24  did not feel that they (police) could do anything

1    about it.  Reporting officer asked Starks what

2    did -- what he did next, and he stated that he

3    went to his mother's home at 300 Lake Street.

4        Q.  Keep going.

5        A.  He stated that he did not tell his

6    mother about the robbery because she was sick and

7    he did not want to upset her.

8        Q.  Is all of that accurate?

9        A.  Some of it is.

10       Q.  Which part is not accurate?

11       A.  The items as far as the scarf and the

12    bag.

13       Q.  So they didn't identify other items that

14    were taken, correct?

15       A.  Not in this statement.

16       Q.  It's not in this statement?

17       A.  Right.

18       Q.  What about the last sentence that you

19    just read?

20       A.  What do you mean, which one?

21       Q.  Reporting officer asked Starks what he

22    did next.  Is all of that accurate?

23       A.  Yes.

24       Q.  Look at the next paragraph.  It says

1    reporting officer.  You see that on Page 2 of

2    Exhibit 8?

3        A.    Yeah.

4        Q.    It says reporting officer asked Starks

5    what route he took to get home, and he (meaning

6    you) stated that he walked south on Genesee and

7    then west on Water Street and south on County

8    Street to Lake Street.  Is that what you told

9    them?

10        A.    I don't remember.

11        Q.    You don't know if you told them that?

12        A.    No.

13        Q.    That's not what you told me here this

14    morning though, right?

15        A.    I told them that I went home to my

16    mother's house and it was on Utica Street.  That's

17    what I told him.

18        Q.    So you didn't tell them how you got

19    there, right?

20        A.    I did.

21        Q.    Okay.  You don't know if what they wrote

22    down is accurate or not, what you told them,

23    right?

24        A.    I don't know.

```
 1              Well, actually, can I ask you a
 2    question?
 3         MR. KRAUSE:  Your attorney can ask you
 4    another question.  I'll come up with another one.
 5         THE WITNESS:  Okay.  Pertaining to where does
 6    County Street stop at --
 7         MR. KRAUSE:  Sir, there's no question.  Let
 8    your attorney ask you a question.
 9         THE WITNESS:  Where does County Street stop
10    at and where does Utica Street -- I mean, where
11    does Utica Street end at and where does County
12    Street begin at?  That's the question because I'm
13    getting confused as far as Utica when you get past
14    Belvidere Street does that mean that that's County
15    Street?
16         MR. STAINTHORP:  I don't know.
17         THE WITNESS:  All right, okay.  Me neither.
18    BY MR. KRAUSE:
19         Q.   Sir, I think I asked you earlier, but at
20    all times you had your red bag with your beige
21    sweater with you at all times, correct?
22         A.   Correct.
23         Q.   So any reference in Exhibit 8 that you
24    said that you took the bag home to your mom's
```

```
1    house earlier would be false?

2         A.   Yes.

3         Q.   So the officers would have just made

4    that up?

5         A.   Probably so.

6         Q.   Any reason why you think they would make

7    up that you took a bag home to your mom's house?

8         A.   I have no idea.

9         Q.   Do you see the last paragraph on Page 2

10   of Exhibit 8?  It starts, At this point.  Can you

11   read that?

12        A.   At this point reporting officer asked

13   Starks what he was wearing on this evening, and he

14   stated that he was wearing a black trench coat and

15   the same clothes that he was wearing at the time

16   of the interview.

17        Q.   So that infers to me that you were

18   wearing the jeans and the shirt and the shoes that

19   you were wearing at the time you were attacked; is

20   that right?

21        A.   Yes.

22        Q.   Were you?

23        A.   Yeah, I think I was, yeah.

24        Q.   So that would have included a white
```

```
1    sweater, right?

2         A.   If that's what was on there, yeah, a

3    white sweater.

4         Q.   Do you have any reason to dispute it was

5    one of the articles of your clothing?

6         A.   Um, no.

7         Q.   A white and yellow T-shirt?

8         A.   Okay.

9         Q.   "Yes"?

10        A.   Yeah, if that's what they say.

11        Q.   Well, do you have any reason to dispute

12   that's what you were wearing?

13        A.   Um, no, if that' what they said.

14        Q.   Blue jeans?

15        A.   Yeah.

16        Q.   You were wearing blue jeans, right?

17        A.   Yes.

18        Q.   And work boots, right?

19        A.   Uh-huh.

20        Q.   And they showed you the trench coat that

21   was found at the scene of the incident, right?

22        A.   Yes.

23        Q.   And you confirmed that that was your

24   trench coat, right?
```

1       A.    I did.

2       Q.    They provided you a photo of a pair of

3    black gloves and a scarf?

4       A.    Um --

5       MR. STAINTHORP:  Well, you're referring to

6    this Exhibit 8?

7       MR. KRAUSE:  8, Page --

8       MR. STAINTHORP:  He has now moved to the next

9    page.

10   BY THE WITNESS:

11      A.    Okay, yes.

12      Q.    Did they show you a picture of black

13   gloves and a scarf?

14      A.    They did.

15      Q.    And did you deny that they were yours?

16      A.    No.

17      Q.    You dispute that when they said that

18   you -- It says here, Starks stated they were not.

19            You're saying that you didn't tell them

20   they were not your gloves?

21      A.    That was totally not what I said.  No, I

22   did not say that.

23      Q.    So you told the police officers, yes,

24   that's my gloves and that's my scarf?

1      A.   I did.

2      Q.   You did?

3      A.   Yeah.

4      Q.   Any reason why they would misstate that

5  you said that's yours or not yours?

6      A.   I have no idea.

7      MR. KRAUSE:  All right.  We have about 5

8  minutes, and I'm going to go into a whole line so

9  I'd rather stop right now.  Why don't we, if

10  everybody agrees, take 20 to 30 minutes or

11  whatever everyone wants to, agrees to, and we can

12  come back and get to it.

13      THE VIDEOGRAPHER:  This will now conclude

14  videotape No. 2.  We're going off the record at

15  12:25 p.m.

16              (A lunch break was taken.)

17      THE VIDEOGRAPHER:  We are now back on the

18  video record at 1:14 p.m.  This is videotape

19  No. 3 of the deposition of Bennie Starks taken on

20  January 22, 2014.  Counsel.

21  BY MR. KRAUSE:

22      Q.   Mr. Starks, do you have Exhibit No. 8

23  still in front of you?

24      A.   Yes.

1     to the -- Strike that.

2             And some of the officers who testified

3     were the officers that completed the reports which

4     are part and parcel of Exhibit 8, correct?

5        A.    Correct.

6        Q.    And did those officers testify at your

7     criminal trial as to the things that they

8     identified in their statements as identified as

9     Exhibit 8?

10        MR. STAINTHORP:  Object to form.

11    BY THE WITNESS:

12        A.    Word for word that's on here?

13        Q.    Did they testify to the subject matter

14    and to the contents of their reports as it relates

15    in these reports?

16        A.    These reports (indicating)?

17        Q.    Yeah.

18        A.    Um --

19        MR. STAINTHORP:  Object to form.

20    BY THE WITNESS:

21        A.    -- yeah.

22        Q.    Going back to that page that I referred

23    you to earlier, did you tell the officers that the

24    scratches on your body were because I, quote,

1    "Must have fell somewhere"?

2        A.   No.

3        Q.   So the fact that they quoted it, your

4    exact words, it's your position that they lied on

5    that quote?

6        A.   Yes.

7        Q.   It goes on to say, The officer asked if

8    the fall was as a result of a robbery that

9    occurred on the 18th and Bennie replied, quote,

10   "no, man," end quote.  Did you see that?

11       A.   No.

12       Q.   So you're saying that he lied?

13       A.   Yes.

14       Q.   Did you tell them, quote, "I don't know

15   where I fell"?

16       A.   No, I didn't tell them that.

17       Q.   Because it's your position that all your

18   scratches result from the attack, right?

19       A.   Correct.

20       Q.   Did you ever tell the officer that, no,

21   man, I never met the bitch, as it relates to Maria

22   Gonzalez?

23       A.   Absolutely not.

24       Q.   You wouldn't use words like that?

1    A.   No, I wouldn't.

2    Q.   If you look at the last page, identified

3  as 1257, Exhibit 8, the officer indicates that he

4  showed you the blue and green scarf that was

5  recovered at the scene and asked you if it was

6  "his property" to which you relied, quote, "no,

7  man, I ain't never seen that either, it ain't

8  mine" end quote.  Did you ever say that?

9    A.   No.

10   Q.   So you're saying the officer lied?

11   A.   Absolutely.

12   Q.   Because it's your testimony that that

13  scarf is, in fact, yours, right?

14   A.   Yes.

15   Q.   And that was identified as an exhibit at

16  your criminal trial, right?

17   A.   Yes.

18   Q.   And if you had given testimony at your

19  criminal trial, which you have the right to do,

20  you would have said that was your scarf, that was

21  your gloves, and that was your coat, right?

22   A.   Yes.

23   Q.   But, again, you don't know how it got to

24  the bottom of the ravine, right?

1       person?

2               A.      Yes.

3               Q.      The third photo, are those the photos

4       of -- do you presume those are the photos of the

5       victim's feet and legs, correct?

6               A.      I guess, yeah.

7               Q.      Well, you saw that at trial, right?

8               A.      I may have.

9               Q.      The fourth photo, do you presume that to

10      be of the victim's hand?

11              A.      I guess, yeah.

12              Q.      Did you see that at the criminal trial?

13              A.      I can't remember.

14              Q.      The fifth photo, have you ever seen

15      those markings on the victim?

16              A.      Maybe at trial.

17              Q.      Did you cause those markings?

18              A.      No.

19              Q.      Did you bite this victim?

20              A.      No.

21              Q.      You never bit Maria Gonzalez?

22              A.      No, I did not.

23              Q.      The last photo, photo 6, did you cause

24      that marking on Miss Gonzalez?

```
 1        A.    No.

 2        Q.    You never bit her?

 3        A.    Absolutely not.

 4        Q.    Do you know why she said you did?

 5        A.    I have no idea.

 6                     (Deposition Exhibit No. 12

 7                     marked as requested.)

 8   BY MR. KRAUSE:

 9        Q.    Sir, I will show you what we have marked

10   as Exhibit No. 12.

11              Sir, have you ever seen Exhibit No. 12

12   before?

13        MR. STAINTHORP:  Just for the record, I'm

14   going to object.  I'm not sure this is an accurate

15   photo, but...

16   BY MR. KRAUSE:

17        Q.    Sir, have you ever seen Exhibit 12

18   before?

19        A.    Maybe at trial.

20        Q.    Those are your gloves, right?

21        A.    Those are gloves that looked like the

22   ones that I had.

23        Q.    Those were the gloves that you were

24   wearing when you were attacked allegedly on
```

1    conspired with them.  So are you saying that she

2    met with people and then said, okay, I'm going to

3    lie and the police and the State's Attorney said,

4    we want you to lie and this is what we want you to

5    say so that you will be lying to deprive Bennie

6    Starks of his rights; is that what you're saying?

7         A.   That's what I'm saying.  Yeah, that's

8    what I'm saying.

9         Q.   Okay.  And what were her motives to

10   conspire with anyone to deprive you of your

11   rights?

12        A.   I have no idea.

13        Q.   Okay.  Now, about a month after you were

14   arrested you were asked to provide a semen sample

15   for further testing; is that correct?

16        A.   Yes.

17        Q.   And what was your understanding at the

18   time of why you were being asked to provide a

19   semen sample?

20        A.   I have no idea.

21        Q.   And what was your understanding of how

22   you were supposed to provide a sample?

23        A.   Masturbate in a cup.

24        Q.   All right.  And did you know at that

1    time that one reason that a semen sample was

2    requested was to definitively exclude you as a

3    source of the semen?

4        A.   Did I know that at the time?

5        Q.   Yes, sir.

6        A.   No, I didn't.

7        Q.   Do you know that now?

8        A.   Yes.

9        Q.   When did you learn that you were asked

10   to provide a semen sample so that you could be

11   definitively excluded as a source of the semen?

12       A.   When the judge -- when they asked --

13   when the State's Attorney's Office asked the judge

14   to get a court order to make me provide some semen

15   in the cup.

16       Q.   All right.  So when it was before a

17   judge to issue an order to make you provide semen

18   you knew before the judge rules that one reason

19   you were being asked to provide that semen sample

20   was so that you could be definitively excluded as

21   a source of the semen; is that correct?

22       A.   No, that wasn't.

23       Q.   Well, when did you first learn that?

24       A.   I learned it actually years later as far

1    as, like I say, I don't know anything about AB/O

2    blood type and H this and that kind of stuff.   I

3    thought that the reason why they were asking

4    because that they just -- she was confused or

5    something to that matter.   I don't know.

6        Q.   All right.   So years after you were

7    convicted you learned that one of the reasons you

8    were asked to provide a semen sample was so you

9    could be definitively excluded as a source of the

10    semen; is that correct?

11        A.   That's correct.

12        Q.   Now, you refused to provide a semen

13    sample; is that correct?

14        A.   I didn't refuse anything.

15        Q.   All right.   Did you --

16        A.   It was a court order, and it was denied.

17        Q.   There was a request to ask you to

18    provide the semen sample?

19        A.   Yes, yes.

20        Q.   Did you have an opportunity to provide

21    the semen sample?

22        A.   No, because the judge denied it.

23        Q.   But do you know if your lawyer, Thomas

24    Boyd, objected to the State's motion to compel you

1      to provide the semen sample?

2          A.   I'm not for sure.

3          Q.   All right.  So did Thomas Boyd ever

4      offer you the opportunity to provide a semen

5      sample?

6          A.   I don't remember.

7          Q.   Well, if you had been offered the

8      opportunity to provide the semen sample, would you

9      have done it?

10         A.   Probably so.

11         Q.   But are you -- and when you looked --

12     Strike that.

13             When you learned that one of the reasons

14     you were asked for a semen sample was so that you

15     could be definitively excluded as a source of the

16     semen, were you sorry that you had not given a

17     semen sample?

18         A.   I can't even say.  I don't -- I don't

19     know.

20         Q.   Well, as you sit here today do you wish

21     you had given a semen sample?

22         A.   Yes.

23         Q.   And would you have been confident that

24     giving a semen sample would have shown that you

```
 1    answer no?

 2         A.    I didn't even really give it a thought.

 3         Q.    Okay.  When you filed your suit in 2009

 4    against Sharon Thomas-Boyd and the Waukegan

 5    defendants and the dental defendants, did you know

 6    that Thomas Boyd was dead?

 7         A.    I did not.

 8         Q.    When did you learn Thomas Boyd was dead?

 9         A.    Like probably a couple of months ago.

10         Q.    I will ask you some questions now about

11    your allegations of wrongful incarceration.

12               In your complaint, your lawsuit that you

13    filed, you say that you were imprisoned for a

14    crime that you did not commit; is that correct?

15         A.    Correct.

16         Q.    Which crimes do you maintain that you

17    did not commit?

18         A.    None of them.

19         Q.    So you did not commit a criminal sexual

20    assault on Maria Gonzalez?

21         A.    No.

22         Q.    Meaning, you did not rape her?

23         A.    No.

24         Q.    Is that correct?
```

1       A.    Correct.

2       Q.    And you did not attempt to put your

3  penis into her mouth; is that correct?

4       A.    I did not.

5       Q.    That means you were wrongfully convicted

6  of aggravated -- Strike that.

7             You were wrongfully convicted of an

8  attempted criminal sexual assault; is that

9  correct?

10      A.    I was wrongfully convicted of

11 everything.

12      Q.    Including what I just said?

13      A.    Yes.

14      Q.    All right.  And you were wrongly

15 convicted of committing an aggravated battery on

16 Maria Gonzalez; is that correct?

17      A.    Correct.

18      Q.    Can we agree that if you committed any

19 of those crimes then the sentence that you

20 received for that specific crime would have been

21 appropriate?

22      A.    If I had did that, of course.

23      Q.    So you were originally sentenced to

24 prison for the criminal sexual assault for what

1      A.   Absolutely.

2      Q.   And you decided on your own to talk to

3  the police?

4      A.   Yes.

5      Q.   They didn't threaten you?

6      A.   No.

7      Q.   They didn't deprive you of water or

8  food?

9      A.   No.

10     Q.   You didn't ask them to stop questioning

11  and they kept questioning you after you asked them

12  to stop?

13     A.   I don't think so.

14     Q.   So what did the police officers do wrong

15  in this case?

16     A.   What did they do wrong?

17     Q.   Yeah.

18     A.   Well, they told a bunch of lies.

19     Q.   Which is the first lies that they told?

20     A.   You know, saying that I said the woman

21  was a bitch and about the scarf and other things

22  in there.

23     Q.   Well, they said you told them it wasn't

24  your scarf?

1      A.    And that's not true.

2      Q.    Well, that helped you, didn't it?   It

3   was to your benefit if it wasn't your property

4   found near the crime scene; isn't it?

5      A.    Well, but it was my coat.   I told the

6   truth, it was my coat.   Those were my items.   Why

7   would I tell them no?

8      Q.    Why would they make up something that

9   would not incriminate you or help?  Actually, what

10   they made up helped your case if that was

11   presented to the Jury?

12      A.    If that's the way you look at it, I

13   mean.

14      Q.    I mean, did it hurt your case any; do

15   you think?

16      A.    I think they did.

17      Q.    How is that?

18      A.    By telling those lies.

19      Q.    Okay.  And then you actually -- your

20   attorney called them to testify?

21      A.    I think he did.

22      Q.    On your behalf?

23      A.    Yeah.   They didn't testify on my behalf.

24      Q.    Why did your attorney call them then?

# Exhibit 2

# ARREST CARD

DOCUMENT CONTROL NUMBER: **D 0532113**

ARRESTING AGENCY NCIC NO./ORI: IL 0492100
CONTRIBUTOR/ORI NO./ORI: IL 0492100

STATE BUREAU NUMBER-SID
FBI NUMBER-FBI: 390 140 B 2

LAST NAME-NAM: **STARKS**
FIRST NAME: **RENEE**
MIDDLE: M

BOOKING NUMBER: P 2405

DATE OF ARREST: 21 Jan 86
ALSO KNOWN AS-AKA:

SIGNATURE OF ARRESTEE
SIGNATURE OF OFFICIAL TAKING FINGERPRINTS
NOTICE: THIS INFORMATION MAY BE COMPUTERIZED IN LOCAL, STATE AND NATIONAL FILES

ARREST LOCATION CODE:

ARREST LOCATION/CITY/DATE: **Waukegan P.D.**

CITY OF BIRTH:
RESIDENCE ADDRESS: **414 McKinley, Wauk**

DATE OF ARREST-DOA:
DATE OF OFFENSE-DOO: 21 Jan 86
ALIAS DOB:
ALIAS DOB:

ARRESTEE HELD FOR PROSECUTION: ☒ YES ☐ NO
IDENTIFICATION NO.:
DATE PRINTED: 01/21/86
STATE:

SEX: **F**  RACE: **Blk**  SOS:
DATE OF BIRTH-DOS: 22 Aug 59
HAIR-HAI: **Blk**  EYES-EYE: **Brn**  SKIN-SKN: **Brn**
HEIGHT: 5'09"  WEIGHT: 150

SOCIAL SECURITY NUMBER-SOC: 346 58 8648
SCARS/MARKS/TATTOOS-SMT
MISCELLANEOUS-MNU

NCIC FINGERPRINT CLASSIFICATION-FPC
CAUTION: BASIS FOR CAUTION-CO
ZIP CODE

| CODE NUMBER | CHAPTER | ARTICLE | SECTION | SUBSECTION | DESCRIPTION OF OFFENSE | U/A/C | | |
|---|---|---|---|---|---|---|---|---|
| 1 | | 38 | 12 - 14 | | Aggravated Criminal Sexual | X | X | F |
| 2 | | 38 | 12 - 4 | | Assault 86 0410 | X | X | F |
| 3 | | 38 | 12 - 14 | | Aggravated Criminal Sexual | X | X | F |
| 4 | | 38 | 12 - 4 | | Assault | X | X | F |
| 5 | | 38 | 12 4 a | | Aggravated Battery | 3 | 3 | F |
| 6 | | | | | WARRANT 86GM106 | | | |
| 7 | | | | | | | | |
| 8 | | | | | | | | |

REPORT REFERENCE NO.: **86— 1898**
BEAT:  SUB-BEAT:
TYPE WEAPON:

NUMBER OF DEFENDANTS:
NUMBER OF CHARGES:
COURT CASE NUMBER:
COURT CLK. NO.:

WARRANT NUMBER:
WARRANT CLEARED: ☐ YES ☐ NO
WARRANT LEADS: ☐ YES ☐ NO

PHOTO NUMBER:
PHOTOGRAPHED ☐ YES ☐ NO
ASSOCIATED/NUMBERED ☐ YES ☐ NO
ARRESTED ☐ YES ☐ NO
SCREEN ☐ YES ☐ NO
NARCOTICS ☐ YES ☐ NO

WARRANT NUMBER:

WAIVED BY:

ISSUE DATE:  BOND SET BY: (1) RULE OF COURT OR (2) JUDGE/MAGISTRATE
JUDGE'S NAME:

BOND NUMBER:
BOND AMOUNT:

TYPE BOND: ☐ CASH  ☐ CARD  ☐ BOND DEPOSIT  ☐ PROP BOND  ☐ 10% BOND  ☐ TRUE

AGENCY INFORMATION:

NCIC
AGENCY: ✗
AGENCY:

SEND CRIMINAL HISTORY RECORD TO:
AGENCY:
AGENCY:

INITIAL COURT DATE:
INITIAL COURT LOCATION: 281

COPY 3 STATE'S ATTORNEY

CLE6-35(7/79)

# Exhibit 3






Exhibit 4

86-1021

FILED

AUG 2 0 1987

LOREN J. STROTZ, Clerk
Appellate Court, 2nd District

STATE OF ILLINOIS)
                  ) SS.
COUNTY OF L A K E)

IN THE CIRCUIT COURT OF THE 19TH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS )
 )
          Plaintiff,)
 )
   -VS-        )   No. 86 CF 106
 )
BENNIE STARKS, JR.,     )
 )
        Defendant.)

   REPORT OF PROCEEDINGS had in the above entitled cause before the Honorable WILLIAM D. BLOCK, Judge of said Court, on the 23rd day of September, A.D., 1986, at the MORNING SESSION.

   APPEARANCES:

     MR. LUIS BERRONES, and
     MR. VAN HERRERO,
       Assistant State's Attorneys,
        on behalf of the People;

     MR. T. LEE BOYD, JR.
      Attorney at Law,
       on behalf of the Defendant.

KAREN SWAMBAR, C.S.R.
COURTHOUSE
WAUKEGAN, ILLINOIS
LICENSE NO. 84-1029

F I L E D

DEC 19 1986

Sally A. Coffelt
CIRCUIT CLERK

000332

1    As I arrived, there was an injured female

2 standing in the doorway.

3    Q    Where was she when -- What area of the door was

4 she in when you saw her, please?

5    A    She was -- she wasn't quite in the lobby yet,

6 she was in between the two, the outside door and the

7 secondary door.

8    Q    Did you observe this individual that was in the

9 doorway?

10    A    Yes.

11    Q    Can you describe her condition when you saw

12 her?

13    A    She was covered with mud.  She had night

14 clothes on that were torn.  She was leaning up against

15 the wall shaking and crying.  She had numerous injuries

16 about her face, and her arms, and legs.

17    Q    What types of injuries  on her face did you

18 observe?

19    A    It appeared to be swollen, seemed to be cuts.

20 She was unable to speak due to the swelling.

21    Q    Did you try talking to her?

22    A    Yes.

23    Q    Were you able to communicate with her in any other

24 in Spanish or English?

000345

000345

1    A    Yes, Officer Tench, who is Evidence Technician,

2  and Sergeant Umari, who was the shift sergeant at that

3  time.

4    Q    Can you tell us what, if anything, you did find

5  when you went down into the ravine area?

6    A    Once down into the ravine, we located a black

7  coat, some gloves, there was a scarf located, a pair of

8  underwear, watch, some keys.  I believe there was some

9  blood, several hypodermic needles were located, a pipe,

10  and other items that I'm unable to recall right now.

11    Q    Now, when you first went down there, you said

12  that you observed a coat?

13    A    Yes.

14    Q    I'm showing you what's been marked as People's

15  Exhibit Number 17 for Identification, and ask if you

16  recognize it?  Take a look at that.  And ask if you

17  recognize that?

18    A    Yes, I do.

19    Q    What do you recognize it to be?

20    A    This is a coat that was located at the bottom

21  of the ravine.

22    Q    How can you tell that's the coat that you

23  located at the bottom of the ravine?

1    Group Exhibit Number 31, and ask if you recognize that?

2         A    I do.

3         Q    What do you recognize that to be?

4         A    We call it a rape kit.

5         Q    How can you recognize that to be the one that

6    was prepared on January 19th?

7         A    Because my name is on it, for one thing.

8         Q    Now, in that -- when the items in that kit were

9    taken, were you present?

10        A    Yes.

11        Q    Okay.  Who was in the room with you when they

12   were taken?

13        A    Another nurse, and the doctor.

14        Q    What doctor is that?

15        A    Dr. Vugrincic.

16        Q    Can you tell us what you did in preparation for

17   preparing that kit?

18        A    The nurse does all of the combing on the pubic

19   hair, the samples of the pubic hair, the hair on the

20   person's head, all of those things, the oral swabs.  And

21   the doctor does only the vaginal collections.  We do the

22   rest.

23        Q    Now, can you tell us what, specifically, what

24   you did on that date?

1    A    We did the combing of the, as I say, the pubic

2 hair, and the samples of the pubic hair.

3    Q    After you combed the pubic hair, you took

4 samples, what did you do with those items?

5    A    They're placed in an envelope, that is in here.

6 This kit contains certain envelopes, certain

7 instructions, and we followed them right to the letter.

8    Q    When you placed them into the envelope, what,

9 if anything, did you do?

10    A    We sealed them, put the person's name on them,

11 and put our name on name.

12    Q    How are they sealed?  Do you staple them?

13    A    No.

14    Q    How are they sealed?

15    A    Lick, lick the envelope.

16    Q    Showing you two envelopes of People's Group

17 Exhibit Number 31, and I ask you if you recognize those?

18    A    Yes, I do.  That is my handwriting.

19    Q    How do you recognize those?

20    A    With the handwriting.

21    Q    Are those in substantially the same condition

22 as when you sealed them -- Who sealed those, by the way?

23    A    The nurse, the nurse does.

24    Q    Is that in substantially the same condition as

000402

1     when you sealed them on January 19th?

2        A    Yes, it is.

3        Q    What other items of evidence did you collect?

4        A    Oral, the saliva from the mouth on a disc. We

5     also take blood from the patient, and put on a disc, and

6     put it in there to seal it. Any swabs around the mouth,

7     with a cotton swab we used, and also a -- usually, from

8     the rectum, we don't, we don't go to the vagina.

9        Q    All right. Showing you, again, what's part of

10    People's Group Exhibit Number 31, indicates, says oral on

11    there, do you recognize that?

12       A    Yes.

13       Q    What do you recognize that to be?

14       A    That's the oral swab that would come from the

15    patient's mouth.

16       Q    Okay. Now, when you take that swab, what did

17    you do with it?

18       A    We put it right in this container.

19       Q    And then what happens?

20       A    We seal it, put the identification on it, and

21    that's it.

22       Q    I'm showing you what's been marked, again,

23    Group Exhibit Number 31, two vials, do you recognize

24    those?

1     A   Yes, these are the -- this is the blood sample

2  that we take from the patient.  Now, the doctor -- either

3  the doctor or the nurse can taken this.  I think Dr.

4  Vugrincic took this.

5     Q   Did Dr. Vugrincic take that in your presence?

6     A   Oh, yes.  Yes, we're with him all the time.

7     Q   What happens after the doctor takes the blood?

8     A   We put it, as I say, there's one drop put on a

9  disc, a paper disc there, and then we take this, and seal

10  this, and put it in the kit.

11     Q   Okay.  Are those two vials -- who sealed those?

12     A   The nurse.  The nurse does.

13     Q   Are those two vials in substantially the same

14  condition as when you sealed them on January 19th, 1986?

15     A   They they are.

16     Q   Showing you what's, again, People's Group

17  Exhibit Number 31, I ask you if you recognize that?

18     A   Yes, it's my handwriting.

19     Q   What do you recognize that to be?

20     A   That's a slide.  It is probably from the

21  vagina.  It's probably a vaginal specimen that the doctor

22  had put onto the slide.

23     Q   That happens when ... that ... a specimen

24  to a slide?

1     A   We put the -- we take the slide, and put it

2   into the box, and then, we put the name on it -- well,

3   the name is already on it, but then we seal it.

4     Q   The nurse usually seals it, not the doctor?

5     A   The nurse usually seals it, the doctor does

6   not.  The nurse usually does.

7     Q   Now, are these items in substantially the same

8   condition as when you sealed them that day?

9     A   Yes, they are.

10     Q   What do you do with these items after you

11   sealed them?

12     A   We put them in this box.  We cannot leave that

13   box alone, we have to keep that box with us at all times.

14   If we leave the room, we have to take the box with us.

15   If for any reason, we go anywhere, that box, with those

16   specimens goes with us, so we don't break the chain of

17   evidence.

18     Q   Now, on January 19th, did you have possession

19   of that box?

20     A   Yes, I did.

21     Q   How long did you hold onto that box?

22     A   Probably about an hour.

23     Q   And what happened after that?

24     A   We turned it over to the police officer, whose

1    signature is on that.

2        Q    When you turned that box over to the police

3    officer, do you turn it over to him unsealed, or sealed?

4        A    No, we sealed it in the presence -- in his

5    presence.

6        Q    Did you seal this particular box?

7        A    Yes, it's the red seal there.

8        Q    Okay.  How many pieces of tape did you use to

9    seal that box?

10       A    Just the one seal is what we put on that.

11       Q    Now, when you saw Maria Gonzalez at the

12   hospital, do you recall what her condition was?

13       A    She was badly assaulted, beaten.

14       Q    And did she -- can you describe what you

15   observed about her appearance?

16       A    Her face, her eyes were swollen.  She had

17   quite a few abrasions on her body, arms, legs, back.  She

18   was very dirty.  And her clothing was very dirty.  But

19   she was badly beaten about the head, and the face, neck

20   area.

21       Q    Did she -- Can you describe whether she was

22   crying or --

23            .   .          but                           with her

24   too well, because she speaks Spanish, and we don't, so we

1  than I know he did speak some Spanish.

2      Q    He did speak some Spanish.

3          Were you present when this conversation took

4  place?

5      A    Yes, I was.

6      Q    And the other interpreter was a police officer,

7  is that correct?

8      A    Yes.

9      Q    When these people were speaking with Ms.

10 Gonzalez, can you describe what her condition was, what

11 was she doing?

12     A    She had just been brought into the emergency

13 room.  She was very traumatized and very upset.

14     Q    And at that time, you started certain

15 procedures, is that right?

16     A    Yes.

17     Q    Okay.  What did you do?

18     A    Well, the doctor, of course, examines her, and

19 then, we questioned her several times through the evening

20 about possible sexual assault, and she denied it.  So, we

21 cleaned her.

22     Q    Was this in English or Spanish?

23     A    In English, and with an interpreter too.  We

24 had the doctor come back too.

1    submit to this Court that after 34 years, I believe,

2    Judge, that this witness is able to understand enough

3    English for us to submit herself to direct examination

4    for this jury.

5         THE COURT:  I'm going to allow the use of the

6    interpreter.

7                   DIRECT EXAMINATION CONT.

8              BY MR. BERRONES:

9         Q.   Ms. Gonzalez, I would like you to tell us

10   where you live right now.

11        A.   I live at, what's the name, Glen Flora.

12        Q.   How long have you lived there?

13        A.   A short time; three months.

14        Q.   Before you lived at Glen Flora, did you live

15   at 200 South Utica?

16        A.   200 Utica, yes.

17        Q.   That's in Waukegan?

18        A.   Yes, in Waukegan.

19        Q.   Now, on January 18, 1986, were you living

20   at 200 South Utica?

21        A.   Yes.

22        Q.   And on that date, did you go out during

23   the evening?

24        A.   Yes.  I went outside in the evening for some

                                                      10

1    air because it was very hot in the house.

2         Q.    When you went out, was it dark already?

3         A.    It was about 8:30, nine o'clock. I don't

4    remember very well.

5         Q.    When you went outside, did you see any

6    people?

7         A.    No, only the people who were passing by

8    on the street. There was no one.

9         Q.    Ms. Gonzalez, can you tell us how old you

10   are?

11        A.    My age? I'm 69 years old.

12        Q.    Now, when you went outside, what did you do?

13        A.    I stood standing looking ahead to 300 Lake.

14        Q.    Where were you standing?

15        A.    In this corner here.

16        Q.    The corner of what?

17        A.    One of the sidewalks on Utica and Lake.

18        Q.    Was anybody out there with you at that time?

19        A.    No one. No one.

20        Q.    As you stood outside, can you tell us what

21   happened?

22        A.    When I was standing looking over there, I

23   saw a black man coming to attack me. He was sitting,

24   he turned --

11

000431
000431

BY MR. BERRONES:

    Q.    After he grabbed you and put his arm around you, what happened?

    A.    He picked me up with this hand and he threw me like this.  (Indicating.)

    MR. BERRONES:  For the record, indicating grabbing with the other hand, the right hand.

    THE COURT:  The record will show she made a sharp gesture with her right hand.

BY MR. BERRONES:

    Q.    After he threw you, what happened?

    A.    And I fell down after he threw me.  I fell down.

    Q.    Where did you fall?

    A.    It wasn't on the sidewalk.  It was on the grass.

    Q.    Where was this grass located in relation to your building?

    A.    He had taken me away from the building.  I was away from the building.

    Q.    When you landed on the grass, did the black man do anything else?

    A.    He hit me and he punched me on my face here. He kept punching.

14

000434
000434

1      Q.    When you say he punched you in the face,

2  can you tell us what part of your body he hit you?

3      A.    First he hit me in the face here, this way

4  here and here and here.  All over the face.  (Indicating.)

5      MR. BERRONES:  Ask the record reflect she's

6  motioning all over her face.

7      THE COURT:  She motioned on her right cheek,

8  three points across her forehead, and her left cheek.

9  BY MR. BERRONES:

10      Q.    After he had hit you, what happened?

11      A.    After he hit me, he raped me.

12      Q.    You say he raped you, where did that

13  occur?

14      A.    In the ravine because he grabbed me and

15  pulled me down.

16      Q.    How far did he pull you down?

17      A.    Far because there at Utica it goes down

18  far.

19      Q.    Can you describe to us how he pulled you

20  into the ravine?

21      A.    Yes.  He pulled my feet and legs, pulled,

22  and he did this, and he pushed me up and down.

23  (Indicating.)

24      MR. BERRONES:  I also ask the record reflect when

15

1  she's testifying  she was being pulled by her legs,

2  she made an opening motion with her hand.

3       THE COURT:  An opening and a closing motion

4  lifting her arms and spreading them apart from her

5  body and then back in front of her body.

6  BY MR. BERRONES:

7       Q.    While this person was pulling you down,

8  what did you do?

9       A.    When he pushed me down, what do you mean?

10      Q.    When he was pulling you down, what were

11 you doing?

12      A.    I was moving around and trying to get up.

13 I was moving around like this.  (Indicating.)

14      Q.    As you were moving, were you hit anymore?

15      A.    Yes.

16      Q.    Where were you being hit on your body?

17      A.    In the whole body.  In the whole body where

18 ever you want.  I can show you.  Here and here and here

19 and everywhere.  Here and here, everywhere.  (Indicating.)

20      Q.    As he was pulling you down -- strike that.

21 Can you tell us what happened when he got you into the

23      A.    When we were in the ravine, he let go.  Can I

24 say something you didn't ask me?  But I can't say it

000436

000436

16

1    it until you ask me.

2         Q.    Did anything happen before he got you into

3    the ravine?

4         A.    That's when he raped me, yes.

5         Q.    Where were you when he raped you?

6         A.    In the bottom of the ravine.  He drug me

7    down.

8         Q.    Can you tell us how he raped you?

9         A.    Yes.  He did this to me.  He took off my

10   pants and he raped me.  (Indicating.)

11        Q.    When you make a motion saying that he did this

12   to me, can you tell us what you mean?  Was he holding

13   you?

14        A.    Yes.

15        Q.    Where was he holding you?

16        A.    As he pushed down like this and he didn't

17   let me --

18        Q.    What part of your body was he holding?

19        A.    All.  My whole body.

20        Q.    When he raped you, do you remember what he

21   did with his clothing?

22        A.    His clothing?

23        Q.    Yes.

24        A.    His clothing?

Q.    Yes, his clothing.

A.    He had his pants unbottoned here.    (Indicating.)

Q.    Can you tell us where he had them unbottoned?

A.    Right here.    (Indicating.)

MR. BERRONES:    Indicating, I don't know if the Court can see, indicating with her hands the front of her pants, motion down.    I ask the record reflect that.

THE COURT:    She's indicating a wide movement using both hands moving from the center point of the groin upward along the line at the top of the leg towards the up and towards the rear.

BY MR. BERRONES:

Q.    Before he raped you, did he take any of your clothing off?

A.    No.    He was pulling me like this and pulling me.    (Indicating.)

Q.    Did he do anything with your underwear?

A.    No.    When he took them off he just threw them down.

Q.    Now, while this was going on, was he

A.    He didn't say anything to me.    He was just doing this.    (Indicating.)

18

1          MR. BERRONES:  For the record, I ask the

2    record reflect --

3          THE COURT:  She made a number of striking

4    motions with one hand upon the other.

5    BY MR. BERRONES:

6          Q.    Did he say anything to you at all after he

7    grabbed you?

8          A.    No.  Just this.  He was hitting me, and

9    he was kicking me like this.  (Indicating.)

10         Q.    You said he raped you.  Can you describe

11   to us what you felt as he was doing this?

12         A.    I felt something was touching me there,

13   and I moved back and forth.

14         Q.    Where was he touching you and with what

15   part of his body?

16         A.    He touched me all over.  He didn't leave me

17   alone for a minute.  He kept touching me.

18         Q.    Did you ever feel his penis in your vagina?

19         MR. BOYD:  Objection.  Leading and suggestive.

20         THE COURT:  Overruled.

21         THE WITNESS:  Yes.

22   BY MR. BERRONES:

23         Q.    Tell us how many times.

24         A.    I felt three or four times because I kept

19

000439
000439

1    moving around like this and like that.  I felt it.

2    (Indicating.)

3        Q    After you had felt his penis in your vagina,

4    what happened?

5        MR. BOYD:  I object to that.  That's not the

6    testimony as I recall.

7        THE COURT:  I'll sustain it as to the form.

8    BY MR. BERRONES:

9        Q    Did anything else happen when you were in

10    the ravine?

11        A    Just hitting and hitting and hitting and he

12    didn't leave me alone.

13        Q    Did he do anything else?

14        A    With his closed fist here and here and here.

15    My eyes were closed from the  punches.  Here and here

16    and here and all over.  (Indicating.)

17        Q    After he raped you, did he try to put his

18    penis anyplace else?

19        A    Yes.  He did it three times.

20        Q    What did he do three times?

21        A    Told me to give him pussy three times, put

22    his penis here, and he told me to do that.  (Indicating.)

23        MR. BERRONES:  I ask the record reflect that she

24    touched her left cheek indicating that while she was

1 saying, "He placed his penis here."

2  THE COURT: The record will so show, and that she

3 made three kissing movements with her mouth.

4 BY MR. BERRONES:

5  Q. When the defendant placed his penis by

6 the left cheek, what did you do?

7  A. I held him like this and I did it like this,

8 you can see.  I held him like this and then I pulled.

9 (Indicating.)

10  Q. How many times did you pull?

11  A. Is when I pulled him.

12  Q. How many times did you pull him?

13  A. Two times.

14  Q. When you pulled his penis, what happened?

15  A. He said, "Oh."  I pulled and he went "Oh"

16 like that.  It's finished is when he left me.  He left

17 me but I was like this.  My eyes were completely

18 closed.  (Indicating.)

19  Q. When he left you, what did you do then?

20  A. I got up.  I crawled up.

21  Q. Where did you crawl to?

22  A. To the sidewalk on Utica.

23  Q. Did you see the person come out of the ravine?

24  A. Yes.  I saw him leave.

21

1    Q.    When you saw this person come out of the

2  ravine, did he have anything in his hands?

3    A.    A red bag.  He was carrying it like

4  this, like I would be carrying this bag like this.

5  He left and he went that way and then he went into

6  the apartment.  (Indicating.)

7    Q.    Had you seen that red bag before?

8    A.    No.  Only when he got up and I saw it.

9    Q.    When you first saw him, you saw the red bag?

10    A.    Yes.

11  MR. BOYD:  I object to that.

12  THE COURT:  I'll sustain it.  It's getting leading.

13  She testified to a number of times he got up or two

14  times at least, I think.

15  BY MR. BERRONES:

16    Q.    When you first saw the person come at you,

17  was this person wearing a coat?

18    A.    Yes.  He had it with the red bag.

19    Q.    I'm showing you what's been marked as

20  People's Exhibit No. 17 and I'll ask you to take a

21  look at that coat.

          Yes, this is it.

23    Q.    You recognize that as the coat?

24    A.    Yes.  That's the one he was wearing.  He had

1  it like this, along about his red bag.

2      Q.    Now, when this person left the ravine,

3  did he take this coat with him?

4      A.    No, he didn't have it.  When he was hitting

5  me, he didn't have it.  He didn't have it.

6      Q.    Is that coat in substantially the same

7  condition as when you saw it?

8      A.    I don't know how to answer that.

9      Q.    Does that look like the coat?

10     A.    The color is, yes, the same color, but he

11 had it folded like this.  (Indicating.)

12     THE COURT:  Show a number of times the witness

13 has testified as he had it like this she made a gesture

14 over her left arm.

15     THE WITNESS:  Yes, he had it in this arm.

16 BY MR. BERRONES:

17     Q.    When you saw the defendant come out of

18 the ravine, did you see where that person went?

19     A.    Yes.

20     Q.    Where did that person go?

21     A.    To 300 Lake.

22     Q.    Would you please look around the courtroom

23 and see if you see that person who raped you on

24 January 18, 1986, present in court today.

                                              23

000443
000443

1    A.    It's the one sitting over there.

2    Q.    Please tell us something he's wearing.

3    A.    The one who's sitting.  That's the one.

4    Q.    Could you tell me what kind of clothing he's

5    wearing?  What color clothing he's wearing.

6    A.    The pants with white pants.

7    Q.    The clothes he's wearing now.

8    A.    The clothes he was wearing?

9    Q.    Not the clothing he was wearing in January.

10   What is he wearing right now?

11   A.    No. It's not the same clothes he was wearing.

12   Q.    Could you step down and touch the person?

13   Please put your hand on the shoulder of the person who

14   raped you?

15   A.    This one.  (Indicating.)

16   MR. BERRONES:  I ask the record reflect the witness

17   touched the defendant.

18   THE COURT:  The record will so show.

19   BY MR. BERRONES:

20   Q.    What kind of clothes were you wearing on

21   January 18 when you went out?

22   ... ......., . ..... ...., ..... ..... . ...,

23   and another little flowers, grey.

24   Q.    Did you have any underwear on?

1  A.  Just the house dresses and my slippers.

2  Q.  Anything underneath the house dresses?

3  A.  Some underpants that he took off.

4  Q.  I'm showing you what's been marked as

5 People's Exhibit No. 22 for identification. Do you

6 recognize those?

7  A.  Yes. These are mine. Those are mine.

8  Q.  Are these in the same condition as you were

9 wearing them?

10  A.  Yes, they are. And these too.

11  Q.  I'm showing you what's marked as People's

12 Exhibit No. 23 for identification. Do you recognize

13 this?

14  A.  Yes. These are the ones I was wearing. Those

15 are the ones I wore.

16  Q.  Basically the same condition as you had

17 them --

18  A.  Well, they're dirty, but --

19  Q.  They weren't dirty when you first put them on.

20  A.  No. But since there was a lot of mud.

21  Q.  Showing you what's been marked as People's

22 Exhibit No. 28 and ask you if you recognize that.

23  A.  Yes, I do. This is what I wore. I wore it

24 buttoned, and he pulled me like this. I had it closed

1    A.    They're my underpants.

2    Q.    Were these the ones you were wearing on

3  January 18, 1986?

4    A.    Yes.

5    Q.    Are these the same underwear that he took off

6  of you that day?

7    A.    Yes.  He took them off like this.  (Indicating.)

8    Q.    Now, when you were in the ravine, did the

9  defendant ever bite you?

10   A.    Yes.

11   Q.    Where did he bite you?

12   A.    Here, here, here.  He pulled my hair up

13  like that and he took out some hair, and he bit me here.

14  (Indicating.)

15   MR. BERRONES:  I ask the record reflect the last one

16  indicating he bit her on the left shoulder.

17   THE COURT:  The record will so show.

18  BY MR. BERRONES:

19   Q.    While the defendant was hitting you, did you

20  ever rip anything off his hand or off his wrist?

21   MR. BOYD:  I'm objecting to the leading nature of

22  these last questions.

23   THE COURT:  Sustained.

24

BY MR. BERRONES:

Q.     Do you remember -- strike that. What, if anything, did you grab of the defendant's?

A.     His watch because he was going to hit me with a knife. He went into his pants like this and he was going to hit me with a knife. (Indicating.)

MR. BOYD:  I could not hear. May I have that last question and answer read to us?

THE COURT:  Give the last portion.

(Whereupon the reporter read back the requested testimony.)

BY MR. BERRONES:

Q.     What did you do with the watch?

A.     The watch, I had it in this hand. He was going to do this to me, but I couldn't see very well so he went like this, and I pulled his watch and I ripped it off.

Q.     Do you recall what the watch looked like?

A.     No, I don't. I can't remember. I couldn't see anything. I had my eyes like this. They were closed. (Indicating.)

Q.     Then you grabbed the watch off, what did you do with it?

A.     I don't know.

1    Q.    Did you talk to Patrolman Juarez at the

2  scene?

3    A.    No.

4    Q.    Did you talk to an officer by the name of

5  Martinez at the scene?

6    A.    I don't know.

7    Q.    Did you talk to a Hispanic officer at the

8  scene?

9    A.    I don't know.

10    Q.    Did you tell any Waukegan Officer at that

11  scene that you had not been raped?

12    A.    No.  My head wasn't right.  I was hit.

13    MR. BOYD:  Motion to strike the rest of it.

14    THE COURT:  Overruled.

15  BY MR. BOYD:

16    Q.    My question to you is this --

17    MR. BERRONES:  I ask that he let her finish

18  responding.

19    THE COURT:  I think it's sufficient.

20  BY MR. BOYD:

21    Q.    My question to you is --

22    THE COURT:  She said, "I don't know.  My head

23  was hit."

24

BY MR. BOYD:

Q.     My question to you is did you tell any Waukegan Police Officer that you had not been raped?

MR. BERRONES:  Objection.  Asked and answered.

THE COURT:  It's cross examination.  Overruled.

BY MR. BOYD:

Q.     At the scene.

A.     I don't know.  I don't know what happened. I wasn't well.

MR. BOYD:  Motion to strike that last part.

THE COURT:  Overruled.

BY MR. BOYD:

Q.     During the course of this incident, when you were being struck, were you being struck with any weapon?

A.     He had taken out his knife to hit me, but I had already been hit and he kept punching me, and he took me by the neck and he did that to me.  (Indicating.)

Q.     Did this person ever strike you with a metal pipe?

A.     I don't know.

Q.     Did you tell any Waukegan Police Officer at the scene that the man had struck you with a metal pipe?

REDIRECT EXAMINATION

BY MR. BERRONES:

1

2

3    Q.    Dr. Schneider, do you know Dr. Steven

4  Smith?

5    A.    Yes.

6    Q.    How do you know him?

7    A.    He was an instructor of mine at Northwestern

8  Dental School, and I worked with him on four bite

9  mark seminars at Northwestern, and I have worked with

10 him on several mass disaster preparedness in his

11 seminars, and I worked with him on a special symposium

12 we gave on mass disaster preparedness that I invited

13 him out to give a presentation on and other things.

14   Q.    Has he been one of your teachers in the

15 forensic odontology field?

16   A.    Yes.

17   Q.    And did he check your work?

18   MR. BOYD:  I object to that unless he checked his

19 work on this case.

20   THE COURT:  Objection sustained.  I think we'll

21 just have the objection.

22

23 BY MR. BERRONES:

24   Q.    How long have you known Milan Kajfez?

187

9-24-86
continued

1     A   Yes, I have.

2     Q   Did you go to the same high school?

3     A   Yes, we did.

4     Q   You were buddies?

5     A   No. I just knew who he was, because he was a

6 wrestler, and he went downstate and won.

7     Q   But you've known him for 15 years?

8         Have you worked with him before?

9     A   Yes, I have.

10    Q   Okay. And you are familiar with him, are you

11 not?

12    A   Yes, I am.

13    Q   On a social level?

14    A   Yes.

15    Q   Now, who rendered whose opinion first in this

16 case, you or Dr. Schneider?

17    A   I don't feel it was one before the other, we

18 were --

19    Q   Both you guys came to it at the same time?

20    A   Yes.

21        We were looking at the photographs, and --

22    Q   You answered my question. You both came to it

23 at the same time?

24    A   Yes.

1      Q    Okay.  Now, did you have anybody outside of

2  yourself and Dr. Schneider check your work?

3      A    No, we did not.

4      Q    Okay.  How many times have you testified in

5  court?

6      A    On a forensic case?

7      Q    Yes.

8      A    Twice.

9      Q    And did you testify in court for the

10  prosecution or the defense the other time?

11      A    The prosecution.

12      Q    Have you ever testified in court for the

13  defendant on a criminal case?

14      A    No, I have not.

15      Q    What prosecution unit did you testify for?

16      MR. BERRONES:  Objection, irrelevant.

17      THE COURT:  Over-ruled.

18      DR. HAGSTROM:  I'm not sure I understand

19  prosecution.

20      THE COURT:  Prosecutors for what?

21      DR. HAGSTROM:  Oh, Lake County, Illinois.

22  BY MR. BOYD:

23      Q    That's this county?

24      A    Yes.

1      Q    Okay.  You've testified in this building, for

2   this Lake County Prosecutor's Office?

3      A    Yes, I have.

4   MR. BOYD:  I have nothing further.

5           Oh, excuse me.

6   BY MR. BOYD:

7      Q    Are you getting paid for this?

8      A    We're being paid for the supplies we've used,

9   the models we've taken, and what work.

10     Q    For the work that you've done?

11     A    Yes.

12     Q    Okay.  Are you billing them by the hour?

13     A    We have not decided how we're going to bill for

14  this.

15   MR. BOYD:  Okay.  Nothing further.

16                REDIRECT EXAMINATION

17   BY MR. BERRONES:

18     Q    Dr. Hagstrom, when you were conducting your

19  tests, and observations, was this simultaneously with Dr.

20  Schneider?

21   MR. BOYD:  Objection, I did not ask that, judge.

22   MR. BERRONES:  Judge --

23   MR. BOYD:  I asked whether or not he reached the

24  opinion.

                    000632

1      THE COURT:  Well, I think it's within the scope of

2  the cross.  Over-ruled.

3      DR. HAGSTROM:  Would you repeat that again?

4  BY MR. BERRONES:

5      Q    Did you conducted your examinations and tests

6  simultaneously with Dr. Schneider?

7      A    Yes.

8      Q    Is that why you -- were you forming your

9  opinions as you were forming those tests?

10     A    Yes.

11     MR. BERRONES:  I have no other questions.

12     MR. BOYD:  Nothing further.

13     THE COURT:  You may step down.

14          (Whereupon the witness was excused.)

15                    SHARON THOMAS-BOYD

16  having been first duly sworn, was examined and testified

17  as follows:

18                    DIRECT EXAMINATION

19  BY MR. BERRONES:

20     Q    Will you please state your name, and spell your

21  last name?

22     A    Sharon Thomas-Boyd, T-h-o-m-a-s -- B-o-y-d.

23     

24     A    Yes, I am.

1    subjects took approximately $80.00 in cash, his trench

2    coat, a pair of gloves, and a wristwatch. I asked him if

3    he could describe the subjects. And the only thing that

4    he could remember, he said the spanish subject was short,

5    and the black subject was tall. I asked him if he

6    continued walking home, after he was robbed, he said that

7    he ran home to his mother's house, on Lake Street. I

8    asked him if he called the police. He said that he

9    didn't because he didn't think the police would do

10    anything for him. I asked him if he told his mother that

11    he was robbed, and he said, "No, because she's sick, and

12    I didn't want to get her upset."

13        At this time, I asked him if he had purchased

14    any items at Regents Clothing Store on Genesee Street, in

15    Waukegan, that day. And he stated that he had. I asked

16    him what he purchased. And he said he purchased a beige

17    men's sweater. I then asked him if the package that he

18    had received the item in, and carried the item in, was

19    red in color. And he said it was. I asked him if he had

20    the package with him while he was drinking at the Genesee

21    Inn, and he said that he did. At this point, I said,

22    "Well, when you were walking home, did you have the

23    package with you when you were robbed?" And he said,

24    "No, I dropped the package off earlier at my mother's

1    house, prior to that."

2        Q    Was your --

3        A    Go ahead.

4        Q    When you were having this conversation with

5    him, did he indicate to you what time he left the bar?

6        A    He said he left the bar at approximately 10:30,

7    with the package in his hand.

8        Q    Now, when he told you that he ran to his

9    mother's house, did he tell you where his mother's house

10    was located, what address?

11        A    He said it was located at 300 Lake Street.

12        Q    Did you show the defendant a coat while you

13    were talking to him?

14        A    Yes, I did.

15        Q    What coat did you show him?

16        A    I showed him a black trench coat, with the

17    brand name of Campus, I believe it was a size 40.  It was

18    recovered at the -- in the ravine, and was identified by

19    the victim as being the coat worn by the offender.

20        Q    I show you what's been marked as People's

21    Exhibit Number --

22        MR. BOYD:  I'd like all that barred that went past

23    what --

24        THE COURT:  I'll sustain what the victim says.  And

1      Q    And you have a current rank of Sergeant, do you

2  not?

3      A    Yes, I do.

4      Q    Okay.  Now, Sergeant, do you know a Maria

5  Gonzalez?

6      A    Yes, I do.

7      Q    And did you have occasion on January 19th,

8  1986, to speak to Ms. Gonzalez?

9      A    Yes, I did.

10     Q    Do you recall where you spoke to her at?

11     A    Yes, I do.

12     Q    And where was that at?

13     A    At Victory Hospital, in the Intensive Care

14  Unit.

15     Q    Okay.  About what time was it, do you remember?

16     A    Approximately 9:30 a.m.

17     Q    Okay.  And did you have occasion to speak to

18  her concerning a description of the alleged offender?

19     A    Yes, I did.

20     Q    And did she tell you, officer, that the alleged

21  offender had no facial hair?

22     A    Yes, she did.

23     Q    Did she also tell you that the alleged offender

24  was approximately 18 to 19 years of age?

1     A    Yes, she did.

2     MR. BOYD:  Okay.  I have no further questions.

3  Thank you, very much, officer.

4     MR. BERRONES: No cross, judge.

5     THE COURT:  You may step down.

6          (Whereupon the witness was excused.)

7     MR. BOYD:  Judge, there is a possibility of

8  a stipulation between myself and the prosecution, judge.

9  Perhaps, we can just have one moment, and maybe we can

10  work this out.

11          (Whereupon counsel have a conference out

12         of the hearing of the reporter.)

13     MR. BOYD:  Your honor, I believe there will be a

14  stipulation by and between the parties, the defendant,

15  Bennie Starks, my client, and myself, and the people of

16  the State of Illinois represented by Mr. Herrero and Mr.

17  Berrones, that if Patrolman Martinez was called to

18  testify, that he would testify that he is a patrolman

19  with the Waukegan Police Department, and that on January

20  the 18th, 1986, he had occasion to have a conversation

21  in Spanish with Ms. Maria Gonzalez.  This conversation

22  took place at approximately 300 Lake Street.  And that at

23  that time she indicated, in response to his questions,

24  that she had not been raped, that the alleged offender

1    says, yes, that's one of mine. He looks through his

2    records, and finds a receipt, with Starks name on it, a

3    black coat, how much it cost, what it was. Mr. Sinclair

4    came in here, and looked at the defendant, and said,

5    "Yes, that's the same person who brought the coat into my

6    cleaners." That is this man's coat.

7            How else do we know that that was the defendant

8    down there raping and beating Maria Gonzalez? Well, that

9    night, the defendant went to a few bars to have a few

10   drinks. And he was seen by people at those bars. He was

11   seen by people who remembered the unusual coat, and how

12   he wore it. But who also remember that red bag. Seeing

13   the defendant with that red bag, that red bag that you

14   get at clothing stores. And where had the defendant

15   gotten that red bag? That very same day, he had gone to

16   a clothing store, where Benjamin Bones works, and bought

17   a sweater. And what did Ben Bones say? "I remember the

18   defendant, I remember that coat on him, that's one thing,

19   because that's the only type of coat like that that I saw

20   on my customers. And he did buy something, and I gave

21   him a red bag, about this big," being about 18 by 20

22   inches, two feet -- 24 inches by 26 inches, that

23   very night, on January 18th, 1986. And the defendant

24   carried that red bag all night, all night to the bars

000755

1   that he went to, all night to the time that he beat and
2   raped Maria Gonzalez.
3           And how do we know that he carried that bag
4   around? Because people saw him with it. Mr. Calvin
5   Williams, who was at the Genesee Inn, drinking orange
6   juice that night, remembers the defendant walking in,
7   again, wearing that coat, carrying a red bag. Melody
8   McCain remembers the defendant, this man, wearing that
9   coat, carrying a bag. Harry Boyer says it was this man
10  who came into the Headquarters Tavern, when I was in
11  there, wearing that black coat, and carrying a red bag.
12  Although he described it like a bag, a plastic bag you
13  get at the hospital. Basically, the same dimensions he
14  demonstrated as the bag that Benjamin Bones had earlier
15  given the defendant when he had bought a sweater.
16          How else do we know that the defendant was
17  there when Maria Gonzalez was brutally raped and beaten?
18  By the bite mark that was left on her shoulder. That
19  bite mark on her left shoulder was left by that man. You
20  will be able to see the clarity of that bite mark that
21  was left on her shoulder. You'll see in People's Exhibit
22  Number 39. And what does that bite mark tell us? Well,
23  Dr. Schneider and Dr. Hagstrom were called in to examine
24  that bit mark. And they went through some painstaking

000756

# Exhibit 5

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4

 5    BENNIE STARKS,                  )
                                      )
 6             Plaintiff,             )
                                      )
 7        vs.                         )   No. 09 C 348
                                      )
 8    CITY OF WAUKEGAN, and PRESENT )     Judge Gary Feinerman
      and FORMER WAUKEGAN POLICE      )
 9    DEPARTMENT OFFICIALS:           )   Magistrate Judge
      LIEUTENANT URBANCIC, W. BIANG,)     Mason
10    P. STEVENSON, M. JUAREZ,        )
      D. DEPREZ, DR. CARL HAGSTROM, )
11    DR. RUSSELL SCHNEIDER AND       )
      SHARON THOMAS-BOYD,             )
12                                    )
               Defendants.            )

13

14

15

16         The deposition of WILLIAM BIANG, pursuant to

17    notice and pursuant to the Federal Rules of Civil

18    Procedure for the United States District Courts

19    pertaining to the taking of depositions, taken before

20    Carmella T. Fagan, C.S.R., R.P.R., Notary Public

21    within and for the County of Cook and State of

22    Illinois, at 1180 North Milwaukee Avenue, in the City

23    of Chicago, Cook County, Illinois, commencing at

24    10:10 a.m. on the 3rd day of November, 2014.

25             BREHON REPORTING   (708) 442-0027
```

1      A      Correct.

2      Q      And subsequently, a cleaning tag was

3  found in the coat, correct?

4      A      Yes, sir.

5      Q      And that cleaning tag was traced back

6  to Sinclair Cleaners.  Do you remember --

7      A      Yes, sir --

8      Q      -- that?

9      A      -- I do.

10     Q      And that officers had gone to Sinclair

11  Cleaners and obtained the name and the address of the

12  person who had brought that coat in for cleaning?

13     A      Yes, sir.

14     Q      And that was Mr. Starks?

15     A      Yes, sir.

16     Q      And they had also, officers had shown

17  Mr. Sinclair of Sinclair Cleaners a photograph of

18  Mr. Starks and he had identified Mr. Starks as being

19  the person who brought the coat in for cleaning,

20  right?

21     A      Yes, sir.

22     Q      All right.  When you had the interview

23  with Mr. Starks on January the 21st of 1986, he

24  acknowledged that he had been in possession of the

1    long, black trench coat, correct?

2        A      Yes, sir.

3        Q      And he told you that, in fact, he had

4    been the victim of a robbery during which that trench

5    coat had been taken?

6        A      Yes, sir.

7        Q      So, again, in terms of Mr. Starks'

8    statements to you, what he was telling to you

9    corroborated facts that you, "you," meaning the

10    Waukegan Police Department, had independently learned

11    in the course of the investigation?

12        MR. KARAVIDAS:  Objection.

13        MR. TROBE:  Objection, form.  There's no

14    corroboration of the robbery.

15        MR. KARAVIDAS:  Join.

16        MR. STAINTHORP:  Okay.  First of all, I don't

17    want speaking objections.

18        MR. TROBE:  I'll make my objections.

19        MR. STAINTHORP:  I want objections --

20        MR. TROBE:  I don't care what you want.  I

21    don't --

22        MR. STAINTHORP:  I want objections --

23        MR. TROBE:  -- care what you want.

24        MR. STAINTHORP:  Well, I'm telling you, I want

1    objections pursuant to the Federal Rules.

2         MR. TROBE:  Okay.  I don't care what you want.

3         MR. STAINTHORP:  So if you want to make an

4    objection to form, that's fine.  But you should not

5    be making speaking objections.

6         MR. TROBE:  Then you should not be asking

7    intentionally misleading questions that misstate the

8    evidence, okay?

9         MR. STAINTHORP:  I thinks that's an

10   unfortunate statement that you just made, and I

11   think --

12        MR. TROBE:  It was accurate.  Maybe it's

13   unfortunate, but it's accurate.

14        MR. STAINTHORP:  No, it's not.

15        MR. TROBE:  So if you don't want me making

16   speaking objections, don't make mislead --

17   intentionally misleading questions.

18        MR. STAINTHORP:  Okay.  The Federal Rules

19   provide that you do not make speaking objections.

20   You can make objections to form, but you do not make

21   speaking objections, which then have the effect of

22   instructing the witness what you want the witness to

23   say.

24        MR. KRAUSE:  John, just move on, please.

1    MR. TROBE: Then ask --

2    MR. STAINTHORP: I -- I agree.

3    MR. TROBE: -- fair questions.

4    MR. KRAUSE: John, you're, like, the master of

5  speaking objections, so let's --

6    MR. STAINTHORP: Okay.

7    MR. KRAUSE: -- just go, all right?

8    MR. TROBE: You just -- you're doing a

9  speaking objection to my objection.

10   MR. STAINTHORP: No. It's inappropriate and

11  it's improper.

12   MR. TROBE: So are mis -- intentionally

13  misleading questions.

14  BY MR. STAINTHORP:

15   Q  So in terms of the fact the --

16  Mr. Starks' acknowledgment that he had the black

17  trench coat and that trench coat was taken from him,

18  that statement also corroborated information as to

19  the trench coat being found at the scene that you had

20  independently generated in the course of your

21  investigation?

22   A  I --

23   MR. KARAVIDAS: Objection, form --

24   THE WITNESS: -- don't understand that

1    question.

2            MR. KARAVIDAS:  Objection, form of the

3    question, compound question, lack of foundation.

4            THE WITNESS:  I -- I -- you'd have to rephrase

5    that question.  I have no idea what you're asking.

6    BY MR. STAINTHORP:

7        Q        Okay.  Certainly Mr. Starks at no time

8    denied that he had been in possession of the trench

9    coat, correct?

10       A        That's correct.

11       Q        And he identified the trench coat that

12   was found at the scene as having belonged to him,

13   correct?

14       A        Yes.

15       Q        And as having been stolen from him in

16   a robbery, correct?

17       A        He said his coat was taken in a

18   robbery.

19       Q        Okay.

20       A        Yes.

21       Q        There were also gloves that were found

22   at the scene of the -- of the attack, correct?

23       A        I'd have to look at the reports.  I

24   don't have all the details, but, that's -- you know,

1      can I look at my reports to refresh my recollection?

2              Q        That's -- sure.  Yeah.  Go ahead.

3                          (WHEREUPON, the Witness was

4                          reading Biang Exhibit 3.)

5              A        What's the question again?

6              Q        You've now had a chance to review your

7      report?

8              A        Yes, sir.

9              Q        You now recall that there were, in

10     fact, gloves that were found at the scene of the

11     attack?

12             A        Yes, sir.

13             Q        And Mr. Starks didn't attempt to deny

14     that he had had gloves that were similar to those

15     found at the scene of the attack?

16             MR. KARAVIDAS:  Object --

17             MR. KRAUSE:  I'm going to object,

18     mischaracterizes the exhibit --

19             MR. KARAVIDAS:  Just objection --

20             MR. KRAUSE:  -- as to the form.

21             MR. KARAVIDAS:  -- form of the question, lack

22     of foundation.

23     BY MR. STAINTHORP:

24             Q        You can go ahead.

1       A      He said that a pair of gloves were

2  taken.  He identified the -- when he saw the photo of

3  the gloves, he said they were not his.

4       Q      And this was a Polaroid photo --

5       A      Yes.

6       Q      -- correct?

7       A      That's correct.

8       Q      All right.  But, in fact, he described

9  a pair of gloves that had -- that were black driving

10  gloves, with holes on the back of the gloves,

11  correct?

12       A      Yes, sir.

13       Q      The gloves that were found were black

14  gloves with holes in the back?

15       A      I can't recall.  I -- I don't remember

16  what they looked like.

17       Q      Okay.

18       A      This is 1986.  I have no recollection

19  of the picture of what the gloves -- you have to show

20  me the picture.

21       Q      Okay.  Have you reviewed that picture

22  of the gloves?

23       A      No, sir.

24       Q      From reading your report, you're aware

1      that a watch was found at the scene of the attack,

2      correct?

3              A       I can't recall that.  What report

4      would that be in?  Not in this one.

5              Q       Let me try it a different way:  You

6      don't recall at this point whether a watch was found

7      at the scene of the attack --

8              A       No, sir.

9              Q       -- correct?  All right.  But Mr.

10     Starks volunteered to you that he had, in fact, had a

11     watch stolen in the course of this robbery, correct?

12             A       That's correct.

13             Q       Now, in the course of this interview,

14     Mr. Starks volunteered to you that earlier in the day

15     on January the 18th, 1986, he had gone to Regent's

16     clothing store and purchased some clothes; is that

17     correct?

18             A       Yes.

19             Q       And that when he purchased those

20     clothes, he was provided with a red bag by the store,

21     correct?

22             A       Yes.

23             Q       And that corroborated information that

24     you had independently learned from the clothing

1      store; is that correct?

2              A       Yes.

3              Q       And the clothing store had, in fact,

4      identified an -- or an employee of the clothing store

5      had identified Mr. Starks as purchasing a white

6      sweater on the evening of January the 18th, 1986?

7              MR. KRAUSE:  Objection, misstates the

8      evidence.

9              THE WITNESS:  It was a beige sweater.

10     BY MR. STAINTHORP:

11             Q       Okay.

12             A       That Starks said he purchased a beige

13     sweater.

14             Q       Yeah.  You know what?  I --

15             A       I don't see anything directly from

16     Regent's.

17             Q       Yeah.  I -- what was that?

18             A       I don't see anything in here from --

19     directly from Regent's.

20             Q       Yeah.

21             A       If it's there, I -- I don't have it.

22             MR. STAINTHORP:  All right.  Well, let's mark

23     this as Exhibit 4.

24                            (WHEREUPON, Biang Exhibit 4 was

Page 49

1    for him to sign?

2          A       No.

3          Q       Did you ask him if he would give a

4    court-reported statement?

5          A       No, sir.

6          Q       Did you ask Mr. Starks if he had

7    attacked Maria Gonzalez?

8          A       I'm sure I did.  Yes.

9          Q       And what did he say?

10         A       I'm sure he said "No."

11         Q       Did you record that in your report of

12   the interview?

13         A       I recorded what his statement was as

14   regards to the incident.  I recorded where -- you

15   know, what he said about where he was at and what he

16   had done.

17         Q       That wasn't my question.  So you --

18         A       No.  Obviously not.

19         Q       You didn't record it?

20         A       No, sir.

21         Q       Why not?

22         A       I don't -- it didn't seem germane to

23   the facts at the time.  I mean, we knew he denied it.

24   We knew it was a denial.

Page 52

1    suspect denied culpability, to challenge that suspect

2    with respect to that denial?

3         MR. TROBE:  Objection to form, incomplete

4    hypothetical.

5         THE WITNESS:  Generally we would try to get a

6    confession from the suspect.  Yes.

7         Q        And certainly one method of doing

8    that, if someone denies something, is to then

9    challenge that denial, correct?

10        A        I believe that would be one way.  Yes.

11        Q        Okay.  And certainly in your

12   experience as an investigator, you were very familiar

13   with suspects initially denying a culpability and

14   then subsequently acknowledging it, correct?

15        A        Correct.

16        Q        And certainly as an experienced

17   investigator, you recognized that if you could get a

18   confession or some kind of statement of involvement

19   from Bennie Starks, that would be very useful

20   information in a prosecution, correct?

21        A        All in the other -- that's correct.

22   But also if you can get him caught in a lie and he

23   makes up a statement that's not true, that's

24   beneficial as well.

1          MR. TROBE:  Objection to form.  As to what

2     time?

3          THE WITNESS:  Yeah.  I don't -- I don't

4     remember if that was a presumption, but we knew it

5     was just a lot of baloney.

6     BY MR. STAINTHORP:

7          Q      And I just want to be clear:  That was

8     your understanding back on January the 21st, 1986,

9     when you interviewed Mr. Starks, correct?

10         A      We felt it was a false statement.

11    Yes.

12         Q      And you pursued this investigation

13    based upon your -- your understanding that that

14    statement was, I think you just said, "baloney"; is

15    that correct?

16         A      It was a false statement.

17         Q      All right.  And that's how you pursued

18    the investigation?

19         A      We didn't -- we didn't think that

20    there was a robbery that took place.

21         Q      So it's fair to say that you pursued

22    this investigation, on the balance of this

23    investigation, with the presumption that no robbery

24    took place, correct?

1          MR. TROBE:  Objection, asked and answered.

2                You can answer again.

3          THE WITNESS:  We pursued the investigation

4     because Starks could give us absolutely no

5     information about anything that happened in this

6     robbery, no description that was worth a darn.  There

7     was absolutely nothing that -- nothing credible in

8     his statement to us where he could have said, "I was

9     robbed."

10               It was the typical -- it was a white

11    guy and a -- a black guy and a Spanish guy; one guy

12    was tall, one guy was short.  That's all I knew.  It

13    was nonsense.

14    BY MR. STAINTHORP:

15         Q     Other than Mr. Starks' inability --

16    strike that.

17               What steps, if any, did you take to

18    investigate whether, in fact, there had been a

19    robbery of Mr. Starks on --

20         A     I did -- I didn't --

21         MR. TROBE:  Let him --

22         THE WITNESS:  -- individually -- I'm --

23         MR. TROBE:  -- just finish.

24         THE WITNESS:  -- sorry.  I'm sorry.

```
 1    BY MR. STAINTHORP:

 2         Q        -- on Jan --

 3         A        I thought you were finished.

 4         Q        Yeah.  I'm sorry.  I was just going to

 5    identify the date.

 6                  What steps, if any, did you take to

 7    investigate whether, in fact, there had been a

 8    robbery of Mr. Starks on January 21st, 1986?

 9         A        I didn't take any steps but I'm sure

10    other officers did that.

11         Q        Have you ever seen any police reports

12    reflecting an investigation into whether the --

13    whether Mr. Starks was robbed on January the --

14         A        No.

15         Q        -- 18th, 1986?

16         A        No, sir.

17         Q        And is it fair to say that if, in

18    fact, there was such an investigation, there should

19    be police reports documenting that?

20         A        Not always.

21         Q        Don't you as a police agency document

22    important steps in an investigation?

23         A        What I'm saying is that there are not

24    always reports written on every item like that at
```

1    that time.  It just didn't happen.

2           Q       And --

3           A       I don't know for sure if there were

4    reports written or not.

5           Q       Okay.  But my question was:  Was it,

6    in fact, your practice as a police agency to document

7    important parts of an investigations?

8           A       We would try to document anything we

9    did to try to debunk his alibi.

10          Q       So that was your orientation in terms

11    of the investigation was to debunk his alibi --

12         MR. TROBE:  Objection to the form.

13         THE WITNESS:  It -- we --

14         MR. TROBE:  "Orientation" is --

15         THE WITNESS:  We didn't really need to,

16    because we had his bite marks, we had his

17    identification, we had his coat at the scene, we had

18    an admission that it was his coat.  We didn't need to

19    debunk anything.

20             It was a solid case.  It wasn't based

21    on a confession.  We didn't have to get a confession;

22    it wasn't critical.  We got an admission that he

23    was -- you know, that he admitted it was his coat,

24    and he admitted he was, you know, in the vicinity at

1    the time.

2    BY MR. STAINTHORP:

3            Q        Well, in fact --

4            A        Well --

5            Q        Go ahead.  Sorry.

6            A        At the time that we're basing the

7    ca -- the attack on.

8            Q        In fact, if he had denied it was his

9    coat, that would have been highly inculpatory,

10   wouldn't it?

11           MR. TROBE:  Objection to the form, calls for

12   speculation.

13           THE WITNESS:  I don't know.

14   BY MR. STAINTHORP:

15           Q        Well, you had independent evidence

16   that that was his coat, didn't you?

17           A        Yes.

18           Q        All right.  So, in fact, if he had

19   denied that it was his coat, you recognize that that

20   would have been very inculpatory evidence --

21           MR. KARAVIDAS:  I'm --

22           MR. STAINTHORP:  -- correct?

23           MR. KARAVIDAS:  -- going to object.  It calls

24   for speculation, lack of foundation.

1          THE WITNESS:  Is it lunchtime?

2                          (WHEREUPON, there was laughter.)

3          MR. TROBE:  Not quite.

4                          (WHEREUPON, there was a brief

5                          recess had in the proceedings.)

6          MR. STAINTHORP:  Okay.  I want to start again,

7     guys.

8     BY MR. STAINTHORP:

9          Q       From your answers before we took the

10    break there, you were -- it's fair to say you were

11    very definite that you considered Mr. Starks' account

12    of being robbed to be a fabrication; is that fair to

13    say?

14         A       Yes.

15         Q       All right.  And you had that opinion

16    at the time Mr. Starks was making that statement to

17    you; is that fair to say?

18         A       Yes.

19         Q       So at the time that you took the

20    statement from Mr. Starks, you considered that the

21    presence of items of his clothing at the scene of the

22    attack was highly incriminating?

23         A       Yes.

24         Q       All right.  And you considered at that

1    time that it was highly likely that Mr. Starks had,

2    in fact, been the person who attacked Maria Gonzalez?

3         MR. TROBE:  Objection to the form.

4         THE WITNESS:  Yes.

5    BY MR. STAINTHORP:

6         Q     I had asked you earlier about whether

7    you had challenged Mr. Starks with respect to his

8    denial of any involvement, and I know you couldn't

9    really recall whether you did that or not.

10             But do you recall his -- anything

11   about his demeanor, even if you don't recall his

12   answers?

13        A     No, sir.

14        Q     Do you recall whether his demeanor

15   changed throughout the course of the statement?

16        A     I can't recall.

17        Q     Do you recall if he ever appeared to

18   you to become nervous during the course of the

19   statement?

20        A     I don't remember.

21        Q     Do you recall if Mr. Starks ever

22   became loud during the course of the statement?

23        A     Not -- don't -- don't remember.

24        Q     Do you recall Mr. Starks ever swearing

1       Mr. Starks.

2               Q       You took Polaroid photographs with you

3       to the hospital, correct?

4               A       Correct.

5               Q       Had you met Maria Gonzalez prior to

6       going to the hospital on that occasion?

7               A       Don't recall.

8               Q       And one of the photographs that you

9       took was of Mr. Starks, correct?

10              A       Yes, sir.

11              Q       Who were the other photographs of?

12              A       I don't recall.

13              Q       Did you make any record other than

14      recording numbers of the identity of that photograph?

15              A       No.

16              Q       The photograph of Mr. Starks that you

17      took with you to the hospital -- strike that.

18                      Did you just take one photograph of

19      Mr. Starks to the hospital?

20              A       I can't recall.  Oh, to -- to the

21      hospital?

22              Q       Yes.

23              A       Yeah, we just took one.

24              Q       Who retrieved it from the photo book?

1          A       I don't know.

2          Q       The statement that you recorded by

3  Mr. Starks, you have that time as 6:50, and the

4  report where you -- where Sergeant Juarez notes going

5  to the hospital as 9:35.  Do you know anything else

6  that you did with respect to this investigation

7  between the statement and going to the hospital?

8          A       No.

9          Q       Is it possible you did something and

10  don't recall, or you know you didn't do anything?

11         A       I don't remember anything.  It's

12  possible I could have, but I don't remember.

13         Q       The photograph of Mr. Starks that you

14  took to the hospital, when was that taken?

15         A       I don't know.

16         Q       Is there any way of determining now

17  when that photograph was taken?

18         A       If you had the picture, on the back of

19  it we usually typed a sticky label that had the date

20  and time that it was taken and who it was.  But I

21  don't have -- I don't know who has those pictures

22  anymore.

23         Q       If no one has those pictures, so if

24  they're not available, is there any way of

1    determining now what date that photograph of

2    Mr. Starks was taken?

3         A        Nope.

4         Q        Back in 1986, other than the actual

5    photograph, having the actual photograph itself that

6    was shown, was there any other method of determining

7    when the photograph that was shown was taken?

8         A        I don't know if it's in the record of

9    who was which photo.  There's a list we had, like,

10   who was photo 3, who was -- I don't know if there was

11   a date put on there or not, but it could have been.

12        Q        What is this list that you're talking

13   about?

14        A        Well, in -- in each book, there was an

15   iden -- we had -- the photos were numbered.  There

16   was a list of who was photo number 1, 2, 3, 4.  There

17   was a sheet that indicated who those people were on

18   that.  So, you know, who photo number 3 was of.

19   There was a list, and to my knowledge, the -- and

20   that was kept with the book.  So that would be the

21   only other way, I guess, if the -- if the date was

22   put on there.

23        Q        And you're not sure whether or not the

24   date was put on there?

```
1          A       I'm not sure.

2          Q       If, in fact, there were multiple

3    photographs of a particular person in the book, was

4    there any record made of the multiple dates on which

5    those photos were taken?

6          A       On the back of the photos.

7          Q       Other than something being noted on

8    the back of the photos, was there any other record of

9    multiple dates on which photographs were taken?

10         A       No, sir.

11         Q       So if, in fact, a person had multiple

12   photographs in -- in the book, other than actually

13   looking at the photograph that was presented to a

14   witness, there was no way of identifying when the

15   photograph was taken?

16         A       The question --

17         Q       I'll ask --

18         A       -- doesn't make sense.

19         Q       -- it again.  The Polaroid photographs

20   in the book, my understanding is, were identified by

21   number.  So, in this case, 321 was Mr. Starks, right?

22         A       I don't remember.  I'd have to look at

23   the books, but I'll take your word for it.

24         Q       All right.  If, in fact, there were
```

1     multiple Polaroids of Mr. Starks taken, they would

2     all have the number 321?

3          A     Yes.

4          Q     Other than actually having the

5     physical photograph itself and looking on the back,

6     there was no other way of identifying when the

7     photograph that was shown to a witness was taken?

8          MR. TROBE:  Objection.  He testified it might

9     have been kept on a list, I thought.

10         THE WITNESS:  Only on that -- only if they

11    were on the sheet where it was logged in when the

12    photo was taken.

13         MR. STAINTHORP:  That's not my question,

14    though.  That's not --

15         MR. TROBE:  Then I don't --

16         MR. STAINTHORP:  -- my question.

17         MR. TROBE:  Objection to the form, because I

18    don't understand.

19    BY MR. STAINTHORP:

20         Q     My question is:  For a person with

21    multiple Polaroid photographs, which we've already

22    established would all be identified by the same

23    number, there was no way, other than seeing the

24    actual photograph that was shown and looking at the

```
 1    back, to identify the date on which the photograph

 2    was taken?

 3          A      Yes.  That's correct.  Yeah.

 4          Q      All right.  And with respect to the

 5    photograph that was shown to a witness, there was --

 6    and with respect to a person who had multiple

 7    Polaroid photographs, there was no record kept, other

 8    than looking at the actual photograph that was shown,

 9    that would indicate which of the multiple photographs

10    was shown?

11          A      Yeah.  I -- I'm guessing that you're

12    saying if there were six photographs, if we showed

13    him the oldest one or the newest one, is what you're

14    saying?  If we took one from the back of the stack

15    that was an old picture, we wouldn't know which one

16    it was, correct?

17          Q      Yeah.  Okay.  Actually, my -- yes, you

18    do get --

19          A      I get your drift.

20          Q      -- what I'm asking you about.  So

21    the -- yeah.  Okay.  I think you've answered it.

22                 Were there multiple photographs of

23    Mr. Starks in the Polaroid book?

24          A      I don't recall.
```

```
1        Q        Can you describe the Polaroid

2   photograph of Mr. Starks that you showed Maria

3   Gonzalez?

4        A        No.

5        Q        All right.  So --

6        A        And I will -- Sergeant Juarez showed

7   him the -- presented the photo lineup.

8        Q        Okay.  So when you went to the

9   hospital with the photographs, how did that occur?

10       A        Sergeant Juarez and I drove to the

11  hospital.  He had the pictures, and he gave her

12  the -- the photos, laid them out on, I guess, it's

13  the hospital thing that's in front of the -- you

14  know, the tray that they have in the hospital rooms.

15                And she looked at the pictures and she

16  pointed to Starks and said something to him in

17  Spanish.  He talked to her in Spanish, so I don't

18  know what he said to her or what she said to him,

19  other than what's in her re -- his report.

20       Q        When Sergeant Juarez gave the

21  photographs to Maria Gonzalez, what was the method in

22  which he gave them?  For instance, did he lay them

23  out?  Did he give --

24       A        He laid them out.
```

Page 72

1    Q        -- them one by one?  Did he give them

2    in a pile?

3    A        As far as I -- best of my

4    recollection, he laid them out on that tray in front

5    of her, and she looked at them and made the

6    identification.

7    Q        Do you know if he was the person who

8    laid them out on the tray or she did it?

9    A        No.  He did it.

10   Q        What position was Mr. Starks'

11   photograph?

12   A        I don't recall.

13   Q        So you don't know what Ms. Gonzalez

14   said, correct?

15   A        Correct.

16   Q        What did she do?

17   A        All I can say is she pointed to the

18   picture of Bennie Starks.

19   Q        You recall that?

20   A        I do.

21   Q        And when she pointed to the picture,

22   did she say anything?

23   A        I don't recall.  And if I did hear, I

24   wouldn't understand.

Page 73

1      Q       When you went to the hospital with

2  Sergeant Juarez, did you inform him about your

3  interview with Mr. Starks?

4      A       I'm sure he was aware of what was

5  going on, yes.

6      Q       When you say that you're sure he was

7  aware of what's going on, that would include you

8  talking to Mr. Starks, correct?

9      A       I don't recall if I told him what

10 Mr. Starks said or any of that.  I do not recall

11 anything like that.

12     Q       Do you think it's likely that that's

13 something that you would do in the course of the

14 investigation?

15     A       I don't recall.  I don't recall doing

16 it.

17     Q       Certainly Mr. -- Sergeant -- sorry.  I

18 may have asked you this:  Who got the photos out of

19 the book?

20     A       I don't recall.

21     Q       Could it have been Sergeant Juarez?

22     A       It could have been anybody.

23     Q       But certainly either Sergeant Juarez

24 or someone was told to get a photograph of

1    investigation prior to that time?

2           A         I don't know the exact involvement of

3    him.  No.

4           Q         Other than what is reflected in

5    Exhibit 7, do you have any recollection of this

6    incident where you arrested Bennie Starks, took his

7    clothing, and photographed the scratches on him?

8           A         No, sir.

9           Q         After you had arrested Bennie Starks

10   and performed the other actions reflected on Exhibit

11   7, what is the next thing you did with regard to this

12   investigation?

13          A         Oh, I can't recall.  Probably turned

14   him over to have Detective Deprez book him and

15   photograph him and incarcerate him.

16          Q         Were you involved in that process

17   besides turning him over?

18          A         Naw.  I don't think so.

19          Q         After you had turned him over to be

20   booked, what was your next involvement in the

21   investigation?

22          A         That night?  I don't think there was

23   anything.  I think we went home.

24          Q         What was the next thing you did in the

1    investigation, not necessarily that night, but at any

2    time?

3            A        Probably the next thing that I would

4    have done was try to ascertain who we could use to

5    identify the bite marks on the victim.

6            Q        And?

7            A        And to do some comparison to see if we

8    could compare the bite marks that were on the victim

9    to Bennie Starks.

10           Q        There's a report that indicates that

11   the next morning after the arrest, Mr. Starks was

12   questioned by Officer Deprez.  Have you seen that

13   report?

14           A        Not recently.

15           Q        Let me show it to you.  I'm going to

16   mark this as Exhibit 8.

17                             (WHEREUPON, Biang Exhibit 8 was

18                              marked and tendered to Witness.)

19                    Let me know when you've had a chance

20   to review it.

21                             ((WHEREUPON, the Witness was

22                              reading Biang Exhibit 8.)

23           A        Okay.

24           Q        All right.  Have you had a chance to

1       photographed?

2               A       I'm sure it had, but I would have to

3       look at the evidence reports to see if that was the

4       case.

5               Q       When you talked to Dr. Schneider on

6       the phone, what did Dr. Schneider say to you?

7               A       I don't recall.

8               Q       Do you recall even the general subject

9       area of what Dr. Schneider said to you?

10              A       I explained what was -- what happened,

11      and I asked him if he would be willing to, you know,

12      work on this with us, and he said that he would.  And

13      that's the only thing I can recall, was that he

14      agreed to come out and look at it and see if there

15      was anything that they could do to -- to make an

16      identification, if it was possible.

17              Q       When you say that you explained what

18      happened, what -- what did you explain?

19              A       I just explained that we had a victim

20      who had been beaten and bitten by the apparent

21      offender, and we asked him if he could come out and

22      look at the -- you know, identify the bite marks and

23      match them with the person that we had in custody.

24              Q       And so --

1       A       Or tell us it wasn't his bite mark,

2  for that matter.

3       Q       When you were told that Dr. Schneider

4  was an appropriate person to contact, were you

5  informed anything about his expertise?

6       A       No.

7       Q       When you talked to Dr. Schneider on

8  the phone, did he represent to you anything about his

9  expertise?

10      A       Not to my recollection.

11      Q       With respect to Dr. Schneider, after

12  you had talked -- well, strike that.

13              How long was this phone conversation?

14      A       I don't know.

15      Q       You were the person in the police

16  department tasked with obtaining an appropriate

17  person to analyze the bite mark; is that fair to say?

18      A       I don't think I was the only person

19  tasked, but I think it was a mutual decision between

20  supervisors in the Detective Bureau.  I must have

21  volunteered to call him.

22      Q       After you made that phone contact with

23  Dr. Schneider, what was your next contact with Dr.

24  Schneider?

1    evidence technicians.

2           Q       Did you see the photographs of the

3    bite marks after they were produced?

4           A       Not to my knowledge.  I might have.  I

5    don't recall.

6           Q       So do you recall any contact you had

7    with either Dr. Schneider or Dr. Hagstrom after the

8    taking of the dental impressions?

9           A       No.

10          Q       Did you at any time talk to either Dr.

11   Schneider or Dr. Hagstrom concerning their opinions

12   with respect to who had made the bite mark?

13          A       I'm sure that I had, but I don't

14   recall the specifics of the conversations.

15          Q       So you believe you had these

16   conversations back in 1986?

17          A       Um-hum.  Yes, sir.

18          Q       What were the circumstances under

19   which you had these conversations?

20          A       I'm sure it was them telling me that

21   they felt that Bennie Starks made those -- beyond any

22   question, made the bite mark on Mrs. Gonzalez.

23          Q       So that's something they told you.

24   Was that at a -- some kind of formal meeting, or was

```
1     report?

2          A        Yes, sir.

3          Q        And you reported accurately at the

4     time you observed those events?

5          A        Yes.

6          Q        Were you preparing that report in the

7     course of your duties as a detective sergeant with

8     the Waukegan Police Department?

9          A        Yes, sir.

10         Q        And it was your understanding that

11    that report was kept in the ordinary course of

12    business of the Waukegan Police Department?

13         A        Yes.

14         Q        With respect to the injuries depicted

15    on this report, there are five enumerated paragraphs.

16    Do you see that?

17         A        Yes.

18         Q        And those five paragraphs detail

19    scratches on various portions of the body of

20    Bennie Starks?

21         A        Yes.

22         Q        Did you personally have an opportunity

23    to observe those scratches?

24         A        I did.
```

1    Q    Could you tell us where specifically

2    you saw those scratches?

3    A    As far as on his body or what room,

4    where we were at in the buildings?

5    Q    No, no.  On his body.

6    A    Well, the two scratches, number one,

7    the back right shoulder, two scratches, approximately

8    two and a half inches in length.  Three small

9    scratches around the circumference of his right

10   wrist, one scratch, about four and a half inches in

11   length and running diagonally from the crease of his

12   buttocks upwards to the upper right hip on the right

13   buttocks.

14          There was one vertical scratch that

15   was approximately an inch and a half in length on the

16   outer right hip, and then one vertical scratch, a

17   half inch in length, located outside the left thigh.

18   Q    What, if any, explanation did Bennie

19   Starks provide to you with respect as to how he

20   received those scratches?

21   A    To me, he didn't give me an

22   explanation.

23   Q    Did you see any reports at any time of

24   how he explained how he received those scratches?

1    Mr. Starks described to you had actually occurred?

2          A      Correct.  He didn't give us any

3    information to investigate basically.

4          Q      So the fact that there's no records

5    would be indicative of the fact that there was no

6    event.

7          A      Correct.

8          MR. STAINTHORP:  Objection to form.

9          THE WITNESS:  I would say that's correct.

10   Yes.

11   BY MR. KRAUSE:

12         Q      The initial charges that the police

13   department filed against Mr. Starks, who made those

14   decisions?

15         A      That would be myself, Sergeant

16   Stevenson, and probably the Detective Division

17   commander, whoever it was at the time.  I can't

18   recall.

19         Q      Those initial charges were filed prior

20   to the work that my clients, the dentists, were

21   engaged for?

22         A      Yes, sir.

23         Q      The reason, as I understand it, that

24   my clients, Drs. Schneider and Hagstrom, were

1       Q      -- during their testimony?

2       A      Correct.

3       Q      They had an opinion to a reasonable

4 degree of certainty that the bite marks on Maria

5 Gonzalez, or the bite mark on Maria Gonzalez, matched

6 the teeth, or dentition, of Bennie Starks.  I want

7 you to assume that, okay?

8       A      Yes, sir.

9       Q      You were asked some questions by

10 Mr. Stainthorp with respect to conversations you had

11 with my clients during the investigation of

12 Mr. Starks.  Do you recall those questions?

13      A      Yes.

14      Q      On some questions you said, you know,

15 "I probably did this," or "I probably said that," and

16 I just want to understand those, your answers.

17            Do you have any specific recollection

18 as to any conversation you had with Dr. Schneider or

19 Hagstrom during the investigation or criminal

20 prosecution of Mr. Starks?

21      A      As I indicated before, I had lots of

22 conversations with them.  But to tell you it was

23 specifically at this time, this many years later,

24 what those conversations were, I probably couldn't.

```
 1        Q       So when you said, "probably," you were
 2   sort of in conjecture saying, these are things that I
 3   could or might have said, or maybe I could or might
 4   have said?
 5                I just want to be clear:  You're not
 6   quoting any words that you said or Dr. Hagstrom or
 7   Schneider said to you of them?
 8        A       No.  I'm --
 9        MR. STAINTHORP:  Objection to form.
10        THE WITNESS:  I'm speaking in generalities.
11   As far as I know, we had conversations, but I
12   couldn't tell you what -- I didn't record those, I
13   didn't write reports on those.  So for me to say
14   specifically that I remember specifics is not
15   correct.
16   BY MR. KRAUSE:
17        Q       Did you do anything to violate
18   Mr. Starks' constitutional rights?
19        A       No, sir.
20        Q       Are you aware of anyone that did
21   anything that violated Mr. Starks' constitutional
22   rights?
23        A       Absolutely not.
24        Q       The role that my clients, Drs.
```

1    about the incident.

2         Q       And I think his testimony in this case

3    was that an alderman, a congressman or somebody, a

4    local official, actually brought him in.  Do you have

5    any recollection about that?

6         A       Could be.  My guess would be Bobby

7    Evans.

8         MR. TROBE:  Yeah, I think it was a

9    congressman.

10        THE WITNESS:  Alderman Evans possibly.

11   BY MR. KRAUSE:

12        Q       I don't recall the name.

13        A       But I -- you know, that's very

14   possible.  I -- I don't recall.  It wasn't unusual

15   for that to happen in certain cases.

16        Q       Did Maria Gonzalez identify that she

17   had scratched her attacker?

18        A       She said she fought with him.  She

19   said she struggled with him, and that's when he

20   started to beat her.  And then she said that she

21   grabbed onto his penis and yanked it really hard when

22   she (sic) tried to put it in his -- in her mouth.

23   But she did say she fought with him, and we assumed

24   scratching would be part of that struggle.

1    from the victim.

2          Q       And certainly those police reports you

3    knew were then going to be presented to the

4    prosecution, correct?

5          A       Right.

6          Q       And that would be their source of

7    information as to the statement that Mr. Starks had

8    given to Detective Deprez, or certainly their initial

9    source of information, correct?

10         A       That was information that they were

11   given.  They were given the entire case file.  Every

12   report that you've seen here they were given.

13         Q       Now, you were shown Exhibit 17, which

14   is these photographs that are allegedly true and

15   accurate copies of photographs taken at the time.

16         A       Yes, sir.

17         Q       I just want to make clear, and I think

18   it is clear:  The photographs that appear on the

19   first page of Exhibit 17, those were not photographs

20   that were used in any identification procedures in

21   this case, correct?

22         A       No, sir.  These were taken after the

23   identification was accomplished.

24         Q       And those show the appearance of

1   Mr. Starks at the time that he was arrested?

2          A        At the time that he was -- after

3   the -- in the interview room before he was -- his

4   clothes were taken and the other photos were taken.

5   These were taken prior to the photos taken of the

6   scratches.

7          Q        And these are not the official booking

8   photographs, correct?

9          A        No.

10         MR. TROBE:   Correct?

11         THE WITNESS:   Correct.  Right.  Correct.

12  BY MR. STAINTHORP:

13         Q        The exhibit that was marked by Mr.

14  Karavidas, which is Exhibit 14, that is Sergeant

15  Juarez's report.

16                       (WHEREUPON, Biang Exhibit 14 was

17                        tendered to Witness.)

18         A        Okay.

19         Q        You indicated this is a police report

20  that you relied upon in the course of the

21  investigation, correct?

22         A        Yes.

23         Q        If you start with the second paragraph

24  that starts, "Gonzalez stated," do you see that?

1    that Maria Gonzalez had alleged to Sergeant Juarez

2    that she was, in fact, raped, correct?

3          A       Yes.

4          Q       And did you at any point have any

5    reason to doubt her statement to Sergeant Juarez that

6    she had, in fact, been raped?

7          MR. KARAVIDAS:  Objection.  This has been

8    asked and answered a number of times.

9          MR. TROBE:  Go ahead and answer.

10         THE WITNESS:  We had several different

11   statements from the witness, from the victim.  We

12   based our investigation on the different -- on the

13   statements.  We had a statement initially, we had

14   another statement.  It happens all the time in

15   criminal cases.  Witnesses change their statement or

16   victims change their statement as their memory gets

17   better, or as things happen, things come back to

18   them.

19              This lady was beaten within an inch of

20   her life, you know.  Anything could have happened.

21   Maybe she's wrong here, maybe she's wrong there.  It

22   doesn't really matter.  The fact of the matter is

23   there was a sexual assault, because in both cases, it

24   says he tried to put his penis in her mouth.

1      that.

2              MR. KRAUSE:  Objection, form.

3              MR. TROBE:  Objection to the form.

4              THE WITNESS:  I don't know -- I don't know why

5      you keep asking the same question, but the answer is

6      the same.  If we had the information and there was a

7      report written, it would go to the state's attorney's

8      office.

9                      If there wasn't a report written, then

10     the officer should have written one and it would have

11     been presented.

12     BY MR. STAINTHORP:

13         Q      Okay.  That was my question.  If an

14     officer had learned that Maria Gonzalez had told her

15     or him that her attacker had not put his penis in her

16     vagina, would you -- strike that.

17                     If Maria Gonzalez had told a police

18     officer that she had consensual sex around the time

19     of the rape, would that have been information that

20     you would have expected the officer to record?

21         A      Yes.

22         Q      And, again, if that information had

23     been recorded, it then would have been transmitted to

24     the prosecutor's office, correct?

 1          A        Yes.

 2          MR. STAINTHORP:  I just need to take a

 3     two-minute break.  I may be done.

 4                         (WHEREUPON, there was a brief

 5                          recess had in the proceedings.)

 6                    Okay.  I'm done.

 7                    FURTHER EXAMINATION

 8     BY MR. KARAVIDAS:

 9          Q        Sir, I want to clear something up.

10     The exhibit that is the rap sheet, what number is

11     that?

12                         ((WHEREUPON, Biang Exhibit 23 was

13                          tendered to Witness.)

14          A        It's 23.

15          Q        So when you look at that, when you

16     look at the charge of battery and criminal damage to

17     property on August 12th, 1982, it's got an offense

18     number of 82-25585?

19          A        Yes.

20          Q        And that corresponds to the reports of

21     the Waukegan Police Department regarding

22     Bennie Starks breaking through a plate glass window

23     and sexually assaulting a woman?

24          A        Yes.

# Exhibit 6

**WAUKEGAN POLICE DEPARTMENT**

**SUPPLEMENTARY REPORT**

| Type of Offense:<br>Agg. Criminal Sexual<br>Assault | Date and Time of Original Offense:<br>18 Jan 86 | Attach to Report No:<br>86-1898 |
|---|---|---|
| | Date and Time of this Report: | |

| Juvenile Name | Age | Sex | Race | Dob<br>Day   Mo.   Yr. | Location<br>of Arrest: | By: |
|---|---|---|---|---|---|---|

| Address | Mothers Name | Work Phone | Fathers Name | Work Phone |
|---|---|---|---|---|

| Legal Guardian: | School & Grade | Home Phone Number: |
|---|---|---|

21 Jan 86/Sgt. Biang/6:50PM                page 1 of 3
Interview: Bennie Starks Jr., age 26
           300 Lake St. Apt 806, TX:623-6225
           or 414 McKinley/441 Dugdale

At the above date and time reporting officer spoke with BENNIE
STARKS JR., age 26, in an interview room at the Waukegan Police Dept.,
in reference to a Sexual Assault, which occurred on 18 Jan 86. STARKS
came to the Waukegan Police Dept. voluntarily, and met with officers
in the Detective Bureau. Starks was advised of his rights per Miranda
by Det. Deprez. Det. Deprez showed reporting officer the rights waiver
form, which was signed by Det. Deprez, and BENNIE STARKS. At this time
STARKS gave reporting officer the following statement.
    STARKS stated that he had been drinking in the Genesee Inn, most of
Saturday evening, and prior to that he had been drinking in a bar on the
westside of Waukegan. He said that he stayed in the bar until approx-
imately 10:30PM, when he decided to walk home. While he was walking
west on Water St., near County St., he was approached from behind by a
male hispanic and a male black subject. STARKS only description was
that the black subject was tall and the hispanic was short. He stated
that they came up from behind him and told him this was a stick up give
us all your money. STARKS stated that the offenders took $80.00 U.S.C.,
his wristwatch, black trenchcoat, and a pair of black driving gloves with
holes on the back of the glove on each glove. Reporting officer asked
STARKS if anything else was taken and he stated that there was nothing
else taken. Reporting officer was then advised by STARKS that he did not
call the police because he did not feel that they (police) could do any-
thing about it. Reporting officer asked STARKS what he did next and he
stated that he went to his mothers home at 300 Lake St. He stated that

| Reporting<br>Officers: | Supervising or<br>Review Officer: |
|---|---|
| 4-WPD-P | |

L372

**WAUKEGAN POLICE DEPARTMENT**                                    SUPPLEMENTARY REPORT

| Type of Offense: | Date and Time of Original Offense: | | | Attach to Report No: |
|---|---|---|---|---|
| Agg. Criminal Sexual Assault | 18 Jan 86 | | | 86-1898 |
| | Date and Time of this Report: | | | |

| Juvenile Name | Age | Sex | Race | Dob Day   Mo   Yr. | Location of Arrest: | By |
|---|---|---|---|---|---|---|

| Address: | | Mothers Name | Work Phone | Fathers Name | Work Phone |
|---|---|---|---|---|---|

| Legal Guardian: | | School & Grade | | Home Phone Number: | |
|---|---|---|---|---|---|

21 Jan 86/Sgt. Biang/6:50PM                              page 2 of 3
Interview: Bennie Starks Jr.  (cont'd)

he did not tell his mother about the robbery because she was sick and he did not want to upset her.

Reporting officer asked STARKS what time he arrived home and he stated about 11:00PM. Reporting officer asked STARKS what route he took to get home and he stated that he walked south on Genesee, then west on Water St., and then south on County St. to Lake St. Reporting officer asked STARKS if he walked home after the robbery and he stated that he ran to his mothers building, after he was robbed.

Reporting officer asked STARKS if he had purchased anything at Regents Clothing Store on that day. STARKS stated that he had purchased a beige sweater earlier that day. Reporting officer asked STARKS if he had the package with him while he was drinking in the Genesee Inn, and he stated that he had. Reporting officer asked STARKS if the package or bag was red in color and he stated that it was. Reporting officer asked STARKS if he had the package with him when he was walking to his mothers apartment from the bar and he stated that he did. Reporting officer asked STARKS if he had the package with him when he was robbed, and he stated that he had taken the package to his mothers house earlier in the day, (changing his original story that he had the bag when he was walking home).

At this point reporting officer asked STARKS what he was wearing on this evening, and he stated that he was wearing a black trench coat, and the same clothes that he was wearing at the time of the interview, a white sweater, a white and yellow t-shirt, blue jeans, and work boots. At this time reporting officer presented a black, Campus brand size 40, trench coat, that was recovered at the scene of this incident, and asked STARKS if this was his trench coat, and he stated that it was. Reporting officer

| Reporting Officers: | | Supervising or Review Officer: |
|---|---|---|
| 4-WPD-P | | |

LB73

WAUKEGAN POLICE DEPARTMENT                                    SUPPLEMENTARY REPORT

| Type of Offense: Agg. Criminal Sexual Assault | | | | Date and Time of Original Offense: 18 Jan 86 | | | Attach to Report No: 86-1898 |
| Date and Time of this Report: | | | | | | | |

| Juvenile Name | Age | Sex | Race | Dob Day    Mo    Yr. | Location of Arrest: | By |
| Address: | | | | Mothers Name          Work Phone | Fathers Name | Work Phone |
| Legal Guardian: | | | | School & Grade: | Home Phone Number: | |

21 Jan 86/Sgt. Biang/6:50PM                    page 3 of 3
Interview: Bennie Starks Jr. (cont'd)

then presented a poloroid photo of a pair of black gloves, and a scarf
which were also recovered at the scene of this incident, and asked STARKS
if these were his gloves. STARKS stated that they were not. STARKS also
stated that the scarf was not his either. He stated that he had never
seen either item before.

At this time reporting officer terminated the interview....

| Reporting Officers: | Supervising or Review Officer |
| 4-WPD-P | |

LB74

# Exhibit 7

IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL DISTRICT, LAKE COUNTY, ILLINOIS
CRIMINAL DIVISION – MISCELLANEOUS REMEDIES

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   2014 MR 2094 |
| | ) | 86 CF 106 |
| BENNIE STARKS, | ) | |
| | ) | |
| Defendant. | ) | |

---

**BRIEF OF NON-PARTIES, Dr. Carl Hagstrom, D.D.S., Dr. Russell Schneider, D.D.S., Sharon Thomas-Boyd, City of Waukegan, Waukegan Police Department Officials Michael Urbancic, William Biang, Phil Stevenson, David Deprez, and the Special Representative for deceased former Miguel Juarez, TO VACATE, PURSUANT TO 735 ILCS 5/2-1401, THE ORDER GRANTING CERTIFICATE OF INNOCENCE TO DEFENDANT, BENNIE STARKS**

---

Petitioners, non-parties City of Waukegan, Waukegan Police Department Officials Michael Urbancic, William Biang, Phil Stevenson, David Deprez, the Special Representative for deceased former Miguel Juarez, Dr. Carl Hagstrom, D.D.S., Dr. Russell Schneider, D.D.S., and Sharon Thomas-Boyd, hereby move this Honorable Court, pursuant to 735 ILCS 5-2/1401, to Vacate its September 25, 2013 Order Granting a Certificate of Innocence to the defendant, Bennie Starks.  In support of this Petition, the Petitioners state as follows:

## INTRODUCTION

In 1986, after a jury trial, Bennie Starks was convicted of two counts of aggravated criminal sexual assault, one count of attempted aggravated criminal sexual assault, one count of aggravated battery, and one count of unlawful restraint, for the attack of MG, a 68-year-old woman.  He was sentenced to 60 years' imprisonment for the two aggravated criminal sexual

1

testified), or during a "fall" (as he told police). (WPD Rpt. 52; *see also* Photographs of taken of Bennie Starks, attaches as Ex. 9 to Ex. C, Dep. of Bennie Starks).

Apart from the scratch marks, the most damning evidence against Starks' "robbery" story is the red bag. In this respect, Starks admitted to police that he purchased a beige sweater from Regents Clothiers earlier that day, that he carried the sweater in a red bag and that he had the red bag with him at Genesee Inn while he was drinking. (Tr. 684; WPD Rpt. 72–73). When asked if he had the red bag with him when he was walking to home from Genesee Inn, Starks stated that he did. (WPD Rpt. 73). Then when asked if he had the package with him when he was robbed, Starks changed his story, stating, "No, I dropped the package off earlier at my mother's house, prior to that." (Tr. 684–85; WPD Rpt. 73). Thus, Starks never contended that the men who robbed him took the red bag. However, during her initial conversation with police officers at approximately 2:00 a.m., about three hours after the attack, **MG independently offered the detail to police that the man who attacked her was "carrying a red bag."** (WPD Rpt. at 4). She also testified at trial that the attacker **carried the red bag** with him to 300 Lake Street after the attack. (Tr. 442–43). This is particular detail about the attacker is far too particular to be a coincidence, and not the type of detail that MG would have made up, or would have known, at that time, to make up in order to frame Starks.

Although MG may have had the motivation to make up the rape (to make the attacker "pay for what he did," as she later put it to Blanca Gonzalez (Tr. 704–05)), MG would have no motivation whatsoever to make up a detail about the attacker's description at the point in time she gave the statement. Her only possible motivation for providing the detail about the red bag would be to help police accurately identify the attacker. She would have no way of knowing that a red bag connected Starks to the attack, other than seeing a red bag herself. Thus, her

36

description of the attacker carrying a red bag must be considered highly credible. **Assuming MG's attacker was carrying a red bag, as she credibly reported to police, and given Starks' statement that the red bag was never taken from his possession during the "robbery," the only reasonable conclusion is that Starks attacked MG while on his way home from Genesee Inn, still carrying the red bag, and therefore the "robbery" never took place.**

In addition, Starks' explanation that he dropped the bag off at his mother's house after leaving Genesee Inn, but prior to being robbed, makes absolutely no sense geographically. In that regard, the Genesee Inn is located at 36 N. Genesee Street, at the intersection of Madison Street. Lake Street, where he lived with his mother, intersects with Genesee Street three blocks south of Genesee Inn. 300 Lake Street is one block west of Genesee Street. Water Street, where Starks alleged he was robbed, is located in between Genesee Inn and Lake Street, one block north of Lake and two blocks south of Madison.

Starks told police that he was robbed while coming home to 300 Lake Street (where he was staying at the time) from the Genesee Inn, shortly after 10:30 p.m. when he left. Patrick McCain testified that he recalled seeing the man identified as the defendant, Bennie Starks, in the bar that night, and also recalled that he was carrying a red bag. (Tr. 489–90). Thus, for Starks' story about the robbery and dropping off the red bag to be true, Starks would have to have left Genesee Inn and walked three blocks south and one block west to 300 Lake Street, where he dropped off the red bag at home, then walked back north to either Water Street or Utica Street between Washington and Water (depending on which version of the robbery Starks tells), and then went straight back home to 300 Lake Street after the alleged robbery. This back-and-forth path of travel is nonsensical, and exposes Starks' alibi as a complete fabrication, especially in light of the fact that MG testified she saw her attacker carrying a red bag.

37

Starks would later change his story at his deposition, testifying the red bag was among the items stolen from him during the robbery. (Ex. C at 112). It is obvious that Starks has changed this key detail in a transparent, last-ditch effort to explain how MG could have observed her attacker carrying a red bag. When he was initially questioned by police, Starks did not know that MG had reported her attacker carrying a red bag, and therefore did not need to tell police that it was stolen to explain how it came to be in the ditch. Instead, he told police he had taken it home to his mother's house. (Tr. 683–84; WPD Rpt. 73). Starks subsequently learned that MG recalled seeing the red bag (which would identify him as the attacker under his current alibi, where the red bag remained in his possession the entire night), and therefore changed his story to say it had been stolen. Given the earlier, contradictory accounts of what happened to the red bag he gave to police, the self-serving change his 2014 testimony represents, and the complete lack of corroboration, the court should afford no weight to Starks' explanation that the red bag was stolen, or for that matter, that any robbery occurred at all.

Finally, Starks' alibi is called into question by the fact that only *one* person attacked MG. Starks said he was robbed by *two* people after leaving Genesee Inn, which would have been around 11:45 p.m., about the same time as the attack on MG. It stands to reason that, if two men robbed Starks and took his belongings, then shortly thereafter one of the men attacked MG, that MG would have seen the other man at some point. However, throughout her reports and testimony, MG only reported seeing one person during the attack, wearing the black trench coat, whom she identified as Starks. It further makes no sense that, after taking the trouble to forcibly rob Bennie Starks of his coat and watch, that his alleged "robber" would attack MG and then leave the items in the ravine.

38

# Exhibit 8

# Roger A. Clark

## Police Procedures Consultant, Inc.

10207 Molino Road, Santee, CA 92071
Phone: (208) 351-2458, Fax: (619) 258-0045
rclark9314@aol.com
December 3, 2014

Mr. John L. Stainthorp, Attorney at Law
Ms. Joey Mogul, Attorney at Law
Mr. G. Flint Taylor, Attorney at Law
People's Law Office
1180 N. Milwaukee Avenue, 3rd Floor
Chicago, Illinois 60642

**Regarding:** *Bennie Starks, v. City of Waukegan, et al. USDC Case No. 09 CV 348.*

Dear Counsel:

Thank you for retaining me to evaluate and provide an opinion regarding the investigation into the attack on Maria Gonzalez that occurred on January 18-19, 1986, and the subsequent arrest and charging of Bennie Starks, and in particular the procedures used by the Waukegan Police Department and its officers in the course of that investigation, focusing on the identification procedures employed and the recording of those procedures and the preservation of evidence of them. Pursuant to the requirements of Federal Rule 26, I have studied the material (listed below) submitted to me thus far. I am informed that additional depositions and/or other material may be submitted in the future. Please be advised that if/when any additional information is submitted, it is possible that a supplemental report refining my opinions may be necessary.

It is also necessary to state at the beginning of this report that I do not make credibility determinations in expressing my opinions. That is, where there are differences in the events proffered by Bennie Starks and others versus the testimony proffered by Waukegan Police Department Officers and/or others, I do not opine for the trier of fact regarding who are the more believable witnesses. The resolution of any such conflicts is obviously within the purview of a jury to decide

Page 1 of 21

**Materials Reviewed to Date:**

1     Fourth Amended Complaint, Starks v. Waukegan et al. 09 CV 348.

2     Police Reports regarding the attack on Maria Gonzalez and the arrest and charging of Bennie Starks.

3     Waukegan 30(b)(6) deposition (Biang).

4     Biang deposition.

5.     Starks deposition.

6.     Crime scene photographs.

7.     Photographs of Bennie Starks taken in January 1986.

8.     Reports from the Northern Illinois Police Crime Laboratory.

9.     Criminal Trial Transcript, People v. Starks, 86 CF.

10.     2-86-1021, Appellate Court Order of June 2, 1988 affirming conviction.

11.     People v Starks, 365 Ill. App. 3d 592 (2d Dist. 2006).

12.     People v Starks, 2012 IL App (2d) 110273.

13.     People v Starks, 2012 IL App (2d) 110324.

14.     Order dismissing charges.

15.     Petition for Certificate of Innocence.

16.     Certificate of Innocence.

17.     Criminal trial exhibits.

18.     List of criminal trial exhibits.

19. Dr. Ed Blake Reports.

20. Letter from Commander Stevenson re: photo books.

21. Discovery produced by States Attorney in the criminal case.

22. Stipulations regarding the DNA evidence entered into by the Plaintiff, Thomas-Boyd, the Crime Lab and the Waukegan Defendants.

23. ALI Model Code of Pre-Arraignment Procedure (1975).

24. Responses to discovery from Waukegan, Biang, Deprez, Stevenson, Urbancic.

**Brief Overview of the Facts:**

*The Crime:*

At 1:04 a.m. on January 19, 1986 (a Sunday), the Waukegan Fire Department received a call for paramedics to respond to 300 Lake Street, Waukegan, to assist a battery victim, Maria Gonzalez, of 200 S. Utica Street. When they arrived at the scene at 1:07 a.m. they found a badly beaten woman, who they estimated to be in her mid 60s. They transported her to Victory Memorial Hospital in Waukegan. Waukegan Police Department (WPD) officers responded to the scene, including an evidence technician, Tench, who took Polaroid photographs of Ms. Gonzalez, and an officer, Genell, who observed that Ms. Gonzalez was dressed in a night gown and robe that was covered with dried mud, that her face was badly swollen and that she had multiple abrasions and contusions on her arms and legs. Officer Genell attempted to question Ms. Gonzalez, but at that point, because of the trauma, she was only able to report that she lived nearby at 200 S. Utica. This address is about 200 feet from where Ms. Gonzalez was discovered.

Officer Genell then went to Victory Hospital at 0200 hours to further his investigation. There, he enlisted the assistance of a Spanish-speaking WPD officer, Martinez, to assist in interviewing Ms. Gonzalez. Evidence technician Tench was also present at the hospital at some point prior to 03:15. Ms. Gonzalez reported, according to Officer Genell's police report timed at 0200, that she was visiting a friend at 300 Lake Street and was on her way home when a male black, who was acting very crazy as though he was on drugs, attacked her and pulled her into the ravine that is just north of 200 S. Utica. (A

review of a map reveals that 200 S. Utica is on the west side of Utica). She described the attacker as a male black, approximately 18 years of age, very tall and skinny with long straight hair, wearing white pants, a long black sweater and carrying a red bag. She stated that the attack occurred at approximately 2300 hours on January 18, 1986. Ms. Gonzalez stated that the attacker said to her "give me some pussy," pulled out his penis and then attempted to sexually assault her but she grabbed his penis and pulled it very hard, and this made him stop attempting to have sex with her. She stated that she was not raped. She stated that the attacker hit her in the eye area with a metal pipe, that she observed he was wearing a metal watch, and that he punched her repeatedly in her face and shoulder. Officer Tench took photographs of Ms. Gonzalez's injuries, including photographs, with and without a scale, of a bite mark on Ms. Gonzalez shoulder, and also made a tracing of the mark. Ms. Gonzalez reported that she was wearing night clothes and slippers, and that the offender took the slippers. Officer Genell then went to the ravine and located the slippers at the edge of the ravine, about 60 feet north of Lake. At 0300 Ms. Gonzalez told Officer Genell, according to his report, that she saw the attacker leave the ravine and enter 300 Lake Street, where several residents of the building were able to observe him.

At 05:35 that morning, according to Genell's report, Ms. Gonzalez told Officer Martinez that she was in fact raped, that the attacker put his penis in her vagina and bit her breasts and nipples, and that she was confused when she earlier stated that she was not raped. Evidence technician Tench then arranged for a rape kit to be completed. Tench also took additional photographs of Ms. Gonzalez's injuries.

In a report timed at 0700, Officer Genell reported that he returned to the ravine with evidence technician Tench and they recovered a black knee length trench coat with blood on the sleeve and Newport cigarettes in the pocket, a scarf with blood and hair, gloves, and a watch and broken watch band. They also found a 36 inch length of conduit pipe. All of this evidence was photographed by Tench.

At 9:35 a.m. Sergeant Juarez, a WPD investigator who spoke Spanish, interviewed Ms. Gonzalez at the hospital. According to his report, Ms. Gonzalez told him that the previous night, what time she could not exactly say, she had left her apartment because it was very warm and had gone out for a walk. She stated that she had been walking north on the east side of Utica when she saw a male black walking southbound towards her and then start running. The man grabbed her around her neck and pulled her into the ravine just north of Lake Street. She struggled with him, and the offender said he wanted some pussy, which Gonzalez understood meant he wanted sex. Once they were in the ravine the attacker began choking and punching her, knocked her to the ground, pulled off her underwear and got on top of her. He took out his penis and, after a struggle, put it in her vagina, then pulled out his penis and told her to suck it. Ms. Gonzalez attempted to put

the penis in her mouth but then grabbed it and yanked it and the offender yelled out in pain. The attacker did then again put his penis in her vagina. She believed that the attacker had ejaculated in her vagina because her vagina felt moist. Ms. Gonzalez reported that she became faint and passed out, then crawled out of the ravine and sat by Utica Street, then went towards 300 Lake street, but before she got there saw the attacker enter that building. She described it taking several minutes to go from Utica and Lake (where she was when she saw the attacker run into the building), to 300 Lake. Ms. Gonzalez described the offender as 18-19 years of age, tall, thin, with medium length hair, no facial hair, medium complexion, wearing a dark blue shirt, white pants, a knee-length black coat and carrying a red plastic bag. In contrast to her earlier report of being hit by a metal pipe, Ms. Gonzalez told Sergeant Juarez that the offender had not used any weapons, and had just used his fists, and had bitten her. She also reported that she smelled liquor on the attacker's breath.

*The Investigation:*

Throughout the day on January 19, 1986, investigators from the Waukegan Police Department interviewed several persons to determine whether they had seen the person described by Ms. Gonzalez as her attacker. Several of these persons had been present in bars in Waukegan on the night of January 18. During some of these interviews the investigators showed persons Polaroid photographs taken from the "mug books" maintained by the Waukegan Police Department. The method of preserving and recording photos shown in these mug books will be addressed later in this report.

Investigators also examined the trench coat that had been found at the scene of the attack, and discovered a cleaning tag inside the sleeve that had the name of Sinclairs cleaners. On January 21, investigators contacted the cleaning store and the owner of the store determined that the cleaning tag was from a customer named Starks. Investigators then obtained a photograph of Bennie Starks from the Bureau of Investigation files (hereinafter "B of I photos) - booking photographs that were taken when someone was arrested - and the owner identified Starks as the person who had brought the coat in for cleaning. Investigators then took the same photograph to Regents Clothiers and an employee identified Starks as someone who had purchased an off-white sweater on Saturday, December 18, and stated that he had been given a red bag in which to carry the purchase.

Investigators also continued their investigation at bars, and obtained a positive identification of Bennie Starks, from the same B of I photo that was shown at Sinclairs and Regents, as having been at the Genesee Inn in downtown Waukegan on the night of January 18, and having left at around 10:45 p.m.

Officers then got word to Bennie Starks that they would like to talk to him, and at around 6:50 p.m. Mr. Starks voluntarily came to the Waukegan Police Station, signed a Miranda waiver, and was interviewed by Investigator Sergeant Biang. Prior to the interview Biang did not tell Starks the information that they had gathered to date with reference to his clothing being found at the scene, him being identified as purchasing a sweater that was carried in a red bag, the attacker carrying a red bag, or Starks being identified as being present in the Genesee Inn until approximately 10:45 p.m. on January 18. Starks was not under arrest at this time.

During the interview with Biang, Starks acknowledged that he had in fact been in the Genesee Inn for much of Saturday evening, finally leaving at a time he estimated at 10:30 p.m. to walk home. He explained that while on his way home he had been attacked and robbed by two males, one black and one hispanic, who had taken $80, his watch, trenchcoat and gloves. Starks explained to Biang that he did not report the robbery to police because he thought they could do nothing about it. Starks stated that after the attack he went to his mother's house at 300 Lake Street, but did not tell her about the robbery because she was sick and he did not want to upset her. He estimated he got home around 11 p.m. When Biang asked Starks whether he had purchased anything that day he stated that he had purchased a sweater from Regents Clothing store, that he had been carrying it in a red bag, and that he had the package with him when he was robbed. Biang stated in his report that Starks then changed this account and said that he had taken the red bag to his mother's house earlier that evening, before the robbery. Starks has testified that he had the red bag with him at the time he was robbed and the robbers took both the bag and the sweater, and that he never told anyone, including the investigating officers, that he did not have the red bag with him when he was robbed.

Biang then asked Starks what he was wearing on Saturday evening, and Starks volunteered that he was wearing a black trench coat, and when shown the coat that had been found at the scene acknowledged that it was his coat. Biang also showed Starks a Polaroid photograph of the scarf and gloves found at the scene, and alleged in his police report that Starks said they were not his. Starks has testified that they were his, stolen in the robbery, and that he always acknowledged this. Starks told Biang that on the Saturday evening he was wearing the same clothes as he was wearing during the interview - a white sweater, a white and yellow T-shirt, blue jeans and work boots.

At 9:35 p.m. Sergeants Biang and Juarez (who died prior to the initiation of this civil litigation) went to Victory Hospital and showed Ms. Gonzalez a photo line up consisting of five photographs taken from the WPD "mug books." The photographs are identified by number only, in a manner and pursuant to a system that will subsequently be described.

Sergeant Juarez's report states that Ms. Gonzalez immediately pointed out a photograph of Bennie Starks as the offender. The conversation with Ms. Gonzalez was conducted in Spanish.

The officers returned to the police station, where, at 11:45 p.m., Sergeant Biang placed Mr. Starks under arrest, took custody of the clothing he was wearing so it could be sent to the crime lab, and had photographs taken, both 35 mm and Polaroid, of scratches on Starks' body. Starks was then booked, with the booking form describing him as 26 years old, 5-9 in height. Photographs of Mr. Starks were taken which show him with short curly hair, a light beard and an established mustache. Biang swore out a Complaint charging Starks with Aggravated Criminal Sexual Assault and Aggravated Battery, alleging, inter alia, that on January 19 Starks had "committed an act of sexual penetration with Maria Gonzalez in that by use of force the defendant placed his penis in the vagina of Maria Gonzalez," and that he caused her great bodily harm both through the sexual assault and by punching and choking her.

The next day, January 22, 1986, at 8:35 a.m. Starks was again interviewed, this time by Detective Deprez. Deprez prepared a police report in which he claimed that when asked where he got the scratches on his body Starks said he did not know, and that he did not get them in the robbery. Starks has denied this and has testified that he told Deprez that he got the scratches when he was robbed and that Deprez's report is false. Deprez also reported that Starks called Ms. Gonzalez a "bitch," and that Starks denied that the scarf recovered at the scene was his. Starks has testified that both of these statements are false.

The rape kit, the clothing found at the scene of the crime, and the clothing worn by Starks when he came into the police station were examined by forensic scientists at the Northern Illinois Police Crime Laboratory. Spermatozoa was identified on both the vaginal swab taken from Ms. Gonzalez and her underpants. Blood and saliva samples were collected from Mr. Starks and tested, and the serologist reported that Starks could not be excluded as a source of the semen. The accuracy and reliability of that report is not an issue that I am qualified to address.

While Ms. Gonzalez was being treated at Victory Hospital, photographs of the bite mark on her shoulder were taken by a Waukegan Police Department evidence technician. Subsequently, two forensic odontologists opined that the bite mark was made by Bennie Starks. The accuracy and reliability of that report is not an issue that I am qualified to address.

On March 31, 1986, pursuant to a request from the crime lab, Sergeant Juarez asked Ms. Gonzalez if she had engaged in sexual intercourse within two weeks of the attack with anyone other than the rapist. Ms. Gonzalez said she had not.

The next day, April 1, 1986, Sergeant Juarez was transporting Ms. Gonzales in his squad car when she informed him she wanted to clarify some issues that she had left out of her prior statements because of her medical condition. Ms. Gonzalez now stated that at the time of the attack she had gone out for a breath of air and was on the lawn of 200 S. Utica, not on the street, when she heard a noise from bushes and then saw a male black run at her. The man grabbed her and dragged her to the ravine, told her that he wanted "pussy," removed her panties and threw them to the side, was beating her, then, when she resisted, pulled out a knife from his pants pocket and attempted to stab her. She hit his hand so hard that she knocked the knife out of his hand. The man continued to punch her and placed his penis in her vagina and she believed that he ejaculated because she felt wet in her vaginal area. After a while, the man got off her and wanted her to place his penis in her mouth. She grabbed the penis and yanked it and he yelled out in pain. She then managed to crawl out of the ravine and sat down, just east of her building. After sitting there for several minutes she saw the man come out of the ravine holding the red plastic bag, walk over to 300 Lake and enter the building. She stated that she then went to the 300 Lake building but the person at the door would not let her in. After a while a rescue squad arrived. Juarez noted that he then asked her whether she remembered the photo line-up and she very emphatically stated that she had identified the person who attacked her.

Subsequently, on May 13, 1986, Sergeant Juarez reported that he interviewed Maria Gonzalez's case worker, Blanca Gonzalez. Blanca said that Maria had told her that she had not in fact been raped, but that the attacker had wanted to have oral sex with her and had beaten her, and that she had made up the story about the rape because she was angry at him for beating her.

*The Trial:*

The case against Bennie Starks proceeded to trial. In connection with the admissibility of evidence concerning other potential sexual partners of Ms. Gonzalez, the trial prosecutor represented to the court that Ms. Gonzalez had not had sex for at least 72 hours prior to the attack. At his deposition, the prosecutor testified that he would not have made this representation unless he or one of his staff had been told this by Ms. Gonzalez, and that when he made that representation he had no reservations about its accuracy.

At trial, Ms. Gonzalez testified that she went outside her house at around 8:30-9:00 p.m., about 5 minutes before the attack, that the attacker punched her all over, raped her 3-4 times, that he took off her underpants before he raped her, that he did not take off her

underpants before he raped her, that he placed his penis by her cheek, that she crawled up the ravine after the attack and saw the man leaving the ravine and going to 300 Lake Street, that she tore off the man's watch because he was going to hit her with a knife, that she did not know whether she had been hit with a metal pipe, that she did not know the age of the person, that she did not know how tall he was, that she didn't know if she told the police the person was 18, that the attacker did not have any facial hair, including not having a mustache, that she did not tell Blanca Gonzalez that the person had not had sex with her, and that she did not tell Sergeant Juarez on January 19 that the man had a knife. She made an in-court identification of Bennie Starks as her attacker. Other evidence presented at the trial established that Starks had been drinking at two separate bars on the night of the attack, that he had facial hair including a mustache, that he had purchased a sweater earlier that day that was packaged in a red bag and that he had the red bag with him that evening. There was also evidence from Sergeant Biang and Detective Deprez concerning Starks' statements to them, as set forth above. In addition, the odontologists testified to their comparison of the bite mark and that it was their opinion that Starks inflicted the bite mark, and the serologist from NIPCL testified that Starks could not be excluded as the source of the semen on the vaginal swab and the underwear. I am not expressing any opinions as to the odontologist or the serologist. Starks was convicted of aggravated criminal sexual assault, attempt criminal sexual assault and aggravated battery, and sentenced to a lengthy prison term.


*Post Conviction Proceedings:*

On March 15, 2002, Plaintiff filed a motion for a new trial alleging that he was actually innocent, that post conviction DNA tests excluded him as the source of semen that had been found on the victim's underwear and that Defendant Thomas-Boyd had made false statements in her reports and had given false testimony at Plaintiff's trial that Plaintiff was included as a possible source of the semen recovered from the victim and her clothing. In 2004, the trial court denied Plaintiff's post trial motion and refused to vacate the convictions. Subsequently, the vaginal swab from the rape kit was located and testing of the spermatozoa revealed that Starks was not the source of that semen either. On March 23, 2006, the Illinois Appellate Court reversed the denial of Plaintiff's post conviction motion and petition and vacated his convictions for aggravated criminal sexual assault and attempted aggravated criminal sexual assault and remanded those cases for a new trial. In reaching this determination the Appellate Court found that "[t]he victim's impeaching prior inconsistent statement that she was not sexually assaulted, coupled with the State's own expert's incorrect testimony regarding the serology results, cast serious doubt as to whether Defendant committed aggravated or attempted aggravated criminal sexual assault." The court further held that based on the current state of the evidence "the

Page 9 of 21

outcome on retrial would probably be changed." The Appellate Court set a bond for Starks and on October 4, 2006, he posted the bond and was released from prison. After the case was remanded for a new trial the State continued to prosecute Plaintiff for the sexual assault charges until May 15, 2012, when the State *nolle prossed (*will not prosecute*)* the aggravated criminal sexual assault and attempted aggravated criminal sexual assault charges.

The Appellate Court had not addressed Starks' conviction for aggravated battery, and Starks continued to pursue post conviction proceedings challenging that conviction. The trial court dismissed Starks' challenge to the aggravated battery conviction, but on June 20, 2012, the Appellate Court reversed that dismissal. In its ruling the Appellate Court relied on the fact that the DNA evidence excluded Plaintiff as the source of the semen found in the body and on the clothing of M.G. and that "[Starks] has always maintained his innocence. Further, the bite mark evidence has been discredited by a report by two odontologists who examined it. The report states that the method used by the State's forensic odontologists in 1986 has since been rejected by its own creators. The report also states that the State's odontologists misapplied the methodology and used flawed preservation and photography techniques. Accordingly, we determine that the new DNA and bite mark evidence is of such a conclusive nature that it would probably change the result on retrial." The Appellate Court remanded the post conviction petition to the trial court for a hearing as to whether Plaintiff's conviction of aggravated battery was a denial of due process because he was actually innocent.

On January 7, 2013, the Lake County State's Attorney acknowledged that Plaintiff was entitled to post conviction relief, agreed that the aggravated battery conviction should be vacated and *nolle prossed* all criminal charges against Plaintiff. On September 25, 2013, Plaintiff was granted a Certificate of Innocence by Judge George Bridges of the Lake County Circuit Court.

*Identification Procedures Used by the Waukegan Police Department in 1986:*

During the post conviction proceedings, Starks' counsel made attempts to discover the photographs used by Sergeants Juarez and Biang in the identification procedure conducted with Ms. Gonzalez on January 21, 1986. These photographs were not included in the discovery materials produced by the prosecutor at the criminal proceedings against Starks, and were not introduced into evidence at the trial.

In response to a subpoena for those photographs, WPD Commander Stevenson sent a letter on April 7, 2009, to the prosecutor stating that based on the numbers listed in the

police reports he could determine that the photographs shown to Ms. Gonzalez were Polaroid "mug shots" that were maintained by the WPD in photo books, and were not the official booking photographs (B of I photos) taken when a person was arrested. Subsequently, when this issue was further explored during discovery in this civil litigation (primarily in the context of two separate depositions of former Sergeant Biang), it was established that when the WPD had contact with a person, either in the context of a formal arrest or otherwise, the WPD would take a Polaroid photograph of that person for inclusion in the "mug books." If the person was being formally arrested the WPD would usually take a Polaroid photograph in addition to the booking photograph.

Once a Polaroid had been taken, it would be placed in a pocket in the "mug shot" book. Any person who had a photo in that book would be assigned a number, and there was a list, separate from the mug shot book, that recorded the number assigned to that person. If a person had multiple contacts with the WPD in which Polaroids were taken, all the Polaroids of that person were placed in the same pocket and were assigned the same number. Thus, for example, if a person had four different contacts with the WPD over a several year period, and each contact generated a Polaroid (as it would normally do), all four of the photographs would be maintained in the same pocket in the mug shot book, and all four would be assigned the same number. If one of the photographs was then used in an identification procedure, either as a suspect or a filler, that photograph would be identified by the person's number alone, with no record made of which of the four different photographs was shown and no record generated of the photographs themselves, such as a Polaroid of the photos shown. Thus, while pursuant to the system and records as they existed then, it was possible to determine the identities of the persons whose photographs were shown, the system would not record which of the several photographs of the person was shown, nor the date of the photograph that was shown. Thus, even in 1986, there was no actual, accurate, record maintained of which photographs were utilized in an identification procedure, both as to the suspect and the fillers.

The letter from Commander Stevenson, and discovery in this civil litigation, has now also established that the mug shot books that were used by the WPD in criminal investigations, and any listings correlating the numbers assigned to the mug shots with the identities of the individuals shown, were intentionally destroyed by the WPD, without any record being maintained of the identities of the persons who photographs were contained in the mug shot books, or the photographs themselves. Thus, it is now impossible to determine which photographs were used in a mug shot book identification procedure, or even who the persons were whose photographs were shown as fillers.

In this civil litigation Waukegan admitted that it had no formal procedures in place in 1986 with respect to the conduct and recording of identification procedures, in the

following Response to a request for documents:

> 7. All department orders, manuals, procedural guides, training, rules,policies, practices, or directives relating to the following subjects in place between 1980 and 1990:
> a. Arrests;
> b. Interviews, interrogations, and/or confessions in general, including the documentation of same;
> c. Collection of evidence from a crime scene;
> d. Identification procedures.
> RESPONSE: Defendant City of Waukegan objects to Request for Production No. 7 because it is overly broad, vague, and ambiguous. Subject to these and the general objections, none. Investigation continues.

*The Bennie Starks Identification Procedure:*

In the case of Bennie Starks, and pursuant to the procedures described above, the five photographs that were shown to Ms. Gonzalez were identified by number only. Discovery in this case has established that Bennie Starks had multiple contacts with the WPD prior to the attack on Ms. Gonzalez, including in February 1977, March 1977, 1978 and 1983. Starks was assigned the number 321 in the mug shot book, and the only record maintained of which photograph of Starks was shown was the number 321, with no record of the date on which the photograph was taken. Thus, it could have been a photograph taken when he was 18, 19 or 23. Similarly, with respect to the filler photographs shown to Ms. Gonzalez, only a number was used to identify the photograph, so while it would have been possible, in 1986, to determine the identities of the persons whose photographs were used as fillers, it would not have been possible, even in 1986, to determine which of the photographs of those persons had been shown, if those persons had had multiple contacts with the WPD. Since the mug shot books have now been destroyed, and no record maintained of the photographs in the mug shot book or the persons assigned a particular number, it is now impossible to determine even the identities of the persons whose photographs were shown to Ms. Gonzalez as fillers.

*The Identification Procedures Used by the WPD in 1986 Violated Generally Accepted Standards for Police Practices as They Existed in 1986:*

Identification of the suspect is, in many cases, a seminal event in a criminal investigation. In many crimes, such as the attack on Maria Gonzalez, there is no doubt that a brutal crime has been committed, but the identity of the perpetrator is contested. By the mid-1980s it was generally recognized in the police community that Police Departments had a duty to avoid using suggestive identification procedures that created the possibility of mistaken identifications of suspects and had a duty to maintain a full and accurate record

of the procedure, so that the reliability of the procedure could be tested. In 1975 the American Law Institute had promulgated standards that should be followed in conducting such identification procedures. [See ALI Model Code of Pre-Arraignment Procedure (1975)]. With respect to identification procedures, Section 160.1(2) of the Code mandated that a law enforcement agency:

"Shall issue regulations pursuant to Section 10.3 implementing the provisions of this Article and designed to insure that:

(a) identification procedures will be reasonably reliable and will not prejudice the rights of any person identified;

(b) that an objective record is kept of any identification procedure sufficient to permit verification of the results of such procedure and ascertainment of the conditions under which it was conducted . . ."

The notes to this section noted that:

"The Supreme Court's decision in United States v. Wade, followed by the course of decisions both in the Supreme Court and in other courts as well as the extensive secondary literature, clearly indicate that it is the impressive character of personal identifications, their peculiar history of unreliability and their peculiar susceptibility to suggestive pressures that has given rise to special concerns." (ALI Model Code of Pre-Arraignment Procedure (1975) Notes, p. 74.)

With respect to the type of record that must be maintained of a photographic identification procedure, the Code required that a written report be prepared that "shall have appended to it copies of any photographs or other representations viewed by a witness, with an indication of the sequence and circumstances in which they were viewed, or a reference to such photographs or other representation which would permit a reconstruction of the procedure." *Id.* Section 160.4(3).

Moreover, by 1986 the courts had made it clear that identification by a witness who had been subjected to a suggestive identification procedure that created a substantial risk of irreparable misidentification was a violation of due process, and thus violated a criminal defendant's Fourteenth Amendment right to a fair trial. *See, e.g., Manson v. Brathwaite*, 432 U.S. 98, 114 (1977). These holdings recognized, moreover, that once a witness identified a suspect in a suggestive identification procedure, that identification might be "frozen," and the witness would continue to identify the suspect, even though other evidence established that the identification was wrong.

In this context, it was generally recognized in the police community that the identification procedure must be fully and accurately recorded and provided to the prosecution. With respect to a photographic identification procedure, this duty included the obligation to record precisely what photographs were shown to the witness, both in terms of the suspect photograph and the filler photographs. Such a record served several vital functions.

Page 13 of 21

From the perspective of the prosecution, a record of the photographic identification procedure would assist in the prosecution of guilty persons, if it was shown that the photographs shown were a fair photographic line-up, the witness had an adequate opportunity to view the suspect at the time of the crime, and the witness made a clear identification at the time of the photo show. Secondly, recording the actual photographs shown would further assist the prosecution of the guilty because in most jurisdictions in the mid-1980s, a prior identification of the suspect was admissible at the criminal trial. Thus, while an in-court identification of the suspect could often be discounted as worth little, since with an in-courtroom identification it is usually obvious who the defendant is, an identification made at a non-suggestive identification procedure, where a witness who had an adequate opportunity to view the perpetrator was presented with several photographs and picked the suspect, could be powerful inculpatory evidence tending to show that the criminal defendant was guilty. Thirdly, a full and accurate record of which photographs were shown to a witness could be used to rebut a defendant's argument that he was unfairly identified at a suggestive identification procedure.

Conversely, an adequate and accurate record of the identification procedure was also vital to protect the rights of the accused. The courts, and police departments, were aware of the danger of misidentification which would lead to the wrongful charging of innocent civilians. *See, e.g., Simmons v. United States*, 390 U.S. 377 (1968). If an adequate record was kept of the identification procedure, a criminal defendant would be afforded his constitutional right to challenge an identification procedure that was suggestive and created the possibility of misidentification. This challenge could lead to the barring of any identification of the defendant by the witness on the grounds that the identification would be a denial of due process, *see Simmons, supra*, or allow the criminal defendant to challenge the adequacy of the procedure in front of the jury, in an attempt to show that he was misidentified.

The failure of the Waukegan Police Department to have rules and regulations in place in 1986 which mandated the full and accurate recording of identifications procedures, including the precise photographs shown to a witness in such a procedure, violated generally accepted police standards at that time. By 1986 there was a broad field of knowledge relating to the importance of identification procedures, the dangers of mistaken identifications, and the need to record fully and accurately the details of those procedures, including the precise photographs that were used.

The failure of the Waukegan Police Department to maintain, in 1986, an adequate and accurate record of photographic identification procedures is inexcusable. Such a record could easily have been made, with minimal utilization of Department resources, and was essential to create a proper record of the criminal investigation. One method of preserving a record of the photographs shown to the witness is to use photographs that can easily be replicated, such as B of I photos (with the portion of the photograph showing that it is a booking photograph covered up), and then placing the actual photographs in the investigative file. Another method would be to take a photograph of the photographic procedure, which could easily be done using a Polaroid camera (which

the WPD used repeatedly during this investigation). Additionally, the actual photographs used could have been recorded by photocopying them. Such a record, in addition to recording the numbers and identities of the persons whose photographs were shown, would allow, in 1986, an exact replication of the identification procedure. Another method would be to assign additional identifiers to the Polaroids maintained in the mug books. Thus, for instance, a Polaroid taken in 1978 would be 321a, while a Polaroid taken in 1980 would be 321b, and so on. Alternatively, the actual photographs shown could be placed in the investigative file, although this would deplete the Polaroids available for future identification procedures. As far as the suspect is concerned, where that person is at the police station cooperating with the police, the best procedure would be to take a Polaroid of him at that time. This Polaroid would be the most accurate in terms of recording the current appearance of the suspect. The failure to follow this procedure in this case is baffling at best, and highly suspicious at worst.

In summary, the policy and practice of the Waukegan Police Department in 1986 violated generally accepted police procedures both because there were not written regulations in place that mandated the manner and precise recording of identification procedures and also because the actual procedure of the Waukegan Police Department was to not make a full and accurate record of the photographic identification procedure.


*The Destruction of the Mug Books Violated Generally Accepted Police Procedures:*

At some point, exactly when is unclear, the WPD destroyed the mug shot books that it had routinely used for years in criminal investigations. This destruction violated generally accepted police practices in effect from 1986 to the present.

It was apparently known throughout the WPD that where a photographic identification procedure had been used the only record kept of which photographs had been shown to a witness was the numbers in the mug shot books and any accompanying register of names. As noted above, even this procedure was inadequate because it failed to accurately record the actual photographs that had been shown, but it at least recorded the identities of the photographs that were shown. The subsequent destruction of these books demonstrates an appalling disregard for the rights of criminal defendants, was irresponsible in the extreme, and violates standards of police practices in effect from 1986 to today. Any reputable police agency is aware that even after a criminal defendant is convicted that conviction may subsequently be revisited, either because additional evidence that was previously unavailable is discovered, because the conviction is reversed on the grounds of legal deficiencies, or other reasons. In such a situation, the prosecutor will often want to restudy the evidence that led to the original conviction, and determine whether to abandon the prosecution or retry the defendant. Moreover, for a criminal defendant the existence of the evidence of the identification procedure may provide critical evidence supporting his claim of innocence. Thus, evidence of identification procedures will continue to be extremely important, even many years into the future.

The destruction by the WPD of the evidence used, apparently routinely, in the criminal investigations that it conducted is inexcusable. Maintenance of these books would subject the Department to minimal exertions. Even if the books were no longer being actively used in identification procedures, they could be kept in a safe place for use when needed, as noted above. In the unlikely event that there was not adequate space to preserve the original books, they could, and should, have been microfilmed, so that they took up almost no space at all. There is no legitimate reason for destroying this important evidence that could be vital to criminal re-prosecutions and/or exonerations. The destruction here demonstrates a cavalier attitude towards the necessity of conviction integrity.

*The Failure to Maintain an Adequate and Accurate Record of the Identification Procedure in the Gonzalez Investigation Deprived Starks of his Right to a Fair Trial:*

A cursory review of the police reports and evidence in this case establishes that there were significant issues regarding accurate identification in this case, and that preservation of an adequate and accurate record of the identification procedure deprived Starks of his right to a fair trial.

The accurate identification of the person responsible for the crimes perpetrated against Ms. Gonzalez was the crucial issue in this case. There was no question that Ms. Gonzalez had been viciously attacked and savagely beaten; she repeatedly stated and testified that she had been raped; and her repeated statements that she had not had vaginal sexual intercourse within weeks or days of the attack, together with the uncontested finding of semen in her vagina and on her underwear, strongly supported that she had in fact been raped. The only real issue in the case was whether the attacker and rapist was Bennie Starks or someone else.

Her initial description of the attacker did not match Starks in many respects. She initially described the attacker as very tall: Starks was 5-9; 18 years old: Starks was 26; long straight hair: Starks' hair was short and curly; clean shaven: Starks had a short beard and an established mustache. Moreover, while she stated that she had yanked on the attacker's penis very hard, there was no record of evidence of injury to Starks' penis, even though he was viewed naked by WPD investigators. While there was other evidence that did point to Starks: including that his clothing was found in the vicinity where Ms. Gonzalez was attacked, he was undoubtedly in the general area on the night of the attack and he stayed the night at his mother's house at 300 Lake, the building the Ms. Gonzalez said she saw the attacker enter, he did provide explanations for all of these facts. There were no inculpatory statements by Starks, and no other witnesses to the attack besides Ms. Gonzalez and the attacker. Thus, the criminal trial was essentially a contest about whether Starks was properly identified as the attacker.

A record of the identification procedure was essential for Starks to defend against the criminal case in 1986. Had the identification photographs been adequately and accurately preserved he would have been able to argue that the procedure was unreasonably

suggestive and evidence of any identification by Ms. Gonzalez should be barred, or argue to the jury that the identification was tainted by the unfair procedure employed. Additionally, the destruction of the mug shot books at some point after 1986 deprived Starks of the ability, when his convictions were undermined by the DNA evidence, to additionally argue that his rights were violated by the unfair identification procedure.

## CONCLUSION

The Waukegan Police Department failed to follow generally accepted police practices when it failed to keep an adequate and accurate record of the identification procedures used in 1986, and in particular the procedure used in Bennie Stark's case, and when it subsequently destroyed the photographs used in that identification procedure as well as all records of what photographs were used.

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an Administrator/Lieutenant in the same jail facility (Men's Central Jail). I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers. Those cases included possible complaints relating to both misdemeanor and felony crimes. They frequently required follow-up investigations and interviews before the exact nature of the case could be determined. As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer. Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator. At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance. This process gave me an expertise in the POST Basic curriculum. I also supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993. Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy-busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Page 18 of 21

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects. Additionally, the majority of the 700 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired -- either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension.

This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by California POST and my Department. These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel." This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Illinois, Indiana, Louisiana, Missouri, Oregon, Nevada, New Mexico, Ohio, Pennsylvania, Texas, Utah and Washington. I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission. I have testified before the Harris County (Texas) Grand Jury. I have also submitted written opinions in matters before Alaska, Florida, Idaho, Montana, North Carolina, Oregon and Wyoming Federal and State Courts.

I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles,

California. I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana. I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons." On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas). As a result of my expert testimony in Border Network, et al. v. Otero County, et al., Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden. The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force. Blankenhorn v. City of Orange, et al., 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in a second published case involving Police Detective Investigations. Torres, et al v. City of Los Angeles, et al., 540 F.3d 1031, 1042-43 (9th Cir. 2008). The Torres case was appealed to the U.S. Supreme Court and returned for trial. The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, Hayes v. County of San Diego, - F.3d -, 2011 WL 2315191 (9th Cir. 2011), and Young v. County of Los Angeles, 2011 WL 3771183 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, Starr v. Baca, - F.3d -, 2011 WL 2988827 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in A.D., a Minor; J.E., a Minor; Sue Casey, v. State of California Highway Patrol and Stephen Markgraf, No. 09-16460, D.C. No. 3:07-cv-05483-SI. The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in Lindsey Bishop and Carolyn Clark v. Tony Arcuri, City of San Antonio. USDC Court of Appeals, Fifth Circuit, Case No. 11-50010, March 09, 2012. The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in Nelson v. City of Davis, ___ F.3d ___, 2012 U.S. App. LEXIS 14140 (9th Cir. 2012). Most recently, I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in Jennifer Cruz, et al, v. City of Anaheim, et al. 2014 WL 4236706.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, Macias v. County of Los Angeles, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, Chelsey Hayes, a Minor, etc., v. County of San Diego et al., S193997, 9th Cir. No. 09-55644, S.D. Cl. No. 3:07-cv-01738-DMS-JMA.

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect.

I have been found competent by both Federal and State Courts to render opinions as to the duties and responsibilities of police officers regarding their individual and collective responsibilities as occurred in this case. A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26 and Model X26 ECDs. I own each, along with the download software. I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices. I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage. Two published examples are Lee v. Nashville, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and Heston v. City of Salinas, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007). There are many others.

Attached as Exhibit A is a statement listing my law enforcement qualifications and experience; Exhibit B is my fee schedule; Exhibit C is a listing of matters in which I have testified in the last four years as an expert.

I declare under penalty of perjury that the foregoing is true and correct. Executed December 3, 2014at Santee, CA.


_Roger A. Clark_
Roger A. Clark

# Exhibit 9

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BENNIE STARKS,                        )
                                      )
            Plaintiff,                )
                                      )
      vs.                             )    No. 09 C 348
                                      )
CITY OF WAUKEGAN, and PRESENT )    Judge Gary Feinerman
and FORMER WAUKEGAN POLICE     )
DEPARTMENT OFFICIALS:          )    Magistrate Judge
LIEUTENANT URBANCIC, W. BIANG,)    Mason
P. STEVENSON, M. JUAREZ,       )
D. DEPREZ, DR. CARL HAGSTROM, )
DR. RUSSELL SCHNEIDER AND      )
SHARON THOMAS-BOYD,            )
                                      )
            Defendants.               )


        The deposition of WILLIAM BIANG, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Carmella T. Fagan, C.S.R., R.P.R., Notary Public

within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, in the City

of Chicago, Cook County, Illinois, commencing at

10:10 a.m. on the 27th day of March, 2014.

Page 92

1          Q          In the situation that you just

2   described, would the actual physical photos be

3   retained in the file?

4          A          No.

5          Q          Do those photograph binders still

6   exist?

7          A          I don't believe so.

8          Q          What happened to them?

9          A          I have no idea.  My guess is they were

10  thrown away.

11         Q          Do you know when they were thrown

12  away?

13         A          I have no clue.

14         Q          In the type of photo show that you

15  just described, you did describe mug shots and you

16  also described Polaroids.

17         A          Um-hum.

18         Q          Would those sometimes, mug shots and

19  Polaroids, both be shown to the victim or witness?

20         A          You never mix them.  No.  You wouldn't

21  mix Polaroids with -- if you had -- if you had an ID

22  with mug shots, you used all mug shots.  If you had

23  an ID with Polaroids, you used all Polaroids.

24         Q          Was there some rule of the Waukegan

Page 94

1      A      Okay.

2      Q      -- in the record.  Is there a way of

3   recreating what photos were shown?

4      A      No, not if they don't -- unless you

5   had the actual books, you couldn't do it.  I mean,

6   there were just -- you know, there would be a photo

7   of an offender, you know, there would be numbers,

8   whatever the number might be.  There could be six or

9   seven photos in each stack because they were in a

10  lot, but they always had the most recent photo on the

11  top, and those are usually the ones that you would

12  use in an identification obviously.

13     Q      I didn't quite understand what you

14  just said.  You said that certain people might be in

15  a lot?

16     A      What I'm saying is:  If your number

17  was Number 65, you're Photo Number 65 in the male

18  white book, and if you got arrested seven times,

19  there'd be seven photos of you that could have

20  started in 1960 or '70, all the way up to 1985.  And

21  you could have -- so, you know, if you got arrested

22  seven times, there could be seven different pictures

23  of you, some with your beard, some without, hair

24  longer, glasses on, glasses off.

1          They could all be in the -- but they

2     would all be in behind whatever your number was.   So

3     there could be six or seven photos of each person in

4     those books.

5          Q     Okay.   So if I'm looking through a

6     book, I might see a page that has maybe six photos --

7          A     Um-hum.

8          Q     -- six images on it --

9          A     Right.

10          Q     -- and one of those photos would just

11     have one photo and one might have a stack of six?

12          A     Yeah.   You could only see the top one.

13          Q     I understand.

14          A     Yeah.   There would be -- we didn't

15     throw them away, for the most part.   We kept those in

16     that book.   If they were old photos, you know, for

17     the most part, we -- unless the guy died or

18     something, we wouldn't throw them away.

19          Q     In the event there was more than one

20     photo of a person, then the most recent photo would

21     be stuck --

22          A     On top.

23          Q     -- on top of the last recent?

24          A     Yes.

1   Illinois, then when it came back, we resubmitted to

2   the FBI with the same results.

3            Q       Are you aware of at a -- at any time

4   when you were with the Waukegan Police Department --

5   well, when was it that you were first a sworn peace

6   officer, by the --

7            A       In 1978.

8            Q       -- way?  All right.  Are you aware at

9   any time from 1978 on where the Waukegan Police

10  Department maintained a lab or a division which

11  provided any forensic services similar to those

12  provided by either NIPCL or NIRCL?

13           A       No.

14           Q       So Waukegan never itself had a

15  forensic lab?

16           A       Never.

17           Q       And is it fair to say that Waukegan

18  did not need to maintain its own lab because it was

19  able to receive the services it needed from either

20  NIPCL or NIRCL?

21           A       Correct.

22           Q       So Waukegan was able to rely on NIPCL

23  or NIRCL to provide the forensic services that it

24  needed to conduct its criminal investigations?

Page 221

1    A        Could you repeat that?

2    Q        Yeah.  When you were -- strike that.

3             In 1986 when the Bennie Starks

4    investigation was going on, did Waukegan have any

5    policy or procedure for any police officers to meet

6    with anybody from the lab to discuss the testing of

7    the evidence?

8    A        There wasn't a policy and procedure.

9    No.

10   Q        Were there ever any instances where

11   anybody from the police department met with any of

12   the lab technicians?

13   A        There were situations, yes.  I don't

14   know if it was in that specific case, but there were

15   times when -- when investigators would speak with the

16   technician from the lab.

17   Q        In what types of circumstances would

18   that occur?

19   A        It could be anything, any type of

20   evidence issue that came up, whether it be

21   fingerprint analysis, firearms analysis.  It depends

22   on the case, it depends on the issue.

23             If someone had a question, they would

24   be able to contact the crime lab and ask those

1    questions to the specific technician that worked that

2    case or that particular area.

3         Q        And if there was a conversation

4    between the technician and a police officer, would

5    that have been documented?

6         A        Not necessarily.

7         Q        And were there cases where there was

8    no conversation between a police officer and the

9    technician from NIPCL?

10        A        Absolutely.

11        Q        And what would you say was more often

12   the case, that there would be a conversation or that

13   there would not be a conversation?

14        A        Probably not.

15        Q        All right.  So more often there would

16   not be a conversation?

17        A        Right.

18        Q        I know that Mr. Stainthorp asked you a

19   question earlier that I just wanted to follow up on.

20   He asked you some questions about whether there was a

21   policy to look at other similar crimes to assist in

22   identifying a suspect.

23             And I think your answer was there was

24   not a policy in circumstances where -- in certain

1       Q      Has Waukegan, through its police

2 department, ever had a policy or procedure as to how

3 dentists evaluate evidence, come to opinions to a

4 reasonable degree of dental certainty and then

5 prepare a report that they may provide to the Lake

6 County state's attorney?

7       A      No.

8       Q      Has the Waukegan Police Department

9 ever had a policy or procedure as to retention of

10 forensic dental consultants for evaluation of a

11 victim who has been bitten by an individual?

12      A      No.

13      Q      To your knowledge, Waukegan has never

14 retained a forensic dental consultant, the police

15 department?  That retention would be done by the Lake

16 County State's Attorney Office?

17      A      I don't recall if we called them in or

18 we got their na -- the state's attorney's office

19 provided them for us.  I do not recall.

20      Q      You don't know one way or the other?

21      A      I can't recall.

22      Q      Okay.  In this case, do you agree the

23 City of Waukegan did not retain either Dr. Schneider

24 or Dr. Hagstrom as forensic dental consultants in the

1    **Bennie Starks case to evaluate the bite mark on**

2    **Ms. Gonzalez?**

3              MR. TROBE:  Do you --

4              THE WITNESS:  Can I ask you a question?

5              MR. TROBE:  -- know who retained them?

6              THE WITNESS:  Well, I -- I was pretty sure

7    that I called.

8              MR. TROBE:  But you don't know who actually --

9              THE WITNESS:  I don't --

10             MR. TROBE:  -- paid them?

11             THE WITNESS:  I don't know who paid them.  I

12   don't even know if they were paid.

13             MR. TROBE:  So you don't know who contracted

14   with them?

15             THE WITNESS:  No.  I -- we. . .

16             MR. TROBE:  Okay.  Then I guess the question

17   is:  What do you mean by "retained"?

18             THE WITNESS:  Yeah.

19             MR. TENGESDAL:  Okay.

20   BY MR. TENGESDAL:

21             Q        **Going back to 1986, you don't have**

22   **knowledge one way or another whether or not you were**

23   **given that information of who to contact by the**

24   **state's attorney?**

# Exhibit 10

STATE OF ILLINOIS    )
                      )  SS:
COUNTY OF LAKE     )


IN THE MATTER OF THE DECEMBER TERM, 1985

GRAND JURY

---

TRANSCRIPT OF PROCEEDINGS OF THE PEOPLE VERSUS BENNIE STARKS, JR., had before the December term, 1985 Grand Jury, 10th Floor, Administration Building, Waukegan, Illinois, on Wednesday, February 5, 1986, at the hour of 9:00 o'clock A.M.

PRESENT:    MR. MICHAEL FUSZ,
              Assistant State's Attorney,

           MS. MARY SANCHEZ, Forelady,

           MR. RICHARD LATTANZI, Secretary.

Reported for
LAKE COUNTY REPORTERS, By
Debra Rasmussen, C.S.R.

---

# Lake County Reporters

**P.O. Box 13**
**Zion, Illinois  60099**                            **(312) 746-8580**

LB198

-2-

1    MR. FUSZ: All right. I'd like to advise the members

2    of the Grand Jury this is an investigation into the activities

3    of Bennie, B-E-N-N-I-E, Starks, S-T-A-R-K-S, Jr., on or about

4    January 18th of 1986.

5    I'd like to advise you of your right to subpoena and

6    question any person against whom the State's Attorney's Office

7    is seeking a Bill of Indictment, or any other individual you

8    feel is a relevant witness, and also of your right and ability

9    to examine any documents or transcripts or records you feel

10   are relevant or appropriate.

11   MIGUEL JUAREZ,

12   having been first duly sworn, was examined and testified as

13   follows:

14   E X A M I N A T I O N

15   BY MR. FUSZ:

16   Q    All right. Would you state your name, please?

17   A    Miguel Juarez.

18   Q    All right. And, Mr. Juarez, have you been sworn in,

19   by the way?

20   A    Yes, I have.

21   Q    Okay. What is your occupation or profession?

22   A    Police officer for the City of Waukegan, currently

23   assigned to the Detective Bureau.

24   Q    I would like to draw your attention to January 19,

**Lake County Reporters**
2623 Elisha Avenue
P.O. Box 13
Zion, Illinois 60099
(312) 746-8580

LB199

-3-

1  1986, approximately 9:35 in the morning. Did you have an

2  occasion to interview a victim of an attack identified to you

3  as Maria Gonzales, G-O-N-Z-A-L-E-S?

4       A    Yes, I did.

5       Q    And where did you interview Mrs. Gonzales?

6       A    In the Intensive Care Unit of Victory Hospital.

7       Q    All right, and how was it you came to interview her?

8       A    I was advised that there had been a battery --

9  aggravated battery sexual assault. The victim had been Mrs.

10  Gonzales. I needed to speak to her to get a statement as to

11  what had transpired in this incident.

12       Q    What was her condition when you saw her in the

13  hospital?

14       A    She was in critical condition when I talked with her.

15  As far as her physical condition, her face was all swollen, her

16  eyes were swollen shut. There were numerous bruises, contusions

17  and lacerations about her face. She had a severely fractured

18  nose and, at the time, they thought she had a possible fractured

19  jaw. The nurse also showed me her legs, and from the feet all

20  the way up to her thighs, she had numerous bruises, contusions

21  and lacerations to the front of her legs.

22       Q    Did you speak with Mrs. Gonzales in English or in

23  Spanish?

24       A    In Spanish.

LB 200

-4-

1    Q    You are fluent in Spanish?

2    A    Yes, I am.

3    Q    All right.  What did Mrs. Gonzales tell you when you

4  asked her how this happened?

5    A    She stated that the previous night, which would have

6  been the 18th of January, she wasn't sure of the time, she feels

7  it was a little before midnight, she had stepped out of her

8  apartment.  She lives at 200 South Utica.  It's a senior citizens

9  apartment complex.

10    Q    All right.  How far is that from the Courthouse here,

11  by the way?

12    A    Approximately four blocks south of here.

13    Q    South?

14    A    Yes, yes.

15    Q    All right.  What did she tell you happened?

16    A    She stated that she had exited her apartment, walked

17  out into the parking lot.  The reason she stepped out was because

18  it was so hot in her apartment.  She stated that she had been

19  walking northbound on Utica Street from the complex when she had

20  noticed a male black subject walking southbound towards her.

21  She stated that she didn't think anything of it.  The subject

22  then started running towards her and she thought that the subject

23  was going to keep on running past her.

24    She stated that as the male black subject approached her,

LB201

-5-

1  he grabbed her around the neck.  She struggled with him and

2  the subject dragged her into the ravine which is directly

3  behind the apartments at 200 South Utica.  The ravine would

4  be north of the apartment complex.

5      Q    How far north of Washington is that, by the way?

6      A    Approximately two to three blocks --

7      Q    Okay.

8      A    -- south of Washington.

9      Q    All right.  What did she say happened then?

10      A    She stated the subject dragged her into the ravine.

11  She tried struggling with him.  The subject then began choking

12  her.  She stated the subject whispered into her ear, "I want

13  pussy."  She told me this in English.  I asked her, do you know

14  what "pussy" means.  She stated that meant to her that he wanted

15  to have sex with her.  She stated the subject began beating her

16  about the face.  He knocked her down.  He then pulled her panties

17  off.

18      Q    Did he ever indicate or did she ever indicate he

19  threatened her life?

20      A    She felt that he was going to kill her because of the

21  way that he was beating her up.  She was in fear of her life,

22  yes.

23      Q    So she told you she was?

24      A    Correct, yes, she did.

LB 202

1     Q    What happened after he knocked her to the ground?

2     A    She stated that -- at this point, he removed her

3 panties. She doesn't know at which point he exposed his penis

4 or when he took his clothes off or -- however, he got on top

5 of her, attempted to place his penis in her vagina. She,

6 during this whole time, she started struggling with him. She

7 wasn't able to push him off of her, and he did put his penis

8 in her vagina. She stated that after she felt it was a couple

9 of minutes that the subject then got back up off of her, told

10 her that he wanted her to suck his penis.

11     She stated that she grabbed his penis with both of her

12 hands and she yanked it as hard as she could twice. She stated

13 that the subject yelled in pain and the subject proceeded to

14 beat her about the face and stomach area with his closed fists

15 as hard as he could.

16     Q    What did she say happened then?

17     A    She stated that he then again got on top of her. She

18 feels at this point she lost consciousness. She stated that

19 when she came to, she tried to get out of the ravine. She

20 stated that she crawled out. It took her a couple of minutes.

21 She did state that she was able to see that subject, the male

22 black offender, was putting his clothes back on and that's when

23 she again told me she didn't know when he took them off because

24 of the fact she had a -- blood all over her eyes and her eyes

LB 203

1 were swollen shut at this point.

2  She stated she was able to crawl out of the ravine, it

3 took her a couple of minutes, and when she got to the area of

4 Utica and Lake, she sat by the curb. She stated she attempted

5 to stop passing cars, however they would not stop. She stated

6 she was able to see this male black offender come out of the

7 ravine, go to the apartment at 300 Lake Street and saw him go

8 inside the front door.

9  She stated that after several minutes of sitting there,

10 she was able to crawl over to the apartment at 300 Lake. She

11 pushed on the buttons there, the front door, the security door,

12 and eventually somebody came out and the Fire Department, as

13 were the police, were summoned.

14  Q Did you ask if he had struck her with any weapons?

15  A Yes, I did.

16  Q What did she say?

17  A She stated she did not think so, unless maybe he had

18 struck her when she passed out. She stated that it was just

19 his fists.

20  Q Did she indicate she sustained any other injuries as

21 a result of this attack?

22  A Yes, she did.

23  Q What did she say?

24  A She stated that her chest hurt, her stomach hurt, and

LB204

1   the subject had bit her all over her upper torso.

2       Q    To your knowledge, were photographs taken of these

3  bite marks by the Waukegan Evidence Technician?

4       A    Yes, they were.

5       Q    And were the photographs taken of Mrs. Gonzales right

6  after she was found, right after the police and fire personnel

7  got to the scene?

8       A    Yes; yes, they were.

9       Q    All right.  How old is she, by the way?

10      A    Sixty-seven years old.

11      Q    All right.  All right.  Do you have photographs of

12  the injuries to Mrs. Gonzales?

13      A    Yes, I do.

14      Q    All right.  I'll show you what I've marked as

15  Grand Jury Exhibit No. 1 and I'll ask you if that's a photograph

16  of Mrs. Gonzales taken by police personnel on January 18, 1986?

17      A    Yes.

18      Q    The way she was found?

19      A    Yes, it is.  The photo was taken on the 19th.

20      Q    Okay.  Thank you, by Evidence Technician Newton Tench?

21      A    Yes.

22      Q    All right.  I ask that this be admitted to the Grand

23  Jury as an exhibit for the purposes of this hearing.  Mr. Juarez,

24  did you observe these injuries to her face yourself?

LB205

1      A     While in the hospital, yes, I did.

2      Q     And did you also speak with a -- members of the

3  nursing staff there?

4      A     Yes, I did.

5      Q     Who was that?

6      A     Nurse Keefer.

7      Q     All right.  What did Nurse Keefer tell you about

8  Mrs. Gonzales' condition and her injuries?

9      A     She stated to me that she was in critical but stable

10  condition.  I asked her for the extent of the injuries.  She

11  advised me.

12     Q     Excuse me.  The report says she was serious but in

13  stable condition, in the report that you did.

14     A     That's correct.  She was in serious but stable

15  condition.

16     Q     All right.  All right.

17     A     I had talked to her.  She advised me at that time she

18  had a possible fractured jaw, numerous swellings to the face,

19  her eyes had been swollen.  She had a laceration to the left

20  side of her temple, numerous bite marks in her upper torso,

21  and she is the one that showed me the bruises, contusions and

22  lacerations to her legs.

23     Q     Did you again talk with Mrs. Gonzales at Victory

24  Hospital on January 21st?

LB 206

1   A    Yes.

2   Q    1986?

3   A    Yes, I did.

4   Q    Approximately 9:35 in the evening?

5   A    That's correct.

6   Q    All right, and at that time, did you and Sgt.

7   Biang show a series of photographs in an attempt to identify

8   the attacker?

9   A    Yes, I did.

10  Q    How many photographs did you show her?

11  A    It would be either five or six. I don't recall.

12  Q    When you showed her the photographs, did she indicate

13  she recognized any of the individuals depicted as being the one

14  that attacked her on the 18th at night?

15  A    Yes, she did.

16  Q    Which photograph did she pick out? Whose photographs?

17  A    She picked out the photo of Bennie Starks, Jr., as

18  being the subject that beat her up and sexually assaulted her.

19  Q    What did she say when she picked out the photo?

20  A    She stated that she was positive that this was the

21  subject and that the subject should pay for what he did to her.

22  Q    All right. Without getting into all the details, how

23  was it that the police personnel from Waukegan put Mr. Starks'

24  photograph into that lineup and showed it to her, briefly?

LB 207

1    A    He was at the scene, numerous clothing was located,

2 a black trenchcoat, gloves and a scarf, watch, which we felt

3 was -- were the offender's items of clothing.

4    Q    That was in the ravine where she was attacked?

5    A    Yes, that's correct.

6    Q    Those were found by the police personnel?

7    A    Correct, correct.  That's correct, and the trenchcoat,

8 there was a laundry tag located and we were able to trace the

9 laundry tag to the cleaners and the cleaners were able to tell

10 us who that customer had been.  It was a -- in my opinion, a

11 relatively unique type of trenchcoat, and the subject was brought

12 in for questioning with reference to this case.

13    Q    That is Mr. Starks?

14    A    That's correct, Bennie Starks, Jr.

15    Q    That's how the photograph was placed in the photo

16 lineup?

17    A    That's correct.

18    Q    Did all of these events you have testified to occur

19 in Lake County, Illinois, to your knowledge?

20    A    Yes, they did.

21    Q    All right.  Are there any other questions of Sgt.

22 Juarez in this case?

23         GRAND JUROR #22:  Sergeant, I'd like to ask, was

24 there any robbery on this attack?  Did she have any money on her?

LB208

-12-

1    A    No, sir.  All she had on was like a nightdress,

2  pajama-type, and a coat over that.  She had just briefly

3  stepped out for fresh air and had gone back in there, and, to

4  my knowledge, there's no robbery.

5    GRAND JUROR #22:  This happened at nighttime, between

6  9:00 and 12:00 at night?

7    A    Yes, sir, approximately, yes, yes.

8    GRAND JUROR #22:  And this — it was a — she recognized

9  him in the photo?  Was there any hesitation on her part to

10  see him, since it was at nighttime?

11    A    No hesitation on her identity of him, no.

12        F U R T H E R   E X A M I N A T I O N

13            BY MR. FUSZ:

14    Q    These other photographs, were they also people of

15  similar description?

16    A    Yes.

17    Q    Of other black male subjects?

18    A    Yes.

19    MR. FUSZ:  Any other questions at all?

20  (Five minute recess.)

21    MR. FUSZ:  Madam Forelady, has the Grand Jury

22  concluded its deliberations on this case?

23    THE FORELADY:  Yes, we have voted a True Bill on all

24  five counts.

LB-209

-13-

1        MR. FUSZ:  Okay.  Thank you.

2   (End of proceedings.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24



**Lake County Reporters**
2623 Elisha Avenue
P.O. Box 13
Zion, Illinois 60099
(312) 746-8580

LB210

-14-

STATE OF ILLINOIS      )
                       )
COUNTY OF LAKE         )

      I, DEBRA RASMUSSEN, do herby certify that I am a Certified Shorthand Reporter doing business in the County of Lake and State of Illinois; that I reported in shorthand the foregoing proceedings, and that the foregoing is a true and correct transcript of my shorthand notes taken aforesaid.

*Debra Rasmussen*

LB 211

# Exhibit 11

1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION
3

BENNIE STARKS,                      )
4                                   )
            Plaintiff,              )
5                                   )
        vs.                         )    No. 09 CV 348
6                                   )    Judge Feinerman
CITY OF WAUKEGAN, and               )
7   PRESENT and FORMER WAUKEGAN     )
    POLICE DEPARTMENT OFFICIALS,    )
8   LIEUTENANT URBANIC, W.          )
    BIANG, P. STEVENSON, M.         )
9   JUAREZ, D. DEPREZ and DR.       )
    CARL HAGSTROM, DR. RUSSELL      )
10  SCHNEIDER and SHARON            )
    THOMAS-BOYD,                    )
11                                  )
            Defendants.             )
12
13          The deposition of LUIS BERRONES, taken
14  before Nicole Koziol, Certified Shorthand Reporter
15  and Notary Public, taken pursuant to the Federal
16  Rules of Civil Procedure for the Unites States
17  District Courts pertaining to the taking of
18  depositions held at 404 W. Water Street, Waukegan,
19  Illinois, commencing at 11:30 a.m. on
20  July 28, 2014.
21
22
23
24
```

1        A.    Correct.

2        Q.    I don't mean to be flippant, but what if

3   anything did you do at any time to promote Sherry

4   Boyd falsifying any of her reports?

5        A.    I didn't do anything.

6        Q.    What if anything did you do at any time

7   to promote Sherry Boyd falsifying her testimony?

8        A.    Nothing.

9        Q.    During the time period including the

10  arrest and trial of Bennie Starks what did state

11  and federal law require of a prosecutor such as

12  yourself with respect to the production of

13  evidence to defense counsel?

14       A.    Well, we had to turn over the evidence

15  that we had, and specifically there was a

16  requirement to turn over exculpatory evidence we

17  had.  My recollection is that our office policy

18  was an open file policy.  We turned over

19  everything that we had.  I mean, our file with the

20  exception of information that may have been

21  privileged as work product, but any information we

22  receive from experts or police or any witness that

23  would be used was turned over.

24       Q.    Was it your habit, your personal habit,

1    to follow that procedure, to turn everything over

2    as you said?

3        A.    Yes.

4        Q.    Can you describe the procedures commonly

5    used by criminal defense counsel to obtain

6    evidence prior to trial when you were a

7    prosecuting attorney?

8        A.    It was kind of a pro forma thing.  At

9    least what would happen in the felony courtroom I

10   was in is if I had the information or any

11   discovery, it would be turned over at arraignment;

12   otherwise it would be oral motion for discovery.

13   For the most part the judge set a deadline for us

14   to turn over discovery or for defendants to turn

15   over discovery.

16       Q.    What was your understanding in 1986 of

17   why a prosecutor was required to turn over

18   evidence which was exculpatory?

19       A.    It was a constitutional requirement.

20       Q.    What is meant by exculpatory?

21       A.    Evidence that tends to show or negate

22   the defendant's guilt.

23       Q.    What was your understanding of why your

24   office would turn over evidence that was

1     see that?

2          A.    Yes.

3          Q.    Are these true and accurate copies of

4     documents you turned over to defense counsel for

5     Bennie Starks?

6          A.    Yes, these were turned over at my

7     direction.

8          Q.    Do you have an independent memory --

9     Strike that.  Can you identify -- Strike that.

10              Do you believe you turned over every

11    report that you received from the Northern

12    Illinois Police Crime Lab regarding Bennie Starks

13    to Bennie Starks' criminal defense lawyer?

14         A.    Yes.

15         Q.    And do you believe that you withheld any

16    reports that you received from the crime lab from

17    Bennie Starks' lawyer?

18         A.    No.

19         Q.    If you could look at Exhibit 10 for a

20    moment, page LB 271.

21         A.    Okay.

22         Q.    Do you see on this report it identified

23    the blood standard of Bennie Starks as being blood

24    Type B?

1    A.   Yes.

2    Q.   What if any order did any Court enter

3  prohibiting Bennie Starks' defense attorney from

4  consulting with or offering testimony from any

5  expert on the issues of semen or blood or dental

6  evidence?

7    A.   There was no such order entered.

8    Q.   What if any information have you learned

9  regarding claims by Mr. Starks' postconviction

10 counsel that Thomas Boyd may have provided

11 ineffective assistance of counsel in his

12 representation of Mr. Starks?

13   A.   I have no information about that.

14   Q.   Are you aware that Bennie Starks'

15 postconviction counsel filed one or more briefs on

16 behalf of Bennie Starks accusing Thomas Boyd of

17 ineffective assistance of counsel?

18   A.   No.

19   Q.   Among the various allegations or

20 suggestions by Mr. Starks' postconviction counsel

21 are included the allegation that Bennie Starks'

22 trial lawyer, Thomas Boyd, may not have had all of

23 the reports or all of the raw data from the police

24 crime lab.  What if any insight can you offer with

1    respect to whether Thomas Boyd had all of the

2    reports and data from the crime lab?

3         MR. STAINTHORP:  Objection to form.

4    BY THE WITNESS:

5         A.   I don't know what insight I can give

6    you.  Whatever was turned over to the State's

7    Attorney's Office was turned over to Mr. Boyd.  My

8    practice has always been to ask my experts is this

9    all of the information you have for me.  I

10   couldn't tell you if that's what I did in this

11   particular case or not, but my habit was always to

12   say give me what you have and I will decide what

13   is going over or not.

14        Q.   Your habit was to ask the expert to give

15   you what they had and then unless there was a

16   reason not to turn it over, you'd turn it over?

17        A.   That is correct, unless there was some

18   privilege that would apply.  I can't think of a

19   privilege that would apply, but otherwise it would

20   be turned over.

21        Q.   If you initial a document LB with a

22   number, that means you turned it over to Thomas

23   Boyd?

24        A.   It means I personally turned it over or

1    that one?

2        A.    Yes.

3        Q.    I will read it, "If Mr. Boyd is claiming

4    the sperm can live up to 72 hours in the vagina, I

5    can represent to this Court that if the Court

6    wishes me to make an offer of proof outside of the

7    presence of the Jury I will not ask the victim on

8    direct in front of the jury when the last time she

9    had sexual relations with anybody was, and I can

10   assuredly assure the Court that's over 72 hours."

11   You made that representation to the Court,

12   correct?

13       A.    It appears so, yes.

14       Q.    You would not have made that

15   representation to the Court without a good faith

16   basis to make that representation?

17       A.    Yes.

18       Q.    And certainly in terms of making that

19   type of representation you would have wanted to

20   ask the victim herself when the last time she had

21   sex was before the rape, correct?

22       A.    Probably, yes.

23       Q.    Well, would you have felt comfortable

24   making such an affirmative representation to the

1    Court without asking the victim herself, when was

2    the last time you had sex?

3         A.   Yes, because I was not the only one

4    interviewing the victim.

5         Q.   So somebody would have interviewed the

6    victim, right?

7         A.   Yes.

8         Q.   And somebody would had gotten from the

9    victim this assurance that she had not sex  for 72

10   hours prior to the rape --

11        A.   Yes.

12        Q.   -- at least?

13        A.   Yes.

14        Q.   Do you know that it wasn't you that had

15   that communication with the victim about sex?

16        A.   I don't remember one way or the other if

17   it was me.  It may have been a victim counselor or

18   may have been a police officer.  I can't tell you

19   where that information came from, whether I got it

20   directly from the victim or somebody else.

21        Q.   Did you have any doubts about the

22   accuracy of that fact that you represented to the

23   Court?

24        A.   At the time I made the representation?

1     Q.   Yes.

2     A.   No.

3     Q.   Have you ever had any doubts about the

4  accuracy of the representation?

5     A.   I really have not thought about it since

6  that day probably, so the answer would be no.

7     Q.   And that, in fact, was an important

8  representation in terms of this particular motion;

9  would you agree?

10     A.   I don't know because the Rape Shield Act

11  says no sexual contact.  I don't know what Judge

12  Block's reasoning was, whether it was something

13  that convinced him to grant the motion or whether

14  just the fact that the Rape Shield Act prohibited

15  that kind of evidence that he gave the opportunity

16  to make an offer of proof or argue later on.

17     Q.   But if in fact you were aware of

18  evidence that the victim had consensual sex close

19  in time to the rape, you knew that that could be

20  an explanation for the presence of semen in her

21  vagina, on her underpants, and on the smear?

22     MR. KRAUSE:   I object as to vague "close in

23  time."

24

1    Crime Lab.  There is quite a lot of documents.  I

2    didn't copy them all.  I copied a small sample.

3        A.  Okay.

4        MR. STAINTHORP:  I will mark this as 14.

5                (Deposition Exhibit No. 14

6                marked as requested.)

7    BY MR. STAINTHORP:

8        Q.  Take a look at Exhibit 14.

9        A.  Okay.

10        Q.  Do you know if you have ever seen any of

11    these documents before as shown in Exhibit 14?

12        A.  I don't have any recollection whether I

13    have seen them or not.

14        Q.  And certainly they don't contain your

15    initials and a number at the bottom, correct?

16        A.  Correct.

17        Q.  So if these documents had been turned

18    over in discovery you would expect there to be

19    your initials and a number at the bottom of the

20    page, correct?

21        A.  If they were turned over to Mr. Boyd?

22        Q.  Yes.

23        A.  More likely than not.  As I said before,

24    sometimes when discovery was turned over they

1     weren't always marked, but I guess it would be

2     safe to assume I generally put my markings on

3     them.

4         Q.   I will tell you we also subpoenaed the

5     records of the Lake County State's Attorney and

6     these records did not appear in the file of the

7     Lake County State's Attorney.  Does that suggest

8     to you that these documents as shown in Exhibit 14

9     were never produced to you?

10         A.   Yes, it would.

11         Q.   I know you have previously testified

12     that your policy in the office and your own

13     personal policy was an open file policy that

14     anything that you had was given to defense counsel

15     unless there was some articulable claim of

16     privilege, correct?

17         A.   Yes.

18         Q.   But in that context you were dependent

19     upon other bodies getting you the information in

20     the first place -- Strike that.

21         But you were dependent on other

22     institutions getting you the documents in the

23     first place; is that correct?

24         A.   Yes.

1    you would disclose to defense counsel, correct?

2          MR. KARAVIDAS:  Objection, form, foundation.

3    Calls for speculation.

4    BY THE WITNESS:

5          A.    The conversation that what?

6          Q.    If Miss Thomas-Boyd told you, look, I'm

7    not excluding Mr. Starks as the source of the

8    semen found in Mr. Gonzalez' vagina even though

9    under conventional principles of serology he

10   should be excluded, if she had told you that you

11   would have to disclose that to defense counsel,

12   agreed?

13         MR. KARAVIDAS:  Objection, form, foundation.

14   Calls for speculation.

15   BY THE WITNESS:

16         A.    I may have decided not to use that

17   evidence, which would make it irrelevant.  In a

18   vacuum I can't tell you what I would have done.

19   If I was going to use Miss Thomas in any way, it

20   would be something I would have disclosed.  It

21   goes to the science, the Frye issue.

22         Q.    It also goes to the force of her

23   conclusions, correct?

24         A.    Correct.

1       Q.   Certainly we have no record that

2   anything like that ever was disclosed.  So is it

3   fair to say that it never happened?

4       MR. KARAVIDAS:  Objection, form, foundation,

5   speculation.  We don't know what "that" is

6   referring to.

7   BY THE WITNESS:

8       A.   I don't have any recollection of having

9   that discussion with her.

10       Q.   My question was a little different.

11       Since there is no evidence it was ever

12   disclosed either on the record or through

13   documents that Miss Thomas-Boyd was not following

14   conventional serological principles, it's fair to

15   assume you never had that discussion and never had

16   to disclose it; fair enough?

17       MR. KARAVIDAS:  Objection, form, foundation.

18   Calls for speculation.

19   BY THE WITNESS:

20       A.   Yes, because I would have had to deal

21   with it and it doesn't look like it was dealt

22   with.

23       Q.   So do you recall any contact you had

24   with Miss Thomas-Boyd after the trial?

1    the 14 percent of 450,000, in an attempt to turn

2    the shell game analogy around on him.

3         Q.    The 14 percent was the percentage of B

4    secretors in the population, correct?

5         A.    From my understanding of the evidence,

6    yes.

7         Q.    Your understanding of the evidence was

8    from Miss Thomas-Boyd that B secretors were

9    consistent with being the donor of the semen that

10   was found in Maria Gonzalez' vagina?

11        MR. KARAVIDAS:   Objection, form, foundation.

12   Calls for speculation.

13   BY THE WITNESS:

14        A.    Could you repeat it?

15        Q.    Yes.  Your understanding from the

16   testimony of Sharon Thomas-Boyd and from your

17   discussions with her was that a person who was a B

18   secretor was not excluded as the donor of the

19   semen that was found in Maria Gonzalez' vagina and

20   on her underwear?

21        MR. KARAVIDAS:   Objection, form, foundation.

22   Calls for speculation.

23   BY THE WITNESS:

24        A.    I believe so.

1      Q.    Certainly you would not have made the

2    argument unless you had good faith basis for

3    believing that that was what her testimony was?

4      A.    Yes.

5      MR. KARAVIDAS:  Objection, form, foundation.

6    Calls for speculation.

7    BY MR. KRAUSE:

8      Q.    Just to go to the last page of this, the

9    one that says 793.  Just before you end you again

10   refer to -- you say, "And then you have scientific

11   evidence.  The conclusion is the same.  The

12   defendant was there.  He inflicted that bite mark.

13   That semen was his."  Correct?

14     A.    Yes.

15     Q.    Obviously if he had been excluded as the

16   potential source of that semen, you would not have

17   been able to make that argument, would you?

18     A.    Right.

19     Q.    Now I want to change focus a little bit

20   now and talk about the dentists.  I believe you

21   testified earlier that you believe you heard about

22   the dentists from someone in the State's

23   Attorney's Office?

24     A.    Yes.

1     A.    Correct.

2     Q.    They phrased their conclusion that he

3   was the person who bit Maria Gonzalez?

4     A.    Yes.

5     Q.    And they did that in the letter of

6   May 13, 1986, Exhibit 1?

7     A.    Yes.

8     Q.    And they did it again on the second page

9   of Exhibit 1, that being the letter of July 2,

10   1986?

11     A.    Yes.

12     Q.    And is it fair to say that that level of

13   certainty by these dentists was extremely

14   important to you?

15     A.    Yes, it was important.

16     Q.    You considered this extremely compelling

17   evidence of Mr. Starks' guilt?

18     MR. KRAUSE:   Objection, vague.

19   BY THE WITNESS:

20     A.    Yes.   I mean, corroborative evidence of

21   an identification.

22     Q.    Well, it actually -- it was very

23   important evidence for all of the charges against

24   Mr. Starks, wasn't it?

1      A.    Generally speaking yes, because it was

2    corroborative of identification.    It was an injury

3    with respect to the aggravated battery charge.

4      Q.    First of all, if Mr. Starks bit Maria

5    Gonzalez, he was guilty of aggravated battery,

6    correct?

7      A.    Well, if the Jury found it was great

8    bodily harm, I would guess so.    If you look at all

9    of the evidence, it may have been inconsequential

10    with respect to the finding of great bodily harm

11    because of the beating she took.    So I can't tell

12    you that in fact was determinative one way or the

13    other.

14      Q.    It was very strong evidence that tended

15    to prove Mr. Starks guilty of aggravated battery

16    because the bite itself was inflicting significant

17    harm on her?

18      A.    I can't speculate to that because of all

19    of the other evidence of great bodily harm.    I

20    think it was corroborative of identification.    It

21    was the strategy behind it.

22      Q.    So for you as a prosecutor the

23    importance of this evidence was not so much that

24    it tended to show an aggravated battery but it

 1    tended to show who had committed all of these

 2    crimes on Miss Gonzalez, correct?

 3         MR. KRAUSE:   Objection, mischaracterizes the

 4    witness's prior testimony.

 5    BY THE WITNESS:

 6         A.   Again, it was corroborative of

 7    identification.   It did not tend to prove

 8    penetration.   It didn't tend to prove the

 9    admission of bodily fluid.   It was corroborative

10    of somebody being there and being able to be

11    identified.

12         Q.   Well, she said one person bit her,

13    battered her, dragged her down the ravine, raped

14    her, and attempted to have oral sex with her,

15    correct?

16         A.   Yes.

17         Q.   And this evidence that the bite mark on

18    her was inflicted by Bennie Starks thus tended to

19    prove all of those crimes, correct?

20         MR. KRAUSE:   Objection, speculation.

21    BY THE WITNESS:

22         A.   Yes, to the extent that it proved an

23    element of all of those crimes, which is

24    identification, you're right.

Page 209

1       Q.   Did you question Dr. Hagstrom and/or

2   Dr. Schneider with respect to whether they had

3   followed the standards of national odontological

4   organizations?

5       A.   I don't have any specific recollection

6   of that.  I do remember that we did discuss

7   standards at some point in time, but I don't have

8   any specific recollection of when it was or what

9   the discussions entailed.

10      Q.   I'm presuming that they never told you

11  they violated standards of national odontological

12  organizations; is that correct?

13      A.   They never told me that.

14      Q.   If they had told you that, you would

15  have recorded that and provided that evidence to

16  defense counsel, correct?

17      MR. KRAUSE:  Objection, speculation.

18  BY THE WITNESS:

19      A.   Yes.  Answering, I guess, in a

20  generality, yes.  It may have been I would decide

21  not to use the evidence, and it never became an

22  issue.

23      Q.   In that situation had they advised you

24  of that you either would have said forget these

1    identification.

2        Q.    Well, here there was a challenge to

3    identification?

4        A.    There wasn't in my case in chief.  I

5    don't know if, in fact, in the rebuttal I used a

6    photo lineup, if it was there.  I would tend to

7    think it was not introduced since it is not marked

8    as being admitted.

9        Q.    If in fact the photo lineup was

10   admissible evidence, as I will submit to you it

11   was as of the law in 1986, you would have wanted

12   to use that as evidence that corroborated the

13   identification of Maria Gonzalez of Bennie Starks,

14   correct?

15       MR. KRAUSE:  Objection, mischaracterizes the

16   witness's prior testimony.

17   BY THE WITNESS:

18       A.    I would probably say yes.  The issue is

19   would I have thought about it.  I don't know if I

20   thought about it or not.  Sometimes you miss the

21   forest through the trees.  You are focused on

22   other evidence that accomplishes what you want or

23   you think it does.  I don't know what the answer

24   to that is.  I don't have any specific

1     recollection of dealing with that issue, whether I

2     would use the photo lineup or not.

3          Q.   If you had seen the forest and not

4     missed the issue, and if in fact as I'm submitting

5     to you it was such a photo lineup was admissible,

6     you would have wanted to use it in your case?

7          A.   Probably.

8          Q.   And you recognize as a prosecutor that

9     an in-court identification, although it might be

10    somewhat dramatic, is not really a test in any

11    real sense of the person's ability to ID the

12    perpetrator since there is only one person sitting

13    there who it could be; would you agree with that?

14         A.   Yes, I would.

15         Q.   What contact do you recall having with

16    the Waukegan police department officers who were

17    involved in this case?

18         A.   I don't recall any specific contact I

19    would have had.  I couldn't tell you who I met

20    with, how long, what we talked about.

21         Q.   So if I provide names, I'm sure you know

22    William Biang?

23         A.   Yes, I do.

24         Q.   That name does not ring any bells in

# Exhibit 12



**WAUKEGAN POLICE DEPARTMENT**

SUPPLEMENTARY REI

| Type of Offense: Agg.Criminal Sexual Assault | Date and Time of Original Offense: 18Jan.86 m | Attach to Report No: 86-1898 |
|---|---|---|
| | Date and Time of this Report: | |

| Juvenile Name | Age | Sex | Race | Dob Day    Mo    Yr. | Location of Arrest: | By: |
|---|---|---|---|---|---|---|

| Address: | Mothers Name | Work Phone | Fathers Name | Work Phone |
|---|---|---|---|---|

| Legal Guardian: | School & Grade | Home Phone Number: |
|---|---|---|

22Jan.86 Deprez 8:20am
Interview:.BENNIE STARKS Jr.

    At the above date and time Officer removed BENNIE STARKS
from his cell where he was led  to an interview room.  BENNIE
was then readvised of his rights per Miranda from a preprinted
rights waiver form which he stated he understood.  BENNIE stated
he still would speak with Officer and the following is a summary
of what was stated to Officer by BENNIE.  Officer at this time
asked BENNIE where he had received the scratches that were present
on his body to which he replied "I must've fell somewhere".
Officer asked if the fall was from a result of the robbery that
ocurred on 18Jan.86 and BENNIE replied "No man".  BENNIE stated
"I don't know where I fell".  Officer then asked BENNIE how long
he had been living with his Mother at 300 Lake St. and if he
had a key to her apartment to which he replied he did not have
a key and he had been living with her for 2 weeks.
    Officer then asked BENNIE if it was possible that he may
have known the Victim,MARIA GONZALES, to which he replied "no
man I never met the bitch".  Officer also asked BENNIE if it was
possible that he may have sometime been in her apartment or been
in her apartment having a beer on the 18Jan.86 to which he replied
" I told you man I do'nt know the Bitch and I ai'nt never been
in her apartment".  Officer then asked BENNIE if he had been in
the area of 300 Lake at the time the incident ocurred to which
he replied "no I ai'nt seen no one and I just went to my Mamma's
apartment".
    Officer at this time showed BENNIE the silver toned "Quintel"
digital watch recovered at the scene and asked if he had--Cont.pg.2--

| Reporting Officers: | *Det. D Deprez* | Supervising or Review Officer: | *Sgt Stinson* |
|---|---|---|---|

4-WPD-P

LB75

**WAUKEGAN POLICE DEPARTMENT**                                    **SUPPLEMENTARY REPORT**

| Type of Offense: Agg. Criminal Sexual Assault | Date and Time of Original Offense: 18Jan.86 | Attach to Report No. 86-1898 |
|---|---|---|
| | Date and Time of this Report. | |

| Juvenile Name | Age | Sex | Race | Dob Day Mo Yr. | Location of Arrest: | By |
|---|---|---|---|---|---|---|

| Address: | Mothers Name | Work Phone | Fathers Name | Work Phon |
|---|---|---|---|---|

| Legal Guardian: | School & Grade | Home Phone Number: |
|---|---|---|

Interview: Bennie STARKS continued page 2 ---

-- ever seen it or if it was his to which he replied "no man
I ai'nt never seen it before". Officer then showed BENNIE the
blue/green scarf that was recovered at the scene and asked him
if it was his property to which he replied "no man I ai'nt never
seen that either, it ai'nt mine". Officer then asked BENNIE if
it was possible that a pack of "Newport" cigarettes that were
found at the scene were his and if it was possible that the cigar-
ettes were taken along with his jacket to which he replied "no".
Officer also asked BENNIE what his brand of cigarette was to
which he replied "I do'nt smoke that much". It is noticed that
when BENNIE first requested a cigarette from Reporting Officer
he stated "thats what I smoke". Reporting Officer brand of cigar-
ettes are "Newport". The interview was then terminated and BEN-
NIE was returned back to his cell.

| Reporting Officers: | Supervising or Review Officer |
|---|---|

4-WPD-P

LB76