# Exhibit 13

# WAUKEGAN POLICE DEPARTMENT

## INVESTIGATOR'S NARRATIVE REPORT

| OFFENSE | DATE/TIME THIS REPORT | LOCATION OF INTERVIEW | OFFICER | REPORT NUMBER |
|---|---|---|---|---|
| Sex Assault | | | | 86-1898 |

| CODE | V - VICTIM | W - WITNESS | S - SUSPECT | I - INTERVIEW | | | | |
|---|---|---|---|---|---|---|---|---|
| CODE | NAME | | | AGE | D.O.B. | ADDRESS | APT | TELE | BUS. TELE |

31Mar86 Sgt Juarez 2PM
At the above date and time R/O spoke with MARIA GONZALEZ reference this case. Officer asked her if during a 2 week period prior to her attack, if she had any sex with anybody and she stated ████ no.
Officer advised her that the Crime Lab needed this information for their tests.

| PAGE ____ OF ____ PAGES | [ ] CASE CLEARED BY ARREST | [ ] CASE CLEARED, UNFOUNDED | SUPERVISOR |
|---|---|---|---|
| [ ] ADULT  [ ] JUVENILE | [ ] FURTHER INVESTIGATION NEEDED  [ ] CASE FILED | [ ] CLEARED, VICTIM WILL NOT PROSECUTE  [ ] MULTIPLE CASES CLEARED | |

WPD-4

# Exhibit 14

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4

    BENNIE STARKS,                )
 5                                )
                  Plaintiff,      )
 6                                )
           vs.                    )     No. 09 C 348
 7                                )
    CITY OF WAUKEGAN, and PRESENT )     Judge Gary Feinerman
 8  and FORMER WAUKEGAN POLICE    )
    DEPARTMENT OFFICIALS:         )     Magistrate Judge
 9  LIEUTENANT URBANCIC, W. BIANG,)     Mason
    P. STEVENSON, M. JUAREZ,      )
10  D. DEPREZ, DR. CARL HAGSTROM, )
    DR. RUSSELL SCHNEIDER AND     )
11  SHARON THOMAS-BOYD,           )
                                  )
12                Defendants.     )

13

14

15         The deposition of SHARON THOMAS-BOYD, pursuant
16  to notice and pursuant to the Federal Rules of Civil
17  Procedure for the United States District Courts
18  pertaining to the taking of depositions, taken before
19  Carmella T. Fagan, C.S.R., R.P.R., Notary Public
20  within and for the County of Cook and State of
21  Illinois, at 1180 North Milwaukee Avenue, Third
22  Floor, in the City of Chicago, Cook County, Illinois,
23  commencing at 9:38 a.m. on the 23rd day of September,
24  2014.
25            BREHON REPORTING  (708) 442-0027
```

1 testing evidence on multiple occasions and producing

2 multiple reports, would you have access to your prior

3 work sheets and your prior reports when you were

4 doing the subsequent reports?

5    A.  I really don't know.

6    Q.  The letter that we've identified as

7 Exhibit 9, that does not contain any explanation as

8 to why you need a -- a semen standard or a vaginal

9 standard in order to make a sound, scientific

10 decision.  Do you agree with that?

11    A.  Yes.  It just says I need it to make

12 it.

13    Q.  Right.  Do you know why the letter

14 fails to set forth any underlying reason why you need

15 either the semen standard or the vaginal standard?

16    A.  No.

17    Q.  Now I'm going to go on to Exhibit 10.

18       (WHEREUPON, Boyd Exhibit 10 was

19       marked and tendered to Witness.)

20   MR. KARAVIDAS:  I want to take a break for a

21 few minutes.

22   MR. STAINTHORP:  Okay.  But I --

23   MR. KARAVIDAS:  I want to take a break.

24       (WHEREUPON, there was a brief

1      Bennie Starks, correct?

2            A.      Yes.

3            Q.      All right.  This report does not

4      indicate any testing of the saliva standard from

5      Bennie Starks, does it?

6            A.      I don't know.  I would have to read

7      the whole thing.

8            Q.      Well, why don't you take a look.

9                         (WHEREUPON, the Witness was

10                         reading Boyd Exhibit 10.)

11           A.      No.  It doesn't say anything about

12     saliva samples.

13           Q.      Do you know why you had not tested a

14     saliva sample from Bennie Starks as of March the 5th

15     of 1986?

16           A.      I don't know.

17           Q.      Again, you noted that the -- under

18     "Tests and Conclusions," you again have the request

19     for semen standard and a vaginal standard, correct?

20           A.      Yes.

21           Q.      And essentially it's articulated in

22     the same manner as in your work sheet?

23           A.      Yes.

24           Q.      All right.  So, again, there is no

1     explanation as to the scientific reason why you

2     believe that you needed either a semen standard or a

3     vaginal standard?

4          A.     I did not put it in the report.  No.

5          Q.     At the end of the report, you have a

6     "Table of Results," correct?

7          A.     That is correct.

8          Q.     And that contains the results that you

9     had of the testing that was evidenced by the work

10    sheets; is that correct?

11         A.     Yes.

12         Q.     And do you have any explanation for

13    why you requested a semen sample from Bennie Starks

14    prior to testing a saliva sample?

15         A.     I -- I don't know.

16         Q.     Just going back a minute for the

17    letter that you sent to -- this one (indicating).

18         A.     Yes.

19         Q.     Do you see that a copy was sent to

20    Luis Berrones (sic)?

21         A.     Yes, I do.

22         Q.     And that was the prosecutor in the

23    case?

24         A.     I believe so.  Yes.

1    is.  Yes.

2           Q.      What does "non-secretor" mean?

3           A.      I'm not an expert at this anymore.

4           Q.      So you just don't know?

5           A.      I just don't want to answer because I

6    really -- it's out of my scope at this time.

7           Q.      In terms of forensic serology, do you

8    know what the term "non-secretor" -- strike that.

9                   This type of forensic serology isn't

10   really done anymore because it's been supplanted by

11   DNA.  But back in the day, did you know what the term

12   "non-secretor" meant in terms of forensic serology?

13          A.      In general, it meant that a person

14   would secrete their ABH substances in their body

15   fluids.

16          Q.      If they were a secretor?

17          A.      If they were a secretor.

18          Q.      And if they were a non-secretor?

19          A.      It shouldn't have been there.

20          Q.      And you know that you would normally

21   test for that by testing a saliva standard, correct?

22          A.      It looks like, yes, there's saliva

23   standards on here.

24          Q.      By the time that you filled -- or when

1    you filled this work sheet out, you had determined

2    that Bennie Starks was a -- was ABO type B; is that

3    correct?

4          A.     Yes, that's it says, B.

5          Q.     And you had determined that

6    Mr. Starks' Lewis type was A minus B plus?

7          A.     Yes.  That's what it says.

8          Q.     Do you now know that that means that

9    he would normally be a secretor?

10         A.     That's what it says.

11         Q.     Well, it actually says that under the

12    saliva standard.

13         A.     Right.

14         Q.     But my question is whether you now

15    know that the A minus B plus Lewis type would

16    normally be a secretor?

17         A.     From the conversation, yes, that's

18    what that's indicating.  Yes, I can see that.

19         Q.     But, in fact, he was determined to be

20    a secretor in two different ways, both by the

21    determination of the Lewis factor and also by the

22    saliva standard, correct?

23         A.     That's what it's saying.  Yes.

24         Q.     And if he was a secretor, you would

1    normally expect him to secrete his blood group

2    substances in his bodily fluids, correct?

3         A.    Yes.   It says here for his saliva he

4    secreted B and H.

5         Q.    Right.   And obviously the

6    determination that he secreted B was a determination

7    you made after running tests on his saliva standard,

8    correct?

9         A.    Yes.

10        Q.    So in his saliva, the B blood group

11   substance was sufficiently concentrated that you

12   could detect it in his saliva?

13        A.    In his saliva.   Yes.

14        Q.    And if you go down, you tested the

15   vaginal swab obtained from Maria Gonzalez, correct?

16        A.    Yes.

17        Q.    And determined the H blood group

18   substance --

19        A.    Yes.

20        Q.    -- correct?   And you also tested the

21   semen stain on the underwear and also determined --

22   also found H blood group substance.

23        A.    That's correct.

24        Q.    So since Maria Gonzalez was a

1    non-secretor, both of those blood group substances H

2    must have come from a person other than Maria

3    Gonzalez, correct?

4         A.    I think that's why I requested a

5    sample from her, too, to make sure.

6         Q.    Well, if you determined that she was a

7    non-secretor, did you have -- was there some

8    literature that you had looked at that said that some

9    non-secretors do secrete their blood group substances

10   in some of their bodily fluids, but not all of them?

11        A.    All -- all I know is that this is

12   information I was going off of, and I was trying to

13   be as careful as possible, so I asked for a sample

14   from her and a semen sample from him to exclude.

15        Q.    Well, at any rate, once you had the

16   vaginal swab, and this is the one that -- not the

17   rape kit one, but the one subsequently, you

18   determined that indeed -- I'm sorry.  I -- I'm sorry.

19   This vaginal swab is the rape kit one.  Do you see --

20        A.    Yes.

21        Q.    -- it's "1-01"?  Okay.  And, actually,

22   the one further up the page, the vaginal standard of

23   Maria Gonzalez, is that the subsequent vaginal

24   standard that you requested?

1        A.     I don't know.

2        Q.     And that has nothing marked down for

3  the ABO type, correct?

4        A.     Right.

5        Q.     And then in the column next to that is

6  marked "non-secretor" --

7        A.     Um-hum.

8        Q.     -- is that correct?

9        A.     Yes.  That's what it says.

10       Q.     So looking at that, do you understand

11  that your findings with respect to the subsequent

12  vaginal swab, not the rape kit one, was that Maria

13  Gonzalez did not secrete blood group substances in

14  her vaginal secretions?

15       A.     Yes, that that was the vaginal

16  standard.

17       Q.     So with that information, you knew

18  that the -- that the finding on the vaginal swab, the

19  rape kit vaginal swab, of H, must come from someone

20  other than Maria Gonzalez, correct?

21       A.     Yes.

22       Q.     And you knew that in a normal

23  situation, that must come from -- strike that.

24                And you knew that in the normal

1    situation, since you had not found any B BGS

2    substances in either the vaginal swab or the semen

3    stain, that could not be contributed by a B secretor?

4         A.    No, I didn't know that.  I knew that

5    there was such things as an aberrant secretor that

6    could show only H instead of B, so I wanted to make

7    sure, and I asked for the semen sample.

8         Q.    The only basis for your statement that

9    there were so-called aberrant secretors who -- who

10   secreted only H but not B in their semen was that one

11   study referenced the source book for forensic

12   biology, correct?

13        A.    And there was also information about

14   the H substances in people's salivas for that in the

15   "AABB Technical Manual."

16        Q.    Okay.  The only one that related to

17   semen was sourcebook in forensic biology?

18        A.    That's what I have here, the Davie's

19   study and the "Sourcebook in Forensic Serology."

20        Q.    Well, it's the same thing.

21        A.    Okay.

22        MR. KARAVIDAS:  Here.  That's what you were

23   saying.  You haven't asked her that.

24        MR. STAINTHORP:  Right.

1        MR. STAINTHORP:  I know.  That's what I'm --

2        MR. KARAVIDAS:  The notes you did, but not the

3  report.

4        MR. STAINTHORP:  Right.  So that's what I'm

5  going --

6        MR. KARAVIDAS:  I was -- I was going to tell

7  you that.

8        MR. STAINTHORP:  -- to get to now.  So I think

9  we're on Number 13?

10       MS. REPORTER:  Yes.

11               (WHEREUPON, Boyd Exhibit 13 was

12               marked and tendered to Witness.)

13  BY MR. STAINTHORP:

14       Q.     So I've handed you what's been marked

15  Exhibit 13.  Do you recognize this as a report that

16  you authored that's dated April the 10th of 1986?

17       A.     Yes.  It has my signature.

18       Q.     This report essentially documents the

19  work sheets that we just marked as Exhibit 12,

20  correct?

21       A.     That is correct.  I believe so.  It

22  looks like it.

23       Q.     And, again, at the end of the report,

24  you, again, state that you need a semen standard from

1          Q.       You didn't use that term.

2          A.       Right.  I didn't memorize the

3    transcript, so. . .

4          Q.       In the course of examining your

5    testimony, did you see anywhere that you explained

6    that Mr. Starks would have been excluded as the

7    source of the semen on the swab or the underpants

8    unless he was an aberrant secretor?

9          A.       So did I say that?

10         Q.       Yes.

11         A.       I was never asked that.

12         Q.       Well, you don't think you were asked

13   that when you were asked this question:  "Now, based

14   on the tests that you conducted on all those exhibits

15   on this, did you form an opinion within a reasonable

16   degree of scientific certainty what the source of the

17   sperm was that you located on the underwear and this

18   vaginal swab?"

19         A.       I had said in my report that "to make

20   a sound, scientific decision concerning the possible

21   exclusion of the suspect," I needed the semen sample.

22         Q.       But we already established that in

23   your report, you made no reference to him being

24   excluded unless he was an aberrant secretor, right?

1    We've already established that, I think.

2         A.      But I said here, "to make a sound,

3    scientific decision," I needed that.  And they asked

4    me here, "scientific certainty," and I answered, "I

5    had to include him."

6         Q.      Okay.  Did you feel it would have been

7    useful to the court and to the jury in determining

8    Mr. Starks' fate, to explain that he was excluded as

9    the source of the semen on the swab and the

10   underpants unless he was an aberrant secretor, and

11   you were unable to determine that?

12        A.      I was taught to answer the questions I

13   was given.

14        Q.      And you --

15        A.      I wasn't asked anything about it.

16        Q.      Okay.  What percentage of people, even

17   under the study that you claim to be relying on, were

18   aberrant secretors?

19        A.      It's a small amount.

20        Q.      What percentage?

21        A.      I couldn't tell you right off the top

22   of my head.

23        Q.      Did you ever at any time in this

24   testimony tell this court that Mr. Starks was

1    excluded as the source of the semen on the swab and

2    the underpants unless he was a member of this small

3    percentage of persons who are aberrant secretors?

4         A.    I was never asked.  I answered the

5    questions that I was asked.

6         Q.    Did you ever tell the prosecutor that?

7         A.    I -- I gave the prosecutor my reports.

8    We went to court to try to get the specimen.  I don't

9    recall all of my conversations with him, but

10   obviously I wanted this because this says that to

11   possibly exclude him, I need this.

12        Q.    Did you ever explain to the prosecutor

13   that in terms of wanting the semen sample from

14   Mr. Starks, you were attempting to determine whether

15   he was a part of a very -- a part of a small group

16   that was termed "aberrant secretors"?

17        A.    I told him I wanted the specimen so I

18   could exclude him.

19        Q.    My further -- I understand that.  My

20   further question is whether you ever told him at any

21   time that you wanted the semen sample to determine if

22   Mr. Starks was an aberrant secretor?

23        A.    I don't know.

24        Q.    Do you have any recollection of

# Exhibit 15

1        IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN

3                  DIVISION

4                  --oOo--

5

6  BENNIE STARKS,
       Plaintiff,

7

   vs.               Case No.:  1:09-cv-00348

8

  CITY OF WAUKEGAN and PRESENT

9  AND FORMER WAUKEGAN POLICE
  DEPARTMENT OFFICIALS

10  LIEUTENANT URBANCIC, W. BIANG,
  P. STEVENSON, M. JUAREZ AND D.

11  DEPREZ; DR. CARL HAGSTROM, DR.
  RUSSELL SCHNEIDER and SHARON

12  THOMAS-BOYD,
       Defendants.

13  _____/

14

15      DEPOSITION OF EDWARD T. BLAKE, Ph.D

16        Wednesday, September 10, 2014

17

18

19     REPORTER'S TRANSCRIPT OF PROCEEDINGS

20    BY HEIDI BELTON, CSR, RPR, CCRR, CRR, CLR

21     CERTIFIED SHORTHAND REPORTER NO. 12885

22  -----------------------------------------------

23     CLARK REPORTING & VIDEOCONFERENCING
      2140 SHATTUCK AVENUE, SUITE 405

24       BERKELEY, CALIFORNIA 94704
          (510) 486-0700

25
                                     1

CLARK REPORTING  (510) 486-0700

| | |
|---|---|
| 14:20:18  1 | (Exhibit 8 marked.) |
| 2 | BY MR. KARAVIDAS: |
| 3 | Q.   Sir, I'll show you what's been marked |
| 4 | Exhibit 8 and ask you if that's a true and accurate |
| 14:20:23  5 | copy of your report dated April 2000. |
| 6 | A.   Yes, bearing in mind that the original was |
| 7 | in full color, and this is a black-and-white copy. |
| 8 | Q.   If you can please look at page 4 of that |
| 9 | report.  It says "not relevant" next to items 7, 7-1 |
| 14:21:20 10 | and 7-2.  Do you see that? |
| 11 | A.   Yes. |
| 12 | Q.   Whose handwriting? |
| 13 | A.   I think that that's mine. |
| 14 | Q.   All right.  And that is with respect to |
| 14:21:32 15 | the vaginal swab taken April 1, 1986 and vaginal |
| 16 | smears containing two slides; is that correct? |
| 17 | A.   Yes. |
| 18 | Q.   What were the -- what were the dates of |
| 19 | those vaginal smears that were taken? |
| 14:21:49 20 | A.   I have no idea. |
| 21 | Q.   And why did you write "not relevant" next |
| 22 | to those? |
| 23 | A.   Because I don't think -- and I don't know |
| 24 | when that note was taken, but we've already |
| 14:22:05 25 | discussed the vaginal swab.  There's just a stick. |

170

CLARK REPORTING  (510) 486-0700

| | | |
|---|---|---|
| 14:22:09 | 1 | Q.    Yes. |
| | 2 | A.    And that -- you know, that was examined. |
| | 3 | Q.    All right.  What about the slides? |
| | 4 | A.    Slides I don't know. |
| 14:22:16 | 5 | Q.    As you sit here now, you don't remember |
| | 6 | why they were not relevant? |
| | 7 | A.    That's correct. |
| | 8 | Q.    All right. |
| | 9 | A.    Now, I don't know if there's information |
| 14:22:29 | 10 | in this report or there's information in Mr. Keel's |
| | 11 | notes about examining those smears or not. |
| | 12 | Q.    And then the rest of your report |
| | 13 | includes -- after the written report, it includes |
| | 14 | data with respect to DNA testing and photographs of |
| 14:22:52 | 15 | exhibits; is that correct? |
| | 16 | A.    Correct. |
| | 17 | Q.    All right.  Page 5 of the report says, |
| | 18 | "Examination of the Gonzales Underpants [Item 6]." |
| | 19 | A.    Yes. |
| 14:23:06 | 20 | Q.    That was the only source of the semen that |
| | 21 | you tested in -- that was the subject of this |
| | 22 | April 2000 report? |
| | 23 | A.    That's correct. |
| | 24 | Q.    By the way, this report that you have is a |
| 14:23:22 | 25 | true and accurate copy except for the fact that the |

171

14:23:24  1    original was in color?

2         A.    Correct.

3         Q.    If you turn to page 6.  The middle of the

4    page.  With respect to the examination of the

14:23:40  5    partial vaginal swab collected April 1, it says,

6    "Since the Gonzales alleged sexual assault occurred

7    January 18, 1986, the relevance of this swab is

8    unclear."  And then it continues, "No further work

9    has been conducted on this swab until these

14:23:58 10    questions are satisfactorily answered."

11              I left out, "It is also unclear why the

12    majority of this swab has been removed for testing

13    and what the outcome of that testing revealed.  No

14    further work has been conducted on this swab until

14:24:11 15    these questions are satisfactorily answered."

16              Were those questions ever satisfactorily

17    answered?

18         A.    Your answer -- well, they were partially

19    answered.  Later on, once the report -- the

14:24:31 20    Thomas-Boyd report was provided to The Innocence

21    Project, I think sometime in 2004, it became

22    apparent that this particular vaginal swab was a

23    noncoital, follow-up vaginal swab used by

24    Thomas-Boyd to double-check the presence of antigens

14:25:01 25    in the Gonzales vaginal secretions.  That's my

172

14:25:04  1    understanding.

2        Q.    And was that an appropriate request for

3    Sharon Boyd to make under the circumstances?

4        A.    I don't think it was particularly

14:25:22  5    inappropriate.  I mean, if a scientist has questions

6    that are definable, more testing, the better.

7        Q.    So she asked for follow-up testing on

8    April 1 to obtain a reference sample from Maria

9    Gonzales?

14:25:44 10        A.    Well, she had already -- this is the

11    thing.  She had already determined in an apparent

12    rigorous manner that Ms. Gonzales was an ABO type O

13    nonsecretor.  She did Lewis testing, she did ABO

14    testing on -- on reference samples.  And it's simply

14:26:07 15    not scientifically credible that the vaginal

16    secretions of Maria Gonzales can produce

17    water-soluble ABO blood group substances.  It's a

18    genetic impossibility.  But if you have -- if you're

19    bothered by something, you know, why not -- just as

14:26:28 20    a security blanket, you know, if that's what your

21    approach is, you know, just do that kind of

22    double-check.

23        Q.    All right.  So you don't think that Sharon

24    Boyd asking for the vaginal swab sample taken on

14:26:44 25    April 1, 1986 was inappropriate?

173

**CLARK REPORTING  (510) 486-0700**

14:26:47 1     A.   It's not something that I would have done.

2   I -- I don't know any knowledgeable scientist that

3   would do that.  But if it made her feel better about

4   any of her findings, have at it.  I mean -- you

14:27:04 5   know, it doesn't hurt anybody.  Do you see what I'm

6   saying?

7       Q.   The -- page 10 of your report, paragraph 7

8   says, "We recommend that a reference sample from any

9   consensual sex partner(s) of Maria Gonzales be

14:27:26 10   obtained to determine whether or not such a

11   hypothetical individual can be eliminated as a

12   source of the spermatozoa in her underpants.  In the

13   alternative, if conventional serology typing data is

14   available from a consensual sex partner of Maria

14:27:44 15   Gonzales, this information could be employed to

16   determine whether or not this individual can be

17   eliminated from the 14 percent of the population

18   that the State claims could contribute to the semen

19   evidence."

14:27:55 20       Why did you make that recommendation to

21   get a reference sample from any consensual partner

22   of Maria Gonzales?

23       A.   Because if a consensual sex partner of

24   Maria Gonzales can be proved to be the source of the

14:28:13 25   spermatozoa, then the spermatozoa that's found in

174

**CLARK REPORTING  (510) 486-0700**

14:28:18  1   her underwear isn't relevant to the -- to the

2   inquiry about the assault on Gonzales.  That's

3   obvious; isn't it?

4        Q.   And in paragraph 8 you stated, "We also

14:28:35  5   recommend that a newly collected reference sample

6   from Bennie Starks be obtained.  The reference

7   sample for Starks employed in this analysis

8   originates from eight hair roots.  While hairs are

9   perfectly reliable sources of DNA, that DNA

14:28:50 10   information is no more reliable than the labeling on

11   the hair packet.  A newly collected saliva or blood

12   standard will remove any potential concerns about

13   the history of the reference hair specimen."

14        Did I read that correctly?

14:29:06 15        A.   Yes.  That's what I was trying to get to

16   before, before you got angry with me.

17        When you were talking about the degraded

18   blood sample, it led me to believe that you thought

19   that the DNA analysis for Bennie Starks' reference

14:29:22 20   sample was this degraded blood sample when it

21   wasn't.  The DNA analysis for Bennie Starks'

22   reference sample was the hair sample.

23        Q.   Yeah.  And I actually wasn't meaning that.

24   I simply wanted to talk about degradation and get to

14:29:37 25   the specifics in your reports as we went along.  I

175

**CLARK REPORTING  (510) 486-0700**

14:29:39  1    was just trying to establish some -- some

2    information to talk about these things.  So I really

3    didn't want to get into the specifics until we

4    looked at the report.

14:29:49  5            I see that this April 2000 report was

6    signed by both you and Alan Keel; is that correct?

7        A.    That's correct.

8        Q.    What parts of this report did he author?

9        A.    (Laughter.)

14:30:18 10            Counsel --

11        Q.    Did he author the report and you approved

12    it or did you have a hand in writing the report?

13        A.    I wrote the report and Mr. Keel edited it

14    and approved it --

14:30:26 15        Q.    Okay.

16        A.    -- and signed it.

17        Q.    Thank you.

18            That's Exhibit 8.  What's this other one;

19    3?  I think we're done with 3.

14:31:04 20        A.    I'm going to grab a little bit more water.

21    I'll be right back.  I'm not going anyplace.

22                    (Brief pause.)

23                        (Exhibit 9 marked.)

24    BY MR. KARAVIDAS:

14:31:39 25        Q.    I want to show you what's been marked

176

**CLARK REPORTING   (510) 486-0700**

| | | |
|---|---|---|
| 15:07:44 | 1 | Q.    No.  Is it complete now that it has the |
| | 2 | table of genetic -- |
| | 3 | A.    I think so, yeah. |
| | 4 | Q.    All right.  With respect to the statement |
| 15:08:33 | 5 | at the page 2 of that report, "In order to make a |
| | 6 | sound scientific decision concerning the possible |
| | 7 | exclusion of the suspect Bennie Starks as a possible |
| | 8 | source of the foreign blood group detected on the |
| | 9 | submitted vaginal swab and underwear, a semen |
| 15:08:48 | 10 | standard from Bennie Starks is required," do you |
| | 11 | believe that she should have worded that |
| | 12 | differently? |
| | 13 | A.    To say the least. |
| | 14 | Q.    All right.  How do you think she should |
| 15:09:01 | 15 | have worded that? |
| | 16 | A.    First of all, I don't think that the |
| | 17 | statement was necessary.  However, I don't |
| | 18 | particularly object to her asking for a semen sample |
| | 19 | to remove any lingering doubt that she may have |
| 15:09:34 | 20 | about whatever issues she has about ABO blood group |
| | 21 | substances. |
| | 22 | What she -- what she fails to do here -- |
| | 23 | and this goes back to the point that you elegantly |
| | 24 | made -- was that she never told anybody in this |
| 15:09:52 | 25 | report or in her testimony that her ABO typing |

199

| | |
|---|---|
| 15:09:56 1 | results are compatible with somebody who is an ABO |
| 2 | type O secretor; whereas, Bennie Starks is an ABO |
| 3 | type B secretor -- |
| 4 | Q.   All right. |
| 15:10:10 5 | A.   -- after -- after she said that in the |
| 6 | report and in her testimony.  If she had some other |
| 7 | reservations, fine.  But she had a duty as a |
| 8 | scientist to put that in her report because that's |
| 9 | what her data shows. |
| 15:10:29 10 | Q.   All right.  Let's go to -- let's go to |
| 11 | her -- you've got her complete report now.  So this |
| 12 | page that is titled -- that is titled "Table of |
| 13 | Results, Blood Genetic Marker Analysis," that's part |
| 14 | of her April 10 report; is that correct? |
| 15:10:43 15 | A.   Correct. |
| 16 | Q.   All right.  So she recorded -- the ABO |
| 17 | column, by the way, is the -- is the antigen -- the |
| 18 | blood antigen information that is critical to us; is |
| 19 | that an accurate statement? |
| 15:10:56 20 | A.   Yes. |
| 21 | Q.   All right.  So she recorded the blood |
| 22 | standard of Maria Gonzales as being O.  You see |
| 23 | that? |
| 24 | A.   Yes. |
| 15:11:03 25 | Q.   All right.  So -- so that was an accurate |

200

**CLARK REPORTING   (510) 486-0700**

15:11:08  1    statement of Maria Gonzales' blood type?

2         A.    Yes.

3         Q.    And she recorded the saliva standard of

4    Maria Gonzales -- there is no recording.

15:11:22  5    A.    You're missing one thing that you should

6    know.

7         Q.    Okay.

8         A.    The next column over is labeled "Lewis."

9         Q.    Yes.

15:11:29 10    A.    The Lewis type determines secretor status.

11        Q.    All right.

12        A.    Okay?

13        Q.    So we know that Maria Gonzales was a

14   nonsecretor.

15:11:36 15    A.    Yes.

16        Q.    All right.  We know that.

17        A.    Right.

18        Q.    All right.

19        A.    And we know based upon the Lewis type that

15:11:41 20   she couldn't possibly produce water-soluble blood

21   group substances in her vaginal secretions.

22        Q.    All right.  Okay.  So we know that Maria

23   Gonzales was a non-secretor who was an O blood type?

24        A.    Yes.

15:11:55 25    Q.    So the only person that could have

                                                          201

15:11:56  1    secreted any antigens that were found on the

2    underwear or any vaginal swabs would have had to

3    have come from a secretor?  Any antigens from --

4    from --

15:12:07  5        A.    From the semen deposits.  Because the

6    semen deposits are expected to be a commingled

7    sample.  So the first question that you -- when you

8    get a result from a semen deposit taken from a

9    female's body or her clothing where the samples

15:12:27 10    commingled, you have to -- before you can draw any

11    inference whatsoever about the genetics of the semen

12    source, you first have to answer whether or not

13    everything I've observed can be explained by the

14    female.

15:12:42 15        Q.    And in Maria Gonzales' case it could not?

16        A.    Exactly.

17        Q.    All right.  So I'm going to ask you some

18    questions and if you can try to answer them.

19    Because, again, we're running out of time.

15:12:53 20        "Saliva standard of Maria Gonzales, NS."

21        She was a nonsecretor?

22        A.    Yes.

23        Q.    And "Vaginal standard of Maria Gonzales,

24    NS."

15:13:01 25        She was a nonsecretor?

202

15:13:03  1        A.    Yes.

2        Q.    "Blood standard of Bennie Starks," is

3  listed as B.

4        A.    And -- and a secretor because of his Lewis

15:13:13  5  type.

6        Q.    Correct.   "A-B+."

7              So he's a B secretor?

8        A.    Exactly.

9        Q.    And then the saliva standard of Bennie

15:13:20 10  Starks was B plus H.   He was a secretor?

11        A.    Exactly.

12        Q.    And the vaginal swab of Maria Gonzales was

13  listed as an H.

14        A.    Right.

15:13:28 15        Q.    Was that accurate?

16        A.    Yes.

17        Q.    And then the semen stain on the underwear

18  was listed as an H.   Was that accurate?

19        A.    Yes.

15:13:36 20        Q.    So is all of the information in this table

21  of results -- blood genetic marker -- in Sharon --

22  Shari Boyd's report, is that all accurate?

23        A.    Well, I can't testify to whether it's --

24  the absolute results are accurate, but it's all --

15:13:56 25  it all makes sense.   It has an internal consistency

                                                              203

CLARK REPORTING  (510) 486-0700

15:14:01  1    to it.

2         Q.    All right.  So there isn't anything in

3    that part of the report that you consider to be

4    false?

15:14:07  5         A.    Correct.

6         Q.    All right.

7         A.    My problem is her explanation of this

8    result in light of -- in light of Bennie Starks.

9         Q.    All right.

15:14:15 10         A.    She needed to inform the reader of this

11   report that her findings from the vaginal swab and

12   the -- and the underpants were, at least on the face

13   of it, not genetically compatible with Bennie

14   Starks.

15:14:29 15         Q.    All right.  If she believed that it was

16   possible that the semen that she tested and found

17   only H had such a small amount of B antigen that it

18   did not register on the testing, would that have

19   been a reason for her to ask for a semen standard of

15:14:56 20   Bennie Starks?

21         A.    If she explained all that, fine.  If she's

22   got a reservation, explain the reservation,

23   articulate it, and then what the remedy for the

24   reservation might be.  But that didn't happen here.

15:15:18 25         Q.    All right.  But she wrote a report asking

204

```
15:48:27   1    even though she didn't find any B antigen --
           2              MR. KARAVIDAS:  All right.
           3              THE WITNESS:  -- and in light of the fact
           4    that she only found the H antigen.
15:48:33   5    BY MR. KARAVIDAS:
           6         Q.   All right.  And if she believed that it
           7    was possible that there was such little B antigen in
           8    the semen that it didn't appear on the testing, then
           9    her testimony would have been accurate; is that
15:48:48  10    correct?
          11         A.   That is correct, provided that there is a
          12    logical, reasonable basis for the belief.
          13         Q.   And you --
          14         A.   And so that's a place that you have to go.
15:48:59  15         Q.   All right.  And you believe that she
          16    didn't have a reasonable basis for that belief?
          17         A.   That's correct.
          18         Q.   But to explore that belief, she asked for
          19    a semen sample from Starks to be produced so she
15:49:09  20    could explore that?
          21         A.   So she could explore that what even she
          22    would describe as an aberration.
          23         Q.   And she --
          24         A.   You don't make decisions or give testimony
15:49:22  25    based of beliefs and aberrations.
```

                                                              230

15:49:25  1          Q.    She asked for a semen sample so that she

2     could determine if there was any B antigen in

3     Starks' semen --

4          A.    Yes.

15:49:33  5          Q.    -- is that correct?

6          A.    And my testimony is given that he is

7     demonstrably proven to be a B secretor, that

8     possibility is nonexistent.

9          Q.    So if she had gotten a semen sample and

15:49:48 10     you're saying it's -- it's virtually certain that

11     there would be B secretion in his semen?

12          A.    Absolutely right.

13          Q.    And -- but if she believed that it was

14     possible that there was no B, then she was

15:50:01 15     reasonable in asking for that semen sample?

16          A.    If she believed that that was a viable

17     possibility, then somebody with that state of belief

18     would have a logical reason for making the request.

19     Provided that she articulated her beliefs in her

15:50:24 20     report and in her testimony.  And that she didn't

21     do.

22          Q.    Are you aware that Bennie Starks refused

23     to provide the semen sample when --

24               MR. STAINTHORP:  Objection --

15:50:36 25     BY MR. KARAVIDAS:

231

15:50:36 1      Q.   -- requested?

2           MR. STAINTHORP:  Objection to form.

3 BY MR. KARAVIDAS:

4      Q.   Are you aware that Bennie Starks did not

15:50:40 5 provide a semen sample?

6      A.   Yes.  I mean, there's no question as far

7 as I know that no semen sample from Bennie Starks

8 was provided.

9      Q.   All right.  Are you aware that Bennie

15:50:59 10 Starks' attorney argued before the trial court,

11 objecting to the State's motion to produce that

12 semen sample?  Are you aware of that?

13      A.   No, I'm not.

14      Q.   Are you aware that Bennie Starks has

15:51:14 15 testified in the civil case that if he had known

16 that producing a semen sample would have -- would

17 have had the possibility to exonerate him, he would

18 have produced the the semen sample?  Are you aware

19 of that testimony by Bennie Starks in the civil

15:51:32 20 case?

21      A.   No.

22      Q.   Are you aware that Bennie Starks has

23 testified in the civil case that nobody ever told

24 him that a request for his semen sample was made?

15:51:44 25      A.   No.  I mean --

232

**CLARK REPORTING  (510) 486-0700**

15:51:47 1       Q.    So you're saying that if he -- in your

2    opinion, if he had given a semen sample, that would

3    have for sure shown that he had B antigen and it

4    would have satisfied Shari Boyd that he was not the

15:52:00 5    person who was the source of the semen in the

6    underpants that you tested?

7            MR. STAINTHORP:   Objection --

8            THE WITNESS:   There's --

9            MR. STAINTHORP:   Objection to form.

15:52:07 10            But go ahead.

11            THE WITNESS:   There's absolutely no

12    question that given the genetics of Bennie Starks as

13    determined by Thomas-Boyd that his semen is going to

14    contain the B antigen and at a substantial level.

15:52:27 15    There's no question about that.

16    BY MR. KARAVIDAS:

17       Q.    Paragraph 37 of your report -- and we are

18    really almost done with this part.

19            Paragraph 37 is, "The exculpatory nature

15:52:44 20    of the Sharon Thomas-Boyd ABO findings should have

21    been obvious to any prosecutor or defense attorney

22    that read the Northern Illinois Police Crime

23    Laboratory report dated April 10, 1986. I have no

24    information about whether Starks' trial counsel had

15:52:57 25    a copy of the report at trial. However, it is clear

233

# Exhibit 16





3053 Research Drive, Richmond, CA 94806
(510) 222-8883
FAX (510) 222-8887
Email: ed@fsalab.com

*Original in Full Color*

June 1, 2004

Vanessa Potkin, Esq.
Barry Scheck, Professor
The Innocence Project
100 Fifth Ave., 3rd Floor
New York, NY, 10011
FAX: [212] 364-5359

Re: Illinois v. Bennie Starks
Court Case No. 86 CF 106
Our File No. 97-304

## Affidavit of Dr. Edward Blake

### Expert Qualifications

1.     My name is Edward T. Blake. I am a forensic serologist with extensive

experience in the analysis of biological evidence, including in particular

the application of DNA technologies and, before the advent of forensic

DNA typing, conventional biochemical procedures, to the genetic analysis

of biological specimens. I am a partner in the firm of Forensic Science

Associates located in Richmond, California, where I have been in private

practice since 1978.

2.      I have employed biochemical procedures to the analysis of biological evidence since the mid-1970's, and I have employed the polymerase chain reaction (PCR) process to the genetic characterization of biological evidence since 1986. My initial education and training was at the University of California, Berkeley where I received my B.S. degree in Criminalistics (1968) and my Doctor of Criminology in Forensic Science (1976) under the direction of Dr. George F. Sensabaugh. I received training in the use of the PCR process at the laboratory of Dr. Henry Erlich at Cetus Corp., located in the San Francisco Bay Area where the PCR process was invented. In 1994 the Nobel Prize in chemistry was awarded to a member of Dr. Erlich's staff for his invention of PCR. Between 1986 and 1991, I collaborated with Dr. Erlich and his staff members in developing procedures and applying PCR to the analysis of physical evidence in criminal cases. During that period of time I was the only person in the United States or anywhere else in the world applying this type of DNA technology to criminal investigations. My resume is enclosed as Exhibit 1.

3.      Prior to the advent of DNA technology, I employed conventional biochemical procedures to the examination and genetic characterization of biological evidence. This work included the genetic characterization of blood and semen using immunological procedures for the typing of the ABO blood group substances and electrophoretic procedures for the typing of genetically variable proteins and enzymes. This work is cited in a number of legal decisions, particularly from California.

2

4.   In the late 1970's and early 1980's most of my research, publications, and public presentations focused on the forensic laboratory's role in the investigation of sexual assault cases and in particular, the genetic analysis of semen evidence. In addition to the publications and presentations included in my resume, I participated in the process to create the <u>Report of a Symposium on the Practice of Forensic Serology 1987</u> that documented the then-current state of forensic serology in California. The Symposium Report documented the existing standards and practices employed by any knowledgeable forensic serologist and included standard methods of analysis, evaluation and interpretation of data, note taking, report writing, review, and courtroom testimony. The report of this symposium is enclosed as Exhibit 2.

5.   Many of the early cases where I applied PCR-based DNA typing to the analysis of biological evidence for law enforcement and prosecution services were cases of first impression in the jurisdictions where these cases were litigated. These jurisdictions include California, Pennsylvania, Kansas, Texas, Florida, Virginia, Illinois, New York, Colorado, South Dakota, Ohio, Oregon, Wisconsin, Michigan, West Virginia, New Jersey, Washington, Alabama, Nebraska, Maryland, Iowa, and Arizona. A list of litigated court cases in which I testified at trial and/or provided reports that helped resolve the litigation is enclosed as Exhibit 3. I have been qualified as an expert in forensic serology on more than 100 occasions.

6.   I have also employed PCR-based DNA analyses on physical evidence in post-conviction settings. In fact, the first case anywhere in the world where a DNA analysis revealed the innocence of a wrongly convicted

3

⌣                              ⌣

**Our File No. 97-304**
**Affidavit of Dr. Edward T. Blake**

individual was the case of *Illinois v. Gary Dotson*, an analysis conducted in my laboratory.[1] There are several other cases from my laboratory where the defendants were originally convicted and sentenced to death and where a post-conviction DNA analysis revealed their factual innocence resulting in their convictions being vacated or set aside. The most recent of these cases is the case of *Pennsylvania v. Nicholas Yarris*.

7.  In addition to cases where defendants' claims of factual innocence have been supported by post-conviction DNA testing there are many cases where such claims have been undermined by my laboratory's post-conviction DNA testing. For example, recently in *Illinois v. Lavern McDonald* and *Illinois v. Darryl Moore* post conviction DNA testing supported the State's theory at trial. In recent death penalty litigation, the execution of Ricky McGinn [*Texas v. Ricky McGinn*] was stayed by presidential candidate and Texas Governor George Bush to allow independent post-conviction DNA testing by the State and by the defense, which failed to support McGinn's claims of factual innocence in the rape and murder of his step-daughter.

---

[1] In addition to Gary Dotson, other falsely accused individuals in Illinois whose convictions have been vacated based on our work or our work in collaboration with other scientists include Rolando Cruz [sentenced to death], Alex Hernandez [sentenced to death], Ronald Jones [sentenced to death], John Willis, Omar Sanders, Larry Ollins, Calvin Ollins, and Marcellius Bradford.

4

8.  Many of the American post-conviction DNA exonerations that I
    participated in are briefly described in <u>Convicted by Juries, Exonerated by
    Science, Case Studies in the Use of DNA Evidence to Establish Innocence
    After Trial</u>, published by the National Institute of Justice [NIJ], U.S.
    Department of Justice in 1996. Many of these cases involved poor,
    misleading, and/or erroneous forensic evidence at the defendant's
    original trial.

## Background

9.  In 2000, I was retained by The Innocence Project at the Cardozo School of
    Law to conduct PCR based DNA typing on biological evidence for post-
    conviction review in the Lake County criminal case of *Illinois v. Bennie
    Starks*. The sexual assault victim in this case is Maria Gonzales. The
    Gonzales sexual assault occurred on or about January 18, 1986. The PCR
    based DNA analysis of spermatozoa recovered from three areas [A, B, and
    C] on the Gonzales underpants #24 [Item 6] eliminated Bennie Starks as
    the source of these spermatozoa. My report of this work was published
    on April 3, 2000, and is enclosed as Exhibit 4.

10. At the time of the post conviction investigation in 2000, two distinct
    vaginal specimens from Maria Gonzales were submitted for examination.
    One entirely consumed vaginal swab [Item 8-3] was provided from the
    Gonzales rape kit dated 1/19/86. This vaginal swab had been entirely
    consumed by breaking off the swab tip end so that it no longer existed.
    This broken vaginal swab was illustrated in my report in figure 12.

**Our File No. 97-304**
**Affidavit of Dr. Edward T. Blake**

Examination of the broken vaginal swab end failed to reveal any remaining spermatozoa or vaginal epithelial cells. Thus, it was not possible at that time to conduct DNA typing of spermatozoa from the Gonzales vaginal swab.

11. The other Gonzales vaginal swab specimen [Item 7-1] was a partial noncoital vaginal swab collected from Maria Gonzales on April 1, 1986, approximately three and one half months after her sexual assault. At the time of our 2000 post conviction investigation the relevance and purpose of this noncoital Gonzales vaginal swab was not known because no report from the Northern Illinois Police Crime Laboratory was provided to us.

12. Vanessa Potkin, Esq., an Innocence Project lawyer, and counsel for Starks at the current post conviction proceedings has indicated to me that another vaginal swab from the Maria Gonzales rape kit has recently been discovered. It is possible that this vaginal swab is the remnant of the Gonzales vaginal swab stick end removed from the vaginal swab stick described above.

13. Ms. Potkin has also informed me that a Northern Illinois Police Crime Laboratory report dated April 10, 1986, authored by Sharon L. Thomas-Boyd has just recently been disclosed to The Innocence Project on April 27, 2004. This report concerns Ms. Thomas-Boyd's conventional serology analysis of semen deposits on the Gonzales vaginal swabs and underpants. Ms. Potkin has asked me to review this report in light of Ms. Thomas-Boyd's trial testimony in the Bennie Starks case. No mention of

6

this report appears in the trial transcript record. The Thomas-Boyd

serology report dated April 10, 1986 is enclosed as Exhibit 5.


### The Analysis of Sexual Assault Evidence
### Using Conventional Genetic Markers in General[1]


14.    In order to understand the considerations involved in the interpretation of

sexual assault evidence, it is necessary to have an understanding of the

general scientific facts involved and the logic used in their interpretation.

The analysis of sexual assault evidence usually involves two stages: (1) the

identification and estimation of semen quantity in a given sample; and (2)

the analysis of genetic markers. As of 1987, the standards for conducting

this analysis and reporting the results were clear within the forensic

science community, as reflected in the Report of a Symposium on the

Practice of Forensic Serology 1987.


15.    Genetic markers are inherited biochemical traits that are found in various

body fluids. Each genetic marker system has a certain number of types

associated with it. Every individual has a type that is associated with each

genetic marker system. Genetic marker types can be viewed as serial

numbers that are stamped on our genes that are constant throughout

---

[1] The discussion concerning The Analysis of Sexual Assault Evidence Using
Conventional Genetic Markers in General was also provided to the Hon. David
V. Kenyon, Federal District Court Judge, in my special master report to him in
Habeas Corpus litigation regarding Baylor v. Estelle, Warden. That report, Judge
Kenyon's decision, and the review by the 9th Circuit Court of Appeals are
enclosed as Exhibit 6.

7

one's life. Therefore, genetic markers can be used to distinguish the body fluids of one person from those of another. There are three non-DNA genetic marker systems that are expressed in semen at sufficiently high levels to be frequently useful. They are the ABO, phosphoglucomutase (PGM), and peptidase A (Pep A) genetic marker systems. The Pep A genetic marker system is useful only when the sample might have originated from an individual of African ancestry.

16. In vaginal rape cases, semen evidence is typically mixed with vaginal or other material from the victim. In oral copulation cases, the semen is often mixed with saliva from the victim. Therefore, the interpretation of sexual assault evidence must take into consideration the possible contribution of the female to the observed genetic marker pool. The value of genetic marker testing is that it has the potential to definitively exclude a particular person or segment of the population as the donor of a particular sample. Obviously, if the suspect can not be excluded as the semen source, yet an overwhelming majority of the population can be excluded, the genetic marker evidence can be highly inculpatory. On the other hand, if the suspect can not be excluded as the semen source because no one or most individuals can not be excluded as the semen source, the genetic marker evidence has little, if any, probative value.

## Semen Identification and Quantification

17.     Semen is normally identified in mixed body fluid stains from swabs,
garments, or bedding by the microscopic identification of spermatozoa.
Spermatozoa are cells unique to semen. The microscopic examination of
the cells in suspected semen stains also helps to determine whether or not
semen deposits are commingled with other body fluids such as vaginal
secretions or saliva by the microscopic identification of epithelial cells.
Semen identification can be aided by the assessment of two proteins found
in semen that are derived from the prostate gland. These proteins are the
enzyme acid phosphatase [ACP or AP] and p30. p30 is known in the
medical literature as PSA [prostate specific antigen]. I, together with
George Sensabaugh, discovered and characterized p30 in the mid 1970's.
Under most forensic circumstances p30 is found at detectable levels only
in human semen. Acid phosphatase, on the other hand, is found at very
high levels in human semen and at much lower levels in most other body
fluids. Thus, in order for acid phosphatase to aid in the identification of
semen, it must be quantitatively assessed or assayed. When acid
phosphatase is used for semen identification, one answers the question of
whether or not the acid phosphatase activity in the sample is significantly
greater than would be expected from a non semen bearing sample alone.
If the answer to this question is yes, then there is evidence that the
specimen contains semen. Except for aspermic semen from vasectomized
individuals, the microscopic identification of spermatozoa is a more
sensitive tool for the identification of semen than are either acid
phosphatase or p30 assays.

9

18.   Acid phosphatase and p30 assays can also be employed to estimate the semen dilution in a semen stain extract. This can be accomplished by knowing the amount and range of variation of ACP and p30 in the semen from a population of individuals and then determining the amount of ACP or p30 in a semen deposit extract. Acid phosphatase activity is measured in international units per milliliter [IU/ml]; and p30 is measured in micrograms per milliliter [μg/ml]. For example 90% of the population possess p30 levels of 1900 μg/ml or less in their semen; and 90% of the population possess 760 IU/ml of ACP or less. If one detects 7.6 IU/ml of ACP in a semen stain extract, one can calculate that the semen is no more dilute than one in 100. Stated another way the semen dilution titer is 100. This type of assay and subsequent analysis can be employed to assess whether or not the absence of ABO antigens in a sample extract means that the semen does not contain that antigen as opposed to the alternative possibility, that the sample is too dilute for the ABO antigen to be detected.

### The Genetic Marker Systems

### ABO Blood Group System

19.   The ABO genetic marker system is complicated by the fact that the ABO blood group substances are found in two forms in human beings. They are found in a form that is associated with cell membranes, and, in most individuals, they are found dissolved in the fluid portion of body fluids and secretions such as semen, saliva, and vaginal fluid. Within this

genetic marker system there are four possible types: A, B, AB, and O. Every member of the population falls into one of these four types, and every member of the population has the appropriate A, B, A and B, or O (H) blood group substance on the surface of his or her red blood cells. 80% of the population are "secretors"; that is, they will also have the corresponding blood group substance dissolved in the watery portion of their semen, saliva, or vaginal fluids. Individuals who are nonsecretors (20% of the population) will not have the corresponding blood group substance in the watery portion of their body fluids even though they have blood group substance on their blood cells. Individuals who are A, B, or AB secretors, in addition to possessing the appropriate A, B, or A and B blood group substances, also posses the H (O) blood group substance. This is so because the H (O) blood group substance is a precursor substance upon which the A and B blood group substances are built. The amount of the H blood group substance in the semen and saliva of ABO type A, B, or AB secretors is usually less than or equal to the level of the nominal A, B, or A and B antigens. Since the ABO blood group substances in semen are the water soluble form, ABO typing of semen containing deposits is conducted on cell free extracts.

## PGM System

21. PGM is an enzyme also found in red blood cells. PGM, like ABO, exists in different forms. There are three common variations of PGM types: PGM 1, PGM 2-1, and PGM 2. Each of these three forms can be further sub-typed, ultimately providing the forensic scientist with ten common PGM variants which are unevenly distributed throughout the population.

Our File No. 97-304
Affidavit of Dr. Edward T. Blake

22.  Scientists have collected ABO and PGM data from all over the United
States to ascertain the percentage of the population that has each of the
various forms of ABO and PGM blood group substances. Because the
ABO and PGM systems are inherited independently of each other, the
frequency of individuals having a particular combination of ABO and
PGM types is determined by the product of their individual frequencies in
the population. **The only frequency statistic that is ever considered by a
forensic scientist investigating a sexual assault is the combined
frequency of all possible genotypes potentially possessed by the semen
source.** In the typical case of commingled samples there are usually
multiple possible ABO and PGM types for the semen source based on the
analysis conducted. In those cases where all of the traits detected in the
sample could originate from the female body fluids and there is no
attempt to assess the semen dilution or titer in the sample extracts, the
potential types for the semen source encompass the entire population by
default; and no one can be eliminated as a potential semen source.

### The Thomas-Boyd Conventional Serology Report
### Dated April 10, 1986

23.  In a tersely worded conventional serology laboratory report dated April
10, 1986, Sharon Thomas-Boyd states with regard to the Maria Gonzales
rape kit vaginal swab, "Item 01, Exhibit 01A, retained portion of vaginal
swab identified as being obtained from Maria Gonzales. Tests and
Conclusions: For blood grouping results, see attached table." With regard

to the Maria Gonzales white underwear, Thomas-Boyd states, "Item 07, Exhibit 01B, retained semen stain from white underwear. Tests and conclusions: For blood grouping results, see attached table."

24.     At the end of the report Sharon Thomas-Boyd draws the following general conclusion:

> In order to make a sound scientific decision concerning the possible **exclusion** of the suspect, Bennie Starks, as a possible source of the foreign blood groups detected on the **vaginal swab (item 01-01) and underwear (item 07-01)**, a semen standard from Bennie Starks is required. [emphasis added]

25.     An examination of the table of results and "conclusions" in the Thomas-Boyd report of April 10, 1986, clearly reveals why the Thomas-Boyd analysis excludes Bennie Starks as the source of the semen in the Gonzales case. The reason that Bennie Starks was excluded as the source of the semen on the Gonzales rape kit vaginal swab [Item 01-01] and the reason that Bennie Starks was excluded as the source of the semen on the Gonzales underpants [Item 07-01] was because the Sharon Thomas-Boyd analysis of these semen deposits demonstrated that this semen originated from an ABO type O secretor; whereas, Bennie Starks was determined to be an ABO type B secretor.

26.    In the table attached to her April 10, 1986, report, Sharon Thomas-Boyd
provided analytic findings that demonstrated Maria Gonzales to be an
ABO type O nonsecretor with PGM [phosphoglucomutase] type 1+ 1+.
The nonsecretor status of Gonzales was verified by Lewis typing of red
blood cells and by demonstration of the absence of water soluble ABO
antigens in both her saliva and vaginal secretions. In fact, Sharon
Thomas-Boyd went to the trouble to obtain a noncoital vaginal swab from
Gonzales three and a half months after her sexual assault to supplement
her determination of Gonzales' nonsecretor status. This explains the
Gonzales noncoital reference vaginal swab dated April 1, 1986. The
original typing determinations for Maria Gonzales were based on
reference blood and reference saliva samples obtained from Maria
Gonzales at the time of her assault.

27.    Similarly, Sharon Thomas-Boyd demonstrated that Bennie Starks was an
ABO type B secretor with PGM type 1+ 1-. The secretor status of Bennie
Starks was verified by Lewis typing of his red blood cells and by
demonstration of the ABO water soluble antigens B and H in his saliva.
These determinations were based on reference blood and reference saliva
samples obtained from Bennie Starks.

28.    Sharon Thomas-Boyd demonstrated that the semen from the Gonzales
vaginal swab originated from an ABO type O secretor by finding the
water soluble ABO type H antigen only. The PGM typing of the vaginal
swab was not informative with regard to the PGM type of the semen

source because the PGM type from the vaginal swab was determined to be the same type as possessed by Maria Gonzales herself [PGM type 1+ 1+].

29. Like the semen from the Gonzales vaginal swab, Sharon Thomas-Boyd demonstrated that the semen from the Gonzales underpants originated from an ABO type O secretor by finding the water soluble ABO type H antigen only. Thomas-Boyd also found that the PGM type in the underpants deposit was PGM type 1+ 1-. Since some or all of the PGM type 1+ could originate from Gonzales, herself, the PGM type of the semen source is either 1+ 1- or 1- 1-. Thus, the genetic findings of Sharon Thomas-Boyd taken together reveal that the semen source from the Gonzales vaginal sample is an ABO type O secretor with an undetermined PGM type; and the semen source from the Gonzales underpants is an ABO type O secretor with PGM type 1+ 1- or 1- 1-.

30. Sharon Thomas-Boyd failed to specify the possible conventional serology types of the semen source(s) based on her analyses; nor did she explain in her report why her findings excluded Bennie Starks as that semen source(s).

### Trial Testimony of Sharon Thomas-Boyd
### September 24, 1986

31. At trial, rather than revealing the exculpatory nature of her ABO findings, Sharon Thomas-Boyd testified on direct examination as follows:

Q: Now, based on the tests that you conducted on all those exhibits on this, did you form an opinion within a reasonable degree of scientific certainty what the source of the sperm was that you located on the underwear and this vaginal swab?

A: With comparison with the standards that I received from Bennie Starks, **I could not exclude him as a possible source of the semen. That means that I have to include him**. [emphasis added, TT 360-361]

32. Not only did Sharon Thomas-Boyd misrepresent her exculpatory ABO findings as inculpatory with regard to Bennie Starks, she claimed that her findings reflected typical semen deposits from ABO type B secretors that occur in only 14% of the population. Her cross examination testimony in this regard is quoted below:

Q: Okay. You determined that the defendant's blood type was B?

A: That is correct, yes.

Q: It is a fact, is it not, that 14 per cent of the population of this United States has B type blood?

A: That is correct.

Q: So, when you say that -- Let me go back. If I have B type blood, Okay?

A: Uh-huh.

16

Our File No. 97-304
Affidavit of Dr. Edward T. Blake

Q: And I am a secretor, as you have indicated that the
defendant is, and you find B type of, whatever you call it,
stuff in the seminal fluids –

A: Yes.

Q: --You would have to include me?

A: Right.

Q: Within that group?

A: Yes.

Q: So, if any of the jurors, the judge, anybody else in here
had B type, you would have to include them?

R: Right. [TT 368 to 369]

33.    Sharon Thomas-Boyd was fully aware of the exclusionary nature of
conventional serology typing procedures. Her report demonstrates that
she was fully aware of the exclusionary nature of her ABO findings on the
Gonzales vaginal swab [Item 01-01] and underpants [Item 07-01] because
her findings demonstrate that the semen source is an ABO type O secretor.
Yet she continued to include Bennie Starks in the 14% of the population
who are ABO type B secretors as the following re-direct testimony reveals:

Q: What other types of tests did you do to try [to] exclude
the defendant?

A: Well, the other things I did is when I determined the
blood type markers, I also did red cell enzyme, an (sic)
this included the possible (sic) glucose mutase systems.

Q: How many of those tests, or enzymes did you try to find?

17

Our File No. 97-304
**Affidavit of Dr. Edward T. Blake**

A: Well, I was looking for three. The tests that I do, it develops three enzymes on one plate, from one sample, I can determine three different types.

Q: What is your reason for trying to determine more enzymes?

A: Well, the more blood groups that we determine, the more people we can exclude.

Q: So what does that mean as far as 14 per cent having B type blood?

A: Okay. Why – I have a chart here. Maybe if I showed the chart.

Q: To help you explain better?

A: Yes.

Mr. Boyd: Judge, I object. This is beyond the scope of cross examination.

The Court: Yes, I don't think we're going to get into demonstrative evidence in redirect.

Q: Can you tell us the purpose of trying to find more enzymes?

Objection/Over-ruled

A: Like I say, what I'm trying to do is with more enzymes the more people I can exclude. The more blood groups you have, the more people you can exclude.

[TT 380 to 381]

34.   The Northern Illinois Police Laboratory report dated April 10, 1986,
      authored by Sharon Thomas-Boyd demonstrates that the semen from the
      Gonzales vaginal swab [Item 01-01] and the semen from the Gonzales
      underpants [Item 07-01] originate from an ABO type O secretor. The
      semen concentration in the underpants was sufficiently great that PGM
      activity foreign to the victim was detected. No ABO type B antigen was
      detected in any of these specimens that would have been detected if the
      semen originated from an ABO type B secretor such as Bennie Starks.
      Sharon Thomas --Boyd was well aware of this exclusionary and
      exculpatory finding because she stated so in her report when she
      recognized "the possible **exclusion** of the suspect, Bennie Starks, as a
      possible source of the **foreign blood groups** detected on the **vaginal swab
      (item 01-01) and underwear (item 07-01)**".

35.   Rather, than reporting this information to the jury as any honest and
      competent forensic scientist would have done, Sharon Thomas-Boyd lied.
      She falsely asserted in her sworn testimony that her findings
      demonstrated that the semen originated from an ABO type B secretor, like
      Bennie Starks having never detected any ABO type B antigen whatsoever.
      She went on to testify that any B secretor would be similarly included; and
      that the population of included individuals was narrowed to 14% of the
      general population.

Our File No. 97-304
Affidavit of Dr. Edward T. Blake

36. Any competent and honest forensic scientist would have informed the jury that Bennie Starks was excluded as the semen source because the semen source is an ABO type O secretor that occurs in about 40% of the population. If one also includes the PGM typing information, the semen source from the Gonzales underpants is an ABO type O secretor with PGM type 1+ 1- or PGM type 1- 1-. Individuals with this array of types occur in approximately 14% of the population.

37. The exculpatory nature of the Sharon Thomas-Boyd ABO findings should have been obvious to any prosecutor or defense attorney that read the Northern Illinois Police Crime Laboratory report dated April 10, 1986. I have no information about whether Starks' trial counsel had a copy of the report at trial. However, it is clear that his cross-examination of Thomas-Boyd was based on the assumption that ABO blood type B antigens had been found in the analysis of the semen evidence by Thomas-Boyd.

## Conclusions

38. The analytical findings of Sharon Thomas-Boyd connect the semen deposit in the Gonzales underpants [Item 07-01] and the semen deposit on the Gonzales vaginal swab [Item 01-01] to an ABO type O secretor individual. This ABO analysis eliminates Bennie Starks as the source of that semen because he is an ABO type B secretor. The PCR based DNA analysis that we published on April 3, 2000 demonstrates that the spermatozoa from the Gonzales underpants in areas A, B, and C

20

originates from the same male individual and that Bennie Starks is not that individual.

39. DNA testing previously conducted in 2000 proves that the ABO type O secretor exclusion obtained in April, 1986, and concealed from the trial jury by Sharon Thomas-Boyd is correct. The remaining Gonzales vaginal swab should be provided for DNA testing to confirm Starks' ABO typing exclusion from the semen deposit on the Gonzales vaginal swab [Item 01-01]. This analysis will help to determine the genetic profile of the Maria Gonzales rapist.

I swear under penalty of perjury that these statements are true and correct to the best of my ability.

Edward T. Blake, D.Crim.

County of Contra Costa
State of CA

Subscribed and sworn before me, Elizabeth Pham,

a notary public, on this First day of June, 2004, Richmond, California.

ELIZABETH PHAM
Commission # 1386978
Notary Public - California
Marin County
My Comm. Expires Nov 24, 2006

**21**

# Exhibit 1

## Resume of Dr. Edward T. Blake



3053 Research Drive, Richmond, CA 94806
(510) 222-8883
FAX (510) 222-8887
Email: ed@fsalab.com

## RESUME: EDWARD T. BLAKE

### BIOGRAPHY

1. Birthdate: July 31, 1945.
2. Birthplace: Honolulu, Hawaii.

### EDUCATION

1. Bachelor of Science [Criminalistics], University of California, Berkeley, 1968.

2. Doctor of Criminology [Forensic Science], University of California, Berkeley, 1976.

### HONORS

1. Graduate Research Fellowship [2 years], NILE & CJ, Department of Justice. Grant #75-NI-99-0036. Grant Title: Determination of Genetic Markers in Human Semen.

2. Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic Markers in Human Semen: Application to Analysis of Semen Evidence in Sexual Assault Case Material, 1979-1981.

3. Research Grant, NILE & CJ, Department of Justice. Grant Title: Genetic Markers in Human Semen: Resolution of Some Current Issues Affecting the Interpretation of Semen Evidence in Sexual Assault Cases, 1983-1986.

4. Service Awards, California Association of Criminalists: 1976, 1977, 1984.

5. Distinguished Member Award, California Association of Criminalists, 1985.

Resume`: Dr. Edward T. Blake

## PUBLISHED WORKS

1. Edward T. Blake, Paul J. Cashman, and John I. Thornton, "Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative," *Anal. Chem.*, 45[2], 1973, 394-395.

2. Edward T. Blake and D.J. Dillon, "Microorganisms and the Presumptive Tests for Blood," *J. Pol. Sci. Admin.*, 1[4], 1973, 395-400.

3. Kevin Caldwell, Edward T. Blake, and G.F. Sensabaugh, "Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man," *Science*, 191, 1976, 1185-1187.

4. Edward T. Blake and George F. Sensabaugh, "Genetic Markers in Human Semen: A Review," *J. For. Sci.*, 21[4], 1976, 784-796.

5. Edward T. Blake and G.F. Sensabaugh, "Protein and Enzyme Polymorphisms in Human Semen," *For. Sci.*, 6, 1975, 108, [Abstract]; *International Microform J. Leg. Med.*, 10, 1975, 21, [Text].

6. Edward T. Blake and G.F. Sensabaugh, "Esterase D Typing in Bloodstains," *For. Serol. News*, No. 5, 1975, 1-4.

7. Edward T. Blake, *Genetic Markers in Human Semen*, doctoral dissertation, University of California, Berkeley, 1976; University Microfilms International, #77-15, 567, Ann Arbor.

8. Edward T. Blake and G.F. Sensabaugh, "Expression of Genetic Variation in Human Semen," *Am. J. Hum. Genet.*, 29, 1977, 24A, [Abstract].

9. Edward T. Blake and G.F. Sensabaugh, "Genetic Markers in Human Semen: Quantitation of Polymorphic Proteins," *J. For. Sci.*, 23[4], 1978, 717-729.

10. Edward T. Blake and G.F. Sensabaugh, "Haptoglobin Typing of Bloodstains: Electrophoresis of Immunoprecipitated Haptoglobin," *J. For. Sci. Soc.*, 18, 1978, 237-244.

11. David F. Katz, Edward T. Blake, Ross N. Mills, and Irving Fatt, "A Microliter Oxygen Electrode System for Sperm Suspensions," *Fertil. Steril.*, 30[6], 1978, 691-695.

12. G.F. Sensabaugh, E.T. Blake, and D.H. Northey, "Genetic Markers in Human Semen: III. Alteration of Phosphoglucomutase [PGM] Isozyme Patterns in Semen Contaminated with Saliva," *J. For. Sci.*, 25, 1980, 470-478.

2

Resume: Dr. Edward T. Blake

13. George Sensabaugh, E.T. Blake, and Jan Bashinski, "Acid Phosphatase Assay of Vaginal Swabs," *Proceedings of a Forensic Science Symposium on the Analysis of Sexual Assault Evidence*, U.S. Dept. of Justice, July, 1983, 146-148.

14. Howard C.B. Graves, George F. Sensabaugh, and Edward T. Blake, "Postcoital Detection of a Male-Specific Semen Protein, Application to the Investigation of Rape," *N. Engl. J. Med.*, 312, 1985, 338-343.

15. George F. Sensabaugh, Jan Bashinski, and Edward T. Blake, "The Laboratory's Role in Investigation of Rape," *Diag. Med.*, 8[3], 1985, 46-53.

16. E.T. Blake, C.E. Cook,Jr., and J.S. Bashinski, "Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product," *J. For. Sci.*, 32[4], 1987, 888-899.

17. E.T. Blake, "Progressive Desialidation of Human Transferrin," *J. For. Sci.*, 32[5], 1987, 1342-1347.

18. Edward T. Blake, "Scientific and Legal Issues Raised by DNA Analysis," in *Banbury Report 32: Technology and Forensic Science*, J.Ballantyne *et al.*, Eds., Coldspring Harbor Laboratory Press, 1989, 109-115.

19. Russell Higuchi and Edward T. Blake, "Applications of the Polymerase Chain Reaction in Forensic Science," in *Banbury Report 32: Technology and Forensic Science*, J.Ballantyne *et al.*, Eds., Coldspring Harbor Laboratory Press, 1989, 265-281

20. Cecilia H. von Beroldingen, E.T. Blake, R. Higuchi, G.F. Sensabaugh, and Henry Erlich, "Applications of PCR to the Analysis of Biological Evidence," in *PCR Technology: Principles and Applications for DNA Amplification*, Henry A. Erlich, Ed., Stockton Press, 1989, 209-223.

21. Henry A. Erlich, Russell Higuchi, Cecilia H. von Beroldingen, and Edward Blake, "The Use of the Polymerase Chain Reaction for Genetic Typing in Forensic Samples," *Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis*, June, 1989, Quantico, Va., 93-101, U.S. Government Printing Office, Washington, D.C.

22. E.T. Blake, S. Paabo, and M.D. Stolorow, "DNA Amplification and Typing from Aged Biological Evidence," *Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis*, June, 1989, Quantico, Va., 267-268, U.S. Government Printing Office, Washington, D.C.

23. S. Walsh, R. Higuchi, and E. Blake, "PCR Inhibition and Bloodstains," *Proceedings of an International Symposium on the Forensic Aspects of DNA Analysis*, June, 1989, Quantico, Va., 281-282, U.S. Government Printing Office, Washington, D.C.

Resume: Dr. Edward T. Blake

24. Rhea Helmuth, Nicola Fildes, Edward Blake, M.C. Luce, J. Chimera, Roberta Madej, C. Gorodezky, Mark Stoneking, Norma Schmill, William Klitz, Russell Higuchi, and Henry A. Erlich, "HLA-DQα Allele and Genotype Frequencies in Various Human Populations Determined by Using Enzymatic Amplification and Oligonucleotide Probes," *Am. J. Hum. Genet.*, 47, 1990, 515-523.

25. G.F. Sensabaugh and E.T. Blake, "Seminal Plasma Protein p30: Simplified Purification and Evidence for Identity with Prostate Specific Antigen," *Journal of Urology*, vol. 144, 1990, 1523-1526.

26. Rebecca Reynolds, George Sensabaugh, and Edward Blake, "Analysis of Genetic Markers in Forensic DNA Samples Using the Polymerase Chain Reaction," *Anal. Chem.*, January, vol. 63, 1991, 2-15.

27. D.R. Gibson, J.R. Guydish, B.D.G. Wraxall, E.T. Blake, G. Clark, and P. Case, "Using Forensic Techniques to Verify Self-Reports of Needle-Sharing," *AIDS*, vol. 5, No. 9, 1991, 1149-1150.

28. Edward Blake, Jennifer Mihalovich, Russell Higuchi, P. Sean Walsh, and Henry Erlich, "PCR Amplification and HLA-DQα Oligonucleotide Typing on Biological Evidence Samples: Casework Experience," *J. Forens. Sci.*, Vol. 37, No. 3, 1992, 700-726.

29. George F. Sensabaugh and Edward T. Blake, "DNA Analysis in Biological Evidence: Applications of the Polymerase Chain Reaction," Chapter 7 in *Handbook of Forensic Sciences*, ed. R. Saferstein, Prentice-Hall, New Jersey, in press.

30. R.C. Castro, G. Troup, E. Blake, C. Wheeler, R. Apple, and H.A. Erlich, "Analysis of HLA-Class II Alleles by PCR/Oligo Typing in Various Native American Populations," Abstract #784, *Am. J. Hum. Genet.*, vol. 53, No. 3, 1993.

31. J.S. Waye, P. Newall, E.T. Blake, J.M. Williamson, and D.H. Bing, "A Review of the DNA Evidence in the Case of Guy Paul Morin," Abstract, *Can. Soc. Forens. Sci. J.*, Vol. 28, No. 4, 1995, 255.

32. J.S. Waye, E.T. Blake, J.M. Williamson, and D.H. Bing, "DNA Evidence in the Christine Jessop Homicide Case," *Can. Soc. Forens. Sci. J.*, Vol. 31, No. 1, 1998, 55-62.

4

Resume: Dr. Edward T. Blake

## PRESENTATIONS AT SCIENTIFIC MEETINGS

1. Edward T. Blake and D.J. Dillon, "Microorganisms and the Presumptive Tests for Blood," Fall semiannual seminar of the California Association of Criminalists, October, 1971.

2. Edward T. Blake, Paul J. Cashman, and John I. Thornton, "Qualitative Analysis of Lysergic Acid Diethylamide by Means of the 10-Hydroxy Derivative," Spring semiannual seminar of the California Association of Criminalists, May, 1972.

3. Edward T. Blake, Donald L. Lofgren, and G.F. Sensabaugh, "Distribution of Acid Phosphatases in Human Tissues," Spring semiannual seminar of the California Association of Criminalists, May, 1974.

4. Edward T. Blake and G.F. Sensabaugh, "Esterase D Polymorphism in Bloodstains," Fall semiannual seminar of the California Association of Criminalists, October, 1974.

5. Edward T. Blake and G.F. Sensabaugh, "Protein Polymorphisms in Human Semen," presented as part of a symposium on rape investigation, Fall semiannual seminar of the California Association of Criminalists, October, 1974.

6. Edward T. Blake and G.F. Sensabaugh, "Differential Expression of Amylase Loci [$Amy_1$ and $Amy_2$] in Human Body Fluids and Secretions," May semiannual seminar of the California Association of Criminalists, October, 1975.

7. Edward T. Blake and G.F. Sensabaugh, "Protein and Enzyme Polymorphisms in Human Semen," Seventh International Meeting of Forensic Sciences, Zurich, Switzerland, 1975.

8. Kevin Caldwell, Edward T. Blake, and G.F. Sensabaugh, "Sperm Diaphorase: Genetic Polymorphism of a Sperm-Specific Enzyme in Man," Fall semiannual seminar of the California Association of Criminalists, October, 1975.

9. Edward T. Blake and G.F. Sensabaugh, "The Biochemical Genetics of Semen and the Investigation of Rape," Western Regional Meeting of the American Chemical Society, October, 1975.

10. Edward T. Blake and G.F. Sensabaugh, "Expression of Genetic Markers in Human Semen," American Academy of Forensic Sciences, Washington, D.C., February, 1976.

Resume: Dr. Edward T. Blake

11. Edward T. Blake and G.F. Sensabaugh, "Haptoglobin Typing of Bloodstains by SDS Gel Electrophoresis of Immunoprecipitates," Spring semiannual seminar of the California Association of Criminalists, May, 1977.

12. Edward T. Blake and G.F. Sensabaugh, "Genetic markers in Human Semen: Quantitative Levels of Polymorphic Proteins," American Chemical Society, Chicago, August, 1977.

13. Edward T. Blake and G.F. Sensabaugh, "Genetic Markers in Human Semen: III. Expression of Glyoxalase Activity in Seminal Plasma and Sperm," Spring semiannual seminar of the California Association of Criminalists, May, 1978.

14. G.F. Sensabaugh, E.T. Blake, and D. Northey, "Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva," Spring semiannual seminar of the California Association of Criminalists, May, 1978.

15. Edward T. Blake and G.F. Sensabaugh, "Synthesis and Clean-up Procedures for 4-Methylumbelliferone Phosphate," Spring semiannual seminar of the California Association of Criminalists, May, 1978.

16. G.F. Sensabaugh, E.T. Blake, and D. Northey, "Modification of PGM Isozyme Patterns in Semen Contaminated with Saliva," American Academy of Forensic Sciences, Atlanta, February, 1979.

17. Edward T. Blake, "Concurrent Typing of Gc and Tf on Agarose Gels," Fall semiannual seminar of the California Association of Criminalists, October, 1979.

18. Edward T. Blake and the Northern California Biology Study Group, "Human Hair Comparison: A Blind Trial Experiment," Fall semiannual seminar of the California Association of Criminalists, October, 1979.

19. Keith E. Inman, G.F. Sensabaugh, and E.T. Blake, "The Genetic Relationships of the Prostatic, Seminal, and Vaginal Acid Phosphatases," American Academy of Forensic Sciences, Atlanta, February, 1980.

20. George F. Sensabaugh, Jan Bashinski, and E.T. Blake, "Rates of Drying of Vaginal Swabs," Spring semiannual seminar of the California Association of Criminalists, May 1980.

21. George F. Sensabaugh, Jan Bashinski, and E.T. Blake, "Titers of ABH Blood Group Substances in Human Semen," Spring semiannual seminar of the California Association of Criminalists, May, 1980.

6

Resume: Dr. Edward T. Blake

22. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "Survival of Markers in Preserved Semen Samples," Spring semiannual seminar of the California Association of Criminalists, May, 1980.

23. George F. Sensabaugh, Jan Bashinski, and E.T. Blake, "Rates of Drying of Vaginal Swabs: An Update," Fall semiannual seminar of the California Association of Criminalists, November, 1980.

24. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "Levels of Genetic Markers in Vaginal Fluids," Fall semiannual seminar of the California Association of Criminalists, November, 1980.

25. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "A Systematic Approach to the Analysis of Semen Evidence," Fall semiannual seminar of the California Association of Criminalists, November, 1980.

26. Mary Gibbons, E.T. Blake, G.F. Sensabaugh, and Jan Bashinski, "A Systematic Approach to the Analysis of Semen Evidence: Case Reports," Fall semiannual seminar of the California Association of Criminalists, November, 1980.

27. Edward T. Blake and G.F. Sensabaugh, "A Systematic Approach to the Analysis of Semen Evidence," American Academy of Forensic Sciences, Los Angeles, February, 1981.

28. George F. Sensabaugh, E.T. Blake, and Jan Bashinski, "Titers of ABH Blood Group Substances in Human Semen," American Academy of Forensic Sciences, Los Angeles, February, 1981.

29. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "Levels of Genetic Markers in Vaginal Fluids," American Academy of Forensic Sciences, Los Angeles, February, 1981.

30. George F. Sensabaugh, E.T. Blake, and Jan Bashinski, "Acid Phosphatase Stability in Dried Semen Stains is a Function of Stain 'Dryness'," American Academy of Forensic Sciences, Los Angeles, February, 1981.

31. George F. Sensabaugh, E.T. Blake, and Jan Bashinski, "Rates of Drying of Vaginal Swabs," American Academy of Forensic Sciences, Los Angeles, February, 1981.

32. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "The Quantitative Acid Phosphatase Test: An Indicator for Decision Making in the Analysis of Semen Evidence," American Academy of Forensic Sciences, Los Angeles, February, 1981.

33. Peter D. Barnett, E.T. Blake, and R.R. Ogle, "The Role of the Independant Expert: Several Case Examples," American Academy of Forensic Sciences, Los Angeles, February, 1981.

Resume: Dr. Edward T. Blake

34. Edward T. Blake, "Recent Research in the Forensic Analysis of Semen," Northwest Association of Forensic Scientists, Missoula, March, 1981.

35. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "Considerations on the the Analysis of Semen Swab Evidence," Canadian Society of Forensic Sciences, Toronto, August, 1981.

36. Edward T. Blake, James Kearney, Mark Stolorow, and Brian Wraxall [panelists], Serology Panel Discussion, combined seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

37. Gary Harmor, Brian Wraxall, and E.T. Blake, "Multisystem Approach to Red Cell Black Population Markers: Group IV," combined seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

38. Edward T. Blake, G.F. Sensabaugh, and Jan Bashinski, "Purification and Serological Studies on Two Lectin Specificities from *Ulex europeus* Seeds: A Preliminary Report," combined seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

39. Edward T. Blake, Mary Gibbons, Jan Bashinski, and G.F. Sensabaugh, "Comparative Stabilities of Markers in Semen," combined seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981. 40. Edward T. Blake, Mary Gibbons, Jan Bashinski, and G.F. Sensabaugh, "Population Survey and Stability Studies of p30 in Semen," combined seminar of the California Association of Criminalists and the Northwest Association of Forensic Scientists, October, 1981.

41. George F. Sensabaugh, Howard Graves, E.T. Blake, and Jan Bashinski, "Development of an Elisa Assay for Human Seminal p30," American Academy of Forensic Sciences, Orlando, February, 1982.

42. Edward T. Blake, Mary Gibbons, Jan Bashinski, and G.F. Sensabaugh, "Comparative Stabilities of Markers in Semen," American Academy of Forensic Sciences, Orlando, February, 1982.

43. Edward T. Blake, Mary Gibbons, G.F. Sensabaugh, and Jan Bashinski, "Population Survey and Stability Studies of p30 in Semen," American Academy of Forensic Sciences, Orlando, February, 1982.

44. Edward T. Blake, "Progressive Desialidation of Human Transferrin," combined meeting of the Interamerican Congress of Forensic Sciences and the California Association of Criminalists, Sacramento, November, 1982.

Resume: Dr. Edward T. Blake

45. Edward T. Blake, "Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood," combined meeting of the Interamerican Congress of Forensic Sciences and the California Association of Criminalists, Sacramento, November, 1982.

46. Mary Gibbons, E.T. Blake, and G.F. Sensabaugh, "Lewis A and B Levels in Vaginal Fluid: A Preliminary Study," combined meeting of the Interamerican Congress of Forensic Sciences and the California Association of Criminalists, Sacramento, November, 1982.

47. Edward T. Blake, "Progressive Desialidation of Human Transferrin," American Academy of Forensic Sciences, Cincinnati, February, 1983.

48. Edward T. Blake, "Transferrin: A Potential Diagnostic Indicator of Desialidation Reactions in Blood," American Academy of Forensic Sciences, Cincinnati, February, 1983.

49. Edward T. Blake, "Biochemical Analysis of Sexual Assault Evidence: Current State of the Art," guest lecture, American Academy of Forensic Sciences, Cincinnati, February, 1983.

50. Edward T. Blake, "Comparative Stability of Semen Proteins and Other Genetic Markers," guest lecture, Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

51. Edward T. Blake, work shop instructor, "Prostate Antigen/p30 and Prostatic Acid Phosphatase," Forensic Science Symposium on the Analysis of Sexual Assault Evidence, FBI Academy, Quantico, Virginia, July, 1983.

52. Marty Blake, Jan Bashinski, and E.T. Blake, "Serology Hanging by a Thread," American Academy of Forensic Sciences, Anaheim, February, 1984.

53. Edward T. Blake, Charles E. Cook, Jr., and Jan Bashinski, "PGM Survival in Actively and Passively Dried Vaginal Swabs: Studies on Case Specimens," Spring semiannual seminar of the California Association of Criminalists, May, 1985.

54. Edward T. Blake, C.E. Cook, Jr., and Jan Bashinski, "Distribution of Amylase Activity in Vaginal Swabs: Studies on Case Samples," Spring semiannual seminar of the California Association of Criminalists, May, 1985.

55. Edward T. Blake, C.E. Cook, Jr., and Jan Bashinski, "Semen and Saliva Revisited: Reversal of PGM Degradation in Mixtures by Reducing Agent," Spring semiannual seminar of the California Association of Criminalists, May, 1985.

9

56. Jan Bashinski, E.T. Blake, and C.E. Cook, Jr., "The Detection of Spermatozoa on Vaginal Swabs from Victims of Sexual Assault: The ER versus the Crime Lab," Spring semiannual seminar of the California Association of Criminalists, May, 1985.

57. Jan Bashinski, E.T. Blake, and C.E. Cook, Jr., "A Profile of the Medical Case Histories of Sexual Assault Victims in Oakland," Spring semiannual seminar of the California Association of Criminalists, May, 1985.

58. Edward T. Blake, C.E. Cook, Jr., and Jan Bashinski, "Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product," Spring semiannual seminar of the California Association of Criminalists, May, 1986.

59. Edward T. Blake, "Detection of Antisperm Antibodies: A Case Report," Spring semiannual seminar of the California Association of Criminalists, May, 1986.

60. Edward T. Blake, C.E. Cook, Jr., and Jan Bashinski, "A Gram Modified Christmas Tree Stain," Spring semiannual seminar of the California Association of Criminalists, May, 1986.

61. Edward T. Blake, "Desialidation of Gc Variants," Spring semiannual seminar of the California Association of Criminalists, May, 1986.

62. Edward T. Blake, C.E. Cook, Jr., and Jan Bashinski, "Evidence that 'Vaginal Peptidase' Is a Bacterial Gene Product," American Academy of Forensic Sciences, San Diego, February, 1987.

63. Edward T. Blake, "Detection of Antisperm Antibodies: A Case Report," American Academy of Forensic Sciences, San Diego, February, 1987.

64. Edward T. Blake, C.E. Cook, Jr. and Jan Bashinski, "Inter- and Intra-Individual Variation in the Levels of ABO Blood Group Substances in Human Semen," American Academy of Forensic Sciences, San Diego, February, 1987.

65. Edward T. Blake, C.E. Cook, Jr. and Jan Bashinski, "Inter- and Intra-Individual Variation in the Levels of Acid Phosphatase and p30 in Human Semen," American Academy of Forensic Sciences, San Diego, February, 1987.

66. Edward T. Blake, "Sexual Assault Evidence: The State of the Art," guest lecture, International Association of Forensic Sciences, Vancouver, August, 1987.

67. Edward T. Blake, "Serology Evidence Collection and Technique," guest lecture, National Association of Medical Examiners, San Francisco, September, 1987.

Resume: Dr. Edward T. Blake

68. Edward T. Blake, "Scientific and Legal Issues Raised by DNA Analysis," guest lecture, DNA Seminar, California Association of Crime Laboratory Directors, November, 1987.

69. Edward T. Blake, "Use of PCR/Dot Blot for Dried Stain and Hair Analysis," guest lecture, DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

70. Edward T. Blake, "Reporting of Data to the Forensic and Legal Communities," panel discussion on Formulation and Design of National DNA Data Bases and Information Management, guest lecture, DNA Technology in Forensic Science, FBI Academy, Quantico, June, 1988.

71. Edward T. Blake, "DNA Amplification and Typing from Aged Biological Evidence," An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

72. R. Madej, R. Helmuth, P. Louie, G. Horn, E.T. Blake, and Henry Erlich, "HLA DQα Allele Frequencies Determined by PCR and Nonradioisotopic Dot-Blot ASO Analysis," An International Symposium on the Forensic Aspects of DNA Analysis, FBI Academy, Quantico, June, 1989.

73. Edward T. Blake, guest lecturer, Symposium on Forensic DNA Analysis, National Association of Criminal Defense Lawyers, Washington, D.C., March, 1990.

74. Edward T. Blake, "Experience with PCR Analysis in Criminal Investigation," guest lecture, DNA and the Law, State University of New York at Stony Brook, April, 1990.

75. Gary Sims, Lance Gima, Kenneth Konzak, Jennifer Super-Mihalovich, and Edward T. Blake, "The Recovery, Amplification, and DQα Typing of DNA from Partially Cremated Human Remains," Spring semiannual seminar of the California Association of Criminalists, May, 1990.

76. Edward T. Blake, "A Worldwide Map of the DQα Gene," Spring semiannual seminar of the California Association of Criminalists, May, 1994.

77. Edward T. Blake, "The Role of DNA Evidence in Defense of the Wrongly Convicted", guest lecture, Association in Defense of the Wrongly Convicted, International Symposium, May 4-6, 1995, Toronto.

78. Jennifer S. Mihalovich and Edward T. Blake, "Quantitative Determination of Non-Sperm DNA in the Semen of Aspermic Males and It's Potential Use as a Genetic Marker in Sexual Assault

Resume: Dr. Edward T. Blake

Investigation," Spring semiannual seminar of the California
Association of Criminalists, May 9-13, 1995.

79. Jennifer S. Mihalovich and Edward T. Blake, "PCR Based DNA
Diagnostic Analysis of Familial Dysautonomia [FD] from Hair," Spring
semiannual seminar of the California Association of Criminalists, May
9-13, 1995.

80. John S. Waye, Pamela Newall, Edward T. Blake, Janice M. Williamson,
and David H. Bing, "A Review of the DNA Evidence in the Case of
Guy Paul Morin," Canadian Society of Forensic Science, September 29,
1995, Toronto, Canada.

81. Edward T. Blake, "Molecular Genetics and Violent Crime," Neyman
Seminar guest lecture, Department of Statistics, University of
California, Berkeley, October, 1995.

82. Edward T. Blake, "The Application and Development of PCR in
Forensic Science as Illustrated by the Case of Armando Quintanilla,"
guest lecture, Northern California American Society for Microbiology,
November 16, 1996, San Jose, CA.

83. Edward T. Blake, guest panelist, "Is Something Wrong? Judge for
Yourself: An Interactive Panel Discussion on the O.J. Simpson Case,"
Semi annual Seminar of the California Association of Criminalists,
October 8-11, 1997.

84. Edward T. Blake, guest witness, <u>Crown Commission on Proceedings
Involving Guy Paul Morin</u>, Toronto, November, 1997.

85. Edward T. Blake, guest lecture, First Canadian Symposium on DNA
Forensic Evidence, October 17, 1998, Toronto, Canada.

86. Edward T. Blake, guest lecture, "Understanding DNA," National
Conference on Wrongful Convictions & the Death Penalty, November
13-15, 1998, Chicago.

87. George F. Sensabaugh, George "Woody" Clarke, Peter Neufeld, James
Lockyer, and Edward T. Blake, Moderator, "The Role of Peer Review
and Disclosure in Forensic Science Practice," Semi annual Seminar of
the California Association of Criminalists, May 12-15, 1999, Oakland,
CA.

88. Edward T. Blake and James Lockyer, guest lecture, Second Canadian
Symposium on DNA Forensic Evidence, October 2, 1999, Osgoode Hall
Law School, York University, Toronto, Canada.

89. Edward T. Blake, "The Trial within the Trial," guest lecture, DNA and
Human Rights, Human Rights Center, University of California,
Berkeley, April 27, 2001.

Resume: Dr. Edward T. Blake

## MEMBERSHIP IN PROFESSIONAL SOCIETIES

1. California Association of Criminalists

2. Sigma Xi [Research Socienty of North America]

3. American Society of Human Genetics

4. American Association for the Advancement of Science

5. New York Academy of Sciences

6. American Academy of Forensic Sciences

7. Northwest Association of Forensic Scientists

## WORK EXPERIENCE IN THE FORENSIC SCIENCES

1. Paul L. Kirk & Associates, 1969-1970.

2. Contra Costa County Sheriff's Office Criminalistics Laboratory, intern, 1971-1972.

3. Teaching Assistant, Forensic Science Program, University of California, Berkeley, 1971-1972.

4. Graduate Research Fellow, University of California, Berkeley, 1973-1975.

5. Research Assistant, University of California, Berkeley, 1975-1977.

6. Consultant in Forensic Biology, 1975-present.

# Exhibit 17

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF ILLINOIS
 3                        EASTERN DIVISION

 4    BENNIE STARKS,                    )
                                        )
 5                    Plaintiff,        )
                                        )
 6         vs.                          )   No. 09 C 348
                                        )
 7    CITY OF WAUKEGAN, et al.,         )   Judge Feinerman
                                        )
 8                    Defendants.       )

 9

10              The deposition of GARY C. HARMOR, B.S., F-ABC,

11    called by the Defendants for examination, taken pursuant

12    to notice and pursuant to the Federal Rules of Civil

13    Procedure for the United States District Courts

14    pertaining to the taking of depositions, taken before

15    Shelley M. Bostetter, Certified Shorthand Reporter and

16    Notary Public, at 500 West Madison Street, Suite 2430,

17    Chicago, Illinois, commencing at 9:03 a.m. on the

18    12th day of October, A.D., 2014.

19

20

21

22

23

24
```

1    performed on the vaginal swab?

2        A.    Yes.

3        Q.    So in 2005, Orchid Cellmark performed YSTR

4    testing on the vaginal swab?

5        A.    Yes.

6        Q.    And Orchid Cellmark determined that the vaginal

7    swab did not contain DNA from Bennie Starks; is that

8    correct?

9        A.    Yes.

10       Q.    And Forensic Science Associates was then asked

11   to perform YSTR testing on the panties to determine

12   whether the DNA from Bennie Starks could be found on the

13   panties; is that correct?

14       A.    Yes.

15       Q.    And to determine whether, through YSTR testing,

16   the DNA profile could be correlated between the panties

17   and the DNA on the vaginal swab?

18       A.    Yes.

19       Q.    And those were the panties from January 19th,

20   1986 and the vaginal swab from January 19th, 1986?

21       A.    Yes.

22       Q.    And is it correct to say that the YSTR testing

23   for both the vaginal swab and the panties correlated to

24   show that it was not the DNA profile of Bennie Starks?

1      A.    Yes.

2      Q.    And did they, in fact, correlate to show that

3  they were the DNA of the same individual?

4      A.    Yes.  Within limits.  YSTR testing isn't as

5  specific as the autosomal STR testing.

6      Q.    And was the profile from the panties and the

7  vaginal swab consistent from coming from the same male?

8      A.    Yes.

9      Q.    There was a Y chromosome found; is that

10  correct?

11      A.    Yes.

12      Q.    So that means that there was a male who had

13  produced -- Strike that.

14          It was sperm on both the panties and the

15  vaginal swab?

16      A.    Yes.

17      Q.    In other words, if there was no Y chromosome,

18  there wouldn't have been a male involved; is that

19  correct?

20      A.    Correct.

21      Q.    Did you review any of the materials pertaining

22  to the fingernail scraping testing by Alan Keel?

23      A.    No.

24      Q.    What, if any, information do you have regarding

1   samples that were tested by Sharon Thomas-Boyd in this

2   case?

3       A.   With respect to the vaginal swab?  No.  I don't

4   have any quantitation data that's sometimes produced.  In

5   the panties, however, there was PGM detected, and it

6   takes a lot of semen to produce PGM in a pair of panties

7   or a vaginal swab that's foreign to the victim.

8            So there has to be quite a substantial amount

9   of semen present in the panties, for example, because of

10  the PGM that was detected.  And, therefore, there would

11  have been enough, in my opinion, to detect both B and H

12  or A and H from the semen donor.

13      Q.   So because of the presence of PGM, you believe

14  that the sample was not so dilute that only H would

15  appear and B would not?

16      A.   Yes.

17      Q.   In the Bennie Starks case with respect to the

18  semen on the panties tested by Sharon Boyd?

19      A.   Yes.

20      Q.   And how do you know that Sharon Boyd knew in

21  1986 that the presence of PGM provided information to her

22  that she should know that she should find B in a B

23  secreter and not just H?

24      A.   It should have been part of any training that

190

1    BY MR. KARAVIDAS:

2         Q.   At the bottom of Page 21 at Line 19, there's a

3    question that says, Now, based on the tests you conducted

4    on all those exhibits on this, did you form an opinion

5    within a reasonable degree of scientific certainty what

6    the source of the sperm was that you located on the

7    underwear and this vaginal swab?   Do you see that?

8         A.   Yes.

9         Q.   Now, before that, the only information she

10   provided was that the victim was an O blood type and the

11   defendant was a B blood type?

12        A.   The victim was an O non-secreter.

13        Q.   And the victim was a B blood type?

14        MR. STAINTHORP:   Objection.

15   BY THE WITNESS:

16        A.   Suspect.

17        MR. STAINTHORP:   You don't mean that.

18        MR. KARAVIDAS:   I'm sorry.

19   BY MR. KARAVIDAS:

20        Q.   The suspect was a B blood type?

21        A.   Yes.

22        Q.   The victim -- Strike that.

23             The only information that she provided in her

24   testimony before asking -- she was asked her opinion, was

Case: 1:09-cv-00348 Document #: 360-2 Filed: 04/06/15 Page 79 of 138 PageID #:10674
Case: 1:09-cv-00348 Document #: 313-25 Filed: 03/02/15 Page 193 of 322 PageID #:7613

193

1    included through serological testing.  Not a supposition

2    that he might be some of this rare secreter.

3             And, therefore, she should have said, at the

4    very least, that she found O secreter, which is

5    inconsistent with him.  And, by the way, he could be a --

6    one of these rare instances of aberrant secreter or

7    whatever you want to call it; and, therefore, he wouldn't

8    be excluded at that point, if he were that.  But I have

9    no proof of that.  So she shouldn't even really testify

10   without any proof of it.

11             Q.  Well, when she said, I could not exclude him as

12   a possible source of the semen, was that a reasonable

13   statement by her?

14             A.  I don't think so.  But I think she could have

15   said, Because I can't have this semen sample from him, I

16   can't draw any conclusion; it's inconclusive.

17             Q.  Well, since she didn't have the semen sample

18   that she wanted, was it reasonable for her to state, I

19   could not exclude him as a possible source of semen?

20             A.  No.  The data shows that he is excluded as the

21   source of the semen.

22             Q.  He's excluded as the source of the semen if

23   he's not an aberrant secreter?

24             A.  Well, it's -- Yes.  That's true.  It's an

Case: 1:09-cv-00348 Document #: 360-2 Filed: 04/06/15 Page 80 of 138 PageID #:10675
Case: 1:09-cv-00348 Document #: 313-25 Filed: 03/02/15 Page 194 of 322 PageID #:7614

194

1  unusual type.  It's a rare -- relatively uncommon

2  circumstance.

3         The data that she had from him showed B in his

4  saliva, B on his red cell, and Louis showed he was a

5  secreter.  There was nothing to indicate that he was a

6  secreter that put more H out than B.

7         If that were true, his saliva sample, which is

8  less concentration of B substances than semen, should

9  have shown that as well.  Then if she had gotten H only

10  on his saliva after getting B on his red cells, then she

11  would have a reason to request a semen sample to check

12  the semen for that to see if it responds the same as the

13  saliva.

14     Q.   How many times have you testified in a judicial

15  proceeding?

16     A.   400 times.

17     Q.   And, like, times 350 through 400, were you

18  better than you were times 50 through 100?

19     A.   Yes.

20     Q.   Did you get better at it the more you did it?

21     A.   Yes.  I'm not sure about the numbers.  But,

22  yes.

23     Q.   But at some point did you think you were a lot

24  better at it than you used to be?

Case: 1:09-cv-00348 Document #: 360-2 Filed: 04/06/15 Page 81 of 138 PageID #:10676
Case: 1:09-cv-00348 Document #: 313-25 Filed: 03/02/15 Page 239 of 322 PageID #:7659

239

1    Q.    And you're basing that on the fact that she

2    told the police that she had not had consensual sex with

3    anyone for two weeks before the attack?

4    A.    Yes.

5    Q.    How long would semen live in the vagina after

6    having sex, whether consensual or not?

7    A.    Well, sperm, themselves, would last three to

8    seven days.  Sometimes 12 to 14 days, a few sperm, almost

9    undetectable.  The seminal fluid that contains the PGM

10   and ABO secreters drains out within 24 hours.

11   Q.    So you would have to have semen collected

12   within 24 hours in order to determine blood type?

13   A.    Yes.

14   Q.    So if you had semen collected three or

15   four days later, you might -- you might -- you'd be able

16   to find sperm, but you would not be able to determine

17   blood type?

18   A.    Correct.

19   Q.    So how, if in any manner, would your opinions

20   change if you had evidence that Maria Gonzalez had

21   engaged in consensual sex?

22   A.    Well, if she had engaged in consensual sex with

23   an ejaculate within 24 hours, then I would have to find

24   out -- we'd have to test the individual to find out what

# Exhibit 18

This Order Is Not Precedential
And Not To Be Published

FILED

JUN 2 1988

LOREN J. STROTZ, CLERK
APPELLATE COURT, 2nd DISTRICT

No. 2-86-1021

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 86 CF 106 |
| BENNIE STARKS, | ) ) | |
| Defendant-Appellant. | ) ) | Honorable William D. Block, Judge Presiding. |

ORDER PURSUANT TO SUPREME COURT RULE 23

The defendant, Bennie Starks, appeals from his convic-
tions and sentencing following a jury trial in the circuit court
of Lake County. The charges in the five-count amended indictment
filed against him all arose from the January 18, 1986, assault
upon complainant, a 69-year-old resident of Waukegan. The charges
were as follows:

Count  I - Aggravated criminal sexual assault (caused
bodily harm [placed penis in victim's
vagina by force]) Ill. Rev. Stat. 1985, ch.
38, par. 12-14(a)(2)

Count  II - Aggravated criminal sexual assault (victim
60 years of age or older) Ill. Rev. Stat.

8

86-1021

-2-

1985, ch. 38, par. 12-14(a)(5)

Count III - Attempted aggravated criminal sexual
assault (caused bodily harm [choked, hit
and knocked victim to the ground] and
attempted to place penis in victim's mouth)
Ill. Rev. Stat. 1985, ch. 38, par.
12-14(a)(2), par. 8-4(a)

Count IV - Aggravated battery (caused bodily harm to
victim over 60 years of age [choked, hit,
knocked victim to the ground and bit her])
Ill. Rev. Stat. 1985, ch. 38, par.
12-4(b)(10)

Count V - Unlawful restraint. Ill. Rev. Stat. 1985,
ch. 38, par. 10-3.

The jury found the defendant guilty on all five counts.
The court vacated the defendant's unlawful restraint conviction
as a lesser included offense of aggravated criminal sexual
assault, and it imposed concurrent extended terms of 60 years'
imprisonment for each of the two aggravated criminal sexual
assault convictions, 30 years for attempted aggravated criminal
sexual assault and 10 years for aggravated battery.

In this appeal, the defendant contends: (1) he was not
proved guilty beyond a reasonable doubt; (2) the per se applica-
tion of the rape shield statute denied him the right of confron-
tation; (3) his multiple convictions for aggravated criminal
sexual assault based on one act of intercourse, and his convic-
tion for aggravated battery based on the same element of force as

9

86-1021

-3-

the sexual assault cannnot stand; (4) it was error for the court to impose extended term sentences on him for all his convictions; and (5) the statute upon which his aggravated criminal sexual assault and attempted aggravated sexual assault convictions are based is unconstitutional.

The State's first witness, Officer William Genell, testified that he was on patrol duty the night of January 18, 1986. He received a radio dispatch at about 2 a.m. and proceeded to the area of 300 Lake Street in Waukegan, Illinois. Complainant was leaning against the wall to the doorway at 300 Lake when Genell arrived at the scene. She was shaking and crying and Genell noticed that she had numerous injuries on her arms and her legs. She was wearing a nightgown and was covered with mud; her face was swollen. Genell was able to talk with her a little in English and Spanish with Officer Martinez translating.

After complainant had been taken to the hospital, Genell searched the ravine area across the street from 300 Lake. He found a pair of slippers located halfway down the ravine but was unable to find any other evidence at that time due to darkness. At daylight, after Martinez talked with complainant at the hospital about 5:30 a.m., Genell returned to the ravine and found a black trench coat, gloves, a scarf, a pair of underpants, a watch and watchband, a pipe, some keys, hypodermic needles and blood.

Waukegan fire department Lieutenant Robert Harvey testified he responded to a call at 300 Lake Street in Waukegan with firefighter paramedic Clifford Hook. A Waukegan fire

86-1021

-4-

department vehicle already on the scene had a female, who appeared to be battered, immobilized on a long board with a Philadelphia collar in place. She was moaning, had numerous contusions, abrasions and lots of swelling in her face; she appeared to be in shock because her body was trembling and shaking.

Waukegan police Lieutenant Michael Urbancic testified that he examined the black trench coat retrieved from the ravine and found a cleaning tag from Sinclair Cleaners pinned to the inside of the left sleeve.

Kenneth Sinclair, the owner of Sinclair Cleaners, testified that he checked the laundry tag found inside the sleeve of the coat against his business records. The records indicated the coat had been brought to the cleaners by an individual with the last name of Starks. Defendant stipulated to Sinclair's identification of him in court as the man who had the coat cleaned.

The complainant testified with the aid of an interpreter that about 8:30 or 9:00 on the evening of January 18, 1986, she went outside for some fresh air. She was wearing two robes, a pair of underpants and house slippers. She walked to the corner and was standing there, looking ahead toward 300 Lake Street. She heard a noise, turned and saw a crouched black man get up and come toward her. She started walking toward her house, but the man ran. He grabbed her from behind with his arm around her neck, threw her down on the grass, and repeatedly punched her all over her face. He pulled her by her feet and legs down into the ravine. She was moving around and trying to

11

86-1021

-5-

get up. He continued to hit her all over her body as she strug-
gled to get up.

She testified that at the bottom of the ravine, he took
off her pants and raped her. She said he "pushed down" and was
holding her whole body. He had his pants unbuttoned. Before he
raped her, he did not take any of her clothing off. He was
pulling her. He didn't do anything with her underwear; when he
took them off he just threw them down. He didn't say anything to
her; he was just striking her and kicking her. When he raped
her, she felt something was "touching [her] there" and she moved
back and forth. She felt his penis in her vagina three or four
times because she kept moving around. He kept hitting her and
hitting her with his closed fist.

After he raped her, he put his penis on her cheek and
told her three times to "give him pussy," demonstrating for her
the kissing movement he wanted her to do with her mouth. She
testified she held his penis and pulled on it twice, causing him
to exclaim, "Oh." He then left her. During the attack, the man
bit her on her left shoulder and she tore off his watch. As the
man was leaving the ravine, complainant saw him carrying a red
bag, but he was not carrying or wearing his black coat. She saw
him climb up the ravine and go to the apartment building at 300
Lake. She identified the defendant in court as the individual
who attacked her on January 18, 1986.

On cross-examination, complainant testified she did not
know how much time elapsed during the assault. She denied she
told any Waukegan police officer at the scene that she had not

12

86-1021

-6-

been raped, stating, "My head wasn't right. I was hit." She stated that defendant took out his knife to hit her, but she had already been hit. She did not know if the defendant struck her with a metal pipe, or whether she had told this to an officer at the scene. She stated that defendant had no facial hair and was thin. She did not know anything about whether she told an officer at the scene that the man was about 18 years old. She testified she knew Blanca (Blanche) Gonzalez, her social worker. She denied having a conversation with Gonzalez after being released from the hospital in which she told Gonzalez that the man did not have sex with her and that the man was going to pay for beating her up so badly. She denied she told Gonzalez that she had seen the defendant before in the area. She did not tell the officer at the scene about the knife, but told officer Juarez the next day.

On redirect examination, she testified she couldn't recall talking to anybody at the scene because she was in the dark, couldn't see, and "couldn't feel [her] body."

Bliss O'Connor, a nurse in the Victor Hospital emergency room, testified that she treated complainant on the morning of January 19. She was brought into the emergency room at about 2 a.m. Her eyes were swollen, she was very dirty, she was badly beaten about her head, face and neck and she had quite a few abrasions on her body and arms. O'Connor stated complainant was very traumatized and upset. O'Connor testified they couldn't communicate with her too well because she spoke Spanish and they didn't so they had an interpreter. O'Connor and another nurse

13

86-1021

-7-

assisted Dr. Vugrincic in administering a Vitullo test kit about 5 a.m. Between 2 and 5 a.m., the emergency room staff and Dr. Vugrincic, who spoke some Spanish to complainant, questioned her several times whether she had been sexually assaulted. Part of this questioning of complainant was in English and part was in Spanish, with the doctor used as an interpreter; she denied she had been sexually assaulted.

After the nurses had bathed, treated, and prepared complainant for admission to the hospital, they called down an interpreter from the hospital, a registered nurse by the name of Del Martinez, so that he could explain to complainant what was happening to her. O'Connor was not present during Martinez's conversation with complainant. Over the defendant's objection, O'Connor testified that when Martinez came out of the room after he talked with complainant, he told O'Connor and the other nurse that she told him she had been sexually assaulted. At that point O'Connor got the doctor, and the Vitullo test kit was administered as noted above. Del Martinez was not permitted to testify because the court found that complainant's statement to him was hearsay which did not meet the standard for admission under the "prompt complaint" rule.

Dr. Vugrincic testified that when he examined complainant in the emergency room she had tremendous swelling of the face, neck and upper body. Her entire body was covered with dirt and numerous abrasions down to the knees and back. There was a bite mark and swelling over the area of the mark on the left shoulder. He performed the Vitullo rape test kit on complainant

14

86-1021

-8-

about 5:45 a.m. When asked if he observed anything unusual about her vagina he responded that,"[a]bsolutely every cavity of her body was filled with dirt. There was dirt in the entire vagina and those areas and even the rectum was full of dirt." The doctor testified that due to her numerous contusions, lacerations, abrasions and hematomas, they did extensive X-ray work of her skull, spine, left shoulder and extremities. Complainant was not unconscious and was aware of things around her, but she was not talking much and they could not establish many details of what she was going through.

On cross-examination, the doctor stated he found no sign of lacerations or abrasions or blood in the vagina. Except for normal vaginal secretions and a tremendous amount of dirt, he observed no abnormal secretions in the vaginal area. On redirect examination, the doctor stated the dirt did not impair his ability to see all the vaginal structures.

Sharon Thomas-Boyd, a forensic serologist, testified that she examined the evidence in the Vitullo collection kit. These includes saliva standards and blood and hair samples from complainant and the defendant. Boyd also examined the crotch of complainant's underpants which were found in the ravine, and a vaginal swab and smear obtained from her. All tested positive for the presence of semen. Upon performing further genetic marker typings, Boyd determined that complainant is a nonsecretor and that the defendant is a secretor. After examining all of the evidence, Boyd's opinion was that she could not exclude the defendant as a possible source of the semen.

15

86-1021

-9-

On cross-examination, Boyd testified that approximately 14% of the population of the United States has the same blood type as the defendant, and that any B-type secretor in that percentage group could have been the possible source of the semen examined by her. It was stipulated that the population of Lake County on January 19 was in excess of 450,000 people. On redirect examination, Boyd testified she did not rely only on ABO typing, but performed red cell enzyme tests in order to be able to exclude more people as the possible source of the semen.

Russell Schneider, a dentist and forensic odontologist, testified that he examined a large bruised bite-mark on complainant's left shoulder on January 22. He photographed the bite-mark and had the print blown up to life-size. Schnieder then took photos and impressions of the defendant's teeth and X-rayed his upper and lower bite. Upon comparing the defendant's bite to the photograph of the bite-mark on complainant's shoulder on a point system, Schneider found 62 similar characteristics. He found two highly unusual characteristics as well: the defendant's very small peg-shaped canine or "eyetooth" and his upper right central incisor which was chipped or broken. It was Schneider's opinion that it was the defendant who bit complainant on the shoulder.

On cross-examination, Schneider admitted that the instant case was the first time he had prepared a criminal work-up for bite-mark comparison and that he did not compare the X rays of the defendant's teeth against the model made of the defendant's teeth. Schneider also admitted that the bite-mark was four days old before he photographed it.

16

86-1021

-10-

Carl B. Hagstrom, also a forensic odontologist, testified that he worked with Dr. Schneider on this case. It was his opinion that the models obtained from the defendant are the models of the teeth that inflicted the bite-mark shown in the photograph of complainant's shoulder. It was also his opinion that it was the defendant who inflicted the bite-mark on complainant.

Benjamin Bones, an employee of Regent Clothiers and Jewelers at 21 South Genesee in Waukegan, testified that during the last hour of business on January 18, he sold a sweater to a black male customer. He identified the defendant in court as the man to whom he sold the sweater. He packaged the sweater for the defendant in a red bag that had the store's name on it.

Melody and John McCain both testified that they worked at the Genesee Inn, a bar, on January 18. The defendant was there from about 5:10 p.m. until 10:30 or 10:45 p.m. on the night of January 18. He was wearing a black trench coat and gloves with zipper-type straps, and was carrying a red bag. At one point during the evening, he left for about 20 minutes. When he returned, his clothes were neat and clean. The McCains did not recall whether he had any facial hair, nor did Calvin Williams, a Genesee Inn patron on January 18, who also testified.

Harry Boyer testified that defendant was at the Headquarters Tavern from about 10:45 to about 10:55 p.m. on January 18. He was wearing a stocking cap and black gloves with zippers on top. He was carrying a red plastic bag. Boyer observed that

86-1021

-11-

the defendant had a "scraggily," thin mustache. Boyer did not notice any mud on the defendant's clothes.

Waukegan police officer David Du Prez testified the defendant signed a waiver form after being advised of his rights. Waukegan detective sergeant William Biang testified he took a statement from the defendant on the evening of January 21. The defendant told Biang that he spent most of the day on January 18 drinking and that he was at the Genesee Inn until 10:30 p.m. As he was walking home from the Inn, he was approached from behind by a black male and a male Hispanic who announced a robbery and took his coat, gloves, wristwatch and $80. Afterward, the defendant stated he ran home to his mother's house at 300 Lake Street. He did not call the police to report the robbery because he did not think they would do anything for him. He did not tell his mother about the incident because she was sick and he did not want to upset her. Biang stated the defendant admitted buying a sweater from Regent Clothiers, that it was in a red bag, and that he had the bag with him at the Genesee Inn. He testified he did not have the package with him when he was robbed, however, because he dropped it off earlier at his mother's house. Biang showed him the coat found in the ravine and the defendant stated it was his.

Biang testified that defendant was placed under arrest that evening. Biang identified photos taken of the defendant's body which showed a scratch on the defendant's upper right shoulder, two scratch marks on the defendant's right wrist, and a scratch mark on the defendant's upper right buttock.

18

86-1021

-12-

The defendant did not testify at trial. His first witness was Blanche Gonzalez. Gonzalez testified that she works for the Illinois Department of Public Aid and that she met complainant in the course of her occupation. Some time after complainant's discharge from the hospital in January and before May 1986, Gonzalez had a telephone conversation with complainant. During this conversation, she told Gonzalez that she had accused a man of having sexual intercourse with her but that her accusation was not true. She told Gonzalez that the reason she was saying that the defendant had sexual intercourse with her was "because he was going to pay for beating her up." Complainant told her: "He didn't want to have any -- didn't want to rape me, he wanted oral sex." Complainant told Gonzalez she had seen the man in the area before.

Gonzalez testified on cross-examination that she did not inform the police about her conversation with complainant until the police came to interview her on May 13 because complainant told her not to say anything about this. Gonzalez told Sergeant Juarez about what complainant had told her because she did not "feel that a person should go to prison for something he did not do."

Waukegan sergeant Miguel Juarez testified that he interviewed complainant on January 19 at approximately 9:30 a.m. During this interview, she told Juarez that the alleged offender had no facial hair and that he was 18 or 19 years old.

The parties stipulated that if called to testify, Waukegan patrolman Martinez would testify that he spoke with

19

86-1021

-13-

complainant in Spanish on January 18, 1986 at 300 Lake Street. At that time, in response to his questions, she stated that she had not been raped but that she had been struck with a metal pipe. It was further stipulated that Bennie Starks was 26 years old at the time of the alleged occurrence.

The defendant contends he was not proved guilty beyond a reasonable doubt where there was no corroborative prompt complaint, and the victim's testimony was neither clear and convincing nor corroborated by other evidence. Specifically, defendant argues where complainant several times denied that a sexual assault had occurred, her later testimony to the contrary cannot be considered "clear and convincing," and the State did not meet its burden of corroborating it with other evidence.

Defendant points out that Dr. Vugrincic's vaginal examination of complainant failed to reveal any signs of blood, abrasions, lacerations or abnormal secretions despite the numerous other abrasions she suffered. Further, he argues, a reasonable doubt of his guilt exists where the State attempted to show that he could not be excluded as a possible source of the semen found on complainant's underpants and vaginal swab but the evidence showed the underpants were removed before the sexual assault. He contends this also raises doubt about the source of the semen on the vaginal swab because the semen found on the swab and the underpants was from the same blood group. Inasmuch as 14% of the general population shares the blood group found in both specimens, defendant contends the State's evidence

20

86-1021

-14-

establishes only that the defendant was one of 63,000 in Lake County who could have been the source of the semen.

Initially, the State points out complainant's first report that she had been sexually assaulted was not made at trial as the defendant asserts but, rather, was made at the hospital to nurse Del Martinez. Further, it argues complainant's testimony was clear and convincing and, standing alone, was sufficient to sustain defendant's convictions notwithstanding her denials that she had been sexually assaulted. As to the complainant's first two denials - one at the scene to officer Martinez and one later to the emergency room staff - it argues they occurred shortly after the attack while the complainant was in a state of shock and extreme trauma. As to the third denial during the complainant's phone conversation with Blanche Gonzalez, the State points out the complainant flatly denied the conversation occurred and, thus, a credibility question was presented, particularly where the evidence showed Gonzalez did not come forward with this information until the police came to her.

The State additionally argues the complainant's testimony was substantially corroborated by the discovery of the defendant's coat at the scene, and evidence that he had been seen earlier that evening wearing the coat and carrying a red bag holding the sweater he had purchased from Regent Clothiers. Further, the evidence showed defendant could not be excluded as the possible source of the semen found on complainant's underwear and vaginal swab, or of the hair found on a scarf discovered at the scene. Also, photographs of the defendant's body showed four

21

86-1021

-15-

scratches, including two on his wrist which coincided with complainant's testimony that she pulled off her assailant's watch. The State acknowledges defendant's argument that complainant's underpants were removed prior to the sexual assault, but argues complainant's testimony does not necessarily indicate the underpants were taken off completely at first, but that they may only have been pulled partially down during the sexual assault, come in contact with the semen, and then later come off completely during the struggle and, thus, were then found at the scene. Although admittedly not conclusive of the defendant's guilt, the State asserts the scientific evidence that the defendant could not be excluded as a source of the semen nevertheless is corroborative of the complainant's testimony.

The State's evidence was sufficient to prove the defendant guilty beyond a reasonable doubt.

In assessing the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. (People v. Hernandez (1988), 121 Ill. 2d 293; People v. Yarbrough (1988), 166 Ill. App. 3d 825, 832.) The relevant inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) (Jackson v. Virginia (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789; People v. Sanchez (1986), 115 Ill. 2d 238, 261; People v. Collins (1985), 106 Ill. 2d 237, 261.) All of the evidence is to be considered in the light most favorable to the prosecution in

22

86-1021

-16-

order to preserve the fact finder's role of weighing all the evidence. <u>Jackson</u>, 443 U.S. at 319, 61 L. Ed. 2d at 573, 99 S. Ct. at 2789.

A conviction for aggravated criminal sexual assault will be upheld when there is either some corroboration of the testimony of the prosecuting witness or that testimony is otherwise clear and convincing. (<u>People v. Server</u> (1986), 148 Ill. App. 3d 888, 894.)

Evidence of complainant's pretrial denials, particularly the one made to Blanche Gonzalez when complainant was not under any extreme physical or mental stress, substantially impeached the truth of her testimony. As such, defendant's conviction cannot be sustained unless the complainant's testimony was sufficiently corroborated by other evidence. We believe it was.

Although evidence of a prompt complaint is one type of corroborating evidence (<u>Server</u>, 148 Ill. App. 3d at 895), the court here refused to allow evidence of the complainant's statement to nurse Del Martinez as evidence of a "prompt complaint." Rather, the evidence was admitted only to show why the Vitullo rape kit was administered three hours after complainant was brought to the emergency room. Ordinarily, evidence of a prompt complaint is permitted on the basis that it is entirely natural that the victim of a forcible rape or, as here, of criminal sexual assault, would speak out regarding it. (<u>People v. Damen</u> (1963), 28 Ill. 2d 464.) Although a prompt complaint may also fall within the "spontaneous declaration" exception to the

23

86-1021

-17-

hearsay rule, there is no fixed time limit within which a corrob-
orative prompt complaint must be made. (People v. Morrow (1982),
104 Ill. App. 3d 995.) The complaint sought to be admitted must
have been made without inconsistent or unexplained delay, however
(People v. Fuelner (1982), 104 Ill. App. 3d 340), and it must be
voluntary and not made as a result of a series of questions.
(People v. Taylor (1971), 48 Ill. 2d 91). The court here appar-
ently felt this latter requirement was not met where the com-
plainant had been questioned at some length by the police and
hospital staff before she spoke to Del Martinez. The State does
not rely on complainant's statement to Martinez and finds suffi-
cient other corroborative evidence as noted above.

We find no reasonable doubt was raised due to the lack
of actual physical trauma to the complainant's vagina, and, in
fact, this type of physical evidence is not necessary to sustain
a conviction. (People v. Du Pree (1987), 161 Ill. App. 3d 951,
961; People v. Wallace (1986), 145 Ill. App. 3d 247, 252.)
Although neither party mentions it, we find particularly corrobo-
rative Dr. Vugrincic's testimony that the complainant's "entire
vagina and those areas and even the rectum [were] full of dirt."
We believe the jury could reasonably have inferred that defen-
dant's body also became covered with dirt during the assault and
that the dirt in the complainant's vagina could have been depos-
ited there by the defendant.

No reasonable doubt was raised based on the defendant's
assertion the complainant's underpants were removed before the
assault occurred, thus making it unlikely the semen found thereon

24

86-1021

-18-

was his. Complainant's testimony on this point at trial was ambiguous where, on one hand, she testified the man took off her pants and raped her and, on the other, that he did not take any of her clothing off before he raped her. Based on complainant's testimony, it is conceivable, as the State argues, that the underpants were first simply pushed down and sometime later were taken off completely. That complainant's testimony was ambiguous is supported by reference to the parties' closing arguments at trial. The defendant argued, without objection, that complainant's underpants were off <u>before</u> the sexual assault; the State, in rebuttal, also without objection, argued that the complainant emphatically testified her underpants were removed <u>after</u> the sexual assault. We can only assume both parties were arguing reasonable inferences drawn from the evidence. The record of complainant's testimony, given with the aid of an interpreter, was poorly phrased in many instances and often seemed nonresponsive. Moreover, complainant testified in many instances by "indicating." Viewing the evidence in the light most favorable to the prosecution, we conclude the defendant cannot be excluded as a possible source of the semen found on the complainant's underpants.

Since the semen found on the underpants and the vaginal swab were from the same blood group, evidence that the defendant could not be excluded as a possible source was corroborative of the complainant's testimony that she was sexually assaulted. Although the mere fact defendant was included within the 14% of the general population who could have been the source of the

25

86-1021

-19-

semen might be insufficient alone to establish guilt beyond a reasonable doubt, as found in People v. Schulz (1987), 154 Ill. App. 3d 358, 364-65, there was other evidence here linking the defendant to the crime, particularly a positive identification by the victim and testimony that the bite-mark on her shoulder matched defendant's teeth. Thus, the scientific evidence presented here provided corroboration of the complainant's testimony. (People v. Hall (1985), 134 Ill. App. 3d 961, 967; People v. Brown (1984), 122 Ill. App. 3d 452, 455.) Moreover, the complainant testified her assailant fled the scene carrying a red bag. According to defendant's statement, he had dropped this red bag off at his mother's house before he was robbed. Thus, defendant's statement to the police has little, if any, exculpatory value.

In sum, viewing all the evidence in the light most favorable to the prosecution, we conclude complainant's testimony was corroborated and, thus, defendant's guilt of aggravated criminal sexual assault was proved beyond a reasonable doubt.

The defendant next contends the court's strict application of section 115-7 of the Code of Criminal Procedure of 1963 (the rape shield statute) denied him his right of confrontation. Specifically, he claims that if he would have been permitted to inform the jury of a possible relationship the complainant had with another man it would have explained the presence of the semen, and the jury would have acquitted him.

Prior to the trial the judge conditionally granted the State's motion in limine to preclude the defendant from

86-1021

-20-

presenting any evidence concerning the complainant's prior sexual activity with anyone other than the defendant. The court's ruling was conditioned upon (1) the evidence to be submitted in the State's case-in-chief and (2) a specific offer of proof from the defendant as to what evidence he would adduce on cross-examination.

The court's conditional ruling cannot be viewed as the _per se_ application of the rape shield statute the defendant claims. After the State presented evidence during its case-in-chief concerning the semen found on complainant's underpants and vaginal swab, the defendant never availed himself of the opportunity to make an offer of proof concerning complainant's prior sexual relationship with anyone else. The State maintains defendant's failure to make an offer of proof has waived his claim of error as to this issue. We agree. People v. Green (1983), 118 Ill. App. 3d 227.

Defendant next challenges his multiple convictions. He first contends one of his two convictions for aggravated criminal sexual assault must be vacated under the rule announced in People v. King (1977), 66 Ill. 2d 551, that "prejudice results when more than one offense has been carved from a single physical act." Here, he contends, there was only one act of sexual penetration and thus, he can only be convicted on one count of aggravated criminal sexual assault.

In _King_, it was stated:

"Prejudice, with regard to multiple acts, exists only when the defendant is convicted of more than one

27

86-1021

-21-

offense, some of which are, by definition, lesser
included offenses. Multiple convictions and concurrent
sentences should be permitted in all other cases where
a defendant has committed several acts, despite the
interrelationship of those acts. 'Act,' when used in
this sense, is intended to mean any overt or outward
manifestation which will support a different offense."
King, 66 Ill. 2d at 566.

"Included offense" is one which contains some, but not all of the
elements of the greater offense and which contains no element not
included in the greater. People v. Pumphrey (1983), 115 Ill.
App. 3d 1031; Ill. Rev. Stat. 1985, ch. 38, par. 2-9; see also
People v. Traufler (1987), 152 Ill. App. 3d 987, 990; People v.
Smith (1987), 152 Ill. App. 3d 589.

The State argues this court should uphold defendant's
multiple convictions on the basis that each of the "three or four
times" the complainant felt the defendant's penis in her vagina
constituted an individual act of penetration sufficient to
support a separate conviction for aggravated criminal sexual
assault. However, there was no evidence that each of the "three
or four times" complainant felt the defendant's penis was a
reinsertion or repenetration, thus distinguishing the instant
cause from People v. Myers (1981), 85 Ill. 2d 281, People v.
Harris (1985), 134 Ill. App. 3d 705 and People v. Dixon (1982),
91 Ill. 2d 346.

The evidence here does not support a finding of sepa-
rate physical acts as in Myers, Harris, and Dixon, however, and

28

86-1021

-22-

we conclude one of the defendant's convictions for aggravated criminal sexual assault must be vacated.

Defendant also contends his conviction for aggravated battery must be vacated where the "use of force" alleged in counts I and II charging aggravated criminal sexual assault against the complainant is the same conduct of choking, biting, hitting and knocking the complainant to the ground upon which the aggravated battery charge is based. He cites in support People v. Mormon (1982), 92 Ill. 2d 268 and People v. Hood (1974), 59 Ill. 2d 315.

The defendant in Mormon was convicted, inter alia, of rape and armed violence based on rape. At both levels on appeal, the court rejected the State's argument that the acts of committing rape and of carrying a weapon while committing the rape were two separate acts, finding that the use of the weapon constituted the element of force essential to both offenses. (97 Ill. App. 3d at 566; 92 Ill. 2d at 268.) In People v. Hood, the defendant was convicted of aggravated assault and rape. On appeal to the supreme court, the defendant's conviction for aggravated assault was vacated where the acts which gave rise to the aggravated assault, several blows struck to the victim and a knife threat, constituted the element of force in the rape charge as well. As the State suggests, Hood was decided prior to either People v. King or People v. Dixon and may well have been decided differently under those cases given the apparently separate acts of striking the victim and threatening her with a knife.

29

86-1021

-23-

The defendant's aggravated battery conviction should not be vacated. The aggravated battery charge is the only one which alleged the defendant bit the complainant. According to the record, this bite to the complainant's left shoulder occurred sometime during the sexual assault and, thus, was a separate act from the force exerted by the defendant in accomplishing the sexual penetration. Further, applying the Dixon analysis, the State concludes the repeated beatings of the complainant by the defendant here, although closely related, were not one physical act and any one of the acts alleged in the indictment for aggravated battery was sufficient to support his conviction therefore. Moreover, as the State points out, the aggravated battery charge is not a lesser included offense of the aggravated criminal sexual assault conviction under count I since it includes the additional element that the complainant was "over the age of sixty (60) years."

Accordingly, the defendant's conviction for aggravated battery is affirmed.

Defendant next contends the trial court's imposition of extended terms of imprisonment on all four counts was improper. He notes the court in People v. Jordan (1984), 103 Ill. 2d 192, 206, relying on People v. Evans (1981), 87 Ill. 2d 77, and construing section 5-8-2(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1979, ch. 38, par. 1005-8-2(a)) found that:

"[W]hen a defendant has been convicted of multiple offenses of differing classes, an extended-term sentence may only be imposed for the conviction within the

30

86-1021

-24-

most serious class and only if that offense was accom-
panied by brutal or heinous behavior."

Defendant's convictions here for aggravated criminal
sexual assault were class X offenses (Ill. Rev. Stat. 1985, ch.
38, par. 12-14(c)); his conviction for attempted aggravated
criminal sexual assault was a class 1 felony (Ill. Rev. Stat.
1985, ch. 38, par. 8-4(c)(2)); and his conviction for aggravated
battery was a class 3 felony (Ill. Rev. Stat. 1985, ch. 38, par.
12-4(e)).

The State concedes that the 30-year and 10-year extend-
ed term sentences imposed, respectively, for attempted aggravated
criminal sexual assault and aggravated battery were improperly
imposed under Jordan and must be vacated. (See also People v.
Holland (1987), 121 Ill. 2d 136, 161.) It disagrees, however,
with the defendant's request for a remand for a new sentencing
hearing, arguing the record supports the conclusion that the
sentencing judge intended to impose severe penalties and request-
ing this court to use its authority under Supreme Court Rule 615
(107 Ill. 2d R. 615(b)(4)) to reduce the sentences to the maximum
nonextended term possible for each of those two offenses.

We are persuaded that this is an appropriate exercise
of the court's authority under Supreme Court Rule 615. A review
of the sentencing judge's comments here show he was motivated to
impose the extended terms based on the defendant's extremely
brutal and heinous beating of the 69-year-old complainant; the
defendant's past criminal history which revealed repeated crimi-
nal acts despite his having had the benefits of the criminal

31

86-1021

-25-

justice system; a significant escalation in the degree of violence which attended the present offense compared with his past offenses; the lack of applicable mitigating factors; and the defendant's minimal potential for rehabilitation. Accordingly, the defendant's sentences for attempted aggravated criminal sexual assault and aggravated battery are reduced, respectively, to 15 years and five years.

The extended 60-year term imposed for each of the defendant's two aggravated criminal sexual assault class X convictions may stand, since Jordan applies only "when a defendant has been convicted of multiple offenses of differing classes." Jordan, 103 Ill. 2d at 206-207; see also People v. McFarland (1987), 161 Ill. App. 3d 163, 174.

Defendant's final contention is that section 12-14 of the Code is unconstitutional on the basis it is overbroad and ambiguous in its definitions and applications. He requests this court adopt the position taken in People v. Haywood (4th Jud. Cir. Oct. 7, 1985), No. 85CF29, wherein the court found unconstitutional the Criminal Sexual Assault Law of 1984. (Ill. Rev. Stat. 1984 Supp., ch. 38, pars. 12-12 through 12-18.)

We conclude (1) defendant has waived the issue and (2) the issue is without merit. Defendant neither raised this issue at trial nor in his post trial motion, thus waiving it. (People v. Du Pree (1987), 161 Ill. App. 3d 951, 966-67.) Moreover, on the merits, the Illinois Supreme Court has reversed the decision of the circuit court in Haywood, finding that the statutes defining the offenses of criminal sexual assault and aggravated

32

86-1021

-26-

criminal sexual assault are not unconstitutionally vague, overbroad, or ambiguous so as to be in violation of the due process clauses of either the United States or Illinois Constitutions. (People v. Haywood (1987), 118 Ill. 2d 263.) Accordingly, no reversal of defendant's convictions on this basis are warranted.

The judgments of the circuit court of Lake County finding the defendant guilty of aggravated criminal sexual assault charged in count I, attempted aggravated criminal sexual assault charged in count III, and aggravated battery charged in count IV are affirmed. The court's judgment of conviction and sentence for aggravated criminal sexual assault charged in count II is vacated. The 30-year extended-term sentence imposed for attempted aggravated criminal sexual assault is reduced to 15 years, and the 10-year extended-term sentence imposed for aggravated battery is reduced to five years.

Judgment affirmed in part; judgment vacated in part; judgment modified in part.

UNVERZAGT, J., LINDBERG, P.J., and REINHARD, J.

33

# United States of America

**State of Illinois,**
**Appellate Court,**
**Second District,**  } ss.

General Number:  2-86-1021
        Re:  People v. Bennie Starks.

I, ROBERT J. MANGAN, Clerk of the Appellate Court, in and for said Second Judicial District of the State of Illinois, and the keeper of the Records and Seal thereof, do hereby certify that the foregoing is a true, full and complete copy of the decision of the said Appellate Court in the above entitled cause of record in my said office.

IN TESTIMONY WHEREOF, I have set my hand and affixed the seal of the said Appellate Court, in Elgin, in said State, this 4th. day of February , A.D. 20 05 .

_____
Clerk Appellate Court, Second District .

UNITED STATES OF AMERICA

STATE OF ILLINOIS )
APPELLATE COURT ) ss:
SECOND DISTRICT )

At a Session of the Appellate Court begun and held at Elgin on the 1st da
of January, in the year of our Lord one thousand nine hundred and eighty-eight
within and for the Second District of Illinois:
Present: Honorable GEORGE W. LINDBERG, Presiding Justice
Honorable MARVIN D. DUNN, Justice          Honorable PHILIP G. REINHARD, Justice
Honorable WILLIAM V. HOPF, Justice         Honorable GEORGE W. UNVERZAGT, Justice
Honorable LAWRENCE D. INGLIS, Justice      Honorable ALFRED E. WOODWARD, Justice
Honorable WILLIAM R. NASH, Justice
                    LOREN J. STROTZ, Clerk
                    F. JOHN RANDALL, Sheriff
------------------------------------------------------------------------

#2-86-1021
PEOPLE OF THE STATE OF ILLINOIS,                    APPEAL FROM THE
          Plaintiff-Appellee,                       CIRCUIT COURT OF
v.                                                  Lake County
BENNIE STARKS,
          Defendant-Appellant.                      TRIAL COURT NO.
                                                    86CF106

### MANDATE

The judgments of the Circuit Court of Lake county finding the
defendant guilty of aggravated criminal sexual assault charged in Count 1,
attempted aggravated criminal sexual assault charged in Count III, and
aggravated battery charged in Count IV are affirmed. The Court's
judgment of conviction and sentence for aggravated criminal sexual
assault charged in County II is vacated. The 30 year extended-term
sentence imposed for attempted aggravated criminal sexual assault is
reduced to 15 years, and the 10-year extended-term sentence imposed
for aggravated battery is reduced to five years.
          Judgment affirmed in part; judgment vacated in part;
judgment modified in part.

          Costs to be taxed according to law, and $50 statutory fee
assessed as costs against appellant.

### CERTIFICATE

I, LOREN J. STROTZ, Clerk of the Appellate Court, Second District of the
State of Illinois, and keeper of the records, files and Seal thereof, do hereb
certify that the foregoing is a true copy of the final order of said Appellate
Court, in the above entitled cause of record in my said office.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the Se
of said Court this 14th day of November , 1988, A.D.

                              Clerk of the Appellate Court

# Exhibit 19

<pre>
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4

    BENNIE STARKS,                )
 5                                )
                    Plaintiff,    )
 6                                )
         vs.                      )    No. 09 C 348
 7                                )
    CITY OF WAUKEGAN, and PRESENT )    Judge Gary Feinerman
 8  and FORMER WAUKEGAN POLICE    )
    DEPARTMENT OFFICIALS:         )    Magistrate Judge
 9  LIEUTENANT URBANCIC, W. BIANG,)    Mason
    P. STEVENSON, M. JUAREZ,      )
10  D. DEPREZ, DR. CARL HAGSTROM, )
    DR. RUSSELL SCHNEIDER AND     )
11  SHARON THOMAS-BOYD,           )
                                  )
12                  Defendants.   )

13

14

15          The deposition of RUSSELL SCHNEIDER, D.D.S.,
16  pursuant to notice and pursuant to the Federal Rules
17  of Civil Procedure for the United States District
18  Courts pertaining to the taking of depositions, taken
19  before Carmella T. Fagan, C.S.R., R.P.R., Notary
20  Public within and for the County of Cook and State of
21  Illinois, at 500 West Madison Street, Suite 2430, in
22  the City of Chicago, Cook County, Illinois,
23  commencing at 10:30 a.m. on the 19th day of
24  September, 2014.
25              BREHON REPORTING   (708) 442-4522
</pre>

```
1    records?

2         A        No.  I wouldn't throw it out.

3         Q        So if, in fact, he was a patient, you

4    would expect to have his records?

5         A        Yes.

6         Q        Was your first contact with respect to

7    this case a phone call?

8         A        I don't remember how I was contacted,

9    sir.

10        Q        Did you -- had you heard about the

11   attack on Maria Gonzalez before you were contacted

12   about being a witness in this -- about being a

13   forensic odontologist in this case?

14        A        I don't remember.

15        Q        What is the first contact that you

16   remember with respect to this case?

17        A        Contact with -- I remember going to

18   the -- I remember going to the hospital to examine

19   Maria Gonzalez.  That was the first contact I can

20   remember.  That would be the first contact that I

21   remember.  How that occurred. . .

22        Q        Just going back a minute, you -- you

23   did testify at some point that Bill Biang was your

24   patient, but you said you thought it was subsequent
```

```
 1    to this.  How do you know it was subsequent?

 2          A       I don't know.

 3          Q       So it could have been before, it could

 4    have been later?

 5          A       It could have been.  Could have been.

 6    I don't remember.

 7          Q       In your testimony a minute ago you did

 8    say "subsequently."  Do you know why you said that?

 9          A       Well, I don't believe I knew him

10    before then.  I believe that was my first meeting

11    with him.

12          Q       Was when you went to see Maria

13    Gonzalez?

14          A       Yes.

15          Q       Okay.  But you don't know whether he

16    was a patient of yours before or after this?

17          A       I don't believe he was, but I don't

18    know.  I don't remember.

19          Q       And how it was that you were -- it was

20    organized that you were going to the hospital?

21          A       How was it?  I don't remember how that

22    was.

23          Q       Did you go there by yourself?

24          A       I mean, I went and there were other
```

```
 1    people there.

 2            Q        But did you go there by yourself?

 3    Like, did you get to the hospital by yourself?

 4            A        I don't remember how I got to the

 5    hospital.

 6            Q        Did you get to the hospital in a

 7    police car?

 8            A        I would remember if that happened.  I

 9    didn't take a police car.

10            Q        Did you go to the hospital with Bill

11    Biang?

12            A        I don't remember.

13            Q        And did you go to the hospital with

14    Carl Hagstrom?

15            A        I don't remember that either.

16            Q        Did you go to the hospital with any

17    other police officer other than Bill Biang?

18            A        I don't know if I went to the hospital

19    with anyone.  I don't know if I went there on my own

20    and met them there.  I don't remember.

21            Q        And what time of day was it that you

22    went to the hospital the first time?

23            A        I don't remember that either.

24            Q        What day of the week was it that you
```

1    went to the hospital?

2           A       This is 1986. I don't remember the

3    time or the day of the week that I went to the

4    hospital.

5           Q       Okay. What date was it that you went

6    to the hospital?

7           A       From going through my -- the

8    information that I have, the courtroom testimony, I

9    believe it was January 22nd.

10          Q       Other than your courtroom testimony,

11   do you have any other basis for saying it was January

12   22nd?

13          A       I don't know.

14          Q       Had you worked with the Waukegan

15   Police Department before with respect to your work as

16   a forensic odontologist?

17          A       No.

18          Q       Now, at the time that you were

19   contacted and went to the hospital in terms of the

20   Maria Gonzalez case, did you have any kind of

21   certification as a forensic odontologist?

22          A       A certification? I took classes, I

23   took courses. That was my certification.

24          Q       Well, you had taken the two courses at

1    Q        Is it possible you met her more than

2    one time and you don't recall, or no?

3    A        I don't believe I saw her more than

4    one time.

5    Q        Were you informed by the police

6    officers who were present with you at Victory

7    Memorial Hospital that the police had taken a

8    Polaroid photograph of the bite mark on the day that

9    it had occurred?

10   A        Not to my recollection.

11   Q        Okay.  In the event that there had

12   been a Polaroid photograph taken of the bite mark, is

13   that something you would -- something you would have

14   wanted to review?

15   A        I don't know.  I don't know what that

16   would look like.  I would probably want to see it,

17   but I have no idea if it has any evidentiary value.

18   Q        When you were present at the hospital

19   with Detective Anderson, did Detective Anderson tell

20   you, or it may be Evidence Technician Anderson, I'm

21   not sure, but Officer Anderson, did Officer Anderson

22   tell you that he had taken an additional Polaroid of

23   the -- of the bite mark?

24   A        Not to my recollection.

1        Q       Would that have been something you

2  would have wanted to see?

3        A       If there was a photo, I would want to

4  see it.

5        Q       And if there were two photos, you

6  would want to see both of them, correct?

7        A       I would want to see photos to see if

8  they had any value.

9        Q       If there was a photo taken on January

10  19th, you would want to see that?

11        A       Yes.

12        Q       That could be important in terms of

13  your analysis; is that correct?

14        A       I don't know.

15        Q       You would have --

16        A       I don't know what the photo would look

17  like.  I don't know if it would be important or not.

18        Q       But you would like to see the photo?

19        A       I would like to have seen it.

20        Q       All right.  And then if there was

21  another photograph taken three days after that, you

22  would like to see that Polaroid photograph also?

23        A       Yes.

24        Q       And if there had been a tracing of the

1    were -- were used to produce photographic prints; is

2    that correct?

3          A     Yes.

4          Q     Now, there is -- why don't I show you

5    what I'm going to mark as Exhibit 2.

6                      (WHEREUPON, Schneider Exhibit 2

7                       was marked and tendered to

8                       Witness.)

9                After you've had a chance to look at

10   it now, my first question is going to be:  To your

11   knowledge, have you ever seen this document before,

12   which is a police report?

13         A     I've never seen this document before.

14         Q     You can see that it purports to record

15   the photographing of bite marks on Ms. Gonzalez.  Do

16   you see that?

17         A     Yes.

18         Q     And do you see at the top it says,

19   "Date and Time of This Report"?

20         A     I can't read what it says.

21         Q     It's hard to make out, isn't it?

22         A     I don't know what it says.  I think it

23   says, "28, slash, 86, 1:50 p.m."

24         Q     I agree.  It appears to say "1, slash,

```
 1    28, slash, 86," but it looks like the "28" maybe --

 2         A       Oh, oh.

 3         Q       -- has been changed.

 4         A       Okay.

 5         Q       Do you agree?

 6         A       Yeah.  I'm having a hard time reading

 7    it.  It looks like it does say "1/28/86," at 1:50,

 8    and I assume that's "p.m." and not an "N."

 9         Q       I think it's a "p.m."  Yeah.

10         A       What does it say, "twenty-six-eight"?

11         Q       "28th."  That's correct.

12         A       Okay.  It's been written over.  I

13    don't know what that is, if that's supposed to be a

14    "22"?  It could be a "22," "1/22/86 1:50," and I

15    think that says, "p.m."

16         Q       In fact, it looks like something was

17    written and then it was written over and changed,

18    correct?

19         A       Yeah.  It looks like "1/22."  It looks

20    like it was changed to "1/22."  I don't know what it

21    is.

22         Q       All right.  You've never seen it

23    before?

24         A       No.
```

1    question is on the record.

2              Can you make your question clear on

3    the record so I can hear the whole question?  I

4    assume you mean the ones referenced in Exhibit 3, but

5    I don't know.

6        MR. STAINTHORP:  Well, I've actually forgotten

7    what my question was at this point.

8        MR. KRAUSE:  You said, "the other photos."

9        MR. STAINTHORP:  Oh, okay.

10   BY MR. STAINTHORP:

11       Q      With respect to the photographs that

12   were taken when you were not present or not recorded

13   as being present, do you know what happened to those

14   photographs?

15       A      I don't know anything about those

16   photographs.

17       Q      With respect to your work in this

18   case, would it have been useful to you to have had

19   photographs of the bite mark that were taken on

20   January the 29th of 1986?

21       A      Are you referring to those photos that

22   were taken?

23       Q      Well, this seems to indicate that

24   photos were taken on January 29th.

```
 1          A        I have no idea.  Are those taken with

 2    a -- are they in existence?  Were they taken with or

 3    without a rule?

 4          MR. KRAUSE:  Russ, answer his question.  He

 5    wants to know --

 6          THE WITNESS:  I don't know.

 7    BY MR. STAINTHORP:

 8          Q        Yeah.  I don't know either.  But my

 9    question was -- were you answering my question when

10    you said, "I don't know," that you don't know whether

11    it would be useful or not?

12          A        Yes.

13          Q        Okay.  Now, I'm showing what you I'm

14    going to mark as Exhibit 4.

15                        (WHEREUPON, Schneider Exhibit 4

16                         was marked and tendered to

17                         Witness.)

18                   Have you had a chance to look at that

19    exhibit?

20          A        Yes.

21          Q        This purports to be a memo or some

22    kind of note written by you; is that correct?

23          A        This looks like a work order to the

24    photo lab.
```

```
 1          A        On these three pages?

 2          Q        Yep.

 3          A        The whole thing?

 4          Q        Yep.

 5          A        I don't remember talking to the

 6    prosecutor.  It's possible that I did go over this

 7    and say these things to him.

 8          Q        Do you think it's likely you did that?

 9          A        I don't know if it's likely.  I

10    wouldn't be surprised.

11          Q        Now, if you go to 561 --

12          A        Okay.

13          Q        -- towards the bottom, line 17, you

14    testify about giving instructions to the media

15    company to reproduce the photos so that the ruler in

16    the photo is exactly one-to-one with the ruler?

17          A        Yes.  Um-hum.

18          Q        Did that happen?

19          A        Yes.

20          Q        Did you measure the photograph to

21    ensure that it was one-to-one?

22          A        Yes.

23          Q        And when did you do that?

24          A        As soon as I got it.  Actually, I did
```

```
 1          A        When I did the comparison of the

 2    models to the bite mark, I used one-to-one photos.

 3          Q        But were those photos the same photos

 4    that were then admitted into evidence at the criminal

 5    trial?

 6          A        The photos that were admitted into

 7    evidence were the slides that were taken of those

 8    photos and the models together as a comparison.

 9          Q        I understand the slides were

10    introduced into evidence.  But in addition to that,

11    there were several photographs, but the two that I'm

12    interested in are these two that are in front of you

13    which are marked as Exhibits 39 and 40.

14                   Was it your understanding back at the

15    time of the trial, Exhibits 39 and 40 were identical

16    in all respects, including dimensions, to the

17    photographs that you and Dr. Hagstrom had used to

18    compare the exemplars to the marks?

19          A        No.  I don't know if these photos are

20    life-size.  The photos that we used were made exactly

21    life-size, one-to-one.  I do not know the dimensions

22    on these photos that are numbered 39 and 40.  And, of

23    course, you can't say with 39 because there's no

24    scale in that photo.  And I don't know about 40.
```

1    I -- I don't know if it's life-size or not.

2          Q        Actually, with 39, you would never be

3    able to tell if it's one-to-one because there's no

4    scale, correct?

5          A        You know, there are ways of

6    determining whether a photo is one-to-one.  I have no

7    idea if that can be made one-to-one.

8          Q        But even in terms of your work back in

9    1986, you had no way of knowing that the photograph,

10   a copy of which appears in Exhibit 39, was made

11   one-to-one?

12         A        Photograph Number 39 is a picture of

13   the victim.

14         Q        With a bruise.

15         A        With a bruise.  So in order for that

16   to be one-to-one, it would have to be a huge photo

17   because it would have to be life-size.

18         Q        So 39 is not one-to-one, but 40,

19   you're saying that you did make a print of that photo

20   that was one-to-one?

21         A        We used the negatives that were used

22   to make this photo, Exhibit Number 40, we used those

23   negatives to produce photos that were exactly

24   life-size.

1          Q          And with respect to Exhibit 40, was

2     Exhibit 40, as produced at the trial, exactly

3     one-to-one with respect --

4          A          I do not know if Exhibit 40 is

5     one-to-one, because we did not use this, we used the

6     negatives to make life-size photos.

7          Q          So where are those photos that you

8     made one-to-one?

9          A          I don't know.

10          Q          Did you keep a file of those photos

11     that were made one-to-one?

12          A          I don't have any photos.

13          Q          Did you give those photos to Waukegan

14     police officers?

15          A          I wouldn't have given them to the

16     police officers.

17          Q          Did you give those photographs, the

18     exact one-to-one photographs, to the prosecutor?

19          A          I don't remember what happened to

20     them.

21          Q          So in terms of if someone wanted to --

22     to test your conclusions that the exemplars made of

23     Bennie Starks' jaw and teeth were a match to the

24     one-to-one photographs, that would be impossible to

1    do at this point; is that correct?

2         A    I don't understand your question.

3    You're asking me if the exemplars can be compared to

4    a photograph of one-to-one?

5         Q    Strike that.

6              With respect to the photographs which

7    have the ruler in it, so that's Exhibit 40, which

8    I've marked as Group Exhibit 6, and the copy of that

9    photograph, which has been marked as part of Group

10   Exhibit 7 and which you believe has been digitally

11   altered, you can see the ruler in those photographs,

12   correct?

13        A    Yes.

14        Q    And would you agree with me that the

15   ruler is out of focus?

16        A    Yes.

17        Q    Okay.  Was the ruler out of focus in

18   the original photos that you used in making the bite

19   mark comparison in this case?

20        A    Yes.

21        Q    Why is the ruler out of focus?

22        A    The ruler is out of focus because it

23   is not in the center of the photo that is being

24   taken.  The center of the photo is the actual bite

1    mark.  The ruler is on the side of the bite mark, so

2    the resolution is primarily on the bite mark itself.

3    It would not be uncommon for the ruler to be out of

4    focus.

5                 Nevertheless, that out-of-focus ruler

6    can be used to establish that the lines are in focus,

7    you can establish how -- the size of the ruler, you

8    can duplicate that photo one-to-one by using that

9    ruler and the ruler that was actually used in that

10   photo to make them one-to-one.  You can put the ruler

11   over that photo so that they are exactly the same

12   size.  Whether that's out of focus makes no

13   difference.

14        Q        Were you knowledgeable about the area

15   of photography back in 1986?

16        A        Was I knowledgeable about photography?

17        Q        Yes.

18        A        In terms of taking this mark and being

19   perpendicular to it?

20        Q        Yes.

21        A        Yes.

22        Q        And were you knowledgeable about how

23   to take a photograph where everything within the

24   frame is in focus, or everything important is in --

1    refer to "front teeth" as the four front teeth.  I

2    didn't say that.

3          Q      No.  I understand.

4          A      Okay.

5          Q      You said "front teeth."

6          A      Yeah.  Anterior dentition.

7          Q      And, in fact --

8          MR. TENGESDAL:  He said, "front tooth."

9          MR. STAINTHORP:  No.  He said "teeth,"

10   actually.

11   BY MR. STAINTHORP:

12         Q      But when you said that, I mean, you

13   didn't even identify whether it was mandibular or

14   maxillary, correct?

15         A      Yes.

16         Q      And, again, from your examination,

17   your visual examination, you couldn't make that

18   determination, correct?

19         A      I believe I could.  Yes.  We

20   determined at that -- at the hospital how that was

21   oriented.  When I looked at it, based on interviewing

22   Mrs. Gonzalez, based on looking at the bite mark,

23   looking at the characteristics that were in it, I

24   could orient the -- the jaws.

153

```
 1          Q        Okay.  Forget for a minute about what
 2   Ms. Gonzalez told you.  But from the appearance of
 3   the bite mark itself, what was it about the bite mark
 4   itself when you visually observed it in the hospital
 5   that allowed you to orient some of the marks on the
 6   bite mark as either mandibular or maxillary?
 7          A        I didn't orient it at the hospital.  I
 8   oriented it after I studied it.
 9          Q        I'm sorry.  I thought you just said
10   that from your visual examination, you -- at the
11   hospital, you could orient the bite mark.  Did I
12   misunderstand that?
13          A        When I looked at it, and talking to
14   Mrs. Gonzalez, it all looked consistent that it was
15   upper -- the upper was on top and the lower was on
16   the bottom.
17          Q        Okay.  But was there something other
18   than what Ms. Gonzalez told you that enabled you to
19   orient the bite mark as -- as maxillary rather
20   than -- strike that.
21                   Was there something other than what
22   Ms. Gonzalez told you that allowed you to orient the
23   bite mark?
24          A        I oriented the bite mark using my work
```

1    product, and that's how I came to my conclusion with

2    a reasonable degree of medical certainty how the bite

3    mark was oriented.

4         Q       But that's down the line.  That's

5    several weeks after that, right?

6         A       Yes.

7         Q       What I'm asking now is about in terms

8    of your visual observation of the bite mark.  When

9    you saw her in the hospital, I understood you to say

10   earlier that you made an orientation of the bite mark

11   at that time.

12             And what I'm asking you is:  Other

13   than what Ms. Gonzalez told you, was there something

14   about what you saw in that bite mark that allowed you

15   to make that orientation?

16        A       I don't recall.

17        Q       And you also just referred to a

18   pointed abrasion line.  Can you indicate on the photo

19   that is part of Group Exhibit 7 where that pointed

20   abrasion line is?

21        A       I can't do that right now.  I'm going

22   to have to -- I can't do that now.

23        Q       Have you had occasion to view these

24   photographs?

```
1        Q        Did you ever compare the model with

2   the marks that we've identified to the right of the

3   central red spot being the mandibular teeth?

4        A        Yes, we did.

5        Q        Okay.  And they didn't match?

6        A        No, they didn't.

7        Q        So if, in fact, those marks were made

8   by the mandibular teeth of the biter, then Bennie

9   Starks wasn't the biter?

10       A        In 1986, I analyzed this bite mark to

11  the best of my ability, and I took Bennie Starks'

12  teeth, a model of his teeth, and put them over the

13  bite mark and saw specific unusual characteristics in

14  this bite mark.  I made my opinion with a reasonable

15  degree of medical certainty that certain teeth made

16  those characteristics in the bite mark.

17       Q        But you would agree with me that if,

18  in fact, you oriented it incorrectly, and that those

19  marks that we've identified on 7B -- 7A, I'm sorry --

20  were the mandibular teeth, Bennie Starks did not make

21  this bite mark?

22       A        I can't say that.

23       Q        Why can't you say that?

24       A        We couldn't exclude him.  He can't be
```

1    excluded.

2          Q         But you wouldn't have included him,

3    would you?  I mean, you wouldn't have said that he

4    made the bite mark?

5          A         I couldn't have excluded him.  But he

6    didn't -- those aren't lower teeth on the top of the

7    bite mark.  It's maxillary teeth.

8          Q         Other than comparing the marks on 7A

9    to the model that you had made of Bennie Starks'

10   teeth, and, in particular, the maxillary teeth, what

11   other basis did you have for concluding that those

12   marks were made by the maxillary rather than the

13   mandibular?

14         A         What I did was I compared the upper

15   teeth to show that the -- the width of the teeth, the

16   size of the marks were consistent, that the overall

17   arch shape were consistent on the top at -- with the

18   maxillary teeth on the top of the mark, with the

19   mandibular teeth on the lower part of the mark.

20                   I saw individual characteristics of --

21   tooth number 8 was fractured on the incisal edge.  It

22   was unusual; it appeared as drag mark in the bite.  I

23   saw -- as I dragged the model down the photo, I could

24   see that the front teeth made -- number 8 made a very

1     distinctive mark, that the separation between 8 and 9

2     was present as a linear mark, that the separation

3     between 7 and 8 was present as a linear mark.  And

4     that later, an unusual pegged canine came into the

5     bite.  So the unusual pointy pegged canine of number

6     6 and the unusual fractured tooth of number 8 left

7     marks that were unique, and, in my opinion, with a

8     reasonable degree of medical certainty, that those

9     marks were made by those individual teeth.

10         Q      The -- when you refer to the fractured

11    tooth that made the drag mark, can you point out on

12    Exhibit 7A what you are referring to?

13         A      No, I can't.  I need the model and my

14    original work material to restudy this and show you

15    which marks were which.

16         Q      All right.  So just looking at the

17    photograph of the wound, you can't, from looking at

18    this, identify which is the number 8 fracture,

19    correct?

20         A      I can if I used all of the materials I

21    used to come to my conclusions.

22         Q      But my question was:  Looking at this

23    photograph, you're saying you can't identify what you

24    have -- you claim is the fracture on tooth number 8?

```
 1    and whether or not the materials were present when we

 2    had discussions.

 3           Q       At any rate, was it after that that

 4    you made your initial report to State's Attorney

 5    Barrones?

 6           A       Yes.

 7           MR. STAINTHORP:  Let's mark this as -- what

 8    are we on?

 9           MS. REPORTER:  Number 10.

10                        (WHEREUPON, Schneider Exhibit 10

11                         was marked and tendered to

12                         Witness.)

13    BY MR. STAINTHORP:

14           Q       Have you had a chance to review Number

15    10?

16           A       Yes.

17           Q       Okay.  This was a letter that was sent

18    to Mr. Barrones that contained your conclusions after

19    the examination, correct?

20           A       Yes, sir.

21           Q       And it states that you "found a

22    definite match" between the bite mark and Mr. Starks,

23    correct?

24           A       I found -- yes.
```

 1         Q      Who actually wrote the letter?  Was

 2  it --

 3         A      I did.

 4         Q      And then you presented it to Dr.

 5  Hagstrom for signature?

 6         A      Yes.

 7         Q      Do you see underneath Dr. Hagstrom's

 8  signature there is --

 9         A      Yeah.

10         Q      -- an "R"?  What does that --

11         A      I think --

12         Q      -- refer to?

13         A      -- I actually wrote his name on here.

14         Q      You did?

15         A      I did.  Yeah.  And I would put my

16  initial on there to confirm that I wrote that.

17         Q      Okay.  So this is a letter that you

18  wrote, you signed.  Did you then read it to Dr.

19  Hagstrom?

20         A      I don't remember.

21         Q      But it was your understanding that he

22  agreed with your conclusions and authorized this

23  letter; is that correct?

24         A      Yes.

```
 1         Q         Did both attorneys do that?

 2         A         Yes.

 3         Q         Did any of the defense attorneys ask

 4    you if anyone else could be the person who imprinted

 5    the bite marks on Maria Gonzalez?

 6         A         I was not asked that.

 7         Q         When you used the words "to a

 8    reasonable degree of certainty," whatever the field

 9    is, medical, dental, forensic odontology, what do you

10    mean?

11         A         I mean that when I say I formed an

12    opinion with a reasonable degree of medical

13    certainty, I believe that it's more probably right

14    than not.  And basically that's it.  If I feel more

15    so that I am right than wrong, then I would say, "a

16    reasonable degree of medical certainty."

17         Q         If you were asked hypothetically at

18    trial in 1986 if someone else could have left that

19    bite mark, what would your answer have been?

20         A         Yes, someone could have -- someone

21    else could have made the bite mark.  I didn't

22    identify Mr. Starks to the exclusion of all others.

23         Q         Did you ever convey to anyone that you

24    were a hundred percent certain that Mr. Starks was
```

1    the one that bit Maris Gonzalez and no one else?

2         A       No, I never said, "a hundred percent."

3    I said, "with a reasonable degree of medical

4    certainty."

5         Q       And did you explain -- strike that.

6                 "To a reasonable degree of medical

7    certainty" is what you testified to just a short

8    while ago as to what you meant by that?

9         A       Yes.

10        Q       Do you believe that you applied and

11   possessed the appropriate methodology and skill in

12   order to offer on opinion in 1986 as to the bite mark

13   analysis you did?

14        A       Yes.

15        Q       And did you testify truthfully under

16   oath?

17        A       Yes.

18        Q       Was any of your testimony fabricated?

19        A       No.

20        Q       Did you think you conveyed this to

21   John and perhaps to Peter, but were you aware of any

22   other evidence whatsoever that formed the basis of

23   Bennie Starks' prosecution?

24        A       No.