# Exhibit 20

1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BENNIE STARKS,                          )
                                        )
                Plaintiff,              )
                                        )
        vs.                             )       No. 09 C 348
                                        )
CITY OF WAUKEGAN, and PRESENT )          Judge Gary Feinerman
and FORMER WAUKEGAN POLICE              )
DEPARTMENT OFFICIALS:                   )       Magistrate Judge
LIEUTENANT URBANCIC, W. BIANG,)          Mason
P. STEVENSON, M. JUAREZ,                )
D. DEPREZ, DR. CARL HAGSTROM, )
DR. RUSSELL SCHNEIDER AND               )
SHARON THOMAS-BOYD,                     )
                                        )
                Defendants.             )


        The deposition of DAVID DEPREZ, pursuant to

notice and pursuant to the Federal Rules of Civil

Procedure for the United States District Courts

pertaining to the taking of depositions, taken before

Carmella T. Fagan, C.S.R., R.P.R., Notary Public

within and for the County of Cook and State of

Illinois, at 1180 North Milwaukee Avenue, Third

Floor, in the City of Chicago, Cook County, Illinois,

commencing at 9:12 a.m. on the 9th day of October,

2014.

        BREHON REPORTING    (708) 442-0027

34

1    A.    Correct.
2    Q.    Were you present for that interview?
3    A.    No. According to the -- no.
4    Q.    In terms of having you deal with
5 signing the Miranda waiver and Sergeant Biang
6 actually doing the interview, was that a common
7 procedure within the Detective Division?
8    A.    If it was a high-profile case,
9 somebody more experienced would take over. Yeah,
10 sometimes, depending upon the case.
11    Q.    Was Sergeant Biang in charge of this
12 investigation?
13    A.    I would say yes.
14    Q.    Why would you say yes?
15    A.    Because he took over the interview, so
16 I would say he would be the lead guy.
17    Q.    When you read Sergeant Biang's report
18 prior to the deposition, did that spark any
19 recollection, current recollection, about this case?
20    A.    No.
21    Q.    When you met with Mr. Starks before
22 the Biang interview, did you give him any information
23 about the status of the investigation to that point?
24    A.    I have no idea, sir.

35

1    Q.    If you had given him such information,
2 so if you'd engaged in some kind of substantive
3 discussion with him concerning the investigation,
4 would that be something you would have recorded --
5    A.    Yes.
6    Q.    -- in a police report?
7    A.    Yes.
8    Q.    You've just got to wait for me to
9 finish my question.
10    A.    Sorry, sir.
11    Q.    So the fact that you don't report
12 anything in your police report, do you think it's
13 reasonable to -- to assume that you didn't have any
14 substantive discussion with Mr. Starks about the
15 progress of the investigation?
16    A.    I would say correct.
17    Q.    At some point in the investigation, it
18 appears that some photographs were shown to Maria
19 Gonzalez, the victim in this case. Did you have any
20 involvement in showing those photographs?
21    A.    I don't recall. From what I -- in
22 reviewing it, the answer is no. But I don't
23 remember. I don't recall.
24    Q.    The report that purports to

36

1 memorialize the showing of the photographs doesn't
2 have your name on it. Would that indicate to you
3 that you were not involved in showing photographs?
4    A.    That would indicate I was not
5 involved.
6    Q.    Now, back in 1986 when you were a
7 detective, if you wanted to show photographs to a
8 victim of a crime in an attempt to see if you could
9 get an identification, what was the procedure you
10 followed?
11    A.    Wow. It has switched over the years,
12 so I can't be a hundred percent sure. It could have
13 been we would have just handed her a stack of photos
14 or -- which later on in my career, we'd actually have
15 it in a folder with the pic -- in other words, they
16 would be framed, the six pictures, and we'd hand the
17 whole file with, let's say, six pictures on it.
18    But I remember in the beginning, I
19 would just hand somebody the -- a stack of photos to
20 see if they could identify anybody in the stack.
21    Q.    When you refer to "a stack of
22 photos" --
23    A.    Six.
24    Q.    Six? Okay.

37

1    A.    If I remember correctly, six.
2    Q.    In terms of the photos that you would
3 hand, where would you get those photos?
4    A.    In the Detective Bureau we had --
5 there was one of two ways: either going up to the
6 Bureau of Identification and getting .35 millimeter
7 arrest photographs, or we also had, I guess you would
8 call it years ago, a mug book. Those were Polaroid
9 photos of anybody arrested that we would keep in the
10 book for identifications.
11    So, in other words, I could look to
12 B of I to get a photo of Mr. Starks, or I could go to
13 the mug book to get a Polaroid of Mr. Starks, and I
14 don't know which one was shown to Ms. Gonzalez.
15    Q.    When you showed the photo -- or when
16 you would show the stack of photos to -- well, let's
17 say you're showing a stack of photos, okay? We'll
18 deal with that procedure.
19    When you showed a stack of photos to a
20 victim, how was the identity of the people in the
21 photographs established?
22    A.    There was only a number on the front
23 and the back had the name, and we made sure they did
24 not turn the photo over.

# Exhibit 21

```
1                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION
3
4

   BENNIE STARKS,                    )
5                                    )
                    Plaintiff,       )
6                                    )
            vs.                      )    No. 09 C 348
7                                    )
   CITY OF WAUKEGAN, and PRESENT )    Judge Gary Feinerman
8  and FORMER WAUKEGAN POLICE    )
   DEPARTMENT OFFICIALS:         )    Magistrate Judge
9  LIEUTENANT URBANCIC, W. BIANG,)   Mason
   P. STEVENSON, M. JUAREZ,      )
10 D. DEPREZ, DR. CARL HAGSTROM, )
   DR. RUSSELL SCHNEIDER AND     )
11 SHARON THOMAS-BOYD,           )
                                 )
12               Defendants.     )
13
14
15      The deposition of STEVEN W. ANDERSON, pursuant
16 to notice and pursuant to the Federal Rules of Civil
17 Procedure for the United States District Courts
18 pertaining to the taking of depositions, taken before
19 Carmella T. Fagan, C.S.R., R.P.R., Notary Public
20 within and for the County of Cook and State of
21 Illinois, at 404 West Water Street, in the City of
22 Waukegan, Lake County, Illinois, commencing at 10:20
23 a.m. on the 29th day of October, 2014.
24                        10:2
```

23

```
 1          Q.      Looking at Officer Tench's report,

 2   you'll see that he noted certain times on the report.

 3   Do you see that?

 4          A.      Yes.

 5          Q.      So on page 1 it starts at 0130 hours?

 6          A.      Yes.

 7          Q.      Then if you go to page -- the third

 8   page of that report, still on the same date of

 9   1/19/86, you'll see that he noted something that

10   occurs at 0315 hours?

11          A.      That's correct.

12          Q.      So looking at this report, was it the

13   procedure of the Waukegan Police Department and

14   police officers to record things sequentially; i.e.,

15   the things that happened earlier would be recorded

16   first, and then the things that happened later would

17   subsequently be recorded?

18          A.      That's correct.

19          Q.      So looking at this report, would you

20   agree that it's reasonable to understand from this

21   report that the photographs that are noted, the

22   photographs of the bite mark that she noted on the

23   second page of the report, that portion that I

24   referred to you at the bottom of page 2 --
```

1        A.     Yes.

2        Q.     -- that that occurred prior to 0315

3   hours on January 19th, 1986?

4        MR. KARAVIDAS:  Objection to foundation.

5        MR. TROBE:  Objection to the form of the

6   question and foundation.

7            You can answer if you know, or if you

8   have an opinion.  If you have an opinion, you can

9   answer it.

10       THE WITNESS:  I have an opinion that it

11  happened around 0130 hours.

12  BY MR. STAINTHORP:

13       Q.     Well, okay.  But certainly if you go

14  to page -- the third page of the report, you'll see

15  that there's then a time of 0315 hours --

16       A.     Um-hum.

17       Q.     -- correct?

18       A.     That's correct.

19       Q.     So certainly it would be your opinion

20  that these photographs of the bite mark occurred

21  prior to 0315 hours?

22       A.     Yes.

23       Q.     Okay.  I'm going to mark as Exhibit 2

24  the subsequent report which appears to be dated

```
 1          Q.      What's the date of this report?

 2          A.      January 22nd, 1986, at 1:50 p.m.   I

 3   overrode (sic) the address -- the date as to the

 4   22nd.

 5          Q.      It looks like January 28th, doesn't

 6   it?

 7          A.      No.

 8          MR. TROBE:  Is that a question?

 9          MR. STAINTHORP:  Yeah.

10          MR. TROBE:  It looks like to who, you or him?

11          MR. STAINTHORP:  I think everyone, but --

12          MR. TENGESDAL:  To us, it looks like the 22nd.

13          MR. TROBE:  All right.  So --

14          MR. STAINTHORP:  I -- can ask the question

15   again.

16          MR. TROBE:  -- form of the question.

17          MR. STAINTHORP:  It's a leading question.

18          MR. TROBE:  Right.

19   BY MR. STAINTHORP:

20          Q.      Do you agree it looks like 1/28?

21          A.      It could be construed as "28."  Yes.

22          Q.      Okay.  And what is this about that --

23   those figures, the "2" and then another figure, that

24   enables you to say that's the 22nd?
```

1          A.        It looks like I overrode (sic) the

2    second "2" on there.  It appears to be a "2," but I

3    see where you can say it would be the 28th, also.

4          Q.        What were the circumstances under

5    which you overrode (sic) an original writing and

6    wrote in the "22nd"?

7          A.        Maybe sloppy.  I don't know.

8          MR. TROBE:  Don't guess.

9    BY MR. STAINTHORP:

10         Q.        Yes.  I agree.  I'm not asking you to

11   guess.

12         MR. TROBE:  If you don't remember --

13         THE WITNESS:  I don't remember.  I don't

14   remember.

15   BY MR. STAINTHORP:

16         Q.        All right.  So is it accurate to say

17   you have no current recollection of why it was that

18   you overwrote some number, and, as you now say,

19   attempted to write in "22nd"?

20         A.        That would be correct.  Yes.

21         Q.        Was there a procedure in the Waukegan

22   Police Department back in 1986 that if you made a

23   correction on a report, that you were supposed to

24   initial it?

```
 1          A.      The person taking the photos would
 2    fill it out.  It would be the evidence technician's
 3    responsibility to log in everything that he did in
 4    that book that day.
 5          Q.      What were the circumstances under
 6    which you came to go to Victory Hospital to take the
 7    photographs as recorded in Exhibit 4?
 8          A.      It appears that the detectives
 9    summoned me there to take photographs.
10          Q.      And detectives would -- well, there's
11    only one detective noted here --
12          A.      Yes.
13          Q.      -- right?  That's Biang?
14          A.      Detective Sergeant William Biang.
15    That's correct.
16          Q.      You just referred to "detectives,"
17    plural.  Was that a just a --
18          A.      Detective Sergeant.
19          Q.      -- misstatement?  I mean, what I'm
20    trying to get at here:  Was there more than one
21    detective or was it only the detective recorded here,
22    or do you know?
23          MR. TROBE:  Objection to the form.  Was there
24    more than one detective, what?
```

1          MR. STAINTHORP:  Summoned him.

2          MR. TROBE:  Well, it says he was dispatched.

3    It doesn't even -- well, okay.

4               You can answer the question.

5          THE WITNESS:  I don't recall.  I can't be

6    accurate to that.

7    BY MR. STAINTHORP:

8          Q.     In what manner were you summoned by

9    Detective Sergeant Biang?

10         MR. KARAVIDAS:  I'm going to object to the

11   form of the question, lack of foundation.

12   BY MR. STAINTHORP:

13         Q.     Go ahead.

14         A.     He would have -- probably would have

15   called our radio dispatch communication center, and

16   they would, over the radio, tell me to go to Victory

17   Hospital, Room 573, Room B, and meet with Detective

18   Sergeant Biang in reference to ET work.  That's

19   probably how that transpired.

20         Q.     Prior to going to the hospital as

21   recorded in Exhibit 4, were you aware that you were

22   going to be asked to take photographs?

23         A.     No.  I'm -- when I get to wherever I

24   have got to go, they tell me, "You got ET work to

1       do."  When I get there, it's my determination as to

2       what I got to bring in to do what I got to do.

3              Q.      So when you responded to a scene

4       pursuant to a summons by a detective, you would have

5       with you numerous means of recording evidence?

6              A.      Yes.  I usually would carry a camera

7       case, paperwork, you know, to transpose (sic) what

8       I've done.  We would have what's called an ET kit.

9       They would tell me over the radio maybe blood work or

10      whatever, so that I would have my proper kit.  We had

11      a regular evidence kit that every evidence officer

12      would carry that belonged to him personally, and I

13      would take that with.  If I didn't have it, I'd have

14      to go back to my squad car and get it out of my trunk

15      and take it back in.  It's determined when I get

16      there what I got to do.

17             Q.      In this case, with respect to the --

18      the incidents referred to in Exhibit 4, do you have

19      an actual recollection of the manner in which you

20      were summoned there, or was the description you just

21      gave what would routinely have happened?

22             A.      This is what routinely happens.  Yes.

23             Q.      And with respect to meeting Detective

24      Sergeant Biang and Drs. Hagstrom and Schneider, do

1    you have an actual memory of that meeting?

2         A.        Vaguely.

3         Q.        What is your vague recollection of

4    that meeting?

5         A.        Dr. Schneider, I remember, was a

6    dentist of some sort.  That's all I remember about

7    it.

8         Q.        What -- with respect to the actions as

9    recorded in Exhibit 4, were you given any

10   instructions as to what you were to photograph and

11   how you were to photograph it?

12        A.        No.

13        Q.        So in terms of the taking of the

14   photographs, is it fair to say that was your

15   determination how to take the photographs?

16        A.        Yes.

17        Q.        Did the dentists themselves give you

18   any instructions as to how to take the photographs?

19        A.        I don't recall.

20        Q.        I may have asked you this already, and

21   if I have, I apologize, but I don't recall.

22                  Had you at that point, so this is

23   January of 1986, had any specific photographic

24   instruction as to how to take photographs generally

49

```
 1          Q.      Because of that, you specifically
 2   recorded that in the report?
 3          A.      That's correct.
 4          Q.      When you talk about an "unnumbered
 5   roll," are you talking about an actual number on the
 6   film cassette?
 7          A.      Okay.  Evidence Officer Jones, he was
 8   in charge of our program.  It was his job on things
 9   such as film to put the number on it, which would be
10   transposed (sic) into our book that I spoke of
11   previously.
12                  But in our case, there's always fresh
13   rolls of film that are extra that are in there, so
14   when we run short of film, Mr. Jones would then
15   assign a number to it and then we would go from
16   there.  At this particular time, it looks like there
17   was no film with numbers on it, so I grabbed a
18   brand-new roll, which was unnumbered.
19          Q.      So I think I understand this, but I
20   just want to make clear:  When you're referring to an
21   "unnumbered roll," you're actually referring to the
22   cassette itself usually having a number on it and, in
23   this case, not having a number on it, rather than the
24   negatives that were produced from the roll not having
```

50

1    a number on it?

2              A.        Right.  Right.

3              Q.        And back in the day when you were

4    doing this, the negatives, if you developed a roll of

5    film, the negatives often would have numbers on them?

6              A.        Yes.

7              Q.        Do you have an actual recollection of

8    going to the hospital on this occasion, on the 29th,

9    and taking these photographs?

10             A.        No.

11             Q.        Do you have any recollection as to who

12   asked you to go back to the hospital on the 29th to

13   take these photographs?

14             A.        No.  I -- I could guess, but I don't

15   have a recollection.

16             Q.        What would your guess be?

17             MR. TROBE:  Objection to form.

18                       Go ahead.  You can answer.

19             THE WITNESS:  Probably the detectives would be

20   the ones requesting this, but it's pure speculation

21   on my part.

22   BY MR. STAINTHORP:

23             Q.        And "detectives," you mean the

24   detectives working on the case?

1  department, if he used a scale, that should go into

2  the evidence locker?

3          A.      Should be.

4          Q.      Now, if you can go to 7B, did you take

5  that photograph?

6          A.      No.

7          Q.      How do you know you didn't take it?

8          A.      Here, again, this is a frontal shot.

9  I didn't take any frontal shots of the victim.

10                 Can I speak?

11         Q.      Yeah.  Go ahead.

12         A.      As a matter of fact, all of these

13  photographs were not taken by me.  None of them.

14         Q.      So none of Exhibit 7 were taken by

15  you?

16         A.      No.

17         Q.      And you know that because?

18         A.      They're all frontals and I didn't take

19  any frontals.

20         Q.      Looking at the photographs in Exhibit

21  7, can you determine what, whoever took the

22  photographs, was attempting to record?

23         MR. TROBE:  Objection to foundation, calls for

24  speculation.

```
 1    Police Department sometimes simply refer at the
 2    beginning to the fact that they took Polaroid photos,
 3    and then subsequently in their reports, subsequently
 4    in their reports, not state that they were Polaroids,
 5    although they were?
 6              MR. STAINTHORP:  Objection to form.
 7              THE WITNESS:  I can't state that.
 8    BY MR. KARAVIDAS:
 9         Q.      Can you tell from looking at the pages
10    of Exhibit 1 whether the photos were or were not
11    Polaroids?
12              MR. STAINTHORP:  I'm sorry.  Which page are
13    you referring to?
14              MR. KARAVIDAS:  All three pages.
15              MR. STAINTHORP:  Because there's several
16    different photographs.
17              MR. KARAVIDAS:  I see that.  I understand.
18              THE WITNESS:  On page 1 of Exhibit 1, I see
19    two Polaroids were taken as she was lying on a
20    stretcher at the location where they got her.
21                   On page 2, there's reference to taking
22    pictures of her entire body and the trauma area, but
23    it doesn't stipulate to Polaroids, so I'm assuming it
24    would be the .35 millimeter camera because it didn't
```

1    state "Polaroid."

2                        And on page 3, it's the same.  It

3    would be the .35 millimeter because it does not state

4    "Polaroid."  "Polaroid," I believe, would have been

5    mentioned specifically if there was Polaroids.  Other

6    than that --

7    BY MR. KARAVIDAS:

8            Q.      Page 1 of that report is timed at

9    1:30.  Do you see that?

10           A.      At 1:30 in the morning.  Correct.

11           Q.      And then page 2 is also timed at 1:30

12   in the morning?

13           A.      That's correct.

14           Q.      And then page 3 is timed at 3:15 in

15   the morning?

16           A.      That's correct.

17           Q.      In your experience, were there

18   instances where you used a Polaroid for some photos

19   and then used a .35 millimeter for other photos

20   during the same period of time?

21           A.      Yes.

22           Q.      Under which circumstances would you do

23   that?

24           A.      Quick reference if you -- you know,

1          A.          No, not in my writing.

2          Q.          Well, I'm just wondering if maybe you

3    thought it was the 23rd when you wrote it, and then

4    you realized you were a day off and then changed it

5    to the 22nd?

6          A.          Speculating.  I don't know.

7          Q.          On this report where it's signed

8    "Reviewed by," whose signature is that?

9          A.          Sergeant Bill Miscichawski, now

10   deceased.

11         MS. REPORTER:  Excuse me.  Do you know the

12   spelling of the sergeant's name?

13         THE WITNESS:  Sergeant Bill Miscichawski,

14   M-i-s-c-i-c-h-a-w-s-k-i.

15         MS. REPORTER:  Thank you.

16   BY MR. KARAVIDAS:

17         Q.          Exhibit 7, the photos --

18         A.          Yes.

19         Q.          -- Exhibits 7A through 7D, assuming

20   that those are photos of the victim's shoulder, do

21   you know if those are the photos that you took?

22         A.          These are not my photos.

23         Q.          And how do you know that?

24         A.          It's not my scale.  My scale was clear

```
1    plastic.  This has got black on it.  I never had a
2    scale like that.
3              Q.      When, if at any time, did you ever
4    have any conversation with any member of the state's
5    attorney's office regarding the criminal prosecution
6    of Bennie Starks?
7              A.      Somebody called me -- I live in
8    Arizona in the winter -- I believe it was last year
9    or maybe the year before.  I don't remember.  Someone
10   called me and said that I might have to come back to
11   testify in a trial of Bennie Starks in Chicago.  I
12   don't recall if it was last year or -- or the year
13   before.  I don't remember.  I was in Arizona at the
14   time.
15             Q.      Somebody called from the state's
16   attorney's office?
17             A.      Yes.
18             Q.      And the trial that you were called
19   about was a retrial in the criminal case or a trial
20   in this civil case?
21             A.      I don't remember.
22             Q.      Specifically were you told that the
23   trial would be in Chicago?
24             A.      I believe so.
```

1    done by Dr. Schneider?

2         A.      Possible.  It could be.

3         Q.      Okay.  So if that scale was brought by

4    Dr. Schneider on January 22, 1986, that does not mean

5    that those photos were not yours.  It's just that

6    your scale was not used in the photos --

7         MR. STAINTHORP:  Object --

8    BY MR. TENGESDAL:

9         Q.      -- correct?

10        A.      That's --

11        MR. STAINTHORP:  Object to form.

12        THE WITNESS:  -- correct.

13        MR. TENGESDAL:  That's all I have.  Thank you.

14                    FURTHER EXAMINATION

15   BY MR. KARAVIDAS:

16        Q.      Sir, what, if any, memory do you have

17   of whose scale was used when you took the

18   photographs?

19        A.      I don't have any memory.

20        Q.      So what, if any, memory do you have as

21   to whether Dr. Schneider's scale was used or your

22   scale was used when you took the photographs?

23        MR. TROBE:  That was asked already.

24                Go ahead and answer it again.

# Exhibit 22

# WAUKEGAN POLICE DEPARTMENT

## SUPPLEMENTAL REPORT

TYPE OF OFFENSE: Sex Assault

ATTACH TO REPORT NUMBER: 86 - 1898

STATUS OF THIS JUVENILE: [ ] Arrested  [ ] Victim  [ ] Witness  [ ] Other

| NAME | | | | | | DATE/TIME OF THIS REPORT: 12/8/86  8:30PM | |
|---|---|---|---|---|---|---|---|
| D.O.B. | HT | WT | HAIR | EYES | STREET NAME | AGE | RAC | SEX | ADDRESS | GANG AFFILIATIONS |

School Attending: Grade / Arrested With

Mother's Name / Address / Telephone / Work Telephone

Father's Name / Address / Telephone / Work Telephone / TELEPHONE

[ ] STATION ADJUSTMENT  [ ] REFERRED TO BRANCH COURT  [ ] REFERRED TO JUVENILE COURT  [ ] REFERRED OTHER AGENCY

JUVENILE TURNED OVER TO __X__

### Narrative

R. Robert Madson

Victim - Maria Gonzalez

Location Victory Hosp. Room 5733

On the above date and time, this officer responded to the above location in reference to photographing the injury to the knee on Ms Gonzalez R/T shoulder. R/O photographed the shoulder with 12 exposures, roll of 12 exposures. The exposures were given to ET Jones to take to the camera shop for processing.

REPORTING OFFICER: R. Madson

REVIEWED BY: [signature]

CASE DISPOSITION

WPD2

LB 214

# Exhibit 23

### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| Bennie Starks,                ) | |
|                     ) | |
|        Plaintiff,        ) | |
|                     ) | |
|        v.                ) | No. 09 C 348 |
|                     ) | |
| City of Waukegan, et al.      ) | Judge Gary Feinerman |
|                     ) | |
|        Defendants.      ) | |

### AFFIDAVIT

John L. Stainthorp, under penalty of perjury pursuant to 28 U.S.C. § 1746, state:

1. I am one of the attorneys for Bennie Starks and have personal knowledge of the facts stated herein which are true and correct, to the best of my information and belief.

2. In the course of litigating this case I have subpoenaed the file of the States Attorney of Lake County, have served Requests to Produce on Waukegan for the file of the Waukegan Police Department and on Defendants Drs. Hagstrom and Schneider seeking their entire file and have viewed the entire case file located in the files of the Lake County Court Clerk.

3. Photographs of the bite mark on Maria Gonzalez's left shoulder taken by Officer Tench on January 19, 1986 at around 1:30 a.m., by Officer Anderson at Victory Hospital on January 22 at 11 a.m., and on January 29 when Officer Anderson took 12 exposures, were not in any of the materials that I viewed in this case, and I have never seen them.

4. At his deposition, Dr. Schneider stated that the photograph of the bite mark that he used to match Starks' dentition to the bite mark was not the one with the ruler that was introduced into evidence at the criminal trial, but there is no other photograph with a scale in any

1

of the material I have reviewed in this case that fits the description of the photograph Dr.

Schneider states that he used to make the comparison and Dr. Schneider testified that he did not

know where the photograph is.

Dated: April 6, 2015

John L. Stainthorp

# Exhibit 24

1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE NORTHERN DISTRICT OF ILLINOIS

2                   EASTERN DIVISION

3

4

    BENNIE STARKS,                    )

5                                     )

                    Plaintiff,        )

6                                     )

            vs.                       )    No. 09 C 348

7                                     )

    CITY OF WAUKEGAN, and PRESENT )    Judge Gary Feinerman

8   and FORMER WAUKEGAN POLICE        )

    DEPARTMENT OFFICIALS:             )    Magistrate Judge

9   LIEUTENANT URBANCIC, W. BIANG,)   Mason

    P. STEVENSON, M. JUAREZ,          )

10  D. DEPREZ, DR. CARL HAGSTROM, )

    DR. RUSSELL SCHNEIDER AND         )

11  SHARON THOMAS-BOYD,               )

                                      )

12                  Defendants.       )

13

14

15          The deposition of CARL HAGSTROM, D.D.S.,

16  pursuant to notice and pursuant to the Federal Rules

17  of Civil Procedure for the United States District

18  Courts pertaining to the taking of depositions, taken

19  before Carmella T. Fagan, C.S.R., R.P.R., Notary

20  Public within and for the County of Cook and State of

21  Illinois, at 500 West Madison Street, Suite 2430, in

22  the City of Chicago, Cook County, Illinois,

23  commencing at 10:34 a.m. on the 8th day of October,

24  2014.

25          BREHON REPORTING  (708) 442-4522

37

1        Q.     Well, do you recall members of the

2   Waukegan Police Department being there?

3        A.     I think that was the photographer.

4        Q.     There are some records that indicate

5   that there were more Waukegan police officers there

6   than the photographer.  Is that something you recall?

7        A.     That, I don't recall.

8        Q.     Do you know a William Biang?

9        A.     I know who he is, yes.

10       Q.     Do you recall Mr. Biang or Officer

11   Biang -- or I think, actually, by then it was

12   Sergeant Biang -- being present at the hospital?

13       A.     I don't recall specifically seeing him

14   there.

15       Q.     What do you recall about your

16   examination of the bite mark on Ms. Gonzalez?

17       A.     I recall looking at it and determining

18   that it did look like a bite mark.

19       Q.     Other than determining that it looked

20   like a bite mark, what else did you determine about

21   that mark at that time?

22       A.     I don't recall if I -- anything else

23   at that time.

24       Q.     In particular, at that time did you

1    reach a conclusion or a hypothesis as to the

2    orientation of the bite mark?

3        A.     Yes.

4        Q.     How were you able to make a

5    determination as to the orientation of the bite mark?

6        A.     I believe we were told through the

7    interpreter how Mrs. Gonzalez was being held down and

8    the perpetrator was battering her and bit her.

9        Q.     Other than being told through the

10    interpreter interpreting for Ms. Gonzalez the manner

11    in which she was bitten, were you able from your

12    examination of the bite mark at that time to

13    determine the orientation of the bite mark?

14        A.     I don't recall making a determination

15    looking at the bite specifically of -- with the

16    orientation.

17        Q.     If you go towards the end of this

18    testimony, actually, the last page on which anything

19    appears, and this is redirect by the prosecutor, you

20    were asked:

21                    "Question:  Did you conducted

22                       [sic] your examinations and tests

23                       simultaneously with Dr.

24                       Schneider?

```
1    them developed in his deposition?
2            MR. KRAUSE:  I don't think so.  I think you're
3    talking about the one-to-ones.
4            MR. TROBE:  Yeah.
5            MR. KRAUSE:  That was different.
6            MR. STAINTHORP:  Right.
7            MR. TROBE:  Oh.
8    BY MR. STAINTHORP:
9            Q.     And what were the circumstances under
10   which you first saw the photographs?  For instance,
11   were they delivered to Dr. Schneider?  Were they
12   delivered to you?  Did you go pick them up at a photo
13   shop?
14           A.     They weren't delivered to me.  That's
15   all I recall.
16           Q.     Do you know if Dr. Schneider had them
17   before you had them?
18           A.     I don't recall.
19           Q.     And when you viewed the photographs,
20   did you have concerns about the quality of the
21   photograph, or any of the photographs?
22           A.     No.
23           Q.     Did you have concerns that portions of
24   the photograph were out of focus?
```

1             But to the extent that you can answer

2  it, go ahead.

3          THE WITNESS:  I -- I felt the overlays did

4  fit.

5  BY MR. STAINTHORP:

6          Q.       They fit one way but not the other

7  way.

8          A.       Well, they -- they can't.  You can't

9  have an upper -- an upper overlay's not going to fit

10  where lower teeth left a mark, and vice versa.

11         Q.       All right.  But then how did you know

12  that you were comparing upper to upper, maxillary to

13  maxillary?

14         A.       Because it fit.  I mean, if it didn't

15  fit, we would have said, "Oh, this couldn't be."  But

16  it did fit.

17         Q.       I'm not asking whether it fit.  I'm

18  asking whether, when you used the overlay, you could

19  tell that -- other than it fitting, that the -- the

20  bite marks and drag marks that you were comparing

21  were the maxillary rather than the mandibular?

22         A.       I -- I guess I still don't understand

23  your question, because it's -- that's just the way we

24  do it.  I mean, you get overlays and you see if they

1    wanted to use, how did you determine that those marks

2    were made by the maxillary rather than the

3    mandibular?

4             A.        Because when you lay the overlay on

5    there, the maxillary overlay lined up with it when

6    the mandibular didn't.

7             Q.        Did you at any time report to anyone

8    that if, in fact, the bite marks that you identified

9    as maxillary were, in fact, mandibular, Mr. Starks

10   was excluded as making the bite mark on Maria

11   Gonzalez?

12            A.        Did we ever say that?

13            Q.        Yeah.

14            A.        No, I don't believe we ever said that.

15            Q.        Just so I can be clear:  With respect

16   to the examination of the bite mark, the -- the only

17   way that you determined that the marks that allegedly

18   fit the overlay were the maxillary rather than the

19   mandibular was because they fit Mr. Starks' maxillary

20   overlay, correct?

21            A.        That, and I -- I -- the lower overlay,

22   it didn't leave the same marks, but it still fit in

23   the area where we believe the lower teeth were.

24            Q.        When you say, "it fit in the space,"

```
1      initial letter that you sent to the prosecutor?

2            A.      Yes.

3            Q.      Who actually prepared that letter?

4      Was it yourself or was it Dr. Schneider?

5            A.      Dr. Schneider.

6            Q.      And did you -- did he consult with you

7      while he was preparing the letter?

8            A.      I don't recall if, while he was

9      preparing it, he did.

10           Q.      Dr. Schneider has already testified

11     that he believes that you didn't actually sign it,

12     that he signed your name to it.  Does that appear to

13     be correct?

14           A.      Yes, I would say he did.

15           Q.      All right.  And did you authorize this

16     letter prior to it being sent to the prosecutor?

17           A.      Yes, I would have.

18           Q.      Were you aware of the content of this

19     letter prior to --

20           A.      Yes.

21           Q.      With respect to this initial letter,

22     Dr. Schneider at his deposition said that when the

23     letter says it was a definite match -- well, let me

24     read you the questions and answers and tell me if you
```

```
 1      agree with this:
 2                          ("Question:  When you sent that
 3                           letter, the first letter, to Mr.
 4                           Barrones [sic] in May of 1986
 5                           where you used the word
 6                           'definite,' what did you mean by
 7                           that?
 8                          "Answer:  That's when I used the
 9                           term 'definite match.'  That's
10                           when I found unique
11                           characteristics, individual
12                           characteristics, that I felt were
13                           definitely unique, and,
14                           therefore, with a reasonable
15                           degree of medical certainty, that
16                           was a match.
17                          "Question:  Were you intending to
18                           imply or did you ever imply or
19                           tell anyone that by 'definite,'
20                           you meant that no other person
21                           could have left those marks?
22                          "Answer:  I never said that.")
23      A.      Okay.
24      Q.      Was that also your understanding of
```

1    "definite," that you were not suggesting that no

2    other person could have left those marks?

3            A.      Yes, I would agree with that.

4            Q.      So that was certainly what -- that was

5    your understanding of when you said "definite match,"

6    that you didn't mean that no other person could not

7    have left those marks --

8            A.      Yes.

9            Q.      -- correct?  Did you ever inform the

10   prosecutor of that?

11           A.      No.  I don't think I was asked.

12           Q.      Even if you weren't asked, you didn't

13   think it was important to tell the prosecutor that

14   when you said "definite," you didn't mean that it was

15   necessarily Bennie Starks, but that another person

16   could have made those marks?

17           A.      No.

18           Q.      Okay.  Did you ever tell the jury that

19   when you testified?

20           A.      Again, I wasn't asked.

21           Q.      Okay.  So your understanding was that

22   if you were not asked, you didn't have to tell the

23   jury that another person could well have made those

24   marks?

1          A.      I was just answering questions I was

2     asked.

3          Q.      Okay.  While you reviewed your

4     testimony, did you feel that that testimony in any

5     way misrepresented what, in fact, your real opinions

6     were?

7          A.      No.  As Dr. Schneider said, with a

8     reasonable degree of medical certainty, I felt that

9     it could have been him.

10         Q.      It could have been him.  Okay.  All

11    right.  So you sent this first letter.  Why don't I

12    take it back so I don't lose it.

13                     (WHEREUPON, Schneider Exhibit 11

14                      was tendered to Witness.)

15              And then subsequently you sent another

16    letter.  That was marked as Exhibit 11; is that

17    correct?  And this is Schneider Exhibit 11.  Is that

18    the --

19         A.      Yes.

20         Q.      Okay.  I'm sorry.  Let me just get

21    that out.

22              That's a subsequent letter that was

23    sent to Mr. Berrones on July the 1st of 1986,

24    correct?

1        A.      Yes.

2        Q.      Is that your actual signature?

3        A.      That is.

4        Q.      Did you review this letter before it

5  went out?

6        A.      Yes.

7        Q.      And did you approve of the content of

8  this letter?

9        A.      Yes.

10       Q.      You'll see that the final paragraph of

11  that letter says that the com -- well, "The

12  comparison of the models to the bite photo and the

13  overlays to the bite photo indicated a very specific

14  and unusual pattern leading us to the conclusion that

15  the bite on Maria Gonzalez was inflicted by Bennie

16  Starks Jr."

17           Do you see that?

18       A.      Yes.

19       Q.      All right.  Was that opinion also

20  intended to communicate the same understanding that

21  you had intended to communicate when you said that --

22  when you used the word "definite" in the original

23  letter?

24       A.      I think it was meant to communicate

1    with reasonable medical and dental certainty Bennie

2    Starks could have made the bite.

3          Q.     Actually, you never used that term in

4    the letter, did you?

5          A.     Not in the letter, no.

6          Q.     Why not?

7          A.     I'm really not sure why not.

8          Q.     At any rate, when you used that term,

9    you were, in the words of Dr. Schneider, in his

10    answers, you were not intending to communicate that

11    no other person could have made that bite mark,

12    correct?

13          A.     Correct.

14          Q.     Did you ever tell the prosecutor that?

15          A.     Did not.

16          Q.     Did you ever tell the jury that?

17          A.     Did not.

18          Q.     All right.  After the second letter,

19    which was sent July the 1st of 1986, did you have --

20    did you do any further work on the case prior to your

21    testimony at the criminal trial?

22          A.     No.

23          Q.     Did you have any communications with

24    any law enforcement between the time you sent that

```
 1                      EXAMINATION

 2    BY MR. KARAVIDAS:

 3         Q.      Dr. Hagstrom, are you aware that Maria

 4    Gonzalez initially claimed that she was not raped by

 5    the person who beat her?

 6         A.      No, I'm not aware of that.

 7         Q.      Are you aware that Maria Gonzalez

 8    initially told emergency room personnel that she was

 9    not raped by her attacker?

10         A.      No, I'm not aware of that.

11         Q.      Are you aware that Bennie Starks' coat

12    was found at the scene of the attack?

13         A.      Yes, I am, after we went to the court

14    house and saw that other evidence that was gathered.

15         Q.      Are you also aware that his scarf was

16    found at the scene of the attack?

17         A.      I don't recall that.

18         Q.      Are you aware that his gloves were

19    found at the scene of the attack?

20         A.      Yes.

21         Q.      Are you aware that his watch was found

22    at the scene of the attack?

23         A.      Yes.

24         Q.      Are you aware that Bennie Starks had
```

```
1       that Bennie Starks' tri -- post-conviction lawyers

2       asserted that Bennie Starks' trial lawyer provided

3       ineffective assistance of counsel?

4               A.      I'm not aware of that.

5               Q.      What, if any, information do you have

6       that Bennie Starks' post-conviction lawyers asserted

7       that Bennie Starks' trial lawyer provided ineffective

8       assistance of counsel because he failed to obtain

9       expert counseling with respect to the dental evidence

10      that he provided?

11              A.      I'm not aware of that.

12              Q.      What, if any, evidence do you have

13      that any of Bennie Starks' lawyers asserted that the

14      source of the semen was not necessarily produced by

15      the person who attacked Maria Gonzalez?

16              A.      I'm not aware of that.

17              Q.      What, if any, information do you have

18      that Bennie Starks lived with his mother at the time

19      of the attack in the building across the street from

20      the scene of the attack?

21              A.      I think I've heard that somewhere, but

22      I don't recall where.

23              Q.      What, if any, information do you have

24      that Maria Gonzalez saw her attacker run away from
```

```
 1    had a chip right in the middle of it -- or not right

 2    in the middle, but had a chip in it which enabled it

 3    to leave a little different type of drag line.

 4         Q.    And do you believe that many

 5    individuals in a given population could have that

 6    particular bite mark?

 7         A.    Not matching those upper teeth.  No,

 8    not a great number.

 9         Q.    Was that one of the bases for your

10    opinion that you held in the 1986 trial?

11         A.    Yes.

12         MR. KRAUSE:  I think that's all I've got,

13    John.

14                    FURTHER EXAMINATION

15    BY MR. STAINTHORP:

16         Q.    I just have one follow-up, and I may

17    have misheard what you said.  But I thought I heard

18    you say in response to Mr. Karavidas' questions,

19    earlier questions, that you were aware of scratches

20    on Mr. Starks?

21         A.    I thought a saw a picture somewhere

22    that showed some scratches.

23         Q.    Where did you see the picture?

24         A.    I don't recall where I saw the
```

Exhibit 25

# Statement of Pretty and Senn
# Regarding the Bitemark Evidence in the matter of
# The People of the State of Illinois vs.
# Bennie Starks
# (Revised)

# May 10, 2010

1

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

**Materials reviewed**

a)   Cover letter from the Innocence Project, 100 Fifth Ave., New York, NY 10011
b)   CD-R labeled: Bennie Starks exhibits
c)   CD-R labeled: Trial Testimony Scoring Sheet
d)   Printed copies of the court transcripts of the testimonies of Drs. Schneider & Hagstrom
e)   Printed copy of the ABFO Scoring Sheet for Bite Mark Analysis labeled as to case name
     as Starks-Gongalez [*sic*] signed and dated 5/12/86 by Drs. Schneider and Hagstrom
f)   Duplicates of two sets of dental models said to be the models of Bennie Starks

**1.  The Injury**

1.1. The injury is located on the posterior lateral aspect of the left shoulder of Maria Gonzalez.
     The injury consists of two semi-circular areas of diffuse bruising with more discrete
     bruised areas and linear abrasions contained within the central area of the pattern.



Figure 1

1.2. The discrete areas of bruising and abrasion have *class characteristics* of patterned
     injuries produced by human teeth.
1.3. It is possible to orient the injury with respect to the maxillary and mandibular teeth
     responsible.
1.4. Using the ABFO guidelines of potential conclusions for determining if an injury is a
     bitemark it is our opinion that this injury is a *human bitemark with reasonable medical
     certainty.*
1.5. When assessing a bite injury it is essential to consider the forensic significance of the
     patterned injury. Forensic significance is linked to the number and type of unique
     characteristics that can be identified within the patterned injury. It is our opinion that
     there are *insufficient unique characteristics* within this injury to undertake a bitemark
     comparison leading to a positive identification of a suspect. However, it may be
     possible, based on the presence of class characteristics, to *exclude an individual.*

2

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

2.   **The method of comparison in 1986**

   2.1. The technique used to produce the overlays in this case by Schneider & Hagstrom, while one of several in use in 1986, has now been shown to be inferior when compared with digital techniques (Bowers & Sweet, 1995).
   2.2. The technique used is extremely subjective in that the size and orientation of the biting edges of the teeth (as shown in the overlays) is dependant upon the depth that the teeth models are pressed into the wax.
   2.3. The use of radiographic techniques to produce a transparency is also likely to produce errors of scale -- most often enlargement -- of the biting edges of the teeth.
   2.4. It is impossible to ascertain that the overlays provided to us, and used by Drs. Hagstrom & Schneider, are life sized (1:1).
   2.5. The technique used in 1986 is not currently considered to be the best method of producing overlays and thus the comparison techniques employed in this case would be considered obsolete.
   2.6. The ABFO scoring system used by Drs. Hagstrom and Schneider was published in October, 1986. The scoring system was retracted by the authors in January, 1988 due to their serious concerns over the potential misuse of numerical values leading to inappropriate statistical assertions being made in bitemark cases.
   2.7. Despite the problems associated with the ABFO scoring system, it appears that the scoring sheet as used in this case was completed incorrectly.
   2.8. The photograph used in the overlay comparison process had been scaled to "life size" using a ruler that is not in the same plane with the injury; e.g. the scaling cannot be considered to be accurate as the ruler appears to be placed some unknown distance above the injury. This can determined from the photograph as the injury is in focus and the ruler is clearly out of focus. In order to produce and verify scaled 1:1 photographs it is necessary to have a rigid scale placed passively on the skin adjacent to and in the same plane as the injury.
   2.9. Summary of methodology shortcomings:
      2.9.1. Outdated overlay production technique
      2.9.2. Lack of scale in overlay to allow assurance of proper sizing of overlay
      2.9.3. Improper use of the subsequently retracted ABFO scoring system
      2.9.4. Improper scale placement in the images used for comparison

3.   **Communications with Dr. Russell Schneider**

   3.1. During the American Academy of Forensic Sciences meeting in Washington, D.C. in February 2008 both Dr. Pretty and Dr. Senn had conversations with Dr. Russell Schneider regarding the methods used and conclusions reached in the Starks case. Dr. Schneider was asked if he would consider revisiting the case using the more modern techniques currently in use. Dr. Schneider responded to Dr. Pretty that he would undertake repeat analysis using contemporary techniques.
   3.2. During the American Academy of Forensic Sciences meeting in Denver, Colorado in February 2009 Dr. Senn spoke again with Dr. Russell Schneider and asked if he had revisited the case using the more modern techniques. Also Dr. Schneider was informed that Pretty and Senn had been unable to view much of the original trial material discussed in 4.2 and 4.3 below. Dr. Schneider stated that he would attempt to assist in making any materials still in existence available to Drs. Pretty and Senn for their analysis.
   3.3. On or around July 17, 2009 Dr. Schneider called Dr. Senn. Dr. Schneider said that he had been in touch with the prosecutors and that no other materials would be made available to Drs. Pretty and Senn for their analysis. During this conversation Dr. Schneider also stated, when specifically asked, that the most distinctive individual features seen in the bitemark in this case, the five linear abrasions outlined in red in the

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

double image below, were, in his opinion, made by Mr. Stark's four upper incisor teeth and his right upper canine tooth.



Figure 2

3.4. In the same July 2009 telephone conversation, Dr. Schneider told Dr. Senn that after conversations with the prosecutor, it was his understanding that no additional materials relating to this case would be made available for analysis. Dr. Schneider also stated that it was his impression that the bitemark analysis would not play a large part in any additional legal hearings and that if he were asked to testify again he would testify using the same analysis and materials he used in 1986 and would not perform any additional tests or comparisons.

3.5. Subsequent to the conversations with Dr. Schneider we were notified that dental models in the possession of the court clerk and "epoxy" models in the possession of Dr. Schneider had been located and would be made available to us. High quality duplicates of these models were made by Dr. Denise Murmann and sent to us for analysis.

## 4. Conclusion of Drs. Hagstrom & Schneider

4.1. Because of the significant limitations expressed above in points 1 and 2; namely that the injury contains insufficient forensic detail and that the comparison technique is flawed, it is our opinion that the conclusions drawn in this case are not supported by the evidence that we have reviewed.

4.2. It should be noted that we did not initially have full access to all the materials presented by Drs. Hagstrom & Schneider to the jury, specifically, the dental models of the teeth of Mr. Starks. We subsequently received high quality duplicates of those dental models and have made the analyses.(see 3.5)

4.3. In a similar manner we have been able to examine the images of the radiographic overlays generated in this case and compare them to the actual dental models from which they were produced.

4.4. Despite the fact that the ABFO scoring system was used to indicate a numerical certainty for their conclusions, Drs. Hagstrom & Schneider have gone beyond the guidelines for conclusions for bitemark comparisons published by the ABFO. They first state on May 13, 1986 that the comparison between the injury and the overlay of Stark's teeth resulted in a "definite match". This was further amplified on July 1, 1986 when they concluded that "...a very specific and unusual pattern leading us to the conclusion that the bite on Maria Gonzalez was inflicted by Bennie Starks Jr."

4

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

4.5. The highest level of conclusion afforded by the ABFO guidelines for bitemark comparisons in 1986 was "reasonable medical certainty".

5. **Pretty and Senn Analysis of the Bitemark and the Conclusions of Drs. Hagstrom and Schneider**

5.1. The bitemark on the left shoulder was very likely created by a biter who was more behind than in front of the person bitten. The most distinctive features of the injury, the linear abrasions, were likely made by mandibular (lower) teeth not maxillary (upper) teeth as reported by Drs. Hagstrom and Schneider. (See Figure 2 above and Figure 3 below) Figure 3 images are oriented so that the marks reportedly made by upper teeth are at the top and those made by lower teeth at the bottom. The four most distinctive linear abrasions were made by teeth with mesiodistal (left to right) widths that are approximately the same. The class characteristics of upper and lower human incisors are different. The maxillary (upper) central incisors much wider than the lateral incisors while the four mandibular (lower) incisors are of approximately the same width.



**Hagstrom and Schneider Orientation**    **Pretty and Senn Orientation**
**Figure 3**



**Figure 4**
**The teeth of Bennie Starks in 1986**

5.2. Figure 4 above shows an image and close-up of the teeth of Bennie Starks taken prior to the original trial in 1986. The image clearly shows the contrast between the width relationships of the upper incisors and the lower incisors. Mr. Stark's two (2) upper central incisors are much wider than his two (2) upper lateral incisors while his lower four (4) incisors are of approximately the same width.

5

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

5.3. The orientation of the bitemark by Hagstrom and Schneider was incorrect. The class characteristics of human teeth are in conflict with their orientation of the bitemark. The maxillary (upper) teeth of Bennie Starks do not exhibit the characteristics purported to have made the linear abrasions that demonstrate the reported "definite match."

5.4. The class characteristics seen in the linear abrasions indicate the biter had four (4) mandibular (lower) incisors present at the time the bite was made. This feature indicates that suspected biters who had one or more missing, broken, or malposed lower incisors could possibly be excluded as biters in this injury. Conversely, many suspected biters with all four lower incisors present in normal or near normal configuration could have made the bitemark and could not be excluded.

5.5. In addition to the photographs of Stark's teeth in 1986 Drs Pretty and Senn have now had the benefit of viewing replica study models of the teeth (as of 10th March 2010).

5.6. These high resolution casts are shown in Figure 5. Careful examination of these casts has not changed the opinions of either Dr Senn or Pretty which are outlined fully in Section 6 below.



**Figure 5**
**High resolution dental casts - a replica of those used by Hagstrom & Schneider**

6. **Conclusions**

6.1. The original bitemark reports and conclusions of Hagstrom & Schneider **are incorrect** for the reasons listed above and in 6.5 below.

6.2. No system of forensic comparison would support a conclusion of "definite match" without qualification. In addition it is our opinion that the report is not only semantically incorrect but contains errors of analysis and interpretation.

6.3. The injury is a human bitemark and contains sufficient detail that may allow exclusion of an individual suspect. There is not sufficient detail in this bitemark to allow a positive identification with reasonable medical certainty. (see 1.5 above)

6.3.1. An individual similar to the one seen in Figure 6 who is missing one or more of his or her lower incisors could not create the mark seen in this case and could consequently be excluded.(see Figure 6)

6.3.2. An individual who had a fractured incisal edge of one of his four lower incisors similar to the fracture seen in the upper tooth in Figure 6 could also be excluded since the marks seen in the bitemark express the full, non-fractured width of the incisal edges of the teeth that made them.(See Figure 7)

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

6.3.3. The lower incisor teeth are not commonly lost and at least 90% of young men and women in a given population would have all four lower incisors. A very large proportion of these individuals could create a bitemark similar to the one seen in this case. Consequently, very many individuals in a given population could have made this bitemark. The individual depicted in Figure 6 is an exception.



Figure 6

The image of an individual unrelated to this case illustrating a fractured upper incisor and a missing lower incisor. This individual would be unable to create a mark similar to the one seen in Figure 7



Figure 7

The Bitemark (left) and the same image with outlines of the edges of incisors (right) that could be expected to make this type of mark

6.4. The conclusions reached by Drs. Hagstrom and Schneider that Bennie Starks created the bitemark on the left shoulder of Maria Gonzalez are not supported by the odontological evidence seen in this case.

6.5. The unsupported conclusions appear to be the result of a combination of the following:

6.5.1. Outdated methodology compounded by refusal to revisit the case using more modern techniques

6.5.2. Inadequate imaging

6.5.2.1. No apparent properly scaled images taken at early stages of the injury

6.5.2.2. No serial photography of the healing injury.

6.5.2.3. Photographs taken at non-optimal projections

6.5.2.4. Improper placement of scales

6.5.3. Improper analyses

7

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

   6.5.3.1. Failure to accurately assess the class characteristics of the linear
    abrasions seen in the injury
   6.5.3.2. Improper orientation (by 180$^{o}$) of the mechanism of the bite
  6.5.4. Interpretation Errors
  6.5.5. Failure to take measures to inhibit expectation bias
   6.5.5.1. Only one potential suspected biter
   6.5.5.2. No blinding measures implemented
  6.5.6. Overstatement of association conclusions
   6.5.6.1. Conclusions of Drs. Schneider and Hagstrom
    6.5.6.1.1. "definite match" (May 13, 1986)
    6.5.6.1.2. "...the bite on Maria Gonzalez was inflicted by Bennie Starks Jr."
    (July 1, 1986)
   6.5.6.2. The highest association level published by the ABFO in 1986 was
   "reasonable medical certainty."

 6.6. It is our view that, had we been presented the evidence in this case we would not have
  proceeded to analyse it further than to confirm it as a bitemark. The evidence is in the
  case has a low forensic value and this has been further confounded by the poor
  evidence collection techniques.


Respectfully submitted,


David R. Senn, DDS, DABFO        Iain A Pretty, BDS, PhD.


8

Bitemark Evidence in the People (IL) vs. Bennie Starks (Revised)

# Exhibit 26

# Errors in Orientation and Analysis of a Bitemark by Drs. Hagstrom and Schneider in IL v Starks



Bitemark Injury to the left shoulder of M. Gonzalez



Image on left shows orientation of bitemark by Hagstrom and Schneider...stated drag marks at top made by maxillary teeth




Image on right shows orientation by Pretty and Senn with drag marks at bottom judged to be made by lower teeth

Note that in both images the bitemark is in focus and the scale is out of focus indicating that the scale is not in the same plane as the bitemark. Consequently scaling is not dependable.

Why do Pretty and Senn state drag marks were made by lower teeth? Because of the differences in the class characteristics of human upper and lower incisors.

## Maxillary

- Central incisors are much wider than lateral incisors

- Lateral incisors are much narrower than central incisors

## Mandibular

- Central and lateral incisors are approximately the same width

- Lateral incisors may be slightly wider





# Average widths of adult incisors

- ❀ Maxillary Central Incisor — 8.5mm
- ❀ Maxillary Lateral Incisor — 6.5mm
- ❀ Mandibular Central Incisor — 5.0mm
- ❀ Mandibular Lateral Incisor — 5.5mm



The drag marks visible in this bitemark are consistent with having been created by teeth with the the class characteristics of mandibular incisor teeth.

They are NOT consistent with having been created by teeth with The class characteristics of maxillary incisor teeth.

widths in millimeters

5.8  5.6  5.4  5.6

Other details that create doubt regarding the opinions of Hagstrom and Schneider (H&S) that the drag marks were made by upper teeth.



Overlays of the teeth
Of B. Starks created by H&S
over the area demonstrates the
relationships between them.



Creating hollow volume outlines of the H&S solid volume exemplars allows better visualization of the relationships.



Moving the hollow volume overlay down along the track of the drag marks demonstrates the size discrepancy and lack of congruence between the bitemark and the maxillary teeth of B. Starks.



# Summary

- The patterned injury to the shoulder of M. Gonzalez is a human bitemark with reasonable medical certainty

- The mark can be oriented with regards to which portions of the mark were made by upper and lower teeth

- Drs. Hagstrom and Schneider oriented the bitemark incorrectly (by 180°) confusing and reversing the marks made by maxillary and mandibular teeth

- Conclusions regarding comparisons to any suspected biter would be voided by making those comparisons to an incorrectly oriented and inaccurately analyzed bitemark

# Exhibit 27

1

1

IN THE UNITED STATES DISTRICT COURT

2                NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

3

4     BENNIE STARKS,                      )
                                          )
5                    Plaintiff,           )
                                          )
6          vs.                            )   No. 09 C 348
                                          )
7     CITY OF WAUKEGAN, et al.,           )   Judge Feinerman
                                          )
8                    Defendants.          )

9

10          The videotaped deposition of DAVID SENN,

11    D.D.S., called by the Defendants for examination, taken

12    pursuant to notice and pursuant to the Federal Rules of

13    Civil Procedure for the United States District Courts

14    pertaining to the taking of depositions, taken before

15    Shelley M. Bostetter, Certified Shorthand Reporter and

16    Notary Public, at 500 West Madison Street, Suite 2430,

17    Chicago, Illinois, commencing at 9:11 a.m. on the 8th day

18    of January, A.D., 2015.

19

20

21

22

23

24

1       A.    That's correct.   I have not.

2       Q.    Do you know by any means what Bennie Starks

3    testified to in this case in his deposition?

4       A.    No.

5       Q.    Does it matter to you?

6       A.    No.   I think -- You know, my role, as I see it,

7    is to review the -- the forensic dental evidence and --

8    and make opinions on that.

9       Q.    I understand.   You're not here and you're not

10   offering an opinion -- I am correct -- as to whether or

11   not Bennie Starks committed the acts that he was charged

12   with, correct?

13      A.    No.

14      Q.    That's not your role and you have no opinion,

15   correct?

16      A.    That's correct.   I do not.

17      Q.    All right.   With respect to Bennie Starks being

18   the biter of Maria Gonzalez, am I correct that you are

19   not offering the opinion that he is excluded as being the

20   biter, correct?

21      A.    My opinion for that is that the evidence in

22   this case -- the bitemark evidence in this case is of

23   such low quality in its -- in its form, that it would be

24   very difficult to either include or exclude any biter.

1    Any person who has, in my opinion, all four lower incisor

2    teeth and the lower left canine tooth could have made

3    that bite, you know, because it's such a -- it's such

4    undistinguished evidence.

5        Q.    I understand.  And that's under the premise

6    that we all accept the fact that you believe the

7    orientation of the bite is flipped as it relates to the

8    testimony of Dr. Hagstrom and Schneider versus yours,

9    correct?

10       A.    Yes.  I think -- I think Dr. Hagstrom and

11   Schneider got it upside down.

12       Q.    I get it.  So I am correct -- I just want a --

13   an answer to this question.  You have not and cannot,

14   based for the reasons you just said, exclude Bennie

15   Starks as the biter of Maria Gonzalez; am I correct?

16       A.    I can neither include nor exclude him based on

17   the dental evidence.

18       Q.    Okay.  And what you're telling me -- and if I

19   understand that correctly, David, is that because of the

20   quality of the evidence, you don't have the ability to

21   find that answer, correct?

22       A.    Because of the quality of the evidence I'm

23   unable to either exclude or include Mr. Starks or any

24   other person.

99

1    Starks or anyone else, bit Maria Gonzalez when he was

2    behind her?

3        A.    Repeat that, please.

4        Q.    Is it your opinion that whoever the attacker

5    was, whether it was Bennie Starks or anyone else, they

6    bit Maria Gonzalez's left shoulder when they were behind

7    Maria Gonzalez?

8        A.    Well, you're asking -- You know, if you're

9    asking me to reconstruct a crime scene --

10       Q.    I am.

11       A.    -- and I'm -- I'm telling you that from the

12   orientation of the bitemark, that the relative position

13   of Mrs. Gonzalez and whoever bit her was such that the

14   lower teeth were toward her back and the upper teeth were

15   toward her front.

16           Now, she could have been standing up and he

17   could have been lying on a scaffold with his head leaning

18   over, or she could have been lying on her back and he

19   could have been underneath her.  He could have been on

20   top of her from behind.  There are multiple positions

21   that would allow that kind of -- that kind of

22   orientation.

23           But I don't know, not having been there,

24   exactly how that occurred.  I just know that the biter

1    had to be in a position so that his teeth would be in

2    that position when the bitemark was made.

3        Q.  Okay.  So other than your hypotheses of all

4    these potential ways that Maria Gonzalez could have been

5    bitten, do you have any specific opinion as to where the

6    attacker was and his orientation to Ms. Gonzalez when he

7    was -- when she was, in fact, bitten?

8        A.  I think we said in our report that the -- that

9    he would -- that the attacker would tend to be more

10    behind Mrs. Gonzalez than in front of Mrs. Gonzalez.  But

11    no specific -- I can't -- I can't place the bodies -- the

12    two bodies in specific orientations.

13        Q.  You can't state if they were lying down,

14    kneeling or standing up, correct?

15        A.  No.

16        Q.  But it's your belief and opinion in this case

17    that Maria Gonzalez was bitten from -- while the attacker

18    was behind her, facing her back?

19        A.  More behind her than in front of her.  Yes.

20        Q.  And what draws you to that opinion?

21        A.  The anatomy of the teeth that made the mark,

22    and the position -- and their position in that patterned

23    injury.

24        Q.  Can we agree that if, in fact, hypothetically

# Exhibit 28



**SCHOOL of DENTISTRY**
**UT HEALTH SCIENCE CENTER**

The University of Texas
Health Science Center at San Antonio
Mail Code 7919
7703 Floyd Curl Drive
San Antonio, Texas 78229-3900

| | | |
|---|---|---|
| David R. Senn, DDS, DABFO | Forensic Services | 567-3379 |
| Forensic Odontology | Education & Research | 567-1755 |
| Director | TeleFAX | 567-1965 |
| Center for Education and Research in Forensics (CERF) | senn@utshscsa.edu | |

November 25, 2014

John Stainthorp, Esq.
Peoples Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60648

Mr. Stainthorp,
This letter serves as my report regarding my review of the original bitemark evidence from the 1986 trial, State (IL) v Bennie Starks.

On November 20, 2014 I traveled to Chicago and met with you at your office. After a short discussion I looked at all of the contents of one banker's box that you told me was the extent of the remaining bitemark evidence in the case.

**Material Examined**

The following is an inventory of the items reviewed from that banker's box:

1. Maxillary Dental Model (pink stone) marked as Exhibit #51
2. Mandibular Dental Model (pink stone) marked as Exhibit #52
   (both models above were marked with the number 109)
3. 6 inch/15 cm plastic ruler marked as Exhibit #42
4. Three (3) wax exemplars (2 maxillary, 1 mandibular) marked as Exhibit #57
5. Unmarked (no teeth indentations) wax square marked as Exhibit #53
6. Unmarked wax square marked as Exhibit # 54
7. Occlusal dental radiographic film with maxillary teeth biting surfaces highlighted-marked as Exhibit #55
8. Occlusal dental radiographic film with mandibular teeth biting surfaces highlighted-marked as Exhibit #56
9. Clear acetate with reversed image of highlight seen in 7. (Exhibit #55) above [Exhibit marker missing]
10. Clear acetate with reversed image of highlight seen in 8. (Exhibit #56) above and marked as Exhibit #58
11. Six (6) 3.5x5 Printed Photographs

1

Description of photographs:

    a. Starks' lower teeth with cheek retractors marked as Exhibit #43

    b. Starks' anterior upper and lower teeth-cheek retractors marked as Exhibit #44

    c. Starks' upper teeth in a mirror marked as Exhibit #45

    d. Placement of impression material in an impression tray by one gentleman and observed by another marked as Exhibit #46

    e. Gentleman placing impression tray in mouth of Starks and observed by second gentleman marked as Exhibit # 47

    f. Gentleman holding impression tray in mouth of Starks marked as Exhibit # 48

(The images in 11. are the same images with the same numbers as those previously received on a CD marked as Bennie Starks Exhibits)

12. Three (3) 8x10 Print Photographs

Description of photographs:

    a. Image of M. Gonzalez on a backboard (scene image?) marked as Exhibit #5

    b. Image of M. Gonzalez shoulder with patterned injury without scale marked as Exhibit #39 (this is the same image as the one marked as 40 on CD previously received)

    c. Two images of the same photograph of M. Gonzalez shoulder showing patterned injury with scale and marked as Exhibit #40 (these are the same images marked as 39 on CD previously received)*

    *(When the ruler (Exhibit #42) is placed on the images in 12.c. the images of the ruler in both images are different in size from the actual ruler (Exhibit #42)

13. Maxillary and mandibular dental impression trays with degraded polyether impression marked as Exhibit #49

14. Slide Carousel containing twenty-three (23) 35mm color slides.

    a. Description of material visible on slides

        1. Image of maxillary dental model

        2. Image of mandibular dental model

        3. Image of maxillary dental model from posterior aspect

        4. Image of maxillary dental model from anterior aspect

        5. Image of maxillary dental model from left anterior aspect

        6. Image of shoulder of M. Gonzalez without scale (same image as Exhibit #40)

        7. Image of photograph of shoulder of M. Gonzalez with scale (same image as one of two duplicate images on Exhibit #39)

        8. Image of gentleman placing impression material in tray (labeled as 7) (same image as Exhibit #46)

        9. Image of mandibular dental model placed on photograph of patterned injury with scale (injury mostly hidden by model)

2

10. Image of clear acetate with mandibular tooth markings laid over photograph of patterned injury with scale
11. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
12. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
13. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
14. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
15. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
16. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
17. Image of clear acetate with maxillary tooth markings laid over photograph of patterned injury with scale
18. Image of clear acetate with maxillary tooth markings laid over photograph of patterned injury with scale
19. Image of gentleman placing impression tray in Starks' mouth labeled as 17 (same image as Exhibit #47)
20. Image of gentleman holding maxillary impression in Starks' mouth labeled as 22 (same image as Exhibit #48)
21. Image of anterior upper and lower teeth of Starks with cheek retractors in place labeled as 27 (same image as Exhibit #44)
22. Image of biting surfaces of lower anterior teeth of Starks with cheek retractors in place labeled as 30 (same image as Exhibit #43)
23. Image of biting surfaces of anterior upper teeth of Starks (in mirror) labeled as 31 (same image as Exhibit # 45)

15. A separate cardboard box containing three sets of duplicate blue dental stone models that were good and faithful duplicates of the models listed as 1 and 2 above. I believe these are duplicate models created by Dr. Denise Murmann. Similar duplicates were sent to us (Dr. Iain Pretty and me)

3

## Discussion

All of the material listed above was reviewed and evaluated. The slides in the slide carousel were viewed using a Kodak Carousel Slide Viewer by projections onto an adjacent light colored wall. All of the images in the slide carousel were images previously viewed except those listed as 9-18 above. Since these were new images to me, I requested that high quality digital duplicates of the images on all 23 slides be created. Mr. Stainthorp made arrangements for these duplicates to be made and I received them by Dropbox on November 21, 2014. The original duplicate digital images were archived unaltered and identical copies of those images were enhanced using accepted forensic techniques for image enhancement. Each image was viewed and analyzed. As previously stated all of the images in the slide carousel had been previously analyzed except the images on slides 9 through 18.

The digital images from slides 9-18 were again reviewed and analyzed. These images seem to be those that Dr. Schneider used as a part of the basis for his opinions in the original trial. Following is a discussion (*in italics*) of the information gleaned from each slide.

9. Image of mandibular dental model placed on photograph of patterned injury with scale (injury mostly hidden by model)
   *This slide was apparently used at trial to support Dr. Schneider's opinion of the portion of the injury pattern created by the lower teeth. The following is an excerpt from Dr. Schneider's testimony at trial:*

   *Q. In making your comparison, can you tell us what point's you found in making a comparison?*
   *A. I found a lot of points of similarity.*
   *Q. Can you tell us such as which ones?*
   *A. For instance, on the lower bite, the lower teeth in the bite are all present in the suspect's mouth. They're basically the same width, cuspid to cuspid. The same bite on the acetate was the same size as on the photograph. The teeth were all in the same relative position on the bite as they were on the acetate…*
   *And then later in his testimony;*
   *A. …Everything present on this lower model is in this bite mark.*

   *Unfortunately, in the orientation chosen by Dr. Schneider there were no tooth marks in the portion of the bitemark that he opined were made by lower teeth. There is no known method of measuring the width of teeth marks that do not exist. Similarly the relative positions of teeth cannot be compared to teeth marks if no teeth marks exist. I do not understand how he could say "everything present" on a model is in a bitemark when no teeth marks for the teeth in question exist!*

10. Image of clear acetate with mandibular tooth markings overlaid on photograph of patterned injury with scale.
    *Same issues as 9. above*

11. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)

4

*The images 11-16 are images of progressive movement of the maxillary dental model of B. Starks over the tooth marks seen in the photograph of the patterned injury with scale. Image 11 seems to show Dr. Schneider's opinion of the positioning of the upper dental model at the point of initial contact with the skin*

12. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
*Image 12 shows the same view as 11 above with the model slightly moved toward the center of the bitemark.*

13. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
*In Image 13 the model has been moved more toward the center of the bitemark and the outermost area of the drag mark abrasions begin to become visible.*

14. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
*In image 14 the four drag marks are revealed to a greater extent although they are still mostly hidden by the dental model. (This is the great shortcoming of this method of comparison...most of what you would like to see is hidden. Modern hollow volume or semi-transparent solid volume overlays allow visualization of both the features of the bitemark and the teeth that may or may not have made them)*

15. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
*In image 15, as more of the injury pattern is visible, it becomes apparent that Dr. Schneider believes that Tooth #8, the maxillary right central incisor made **not one, but two** of the linear abrasion drag marks seen in the bitemark. That is, this one tooth made the two centermost drag marks and the other two more lateral marks were made by teeth 7 and 9, the maxillary right lateral incisor and the maxillary left central incisor.*

16. Image of maxillary dental model placed on photograph of patterned injury with scale (pattern mostly hidden by model)
*In Image 16 it is clear that Dr. Schneider believes that tooth 8 made the two centermost drag marks. He makes no explanation in his testimony explaining this astonishing finding other than seeming to believe that the space between these two marks is explained by the small chip that is mostly on the facial of that tooth and well toward the mesial, not in the center of the tooth as it would have to be to cause this dubious feature, He offers no explanation of how one central incisor makes a mark twice as wide as the other central incisor that has the same width.*

17. Image of clear acetate with maxillary tooth markings laid over photograph of patterned injury with scale
*Same issues as discussed in 16 above.*

18. Image of clear acetate with maxillary tooth markings laid over photograph of patterned injury with scale
*Same issues as discussed in 16 above*

5

## Conclusions

Most of the material in the banker's box was material that I had already seen and analyzed. Exceptions include the original dental models, the degraded impressions, the wax bite exemplars, and slides 9-18 in the slide carousel. The duplicate models we received and analyzed in 2010 were good and faithful copies of those examined from the banker's box. The degraded impressions and the wax bite exemplars offered no additional information of value.

The information from slides 9-18, however, was of great value in finally detecting the exact mechanism by which Dr. Schneider believes the bite was created. By reading the transcripts of his testimony at trial and viewing the slide images simultaneously it was possible to comprehend the details of his opinion.

After reviewing this material my opinions as stated in the report submitted by Dr. Iain Pretty and me dated May 10, 2010 have not changed.

The mechanisms defining Dr. Schneider's opinion as described in this material are even more irregular than we believed when we submitted that 2010 report.

The odontological evidence does not support Dr. Schneider's conclusion that Bennie Starks created this bitemark. All of the factors mentioned in the May 10, 2010 report remain and now additional irregularities are added...1) failure to understand and interpret the class characteristics of marks created by teeth with the same or different dental anatomy, and 2) failure to understand and interpret features potentially created by individual characteristics of teeth.

The mechanism chosen by Dr. Schneider and his explanation of that mechanism in his testimony supported by his photographic slides indicate a lack of understanding of dental anatomy, bitemark analysis, and bitemark dynamics.

Respectfully submitted,

David R. Senn, DDS, D-ABFO

6

# Exhibit 29

RUSSELL E. SCHNEIDER, D.D.S.
4634 GRAND AVENUE
GURNEE, ILLINOIS 60031

Telephone (312) 336-2175

May 13, 1986

Louis Barrones
Lake County States Attorney
18 N. County
Waukegan, IL 60085

Dear Mr. Barrones:

    We have completed examination of photos taken
of the bites inflicted on Maria Gonzalez.  We have
examined and compiled analytical work ups from the
models of Benny Starks Jr's teeth.  We have done
a detailed comparison of the bite marks with the
models and have found a definite match.

    It is our conclusion that the bites on Maria
Gonzalez were made by Benny Starks Jr.

Russell E. Schneider                    Carl B. Hagstrom

RES/ccm

LB276

# Exhibit 30

**RUSSELL E. SCHNEIDER, D.D.S.**
4834 GRAND AVENUE
GURNEE, ILLINOIS  60031
Telephone (312) 336-2175

July 1, 1986

Louis Barrones
Lake County States Attorney's Office
18 N. County
Waukegan, IL 60085

Dear Mr. Barrones:

This is a summation of the comparison of the bite mark inflicted on Maria Gonzalez September 22, 1985 and the dentition of Bennie Starks Jr.

Photos were taken of the bite mark on Maria Gonzalez and prints made life size so the ruler in the photo is exactly the size as the ruler when compared side-by-side; thus reproducing the bite mark in it's exact dimensions. Impressions were taken of the teeth of Bennie Starks Jr. and models were poured. These models were made life size so they are the same dimension as the suspects teeth.

These models were compared to the bite mark by two methods. First the models were placed on the marks made by the bite to show the match up of individual characteristics of teeth and bite marks. An impression into wax was made by the upper and lower models. Into these wax indentations was placed silver filings. An x-ray was taken of the wax and filings showing the biting edges of the upper and lower anterior teeth. This x-ray shows the edges white and the background dark. A reverse image acetate was made from the radiograph showing the biting edge dark and the background white. These biting edges were then placed over the bite mark for comparison.

The comparison of the models to the bite photo and the overlays to the bite photo indicated a very specific and unusual pattern leading us to the conclusion that the bite on Maria Gonzalez was inflicted by Bennie Starks Jr.

*Russell E. Schneider DDS*

Russell E. Schneider D.D.S.

*Carl B. Hagstrom DDS*

Carl Hagstrom D.D.S.

RES:ocm

LB277

# Exhibit 31

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Bennie Starks, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 09 C 348 |
| v. | ) | |
| | ) | Judge Feinerman |
| City of Waukegan, et al. | ) | |
| | ) | |
| Defendants | ) | |

## STIPULATIONS

Plaintiff Bennie Starks; Defendant Sharon Thomas-Boyd; Defendant the City of Waukegan, Urbancic, W. Biang, P. Stevenson and D. Deprez and the Special Representative for deceased former Waukegan Police Department Official M. Juarez (the Waukegan Defendants); Defendants Dr. Carl Hagstrom and Dr. Russell Schneider; and Northeastern Illinois Regional Crime Laboratory, formerly known as Northern Illinois Police Crime Laboratory stipulate to the following facts:

1. The Northern Illinois Police Crime Laboratory determined in May, 2004, that it had in its possession the following items of evidence relating to the prosecution of Bennie Starks, in a file named 860231: portions of the victim's underwear with semen stains; a blood standard of Bennie Starks; a vaginal swab from Maria Gonzales labeled 01-01; and a blood standard from Maria Gonzales.

2. On or about May 4, 2004, Ken Pfoser, an employee of Northern Illinois Police Crime Laboratory talked with Vanessa Potkin, an attorney for Bennie Starks, and informed her that the Laboratory was in the possession of a portion of the victim's underwear with semen stains, a blood standard of Bennie Starks, a vaginal swab from Maria Gonzales labeled 01-01 and a blood

1

standard from Maria Gonzales.

3. On or about May 4, 2004, Ken Pfoser wrote on a Case Correspondence Form that he had talked to Vanessa Potkin, an attorney for Bennie Starks, and informed her that the Laboratory was in the possession of a portion of the victim's underwear with semen stains, a blood standard of Bennie Starks, a vaginal swab from Maria Gonzales labeled 01-01 and a blood standard from Maria Gonzales. The attached Exhibit A is a true and accurate copy of that Form.

4. On or about May 6, 2004, Vanessa Potkin prepared and faxed to Ken Pfoser the letter attached as Exhibit B which noted that "your laboratory is in possession of, now, the most critical evidence from this case (i.e. the vaginal swab labeled 01-01," and requested that the Northern Illinois Police Crime Laboratory "takes all necessary precautions to preserve this evidence."

5. Northern Illinois Police Crime Laboratory did take all necessary precautions to preserve this evidence.

6. Northern Illinois Police Crime Laboratory had taken all necessary precautions to preserve this evidence prior to receiving the May 6, 2004 letter from Vanessa Potkin.

7. On or about August 6, 2004, Ken Pfoser prepared a document, attached as Exhibit C, in which he noted that "NIPCL case #860231 was reviewed upon the request of Vanessa Potkin, Innocence Project, Inc, to determine if any evidence was retained by NIPCL. The following items are currently being retained by the NIPCL Forensic Biology/DNA section.

> Blood Standard from Bennie Starks, Jr.
> Blood Standard from Maria Gonzales
> (1) Vaginal swab from Maria Gonsales
> (2) Semen stain(s) from underwear."

8. On or about September 10, 2004, Ken Pfoser faxed to Vanessa Potkin the letter

2

attached as Exhibit D, in which he noted that "upon request of Vanessa Potkin, Innocence

Project, Inc., NIPCL Case #860231 was reviewed for the existence of any retained evidence. The

following items were located in the Forensic Biology/DNA section evidence freezer relative to

NIPCL Case #860231:

> Item/Exhibit 01-01:   (1) vaginal swab of Maria Gonzales
> Item/Exhibit 01-06:   Blood standard of Maria Gonzales
> Item/Exhibit 07-01:   (2) semen stains from underwear and (2) control samples
> Item/Exhibit 20-01:   Blood standard of Bennie Starks, Jr.

The above listed item(s)/exhibits(s) were returned to the Forensic Biology/DNA section evidence

freezer until further instructions. The above listed item(s)/exhibit(s), to the best of my

knowledge, have been retained intact from the period of their last analysis to the present."

9. On or about April 19, 2005, Judge Starck of the Circuit Court of the Nineteenth

Judicial Circuit, Lake County, Illinois, issued the order attached as Exhibit E, in which he

ordered the Northern Illinois Police Crime Lab to transport the vaginal swab to Orchid Cellmark,

20271 Goldenrod Lane, Germantown, MD 20876 for conventional PCR testing and/or Y

chromosome testing.

10. On or about April 20, 2005, Vanessa Potkin forwarded the order (Exhibit E) via fax

to Ken Pfoser at NIPCL. Exhibit F.

11. NIPCL complied with Judge Starck's order and forwarded Item/Exhibit 01-01: (1)

vaginal swab of Maria Gonzales to Orchid Cellmark.

12. Orchid Cellmark received Item/Exhibit 01-01: (1) vaginal swab of Maria Gonzales

on or about April 26, 2005. Exhibit G.

13. Orchid Cellmark performed Polymerase chain reaction (PCR) testing on Item/Exhibit

01-01: (1) vaginal swab of Maria Gonzales and issued a report on August 31, 2005 listing the

results of that testing. Exhibit G.

14. Exhibit G is a true and accurate report of the testing performed by Orchid Cellmark and the results obtained.

15. On or about November 1, 2005, Orchid Cellmark received several buccal swabs from Bennie Starks and subsequently performed DNA testing on those swabs and obtained the result set forth in Exhibit H.

16. Orchid Cellmark compared the DNA results obtained from the testing of the buccal swab of Bennie Starks to the results obtained from the testing of Item/Exhibit 01-01: (1) vaginal swab of Maria Gonzales and determined that Bennie Starks was excluded as the contributor of the male DNA detected on Item/Exhibit 01-01. Exhibit H.

17. Exhibit H is a true and accurate report of the testing performed by Orchid Cellmark, the results obtained, and the comparison of the DNA of Bennie Starks to the male DNA detected on Item/Exhibit 01-01.

This stipulation is to these facts and does not constitute a stipulation that the above facts are necessarily admissible at trial or on summary judgment. If the admissibility of any of these facts is disputed, this may be addressed by the parties in subsequent pleadings, although the failure to object in a subsequent pleading does not constitute a waiver of any objection prior to or at trial.

Dated: November 19, 2014

/s/ John L. Stainthorp
John L. Stainthorp
G. Flint Taylor, Joey Mogul
People's Law Office
1180 N. Milwaukee Ave.
Chicago, IL 60642

Attorneys for Plaintiff Bennie Starks

s/ Jim DeAno
Jim DeAno, Collin Woodward
Deano & Scarry LLC
53 W. Jackson Blvd Suite 740
Chicago IL 60604

Attorneys for Defendant Northeastern Illinois Regional Crime Laboratory, formerly known as
Northern Illinois Police Crime Laboratory

s/ Peter Trobe
Peter Trobe, Michael Furlong
Trobe, Babowice & Associates, LLC
404 West Water Street
Waukegan, Illinois 60085

Attorneys for the Waukegan Defendants

s/ Theodore Karavidas
Theodore G. Karavidas, Samuel A. Kavathas
33 N. Dearborn St., Ste. 502
Chicago, IL 60602

Attorneys for Defendant Sharon Thomas-Boyd

# EXHIBIT A

*Northern Illinois Police Crime Laboratory*
Case Correspondence Form

Laboratory Case Number: 860231

☒ Telephone Conversation
☐ Requests for Copy(s)
☐ Other _____

Call Dennis Cobb back w/ case info. I told him what evidence was at the lab & what I thought might be probative based on notes & reports. He said he didn't know what the chief wants tested but he'll talk to him & call back.

Date: 3/21/02  Time: 11:25 hrs.  Initials: JUT

☐ Telephone Conversation
☐ Requests for Copy(s)
☐ Other _____

TALKED W/ VANESSA POTKIN OF INNOCENCE PROJECT. 212-364-5359 ABOUT EXISTING EVIDENCE
① SEMEN STAINS UNDERWEAR  ④ BLOOD STD URRIA GONZALEZ
② BLOOD STD BENNIE STARKS
③ VAG SWAB

Date: 5/4/04  Time: 11:23 hrs.  Initials: KJ

☐ Telephone Conversation
  Requests for Copy(s)
☐ Other _____

Date:  Time:  hrs.  Initials:

☐ Telephone Conversation
☐ Requests for Copy(s)
☐ Other _____

Date:  Time:  hrs.  Initials:

☐ Telephone Conversation
☐ Requests for Copy(s)
☐ Other _____

Date:  Time:  hrs.  Initials:

Case Correspondence Form
Rev. Date 02-09-96

000052

# EXHIBIT B

05/06/2004 15:24 FAX                                              @001

# THE INNOCENCE PROJECT, INC.
100 Fifth Avenue, 3rd Floor
New York, NY 10011
212/364-5340 Tel
212/364-5341 Fax
www.innocenceproject.org

# Innocence Project

Barry Scheck
Peter Neufeld
*Directors*

TO:          Ken Proser

COMPANY:     Northern Illinois Crime Lab

FAX NO.:     847 - 432 - 5199

TEL NO.:

CC:

CC:

DATE:        5/6              , 2004

PAGES:       2       , including this cover sheet

FROM:        Vanessa Potkin

SENDER'S TEL: 212/364-53 59

MESSAGE:

The information in this facsimile message is PRIVILEDGED AND CONFIDENTIAL intended for the use of the individual or entity named above. If the reader of this message in not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If this fax is delivered incorrectly or fails to transmit completely, please call the above sender immediately.

000050

05/06/2004 15:24 FAX                                                                      ☐ 002



Benjamin N. Cardozo School of Law • Yeshiva University

*Directors*                                                                          *Staff Attorney*
Barry C. Scheck                                                                      Vanessa Potkin
Peter J. Neufeld                                                                     Tel: 212.364.5359
                                                                                     Fax: 212.364.5341

                                                                                     May 06, 2004

Ken Pfoser
Northern Illinois Crime Laboratory
Via Fax

                        Re:          Lab Case No. 8600231-4
                                     Evidence Preservation

Dear Mr. Pfoser:

        Thank you for looking for biological material from this case (Lab Case No. 8600231-4)
and confirming that the following evidence is in your laboratory's possession: (1) the victim's
reference sample (2) reference sample from Bennie Starks (3) a cutting from the underwear and
(4) a vaginal swab [labeled 01-01].

        We have already performed some post-conviction DNA testing in this case, but
unfortunately recent DNA analysis of a vaginal smear that was introduced as an exhibit at trial
failed to produce a male profile. As such, your laboratory is in possession of, now, the most
critical evidence from this case (i.e., the vaginal swab labeled 01-01). It is imperative that the
above listed evidence be preserved while we obtain either the State's Attorney's consent or a
Court Order to have the evidence transferred to another laboratory for testing. This testing could
provide dispositive proof of our client's innocence. I am writing to ensure that your laboratory
takes all necessary precautions to preserve this evidence. If you desire to move the evidence or
do anything else with it, please call me at 212-364-5359.

        I thank you for your time and your attention to this important matter.

Sincerely,

Vanessa Potkin
Staff Attorney


The Innocence Project
100 Fifth Avenue • 3rd Floor • New York • NY  10011

                                                                         008051

# EXHIBIT C

August 6, 2004

Re: NIPCL Case #860231, Waukegan PD case #86-1898

NIPCL case #860231 was reviewed upon the request of Vanessa Potkin, Innocence
Project, Inc., to determine if any evidence was retained by NIPCL. The following items
are currently being retained by the NIPCL Forensic Biology/DNA section.

       Blood Standard from Bennie Starks, Jr.
       Blood Standard from Maria Gonzales
       (1) Vaginal swab from Maria Gonzales
       (2) Semen stain(s) from underwear

If you have any questions concerning this evidence, please contact me at (847) 432-8160.


Kenneth Pfoser
DNA Technical Leader
Northern Illinois Police Crime Laboratory

000047

# EXHIBIT D

TRANSMISSION VERIFICATION REPORT

TIME : 09/10/2004 15:42
NAME : N ILL POL CRIME LAB
FAX : 8474325199
TEL : 8474328160
SER.# : GFOL2J853631

DATE,TIME        09/10  16:41
FAX NO./NAME     12123645341
DURATION         00:00:16
PAGE(S)          01
RESULT           OK
MODE             STANDARD
                 ECM

000049

September 10, 2004

Re: NIPCL Case #860231, Waukegan PD Case #86-1898

On May 4, 2004, upon the request of Vanessa Potkin, Innocence Project, Inc., NIPCL
Case #860231 was reviewed for the existence of any retained evidence. The following
items were located in the Forensic Biology/DNA section evidence freezer relative to
NIPCL Case #860231:

| | |
|---|---|
| Item/Exhibit 01-01: | (1) vaginal swab of Maria Gonzales |
| Item/Exhibit 01-06: | Blood standard of Maria Gonzales |
| Item/Exhibit 07-01: | (2) semen stains from underwear and (2) control samples |
| Item/Exhibit 20-01: | Blood standard of Bennie Starks, Jr. |

The above listed item(s)/exhibit(s) were returned to the Forensic Biology/DNA section
evidence freezer until further instructions. The above listed item(s)/exhibit(s), to the best
of my knowledge, have been retained intact from the period of their last analysis to the
present.

If you have any questions concerning this case, please contact me at (847) 432-8160.


Kenneth Pfoser
DNA Technical Leader
Northern Illinois Police Crime Laboratory

000048

# EXHIBIT E

86-231
KB
3/4

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS,        )
                        Plaintiffs,     )
                                        )
vs.                                     )        86 CF 106
                                        )
BENNIE STARKS,                          )
                        Defendant.      )

APR 19 2005

CIRCUIT CLERK

## ORDER

On motion of Vanessa Potkin and Jed Stone, for Bennie Starks, pursuant to 725 ILCS 5/116-3;

People by Michael Mermel, on a special and limited appearance.

The court being advised in the premises;

IT IS ORDERED;

1.  The State's Motion to Dismiss the Defendant's Motion to Reconsider the Court's Denial of Testing of the Vaginal Swab is DENIED.

2.  The court finds that DNA testing of the vaginal swab from the victim, Maria Gonzales, currently being held at the Northern Illinois Police Crime Lab under lab case number 86-0231 would not be cumulative and shall be tested by DNA technology not available to the parties at the time of trial and by means of testing procedures generally accepted by the relevant scientific community.

3.  ~~This order be stayed for fourteen (14) days.~~

4.  The Northern Illinois Police Crime Lab shall transport the vaginal swab, the ~~whole blood standard of Maria Gonzales and the whole blood standard of Bennie~~ Starks to Orchid Cellmark, 20271 Goldenrod Lane, Germantown, MD 20876 via overnight courier at ambient temperature for conventional STR testing and/or Y-chromosome testing. at defense expense.

5.  If in order to obtain interpretable DNA test results, the scientists at Orchid Cellmark determine that testing would require consumption of the entire sample, Cellmark is then required prior to any testing to consult with the DNA unit of the Illinois State Police Forensic Science Command to agree upon the proper scientific procedure to follow with regard to consumption of sample and then to come back to this court for further instruction or order.

6.    Orchid Cellmark shall prepare a written report of testing and provide the state's
      attorney and defense counsel with copies of same within fifteen days of
      completion of testing.

7.    At the conclusion of testing by Orchid Cellmark all remaining material shall be
      returned to the Northern Illinois Police Crime Lab by overnight courier.

ENTER:

_____

JUDGE

Dated this 19th day
of April, 2005, at
Waukegan, Illinois.

Order prepared by
Jed Stone
Stone & Associates, L.L.C.
415 West Washington Street
Waukegan, IL 60085
847 336 7888

008043

# EXHIBIT F

04/20/2005 10:09 FAX                           ☑001

86-231
1/4

**INNOCENCE PROJECT**

Barry C. Scheck, Esq.
Peter J. Neufeld, Esq.
Directors

Maddy deLone, Esq.
Executive Director

Innocence Project
100 Fifth Avenue, 3rd Floor
New York, NY 10011
Tel 212.364.5340
Fax 212.364.5341

www.innocenceproject.org

TO: _____ Ken Pfoser

COMPANY _____ Northern Illinois Crime Laboratory

FAX NO.: _____ 847-432-5799

TEL NO.: _____

CC: _____

CC: _____

DATE: _____ April 20, 2005

PAGES: _____ 4 , including this cover sheet

FROM: _____ Vanessa Potkin

SENDER'S TEL: 212-364-53 59

MESSAGE: _____

_____ DNA Testing Order

000040

04/20/2005 10:09 FAX                                                    ☒002

86-231
2/4
KS

**Barry C. Scheck, Esq.**
**Peter J. Neufeld, Esq.**
**Directors**

**Maddy deLone, Esq.**
**Executive Director**

Innocence Project
100 Fifth Avenue, 3rd Floor
New York, NY 10011
Tel 212.364.5340
Fax 212.364.5341

www.innocenceproject.org

Vanessa Potkin, Esq.
Direct Dial: 212-364-5390

April 20, 2005

Ken Pfoser
Northern Illinois Crime Laboratory
Via fax: 847-432-5199

RE:  People v. Bennie Starks
     Order for Shipment of Evidence to Cellmark for Post Conviction Testing
     Lab # 06-0231

Dear Ken:

        Thank you for testifying last week in this case. Yesterday, Judge Starck signed an
Order for DNA testing of the victim's vaginal swab.

        Paragraph 4 of the attached order directs the Northern Illinois Crime Lab to send the
Marla Gonzales vaginal swab via overnight courier. Cellmark's address is 20271 Goldenrod
Lane, Germantown, MD 20876, ph 301-428-4980. Since the order also indicates (the
handwritten addition), that we pay for the shipment, please send the evidence via overnight
Federal Express delivery, billing to (third party) Innocence Project account number: 2855-8255-
5. It also would be great if you could fax us a copy of the airbill (212-364-5341) when the
evidence is shipped, for our records.

        Also, Cellmark requests that evidence be shipped to their lab Monday thru Thursday
(since they are not open Saturday for evidence delivery). It would be great if the evidence
could get out tomorrow or Monday, but I realize this may be wishful thinking. I will call you later
today just to make sure there is nothing else I need to do to help facilitate shipment of the
evidence. Thank you.

                                        Sincerely,

                                        Vanessa Potkin
                                        Staff Attorney

                                                            000041

Benjamin N. Cardozo School of Law, Yeshiva University

# EXHIBIT G

08/02/2005 11:28 FAX    08/02/2005 10:06    9815286431        ORCHID CELLMARK GTWN                ☒003
                                                                                                PAGE  02/04



20271 Goldenrod Lane · Germantown, MD 20876
301.428.4980  800.USA.LABS
301.428.4877 Fax
www.orchidcellmark.com

ORCHID
CELLMARK

**REPORT OF LABORATORY EXAMINATION**
August 31, 2005

97-304

Vanessa Potkin, Esq.
Innocence Project
Cardozo Law School
100 5th Avenue, 3rd Floor
New York, NY 10011

Re: Cellmark Case No.: F051188
       People v. Bennie Starks

**EXHIBITS:**

Polymerase chain reaction (PCR) testing was performed on the items listed below, which were received for analysis on April 26, 2005:

        Partial swab labeled "...Vaginal swab of Maria Gonzales..."

**RESULTS:**

A DNA extract isolated from the partial swab labeled vaginal swab was tested using the Powerplex® Y System. The short tandem repeat (STR) loci tested and the types obtained from the vaginal swab are listed in the attached table.

**CONCLUSIONS:**

<u>Vaginal swab:</u>

The data indicate that DNA from a male was obtained from the swab labeled vaginal swab. This male haplotype is suitable for comparison purposes.

Accredited by the American Society of Crime Laboratory Directors / Laboratory Accreditation Board
Dallas, TX  ·  Germantown, MD  ·  Nashville, TN

Page 1 of 4

Report for Case No. F051188
August 31, 2005
Page Two


## EVIDENCE DISPOSITION:

In the absence of specific instructions, evidence will be returned to the submitting agency by
Federal Express or other appropriate carrier.


Jeffrey A. Hickey
Senior Research Associate

Jason E. Kokoszka, Ph.D.
Molecular Geneticist


If expert witnesses are needed for depositions or court testimony, please notify us by telephone at
301-515-6155 at least four weeks in advance.

For information regarding discovery policies and fees, please address all inquiries to the
Discovery Coordinator at 800/872-5227 (fax: 301/428-4877), or refer to the web site of Cellmark
Diagnostics (www.cellmark-labs.com).


cc: Mike Mermel
    State's Attorney's Office
    18 N. County Street
    Waukegan, IL  60085

09/02/2005 11:28 FAX
09/02/2005 10:06    3015296431                    ORCHID CELLMARK GTWN                    @005
                                                                                          PAGE  04/04

Results for Cellmark Case No.: FUS1189
Date: 08/31/05

ALLELES DETECTED - POWERPLEX Y

| Case | Sample | DYS391 | DYS389I | DYS439 | DYS389II | DYS438 | DYS437 | DYS19 | DYS392 | DYS393 | DYS390 | DYS385 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FUS1185-01MY | VAGINAL SWAB | 11 | 13 | 12 | 29 | 12 | 15 | 14 | 13 | 13 | 24 | 11,14 |

Page 3 of 4



The schematic diagram illustrates the fluorescent dye label color and relative PCR product size ranges for the various STR loci present in this particular kit.

*Click on the locus name to learn more about the STR marker of interest.*

# EXHIBIT H

 CELLMARK    13988 Diplomat Drive · Suite 100 · Farmers Branch, TX 75234 · 214.271.8400 · 1.800.752.2774 · 214.271-8322

## LABORATORY REPORT - FORENSIC IDENTITY Y-STR ANALYSIS

**CASE DATA:**

| | |
|---|---|
| Referring Agency: | The Innocence Project |
| Agency Reference #: | Orchid Cellmark Germantown #F051188 |
| Orchid Cellmark Case #: | Y05-0028 |
| Agency Contact: | Vanessa Potkin |
| Victim's Name: | Maria Gonzales |
| Suspect's Name: | Bennie Starks |
| Report Date: | December 5, 2005 |

### 1. Evidence Received

| Accession # | Sample Description | Receipt Date/Method of Delivery |
|---|---|---|
| Y05-0028-01.01 | Buccal swab: from Bennie Starks | 11-1-05 FedEx |
| Y05-0028-01.02 | Buccal swab: from Bennie Starks | |
| Y05-0028-01.03 | Buccal swab: from Bennie Starks | |
| Y05-0028-01.04 | Buccal swab: from Bennie Starks | |

### 2. Results

DNA from specimen Y05-0028-01.01 was amplified and typed using Applied Biosystems' Yfiler kit and F051188 01MY was amplified and typed using Promega's PowerPlex Y kit. The following results (in repeat numbers) were obtained:

| Specimen # | DYS456 | DYS389 I | DYS390 | DYS389 II | DYS458 | DYS19 | DYS385 a/b |
|---|---|---|---|---|---|---|---|
| Y05-0028-01.01 | 17 | 13 | 21 | 27 | 17 | 16 | 16,20 |
| F051188 01MY* | NT | 13 | 24 | 29 | NT | 14 | 11,14 |

| Specimen # | DYS393 | DYS391 | DYS439 | DYS635 | DYS392 | H4 | DYS437 | DYS438 | DYS448 |
|---|---|---|---|---|---|---|---|---|---|
| Y05-0028-01.01 | 14 | 10 | 12 | 23 | 11 | 11 | 14 | 11 | 21 |
| F051188 01MY* | 13 | 11 | 12 | NT | 13 | NT | 15 | 12 | NT |

\* = from Orchid Cellmark Germantown report F051188 dated 8-31-05    NT = not tested using Promega's PowerPlex Y kit

DNA results were obtained using Short Tandem Repeat (STR) analysis. Procedures used in the analysis of this case adhere to the standards adopted by the DNA Advisory Board on DNA analysis methods.

### 3. Conclusion

Based on these results, Bennie Starks (Y05-0028-01.01) (or any patrilineal relative of Bennie Starks) is excluded as the contributor of the male DNA detected on the partial vaginal swab from Maria Gonzales (F051188 01MY).

### 4. Disposition of Evidence

All evidence received in this case will be returned to the submitting agency.
Orchid Cellmark has maintained complete chain of custody documentation from receipt of evidence to disposition.

### 5. Case Review

The results and conclusions described in this report have been reviewed by the individuals below.

Cassie Johnson
Forensic Analyst

Rick W. Staub, Ph.D.
Laboratory Director

Y05-0028
Page 1 of 1

Accredited by the American Society of Crime Laboratory Directors · Laboratory Accreditation Board

Exhibit 32

365 Ill. App. 3d 592, *; 850 N.E.2d 206, **;
2006 Ill. App. LEXIS 232, ***; 302 Ill. Dec. 769



THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENNIE
STARKS, Defendant-Appellant.

No. 2-04-0671

APPELLATE COURT OF ILLINOIS, SECOND DISTRICT

*365 Ill. App. 3d 592; 850 N.E.2d 206; 2006 Ill. App. LEXIS 232; 302 Ill. Dec. 769*

**March 23, 2006, Filed**

**SUBSEQUENT HISTORY:** [***1] Released for Publication July 14, 2006.
Rehearing denied by *People v. Starks, 2006 Ill. App. LEXIS 598 (Ill. App. Ct. 2d Dist., July 14, 2006)*
Appeal denied by *People v. Starks, 222 Ill. 2d 595, 861 N.E.2d 662, 2006 Ill. LEXIS 1851, 308 Ill. Dec. 331 (2006)*
Appeal after remand at, Decision reached on appeal by *People v. Starks, 966 N.E.2d 347, 2012 Ill. App. LEXIS 106, 359 Ill. Dec. 26, 2012 IL App (2d) 110273 (2012)*
Post-conviction proceeding at, Remanded by *People v. Starks, 2012 Ill. App. LEXIS 497, 2012 IL App (2d) 110324 (2012)*

**PRIOR HISTORY:** Appeal from the Circuit Court of Lake County. No. 86--CF--106. Honorable Christopher C. Starck, Judge, Presiding.

**DISPOSITION:** Reversed and remanded.

**COUNSEL:** For Bennie Starks, Appellant: Vanessa Potkin, Barry C. Scheck, The Innocence Project, New York, NY; Jack P. Rimland, Law Office of Jack P. Rimland, Chicago, IL.

For People of the State of Illinois, Appellee: Honorable Michael J. Waller, Lake County State's Attorney, Waukegan, IL.; Michael G. Mermel, Assistant State's Attorney Lake County, Waukegan, IL.; Martin P. Moltz, Deputy Director, Joan M. Kripke, State's Attorneys Appellate Prosecutor, Elgin, IL.

**JUDGES:** JUSTICE McLAREN delivered the opinion of the court. BOWMAN and CALLUM, JJ., concur.

**OPINION BY:** McLAREN of the court

**OPINION**

[**209] [*593] JUSTICE McLAREN delivered the opinion of the court:

Defendant, Bennie Starks, appeals from an order of the trial court denying his motion for a new trial on his convictions of one count of aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, pars. 12-14(a)(2), (a)(5) (now *720 ILCS 5/12-14(a)(2), (a)(5)* (West 2004))) and one count of attempted aggravated criminal sexual assault (Ill. [*594] Rev. Stat. 1985, ch. 38, par. 8-4(a) (now *720 ILCS 5/8-4(a)* (West 2004))). On appeal, defendant contends that the trial court erred in denying his motion because new DNA evidence establishes that he was not physically connected to the crimes and, therefore, demonstrates his actual innocence. Defendant also contends that the trial court erred in denying his motion for a new trial because [***2] the State presented false evidence and made untrue or incorrect arguments to the jury which prevented defendant from being able to confront witnesses against him in violation of his due process rights and right to confrontation under the *sixth* and *fourteenth amendments to the United States Constitution* (*U.S. Const., amends. VI, XIV*). For the reasons set forth below, we reverse the denial of the motion, reverse

365 Ill. App. 3d 592, *; 850 N.E.2d 206, **;
2006 Ill. App. LEXIS 232, ***; 302 Ill. Dec. 769

the convictions of aggravated criminal sexual assault and attempted aggravated criminal sexual assault, and remand for a new trial.

In 1986, defendant was convicted of two counts of aggravated criminal sexual assault, one count of attempted aggravated criminal sexual assault, one count of aggravated battery, and one count of unlawful restraint for the attack on a 68-year-old woman. Defendant was sentenced to 60-year concurrent imprisonment terms for the two aggravated criminal sexual assault convictions, along with concurrent lesser sentences for the other convictions. This matter is now before this court for the second time. Other issues were addressed by this court in our decision on direct appeal. *People v. Starks*, No. 2-86-1021 (1988) (unpublished order under *Supreme Court Rule 23*). [***3] The present appeal addresses issues different from those in the prior *Rule 23* order. All facts necessarily related to the issues set forth in this opinion, including those facts relevant to defendant's right to a fair trial and the use of serology in this case, are stated in this opinion. (The other issues previously raised by defendant, with a recitation of all facts necessary to understand that prior ruling, are detailed in *People v. Starks*, No. 2-86-1021.)

During the trial the victim testified that on the night of January 18, 1986, at about 9 p.m., she walked outside her house wearing her bathrobe and underwear to get [**210] some fresh air. When she walked to the corner, she heard a noise and saw defendant come toward her. The victim started to run away but defendant ran toward her, grabbed her neck from behind, threw her down on the grass, and repeatedly punched her all over her face. The victim testified that defendant then pulled her feet-first down to a ravine, hitting her all over her body as she struggled to get up.

The victim also testified that, at the bottom of the ravine, defendant took off the victim's underpants and sexually assaulted her. However, [***4] the victim also testified that, before defendant sexually assaulted [*595] her, defendant did not take off any of her clothing and that defendant did not do anything with her clothing when he sexually assaulted her. In a seemingly further conflicting way, the victim said defendant just took off the victim's underwear and threw it on the ground. Defendant kept hitting her. The victim felt defendant's penis in her vagina three or four times because she kept moving around. The victim testified that, after defendant sexually assaulted her, he put his penis on the victim's cheek and told her three times to "give him pussy," demonstrating the kissing movement he wanted her to do with her mouth. The victim pulled on defendant's penis twice, causing defendant to exclaim "oh." Then defendant left. During the attack, defendant bit the victim on her shoulder and tore off her watch.

Illinois Department of Public Aid worker Blanche Gonzalez testified that she spoke with the victim shortly after the attack. During this conversation, the victim told Gonzalez that she accused defendant of having sexual intercourse with her but that it was not true. The victim told Gonzalez that the reason she told police [***5] that she was sexually assaulted was "because he was going to pay for beating her up." The victim told Gonzalez that "he didn't want to have any--didn't want to rape [her], he wanted oral sex." This prior inconsistent statement of the victim was refuted by the testimony of the State's forensic serologist, Sharon Thomas-Boyd, and attenuated by the court's denial of defendant's ability to question the victim about her sexual relationships and the State's argument that the scientific evidence was unrebutted and established that defendant had intercourse with the victim.

Officer William Genel testified that he arrived at the scene of the crimes after receiving a radio dispatch. The victim was shaking and crying, and she was muddy, with bruises all over her body. The victim was taken to the hospital. At daylight, Genel searched the ravine for evidence and found underwear, a black trench coat, gloves, a scarf, a watch, and a watchband.

As noted, the State's forensic serologist testified that she examined a collection kit, which included saliva, blood, and hair samples from the victim and defendant. Thomas-Boyd also examined the crotch of the victim's underwear and a vaginal swab and smear [***6] obtained from the victim. Thomas-Boyd determined that the victim was a nonsecretor and defendant was a secretor. Thomas-Boyd testified she could not exclude defendant as a possible source of the semen, a fact that was later called into question.

Dentist and forensic odontologist Russell Schneider testified that he examined a large bite mark on the victim's shoulder and compared it to defendant's teeth and X rays of defendant's upper and lower bite. Upon comparing the bite to the photo of the victim's bite-mark bruise [*596] with a point by point system, Schneider opined that it was defendant who bit the victim.

Defendant was found guilty on all counts and sentenced to 60 years' imprisonment (including concurrent sentences for the [**211] various convictions). Count V (unlawful restraint) was vacated by the trial court after the original jury verdict, as being a lesser-included offense of the other charges. However, in this court's referenced *Rule 23* order, *People v. Starks*, No. 2-86-1021 (1988), count II (aggravated criminal sexual assault) was vacated, the sentence for count III (attempted aggravated criminal assault) was reduced to 15 years' imprisonment, and the sentence for count IV

365 Ill. App. 3d 592, *; 850 N.E.2d 206, **;
2006 Ill. App. LEXIS 232, ***; 302 Ill. Dec. 769

[***7] (aggravated battery) was reduced to 5 years' imprisonment. In the process, this court affirmed the convictions on counts I, III, and IV. Although defendant was also found guilty and sentenced for aggravated battery, that conviction is not subject to this appeal.

After defendant's convictions were affirmed on direct appeal, on March 15, 2002, defendant filed a motion seeking a new trial and other relief, based on postconviction DNA tests excluding him as the source of semen that had been found on the victim's underwear and attributed to defendant at trial. On April 19, 2004, the trial court denied defendant's motion.

As a result of defendant's expert's DNA report, defendant's counsel discovered that the 1986 serology test results in this case were contrary to the trial testimony of the State's serologist, Sharon Thomas-Boyd, because the serology results excluded defendant as the donor of semen from the victim's vaginal swab and underwear. Defendant filed a motion for reconsideration based on this serological exclusion and the State's use of the serologist's incorrect and questionable testimony to obtain the criminal convictions. (Defendant submitted the State's serologist affirmatively [***8] knew, or should have known, that the serology test results excluded defendant from being the semen donor in this case.) After considering the evidence admitted at trial, new exhibits submitted in support of defendant's motion, and counsels' arguments, the trial court denied the motion for reconsideration on June 19, 2004. Defendant filed his notice of appeal from that order on June 30, 2004.

The State argues that defendant's appeal must be dismissed because the trial court did not have jurisdiction over defendant's motion for a new trial, and, in the alternative, because the motion was not a proper postconviction petition. Thus, the State argues, the trial court's order is not an appealable order and this court has no jurisdiction to hear this appeal. Because of the reasons that follow, we deny the State's request to dismiss defendant's appeal for lack of jurisdiction.

[*597] Section 116-1 of the Code of Criminal Procedure of 1963 (*725 ILCS 5/116-1* (West 2002)) provides that motions for a new trial must be filed within 30 days following the entry of a verdict or finding of guilty. The time limitation is mandatory and not directory. *People v. Dzielski, 130 Ill. App. 2d 581, 586, 264 N.E.2d 426 (1970)*. [***9] In the present case, there is no dispute defendant filed his "motion for a new trial" many years after he was found guilty in 1986. Therefore, the "motion for a new trial" filed in March 2002 cannot be construed as a timely motion for a new trial since it was filed more than 30 days after the jury's verdict. We agree with the trial court as to the untimeliness of the motion taken as a motion for a new trial.

As defendant seems to acknowledge, to obtain jurisdiction to address the motion, the trial court should have recharacterized the motion as a postconviction petition. The Post-Conviction Hearing Act (Act) provides:

> "A trial court that has received a petition complaining of a conviction or sentence that fails to specify in the petition or its heading that it is filed under [the [**212] Act] need not evaluate the petition to determine whether it could otherwise have stated some grounds for relief under this Article." *725 ILCS 5/122-1(d)* (West 2002).

Even if the court need not do so, by the strongest of implications, the court also may do so. *People v. Shellstrom, 216 Ill. 2d 45, 51, 833 N.E.2d 863, 295 Ill. Dec. 657 (2005)*. The only logical [***10] construction that would preserve the trial court's jurisdiction of defendant's motion following sentencing was to treat the inappropriately captioned motion as a postconviction petition. This construction was supported by the facts that the motion raised constitutional issues and was made after sentencing. See *People v. Washington, 171 Ill. 2d 475, 489, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996)* ("a claim of newly discovered evidence showing a defendant to be actually innocent of the crime for which he was convicted is cognizable as a matter of due process"). Thus, the trial court did not abuse its discretion in impliedly construing defendant's "motion for a new trial" as a petition under the Act. See *Shellstrom, 216 Ill. 2d at 51*. Hereinafter, for consistency, we will refer to defendant's motion as a petition.

Pursuant to *section 116-3 of the Code of Criminal Procedure*, a defendant may bring a motion for DNA testing subsequent to his trial and conviction. *725 ILCS 5/116-3* (West 2002). To be entitled to DNA testing, the defendant must establish a *prima facie* case showing that "identity was a central issue at trial and that the evidence [***11] to be tested was subject to a sufficiently secure chain of custody." *People v. Johnson, 205 Ill. 2d 381, 393, 793 N.E.2d 591, 275 Ill. Dec. 820 (2002)*. The trial court then must determine whether the evidence is new and materially relevant to the defendant's claim of actual innocence. *Johnson, 205 Ill. 2d at 393*. [*598] After undertaking its evaluation, if the trial court determines that testing is appropriate, it should order same. See *Johnson, 205 Ill. 2d at 393*.

365 Ill. App. 3d 592, *; 850 N.E.2d 206, **;
2006 Ill. App. LEXIS 232, ***; 302 Ill. Dec. 769

If DNA evidence is truly exculpatory, a defendant's conviction should be vacated and the defendant should be released, or some other similar resolution should be had. If the results are neither truly exculpatory nor inculpatory, *i.e.*, they are somewhere in-between or are a nonmatch, which is the situation in the instant case, this may provide a basis for a defendant to file a postconviction petition asserting a claim of actual innocence based on newly discovered evidence. *People v. Dodds, 344 Ill. App. 3d 513, 519, 801 N.E.2d 63, 279 Ill. Dec. 771 (2003)*. In order to support a claim of actual innocence in a petition for postconviction relief, a defendant must present new, noncumulative [***12] evidence material to the claim that could not have been obtained through due diligence at the time of trial. *People v. Henderson, 343 Ill. App. 3d 1108, 1120, 799 N.E.2d 682, 278 Ill. Dec. 817 (2003)*. Such evidence of actual innocence has to be "so conclusive that it would probably change the result on retrial." *Henderson, 343 Ill. App. 3d at 1120*.

There are three stages of review provided for under the Act. *725 ILCS 5/122-1 et seq.* (West 2002). At the first stage, the trial court may dismiss, without any input from the State, the defendant's postconviction petition as frivolous or patently without merit. *People v. Boclair, 202 Ill. 2d 89, 99, 789 N.E.2d 734, 273 Ill. Dec. 560 (2002)*. If a petition proceeds to the second stage, the trial court may appoint counsel for the defendant, who then has an opportunity to amend the petition. *Boclair, 202 Ill. 2d at 100*. If the State fails to [**213] file a motion to dismiss, or the trial court denies same, and the trial court concludes that the petition is supported by the trial record and any accompanying affidavits and makes a substantial showing of a constitutional violation, [***13] the petition proceeds to the third stage at which time the trial court conducts an evidentiary hearing on the merits. *Johnson, 205 Ill. 2d at 389*. At the third stage, the trial court must determine whether the new evidence demonstrates that the defendant is entitled to relief. *Dodds, 344 Ill. App. 3d at 520*.

Accordingly, the trial court should have determined whether the nonmatch DNA evidence is so conclusive that it would probably change the outcome on retrial. See *Dodds, 344 Ill. App. 3d at 520*. Dismissal of a postconviction petition following an evidentiary hearing is reviewed for manifest error. *People v. Pitsonbarger, 205 Ill. 2d 444, 456, 793 N.E.2d 609, 275 Ill. Dec. 838 (2002)*. "Manifest error" is error that is clearly evident, plain, and indisputable, for purposes of our review of the trial court's judgment on a postconviction petition. *People v. Morgan, 212 Ill. 2d 148, 155, 817 N.E.2d 524, 288 Ill. Dec. 166 (2004)*. We discern such error here.

Defendant contends that the trial court erred in dismissing his [*599] postconviction petition because new DNA evidence demonstrates that the result upon a retrial would be different. [***14] In this regard, defendant argues that, at trial, the State relied heavily upon the semen evidence but, now, it maintains that the semen evidence was only of minor importance. Ultimately, defendant maintains that the evidence at his trial was closely balanced, as demonstrated by the State's reliance on the semen evidence and the fact that there was no other evidence proving aggravated or attempted aggravated criminal sexual assault by defendant except for the victim's testimony, which was impeached with a prior inconsistent statement that she fabricated the allegation of rape. Moreover, defendant has now presented evidence which demonstrates that the State's expert witness presented serology evidence which was untruthful or inaccurate. According to defendant, had the jury heard that the semen on the victim's underpants was not that of defendant, the result of his trial would have been different. Thus, defendant maintains that the trial court erred in dismissing his postconviction petition.

The State contends that simply because defendant's semen was not on the victim's underwear does not exonerate him of the crimes. The State argues that the new DNA evidence does not exculpate defendant [***15] because his convictions were not dependent solely upon the semen evidence. Rather, the State maintains that it merely argued at trial that the presence of defendant's semen was one of the indications of his guilt. The State reiterates that it did not rely solely upon the semen evidence to convict defendant. For example, there was evidence that a bite mark on the victim matched defendant's dental records, defendant's overcoat was at the scene of the crimes, defendant had scratch marks that matched marks the victim described inflicting, and the victim identified defendant as her attacker. According to the State, even without the semen evidence, the evidence against defendant was overwhelming.

The determining factor is whether the DNA results in this case go to the ultimate issue: whether defendant actually sexually assaulted the victim, or whether he was wrongfully accused by the victim. See *People v. Waters, 328 Ill. App. 3d 117, 128, 764 N.E.2d 1194, 262 Ill. Dec. 77 (2002)*.

[**214] We find that the DNA results do, indeed, go to the ultimate issue. The victim's impeaching prior inconsistent statement that she was not sexually assaulted, coupled with the State's own expert's incorrect testimony [***16] regarding the serology results, cast serious doubt as to whether defendant committed aggravated or attempted aggravated criminal sexual assault. The DNA results as presented are probative of a factual situation that is so different from the victim's testimony that it resulted in a finding by the trial court which was manifest error and the outcome on retrial would probably be changed.

365 Ill. App. 3d 592, *; 850 N.E.2d 206, **;
2006 Ill. App. LEXIS 232, ***; 302 Ill. Dec. 769

[*600] Defendant also argues in his petition that his case was damaged by the State's unconstitutional and inappropriate use of the rape shield statute. Defendant argues that the use of the rape shield statute offended his due process rights and right to confrontation under the *sixth* and *fourteenth amendments to the United States Constitution* (*U.S. Const., amends. VI, XIV*). The rape shield statute absolutely bars evidence of the alleged victim's prior sexual activity and reputation, subject to two exceptions: (1) evidence of past sexual activities with the accused, offered as evidence of consent; and (2) where the admission of such evidence is constitutionally required. *People v. Santos, 211 Ill. 2d 395, 401-02, 813 N.E.2d 159, 286 Ill. Dec. 102 (2004)*. Admission of such evidence is constitutionally required [***17] under the recited amendments to the constitution where the exclusion of the evidence prevents the defendant from presenting his theory of the case. See *People v. Sandoval, 135 Ill. 2d 159, 175, 552 N.E.2d 726, 142 Ill. Dec. 135 (1990)*. In other words, "if the evidence is probative, the statute's protection yields to constitutional rights that assure a full and fair defense." *People v. Hill, 289 Ill. App. 3d 859, 863, 683 N.E.2d 188, 225 Ill. Dec. 244 (1997)*.

The State argues that the semen found on the victim's underwear was not materially relevant to defendant's claim of innocence and would not have advanced his cause at the time of trial. We disagree.

The State used the rape shield statute to bar testimony on defendant's behalf despite the combination of the victim's impeachment by her admission she had not been sexually assaulted and the untruthful or incorrect testimony of the State's own expert regarding the serology results. In effect, the State has improperly turned the rape shield statute on its head and made it a sword to thwart defendant's constitutional rights of confrontation (rather than a shield to protect the victim's past sexual history). If defendant had been [***18] allowed to present evidence to the jury that the serology evidence excluded him and to present evidence of other possible sperm donors, the result of the trial likely would have been different. We determine that the serology results as they pertained to defendant, the use of incorrect expert testimony, the impeachment of the victim, and the preclusion of a defense by the offensive use of the rape shield statute, resulted in the denial of defendant's constitutional rights so as to be more than an adequate basis to reverse the trial court's dismissal of defendant's postconviction petition for a new trial.

Defendant also argues on appeal that the dismissal of his postconviction petition should be reversed as a result of the ineffective assistance of counsel. Having determined that the actions of the State were so compellingly contrary to defendant's constitutional rights so as to reverse the trial court's ruling on defendant's postconviction petition, we find the argument pertaining to the ineffective assistance of counsel to be moot.

[*601] The award of a new trial in this case is necessary, based upon the noncumulative [**215] evidence of the DNA test results and the probability of a different [***19] result upon retrial because of this evidence. During the first trial, the jury was incorrectly advised that the seminal fluid found on the victim's underwear and in the victim's vaginal fluid could not be excluded as being defendant's. Therefore, the jury was provided incorrect testimony by the State's own expert witness regarding the serology results as they related to defendant. The jury was not advised, as a jury now can be, that defendant could not have been the source of that semen. Defendant can now exercise his constitutional right to confront all witnesses. New DNA evidence would now be available to defendant at a new trial pursuant to section 116-3 (*725 ILCS 5/116-3* (West 2004)) as well.

Because it was manifest error for the trial court to dismiss defendant's petition and deny him a new trial, we reverse the dismissal of defendant's postconviction petition and order that he be given a new trial on the charges of aggravated criminal sexual assault and attempted aggravated criminal sexual assault. Only by granting defendant a new trial, under these circumstances, can we be assured that the interests of justice will prevail.

The judgment of the [***20] circuit court of Lake County is reversed, the convictions of aggravated criminal sexual assault and attempted aggravated criminal sexual assault are reversed, and the case is remanded for a new trial.

Reversed and remanded.

# Exhibit 33



**THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BENNIE
STARKS, Defendant-Appellant.**

**No. 2-11-0324**

**APPELLATE COURT OF ILLINOIS, SECOND DISTRICT**

*2012 Ill. App. LEXIS 497; 2012 IL App (2d) 110324*

**June 20, 2012, Opinion Filed**

**PRIOR HISTORY:** [*1]
   Appeal from the Circuit Court of Lake County. No. 86-CF-106. Honorable John T. Phillips, Judge, Presiding.
*People v. Starks, 365 Ill. App. 3d 592, 850 N.E.2d 206, 2006 Ill. App. LEXIS 232, 302 Ill. Dec. 769 (Ill. App. Ct. 2d
Dist., 2006)*

**DISPOSITION:**   Reversed and remanded.

**JUDGES:** JUSTICE McLAREN delivered the judgment of the court, with opinion. Presiding Justice Jorgensen and
Justice Schostok concurred in the judgment and opinion.

**OPINION BY:** McLAREN

**OPINION**

   [**P1]  Defendant, Bennie Starks, appeals from the trial court's dismissal of petitions he filed under the Post-
Conviction Hearing Act (the Act) (*725 ILCS 5/122-1 et seq.* (West 2010)). In his petitions, defendant alleged his actual
innocence of aggravated battery of which he was convicted in 1986. On appeal, defendant argues that the trial court
erred by: (1) dismissing his 2006 petition for lack of standing; and (2) holding that defendant needed leave to file his
2006 petition and his 2007 supplemental petition. We reverse and remand.

   [**P2]  I. BACKGROUND

   [**P3]  In 1986, after a jury trial defendant was convicted of two counts of aggravated criminal sexual assault (Ill.
Rev. Stat. 1985, ch. 38, ¶ 12-14(a)(2), (a)(5) (now *720 ILCS 5/12-14(a)(2), (a)(5)* (West 2010))), one count of attempted
aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, ¶ 8-4(a) (now *720 ILCS 5/8-4(a)* (West 2010))), one
count of aggravated  [*2] battery (Ill. Rev. Stat. 1985, ch. 38, ¶ 12-4(b)(10) (now *720 ILCS 5/12-3.05(d)(1)* (West
2010))), and one count of unlawful restraint (Ill. Rev. Stat. 1985, ch. 38, ¶ 10-3) (now *720 ILCS 5/10-3* (West 2010))),
for the attack of complainant, a 68-year-old woman. The trial court vacated the unlawful restraint conviction and
imposed concurrent extended terms of 60 years' imprisonment for the two aggravated criminal sexual assault
convictions, 30 years' imprisonment for attempted aggravated criminal sexual assault, and 10 years' imprisonment for
aggravated battery.

   [**P4]  This matter is before this court for the fourth time. Other issues were addressed by this court in our
decision on direct appeal in *People v. Starks (Starks I)*, No. 2-86-1021 (1988) (unpublished order under *Supreme Court
Rule 23*). In the second appeal, we reversed the trial court's dismissal of defendant's 2002 postconviction petition and
remanded the case for a new trial. *People v. Starks (Starks II), 365 Ill. App. 3d 592, 601, 850 N.E.2d 206, 302 Ill. Dec.
769 (2006)*. In the third appeal, we affirmed the trial court's granting of defendant's motion *in limine* to exclude the prior

testimony of the now-deceased complainant on retrial. *People v. Starks (Starks III), 966 N.E.2d 347, 359 Ill. Dec. 26, 2012 IL App (2d) 110273, ¶ 16.* [*3] We will provide only those facts necessary for an understanding of the issues raised on appeal. Further, we will provide factual details as necessary in the analysis portion of this opinion.

[**P5] The indictment for aggravated battery alleged, in pertinent part, that "defendant *** caused bodily harm to [complainant], a person over the age of sixty (60) years, in that he choked her, hit her in the face, knocked her to the ground, and bit her."

[**P6] During the trial, complainant testified that on the evening of January 18, 1986, defendant grabbed her neck, threw her to the ground, repeatedly punched her face, and pulled her, feet first, down a ravine, hitting her and over her body and biting her on the shoulder. At the bottom of the ravine, defendant took off complainant's underpants and put his penis in her vagina. Complainant testified that she believed that defendant ejaculated in her.

[**P7] The State's forensic serologist, Sharon Thomas-Boyd, testified that test results indicated the presence of semen on the underpants that complainant wore during the alleged incident. Further, semen was present on the vaginal swab collected from complainant. Thomas-Boyd testified that, based on samples collected [*4] from defendant, she could not exclude him as a source of the semen.

[**P8] Dentist and forensic odontologist Russell Schneider testified that he examined a large bite mark on complainant's shoulder and compared it to photos, X rays, and a model of defendant's teeth and bite. After comparing defendant's bite to the photo of the bite mark on complainant's shoulder, Schneider opined that defendant bit complainant.

[**P9] During closing argument the prosecutor argued that defendant was the man who raped, beat, and bit complainant. The prosecutor stated the following.

"Now, the evidence clearly has shown that on January 18, 1986, [defendant] brutally beat and raped [complainant]."

"[T]he defendant wanted to subject [complainant] to the most brutal and senseless beating and raping he could."

"There is no doubt the [complainant] was brutally beaten that night. Now, who caused these injuries to [complainant]? Who put [her] through this hellish nightmare, this torture and pain? It was defendant, Bennie Starks. This man, on January 18th, 1986, for some reason, beat and raped [her]."

"[W]e have [complainant], when asked to identify the person who raped [her] *** walked over to the defendant *** saying, 'This is [*5] the person who raped and beat me.'"

The prosecutor used the now-discredited scientific evidence to argue that defendant was guilty of all charges, stating:

"I ask you to look at that evidence. *** All that points to the defendant, that he was there, that he raped [complainant], and beat her. And then you have scientific evidence, the conclusion is the same. The defendant was there, he inflicted that bite mark, that semen was his. He was there, and on that night, he raped and beat [her]. Based on that evidence, I would ask that you find the defendant guilty of all charges."

[**P10] On appeal, in *Starks I*, this court vacated the conviction of and sentence for one count of aggravated criminal sexual assault. Further, we reduced defendant's sentences for attempted aggravated criminal sexual assault to 15 years and for aggravated battery to 5 years. *Starks I*, slip order at 26.

[**P11] On March 1, 2006, while defendant's appeal in *Starks II, 365 Ill. App. 3d 592, 850 N.E.2d 206, 302 Ill. Dec. 769,* was still pending, he filed another postconviction petition asserting his innocence based on new evidence. The new evidence consisted of DNA test results taken from complainant's vaginal swab, which excluded defendant as the source of the semen. [*6] Defendant also sought "access to the bite mark evidence, the trial exhibits, which are currently being stored with the Clerk of Court for an independent examination." Defendant cited studies calling the reliability of bite mark comparison evidence into question. Defendant requested "that his convictions be vacated" and that he be allowed to amend his petition in the event this court remanded the cause then on appeal.

2012 Ill. App. LEXIS 497, *; 2012 IL App (2d) 110324, **

[**P12] During two status calls before Judge Starck, defendant's counsel reminded the court that it had taken the petition under advisement and had set May 17, 2006, as a status date. Judge Starck expressed concern that the issues in defendant's petition might be moot based upon this court's pending ruling. On May 30, 2006, 90 days after defendant filed his 2006 petition, Judge Starck declined to rule on it, stating, "If I don't rule on it, then we automatically go to the second stage." Judge Starck also stated:

> "Part of my feeling is too that while your post-conviction petition attempted to address a number of counts, some of it may be moot regardless because of the Appellate Court reversal of part of the case, a large part of the case. So[,] I'm not sure that I would be inclined [*7] to rule on it anyway. But[,] nonetheless[,] I will not issue a ruling today. Whether it's within 90 days or not, I will not be issuing a ruling today on the case."

[**P13] On March 23, 2006, this court filed *Starks II, 365 Ill. App. 3d 592, 850 N.E.2d 206, 302 Ill. Dec. 769*. In *Starks II*, we considered the trial court's dismissal of defendant's 2002 postconviction petition seeking a new trial based on DNA tests that excluded him as the source of the semen obtained from complainant's vaginal swab and underwear. *Id. at 596*. Based on the DNA tests, the 1986 serology test results were contrary to the trial testimony of Thomas-Boyd; the serology results actually excluded defendant as the source of the semen. *Id*. We held that a new trial was required on the aggravated criminal sexual assault and attempted aggravated criminal sexual assault charges, due to the DNA results excluding defendant as the source of the semen, Thomas-Boyd's incorrect testimony, and the improper use of the rape shield statute. *Id. at 599, 600*. We stated that defendant's conviction of aggravated battery was "not subject to this appeal." *Id. at 596*.

[**P14] On October 4, 2006, defendant was released on appeal bond. The Illinois Supreme Court denied the State's petition [*8] for leave to appeal on November 29, 2006. See *People v. Starks, 222 Ill. 2d 595, 861 N.E.2d 662, 308 Ill. Dec. 331 (2006)* (table). On January 17, 2007, this court remanded the matter to the trial court for a new trial.

[**P15] On January 26, 2007, defendant filed in open court a supplemental petition to his 2006 petition. Defendant stated that, because his "convictions for aggravated criminal sexual assault and attempt aggravated criminal sexual assault have been vacated, he now seeks vacatur and a new trial on his only remaining sentence, aggravated battery." Defendant argued that the following established his actual innocence of aggravated battery: complainant's testimony that she was raped and beaten by a single man and that she had not engaged in consensual intercourse for weeks prior to the attack; and defendant's exclusion as the source of the semen. Defendant essentially alleged that, had the jury heard that he could not have been the source of the semen instead of hearing the now-discredited evidence that he was most likely the source of the semen, the outcome of the trial would probably have been different on the aggravated battery charge. Defendant also sought access to the bite mark evidence to support his claim [*9] of actual innocence and establish his claim of ineffective assistance of counsel.

[**P16] On October 9, 2007, Judge Starck reassigned the case to Judge Phillips. However, the case was set for retrial on the charges subject to *Starks II*. Prior to retrial, defendant filed a motion *in limine* to exclude the prior testimony of the now-deceased complainant. *Starks III, 966 N.E.2d 347, 359 Ill. Dec. 26, 2012 IL App (2d) 110273, ¶ 16*. On January 5, 2011, Judge Phillips granted defendant's motion *in limine*.[1]

> 1  On February 14, 2012, we affirmed the trial court's granting of defendant's motion. *Id*. ¶

[**P17] On the same day, Judge Phillips dismissed defendant's 2006 petition and 2007 supplemental petition, stating:

> "Defendant's claim in his memorandum that because Judge Starck did not take action on the 2006 document within the 'statutory 90-day window' the petition has advanced to the second stage is both incorrect in law and fact."

Judge Phillips determined that defendant failed to seek leave of court to file successive postconviction petitions under *section 122-1(f)* of the Act. Judge Phillips stated:

> "[D]efendant was required to obtain leave of Court to file his successive post-conviction petitions; that leave was never granted to do so by either [*10] Judge Starck or me; and that no implied leave to file the petitions or waiver of the requirement by action or inaction has taken place."

2012 Ill. App. LEXIS 497, *; 2012 IL App (2d) 110324, **

Judge Phillips also determined that defendant did not have standing under the Act, because he had completed his sentence for his aggravated battery conviction. Judge Phillips stated:

"And particularly I would note that as to [defendant's] conviction of aggravated battery, the defendant's liberty is not restrained in any way. His sentence on this charge was served and completed more than 19 years ago. Defendant was not serving consecutive sentences; he was serving concurrent sentences.

So the exception that the Illinois Supreme Court discussed in *Carrera* which arose in *People versus Pack* doesn't assist the defendant in his argument for standing here.

I therefore find that [defendant] does not have standing to pursue post-conviction relief as to the 1986 conviction for aggravated battery, that he has completed the sentence on this conviction, and is precluded from using the Post-Conviction Act's provisions to purge this criminal record."

[**P18] Defendant filed a motion to reconsider on February 4, 2011, which the trial court denied on March 1, 2011. Defendant [*11] filed his notice of appeal on March 29, 2011.

[**P19] II. ANALYSIS

[**P20] Defendant argues that the trial court erred when it dismissed his 2006 postconviction petition for lack of standing. The record indicates that Judge Phillips raised *sua sponte* the issue of standing, after first determining that defendant's 2006 petition had not advanced to the second stage. To determine whether Judge Phillips had the power to dismiss *sua sponte* defendant's 2006 petition, based on lack of standing, we must first determine whether he dismissed defendant's petition at the first or the second stage.

[**P21] The Act provides a three-stage process for the adjudication of postconviction petitions. *People v. Pendleton, 223 Ill. 2d 458, 471-72, 861 N.E.2d 999, 308 Ill. Dec. 434 (2006)*. At the first stage, after a petition for postconviction relief has been filed, the trial court has 90 days to review the petition to determine if it is frivolous or patently without merit. *725 ILCS 5/122-2.1(a)(2)* (West 2010). If the petition is not dismissed within 90 days, then the petition moves on to stage two of the postconviction proceeding. *725 ILCS 5/122-2.1(b)* (West 2010). Further, if the initial 90-day period passes without the trial court examining the petition, "the [*12] petition must proceed to the second stage." *People v. Harris, 224 Ill. 2d 115, 130, 862 N.E.2d 960, 308 Ill. Dec. 757 (2007)*.

[**P22] In this case, it is undisputed that the 90-day period had passed. Judge Starck acknowledged this when, on May 30, 2006, 90 days after defendant filed his 2006 petition, he stated:

"If I don't rule on it, then we automatically go to the second stage. *** But[,] nonetheless[,] I will not issue a ruling today. Whether it's within 90 days or not, I will not be issuing a ruling today on the case."

Judge Phillips dismissed defendant's 2006 petition on January 5, 2011. Thus, there is no doubt that the initial 90-day period passed without the trial court examining defendant's petition. Accordingly, Judge Phillips dismissed defendant's 2006 petition during the second stage of the postconviction proceedings.

[**P23] The trial court's power to dismiss a postconviction petition *sua sponte* on the basis that the petition is frivolous or patently without merit must be exercised during the first stage, within 90 days after the filing of the petition. See *725 ILCS 5/122-2.1(a)(2)*, *(b)* (West 2010). After that, the trial court can no longer dismiss the petition *sua sponte*. *People v. Greer, 341 Ill. App. 3d 906, 910, 793 N.E.2d 217, 275 Ill. Dec. 737 (2003)*. [*13] Instead, the proceeding moves on to the second stage where the court may rule only upon the State's answer or motion to dismiss. See *725 ILCS 5/122-5* (West 2010); *Greer, 341 Ill. App. 3d at 910*.

[**P24] In this case, when the 90 days had passed, the trial court lost its power to dismiss *sua sponte* defendant's 2006 petition for lack of standing. See *id. at 910*; see also *People v. Steward, 406 Ill. App. 3d 82, 90, 940 N.E.2d 140, 346 Ill. Dec. 140 (2010)* (lack of standing is proper basis for dismissal at the first stage of postconviction proceeding). Further, the State did not file a motion to dismiss for the court to grant. Therefore, the trial court committed reversible error by dismissing defendant's 2006 petition. See *People v. Kitchen, 189 Ill. 2d 424, 434-35, 727 N.E.2d 189, 244 Ill. Dec. 890 (1999)* (holding it was error for trial court to dismiss defendant's postconviction petition where the only issue

2012 Ill. App. LEXIS 497, *; 2012 IL App (2d) 110324, **

before it was the breadth and necessity of discovery requests and the State had not filed a motion to dismiss); see also *Greer, 341 Ill. App. 3d at 910*.[2]

2  We are aware of a recent split of authority regarding standing as evidenced by *People v. Henderson, 961 N.E.2d 407, 356 Ill. Dec. 311, 2011 IL App (1st) 90923, 2011 IL App (1st) 090923*, and *People v. Jones, 2012 IL App (1st) 93180*. However, because the issue of [*14] standing is no longer a viable issue in this appeal, we need not address it further.

[**P25]  Next, defendant argues that the trial court erred by holding that he needed leave to file his 2006 petition and his 2007 supplemental petition. Generally, the Act requires a defendant to obtain leave of court to file a successive postconviction petition. *725 ILCS 5/122-1(f)* (West 2010). *Section 122-1(f)* provides, in part:

"Only one petition may be filed by a petitioner under this Article without leave of the court. Leave of court may be granted only if a petitioner demonstrates *cause* for his or her failure to bring the claim in his or her initial post-conviction proceedings and *prejudice* results from that failure." (Emphases added.) *Id.*

However, a defendant is excused from showing cause and prejudice if his successive petition sets forth a claim of actual innocence. *People v. Ortiz, 235 Ill. 2d 319, 330, 919 N.E.2d 941, 336 Ill. Dec. 16 (2009)*. "[T]he *due process clause of the Illinois Constitution* affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence." *Id. at 331*. A defendant must support his claim of actual innocence with evidence that is: newly discovered; [*15] material and not merely cumulative; and of such a conclusive nature that it would probably change the result on retrial. *Id. at 333*.

[**P26]  In this case, defendant's 2006 petition was supported with the newly discovered DNA test results excluding defendant as the source of the semen found on complainant's vaginal swab contained in the rape kit. The vaginal swab was not located until May 2004 and defendant did not receive the DNA test results until December 14, 2005. Therefore, the evidence is newly discovered.

[**P27]  In addition, the evidence is material because it excludes defendant as the source of the semen taken from complainant's vagina after the alleged rape. Further, the evidence is not cumulative. Evidence is cumulative when it adds nothing to what was previously before the jury. *Id. at 335*. The original postconviction DNA test excluded defendant as the source of the semen found on complainant's underwear. The new DNA test excluded defendant as the source of the semen found in complainant's vagina. The new DNA evidence thus is different from the prior DNA evidence and was not previously before the jury. Therefore, it is not cumulative.

[**P28]  In addition, the evidence is of such a conclusive nature [*16] that it would probably change the result on retrial. The State argues that there are uncontroverted facts that demonstrate that defendant was guilty of aggravated battery. The State notes the following evidence. Complainant identified defendant in a photographic lineup, shortly after the alleged attack. Complainant testified that she scratched defendant during the attack and defendant had scratch marks on him. Complainant testified that defendant bit her on the shoulder and Schneider found 62 similar characteristics between the bite mark on her and an impression taken of defendant's mouth. Some of defendant's items were recovered at the scene of the alleged attack. However, when these facts are considered in light of the new DNA evidence, it is probable that the result would change on retrial.

[**P29]  At trial, complainant alleged that she was attacked by a single person; one man who beat, bit, and raped her. The jury heard testimony that the semen found in complainant's vagina was scientifically linked to defendant. This evidence provided strong corroboration for the other evidence presented by the State. However, defendant maintained that he was robbed of his belongings the night of the [*17] attack. He has always maintained his innocence. Further, the bite mark evidence has been discredited by a report by two odontologists who examined it. The report states that the method used by the State's forensic odontologists in 1986 has since been rejected by its own creators. The report also states that the State's odontologists misapplied the methodology and used flawed preservation and photography techniques. Accordingly, we determine that the new DNA and bite mark evidence is of such a conclusive nature that it would probably change the result on retrial. Thus, defendant did not require leave to file his 2006 petition or his 2007 supplemental petition. Therefore, we reverse and remand.

[**P30]  Regarding the procedure to be followed on remand, in this case the trial court did not determine defendant's 2007 supplemental petition to be frivolous or patently without merit within 90 days, because it erroneously concluded that the petition was subject to *section 122-1(f)*. Thus, the 2007 supplemental petition was at the second stage when it was dismissed.[3] See *People v. Inman, 407 Ill. App. 3d 1156, 1163, 947 N.E.2d 319, 349 Ill. Dec. 682 (2011)*.

3   We note that the State failed to move to dismiss either the 2006 petition or the  [*18] 2007 supplemental petition pursuant to *section 122-2.1(b)*.

[**P31] At the second stage, the relevant inquiry is whether the petition establishes a substantial showing of a constitutional violation. *People v. Harris, 224 Ill. 2d 115, 126, 862 N.E.2d 960, 308 Ill. Dec. 757 (2007)*. A freestanding claim of actual innocence is cognizable under the Act because a wrongful conviction of an innocent person violates due process under the Illinois Constitution. *People v. Washington, 171 Ill. 2d 475, 489, 665 N.E.2d 1330, 216 Ill. Dec. 773 (1996)*. Thus, here, the relevant inquiry is whether defendant has made a substantial showing of actual innocence such that a third-stage evidentiary hearing is warranted. *People v. Lofton, 954 N.E.2d 821, 352 Ill. Dec. 738, 2011 IL App (1st) 100118, ¶ 34*.

[**P32] Our review of the dismissal of a petition at the second stage of postconviction proceedings is *de novo*. *People v. Kirkpatrick, 2012 IL App (2d) 100898, ¶ 13*. Further, all well-pleaded facts that are not positively rebutted by the trial record are taken as true. *People v. Pendleton, 223 Ill. 2d 458, 473, 861 N.E.2d 999, 308 Ill. Dec. 434 (2006)*. After reviewing defendant's 2007 supplemental petition, which incorporated his 2006 petition, we have determined that it made a substantial showing of actual innocence. The evidence upon which his actual innocence  [*19] claim was based was newly discovered, material, and not merely cumulative, and the evidence was likely to change the result on retrial. *Lofton, 954 N.E.2d 821, 352 Ill. Dec. 738, 2011 IL App (1st) 100118, ¶ 37*. Therefore, in the interest of judicial economy, we remand this case for a third-stage evidentiary hearing. See *Ill. S. Ct. R. 366(a)(5)* (eff. Feb. 1, 1994); *People v. Quigley, 183 Ill. 2d 1, 13, 697 N.E.2d 735, 231 Ill. Dec. 950 (1998)*.

[**P33] III. CONCLUSION

[**P34] The judgment of the circuit court of Lake County is reversed and the cause is remanded for further proceedings.

[**P35] Reversed and remanded.

# Exhibit 34

STATE OF ILLINOIS     )
                          )SS
COUNTY OF LAKE     )

### IN THE CIRCUIT COURT OF THE NINETEENTH
### JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS

PEOPLE OF THE STATE OF ILLINOIS     )
                                )
      vs.                       )    General No.    *8LCF 106*
Bennie Starks              )            *Cts 1,2,3*
                                  )

### ORDER

**ON MOTION OF THE STATE'S ATTORNEY,** Attorney for the People of the State of Illinois; leave given the State's Attorney to Nolle Prosequi the above entitled cause;

Cause Nolle Prossed, defendant discharged;

Surety on the bond released.

Dated at Waukegan, Illinois, this _15_ day of _May_____, A.D., 20 _12_

                            ENTERED: _John T Phillips_
                                              Judge

☐    Pursuant to a hearing held in this matter, a Public Defender Fee in the amount of $_____ is hereby ordered.

☐    Pursuant to a hearing held in this matter, it has been determined that no Public Defender Fee shall be assessed.

                                          171-335 Rev 2/06

Exhibit 35

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

People

vs.

Starks

)
)
)
)
)
)

Case No. _86 CF 106_

### ORDER

This cause coming before the court on a post conviction petition reply by count III or chooses not to proceed on PCP

The State agrees that post conviction relief shall be GRANTED;

As requested by defense and agreement by state the conviction is VACATED; of as granted before

Charge is reinstated;

State moves to nolle and DISMISS the charge;

On state's motion the reinstated charge is DISMISSED;

Bennie Starks is RELEASED &
DISCHARGED from bond.

ENTER: _____

_____
JUDGE

Dated this _7_ day of _Jan_, 20_13_

Prepared by:
Attorney's Name: _Jed Stone_

Address: _____

City: _____ State: _____

Phone: _____ Zip Code: _____

Fax: _____

ARDC: _____

F I L E D

JAN 0 7 2013

Keith Brin
CIRCUIT CLERK

171-94 (Rev. 10/11)

# Exhibit 36

STATE OF ILLINOIS     )
                            ) ss

COUNTY OF LAKE     )

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS,   )
                                )
         VS.                   )   No. 86 CF 106
                                )

BENNIE STARKS             )

**F I L E D**

SEP 2 5 2013

*Keith Brin*
CIRCUIT CLERK

## ORDER GRANTING A CERTIFCATE OF INNOCENCE

This matter coming to be heard on Petitioner's Petition for a Certificate of Innocence, pursuant to 735 ILCS 5/2-702, the Petitioner being present and represented by his attorney, John L. Stainthorp, and the Attorney General and the State's Attorney of Lake County having refused to intervene as parties, the Court being fully advised finds by a preponderance of the evidence that:

1.    The Petitioner was innocent of all offenses for which he was incarcerated on in this captioned case.

2.    The Petitioner is entitled to a judgment on the pleading and is therefore granted a Certificate of Innocence.

IT IS THEREFORE ORDERED:

The Clerk of the Circuit Court shall transmit a copy of this Certificate of Innocence to the clerk of the Court of Claims, together with the claimant's current address: Bennie Starks, c/o John L. Stainthorp, Joey Mogul, G. Flint Taylor, People's Law Office, 1180 N. Milwaukee Ave., Chicago, Illinois 60642.

. The arresting authority shall expunge or seal the record of arrest from the official records of the arresting authority; and the records of the Clerk of the Circuit Court and Department of State Police shall be sealed until further order of the court upon good cause shown or as otherwise provided herein, and the name of the defendant obliterated from the official index requested to be kept by the Circuit Court Clerk under Section 16 of the Clerks of Courts Act in connection with the arrest and conviction for the offense but the order shall not affect any index issued by the Circuit Court Clerk before the entry of the order.

Dated at Waukegan, Illinois this
25th  day of September ,   2013

ENTER:

*George Bridge*
Judge

1

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY

## CERTIFIED COPY

I, KEITH BRIN, Clerk of the Circuit Court of the NINETEENTH JUDICIAL
CIRCUIT, LAKE COUNTY, in and for the State of Illinois, and the keeper of the records, files
and seals thereof, do hereby certify the above and foregoing to be a true, perfect and complete
copy of a certain _____ ORDER GRANTING A CERTIFICATE OF INNOCENCE _____

_____ , case number _____ 86 CF 106 _____

filed in my office on _____ SEPTEMBER 25 _____ , _____ 2013 _____ in a

certain cause _____ NO LONGER _____ pending in said Court,
              now/no longer

PEOPLE OF THE STATE
_____ Plaintiff and
BENNIE STARKS
_____ Defendant.

IN WITNESS WHEREOF, I have hereunto set my hand, and

Affixed the seal of said Court, at Waukegan, Illinois

_____ OCTOBER 11 _____ , 20 _____ 13 _____

_____
                Keith Brin
        Clerk of the Circuit Court

By: _____
                Deputy Clerk

171-17A  Rev 3/05