UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BENNIE STARKS, | ) | |
| | ) | |
| Plaintiff, | ) | 09 C 348 |
| | ) | |
| vs. | ) | Judge Feinerman |
| | ) | |
| CITY OF WAUKEGAN, WILLIAM BIANG, ARTIS | ) | |
| YANCEY, as Special Representative of Deceased | ) | |
| Defendant MIGUEL JUAREZ, DAVID DEPREZ, CARL | ) | |
| HAGSTROM, RUSSELL SCHNEIDER, SHARON | ) | |
| THOMAS-BOYD, and NORTHEASTERN ILLINOIS | ) | |
| REGIONAL CRIME LABORATORY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| SHARON THOMAS-BOYD, | ) | |
| | ) | |
| Cross-Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CITY OF WAUKEGAN and NORTHEASTERN | ) | |
| ILLINOIS REGIONAL CRIME LABORATORY, | ) | |
| | ) | |
| Cross-Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Bennie Starks spent twenty years in prison for a 1986 rape and assault that he says he did not commit. In this suit, Starks alleges that Waukegan police officers William Biang, David Deprez, and Miguel Juarez (collectively, with the City of Waukegan, "Waukegan Defendants"), dentists Russell Schneider and Carl Hagstrom (together, "Dentist Defendants"), and forensic serologist Sharon Thomas-Boyd conspired to and did violate his federal due process rights in connection with his criminal prosecution, and that they conspired to and did maliciously prosecute and intentionally inflict emotional distress on him in violation of Illinois common law.

1

Doc. 259. Starks also alleges that the City of Waukegan and the Northeastern Illinois Regional Crime Laboratory ("NIRCL"), Thomas-Boyd's employer, are responsible under both the common law and the Illinois Tort Immunity Act, 745 ILCS 10/9-102, for paying any judgments that he might obtain against the individual defendants; Thomas-Boyd has filed a cross-claim to similar effect against both entities. Docs. 230, 259. A three-week jury trial is set to commence on August 17, 2015. Docs. 338, 397.

Everyone except Starks has moved for summary judgment. Docs. 309, 312, 316, 319, 325, 329. Thomas-Boyd also has moved the court to declare Illinois's certificate of innocence statute, 735 ILCS 5/2-702, unconstitutional, Doc. 386, and the Attorney General of Illinois has intervened to defend the statute's constitutionality, Docs. 399, 401. For the following reasons, Dentist Defendants' and NIRCL's summary judgment motions are granted, Waukegan Defendants' and Thomas-Boyd's summary judgment motions are granted in part and denied in part, and Thomas-Boyd's motion to declare the Illinois certificate of innocence statute unconstitutional is denied as moot.

## Background

Starks is the primary non-movant, so the following facts are set forth as favorably to him as the record and Local Rule 56.1 permit. *See Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012); *In re United Air Lines, Inc.*, 453 F.3d 463, 468 (7th Cir. 2006). Wherever possible, the court will cite Starks's Local Rule 56.1(b)(3)(B) responses or Local Rule 56.1(b)(3)(C) statements. Docs. 356, 360 (opposing Waukegan Defendants' summary judgment motion); Docs. 348, 349, 350 (opposing Dentist Defendants' motions); Docs. 352, 353 (opposing Thomas-Boyd's motion). Dentist Defendants attached to their summary judgment materials the transcripts from Starks's 1986 criminal trial, and the court will cite those transcripts for

convenience.  Docs. 313-4, 313-5.  The court also will cite the opinions of the Appellate Court of Illinois in Starks's state criminal proceedings.

In the 1986 trial, which was conducted by the Circuit Court of Lake County, Illinois, a jury found Starks guilty of the January 1986 battery and rape of a 69-year-old woman in Waukegan.  *People v. Starks*, 850 N.E.2d 206, 209 (Ill. App. 2006) ("*Starks II*").  Starks was released from prison and granted a new trial in 2006 on the basis of DNA testing that excluded him as the source of the semen found on the victim and in her underwear.  *Id.* at 211; Doc. 360 at ¶ 38.  The Lake County State's Attorney dismissed the rape and attempted rape charges *nolle prosequi* in May 2012 and the aggravated battery charge in January 2013, and in September 2013, the Lake County court issued Starks a Certificate of Innocence declaring him "innocent of all offenses for which he was incarcerated."  Doc. 360 at ¶ 39; Doc. 360-3 at 125, 127, 129-130.  Following is an overview of the facts surrounding Starks's arrest and conviction; further details appear in the Discussion section.

On the night of January 18, 1986, the victim stepped outside her apartment for some fresh air when, she says, she was knocked down, dragged into a ravine, beaten up, and raped.  Doc. 360 at ¶ 3.  Her attacker, she told police, wore a watch and carried a black trench coat and a red shopping bag.  *Ibid.*  During the attack, she ripped the watch off the attacker's wrist, and the attacker eventually fled with the red bag but left the trench coat behind.  *Ibid.*  When police initially responded to the crime scene, the victim told them that she had only been assaulted, not raped, *id.* at ¶ 4, and emergency room doctors noted that there was no trauma to her vaginal area, Doc. 352 at ¶ 3.  Around 5:00 a.m. on January 19, however, the victim told a hospital worker that she had been raped.  Doc. 360 at ¶ 5.

A caseworker from the Illinois Department of Public Aid testified at Starks's trial that the victim had told her that she had not actually been raped and had lied to police and medical personnel because she wanted Starks "to pay for beating her up." Doc. 352 at ¶ 3; Doc. 313-5 at 78-79. At trial, the victim gave confused and contradictory testimony about what happened the night in question. *Starks II*, 850 N.E.2d at 210; Doc. 313-4 at 108, 114-115, 117.

Police recovered the trench coat and watch from the ravine, along with a scarf and a pair of gloves found in the coat. Doc. 356 at ¶ 6. A dry cleaning ticket in the coat eventually led police to identify Starks as its owner. *Id*. at ¶ 7. On January 21, 1986, Starks voluntarily went to the Waukegan police station, signed a *Miranda* waiver, and spoke to Biang. Doc. 360 at ¶ 7. Starks admitted that the trench coat was his, and that on the night of the attack he was carrying a red bag containing a sweater he had purchased earlier that day. *Id*. at ¶¶ 2, 7. Several witnesses testified at trial that they had seen Starks in various taverns that night with both the trench coat and the red bag. Doc. 313-4 at 146-177. Starks told Biang that he had been robbed of the coat and watch, along with some cash and other items. Doc. 360 at ¶ 7. Starks also told Biang that he had been robbed of the red bag, but Biang's police report indicated that Starks said that he left the red bag at his mother's house before the robbery. *Ibid*.; Doc. 360-1 at 25-26, 28-29 (Starks's January 22, 2014 deposition testimony); *id*. at 136-138 (Biang's January 21, 1986 report). Biang's report was not admitted into evidence at trial, but his testimony was consistent with what he wrote in the report. *People v. Starks*, No. 2-86-1021, 539 N.E.2d 926 (table), slip op. at 11 (Ill. App. June 2, 1988) ("*Starks I*") (reproduced at Doc. 360-2 at 83-108, 93); Doc. 313-5 at 55-63 (Biang's trial testimony).

After taking Starks's statement, Biang and Juarez went to the hospital to interview the victim. Doc. 356 at ¶ 9. The victim had earlier described her assailant as a clean-shaven

African-American male around 18 or 19 years old; Starks at the time was 26 and had a mustache and beard. Doc. 360 at ¶¶ 2-3. Nevertheless, when Juarez showed the victim a photo array, she fingered Starks. Doc. 356 at ¶ 9. The photo array was not introduced into evidence at trial and has since been destroyed. Doc. 360 at ¶¶ 13-14. Neither Juarez nor the victim referred to the photo array at trial; the victim identified Starks in court as her attacker. Doc. 356 at ¶¶ 34-35; Doc. 360-2 at 87; Doc. 313-4 at 114.

Biang returned from the hospital and arrested Starks, whom Biang noticed had scratch marks on his body. Doc. 356 at ¶ 10; Doc. 352 at ¶ 7. The next morning, Deprez asked Starks how he had gotten scratched; according to Deprez's notes, Starks responded, "I must've fell somewhere." Doc. 360 at ¶ 19; Doc. 360-1 at 214-215 (Deprez's January 22, 1986 report). Starks, however, maintains that he told Deprez that he had been scratched during the robbery. Doc. 360 at ¶ 19; Doc. 360-1 at 33-34. Deprez's report was not admitted into evidence at trial, and his testimony was limited to stating that he had administered the *Miranda* waiver to Starks. Doc. 360-2 at 93; Doc. 313-5 at 50-54, 56 (Deprez's trial testimony).

A grand jury indicted Starks on February 5, 1986. Doc. 360-1 at 188. Juarez, the only witness at the grand jury proceeding, testified that the victim identified Starks's picture from the photo array and, in response to a grand juror's question, added that the victim had "[n]o hesitation on her identi[fication] of [Starks], no." Doc. 360-1 at 186, 188 (Juarez's grand jury testimony). Juarez further testified that Starks's picture had been included in the array because he "was at the scene" and because police had found his trench coat, gloves, and scarf in the ravine where the victim was attacked. *Id*. at 187. Juarez also told the grand jury that "there was a laundry tag located [in the trench coat] and we were able to trace the laundry tag to the cleaners and the cleaners were able to tell us who that customer had been." *Ibid*. At trial, however,

Juarez testified only that the victim had told him that her attacker was 18 or 19 years old and clean shaven. Doc. 360-2 at 94; Doc. 313-5 at 85-87 (Juarez's trial testimony).

Meanwhile, having noticed what appeared to be a bite mark on the victim's shoulder, Biang contacted Schneider on January 22, 1986 (the day after Starks's arrest) to serve as a forensic dental consultant on the case. Doc. 360 at ¶¶ 27-28; Doc. 349 at ¶ 34. Biang accompanied Dentist Defendants to the hospital later that day, where they saw the bite mark and helped another officer take pictures of it. Doc. 360 at ¶ 30; Doc. 349 at ¶ 39. Following the indictment, Dentist Defendants took photos and impressions of Starks's teeth, which they then used in their bite mark analysis. Doc. 349 at ¶¶ 40-43. In a May 13, 1986 letter to the prosecutor, Dentist Defendants wrote: "We have done a detailed comparison of the bite marks with the models and have found a definite match. It is our conclusion that the bites on [the victim] were made by Benny [*sic*] Starks Jr." Doc. 360 at ¶ 35; Doc. 360-3 at 79 (Dentist Defendants' May 13, 1986 letter). Dentist Defendants followed up on July 1, 1986, describing their techniques in more detail and concluding: "The comparison of the models to the bite photo and the overlays to the bite photo indicated a very specific and unusual pattern leading us to the conclusion that the bite on [the victim] was inflicted by Bennie Starks Jr." Doc. 360 at ¶ 36; Doc. 360-3 at 81 (Dentist Defendants' July 1, 1986 letter).

Both Schneider and Hagstrom testified to the same effect at trial. Doc. 360-2 at 91-92; Doc. 313-4 at 224-282, 288-295; Doc. 313-5 at 2-5. According to Starks's expert in this case, David Senn, Dentist Defendants overstated their conclusions, as the maximum level of certainty endorsed by forensic odontologist guidelines in 1986 was only within a "reasonable medical certainty." Doc. 350 at ¶ 34; Doc. 350-3 at 38. Furthermore, according to Senn, Dentist Defendants' photograph of the bite mark was out of focus and therefore may not have been to

scale, and, by orienting the bite mark to match the victim's description of the attack (and to match Starks's dentition), they reversed the maxillary (upper) and mandibular (lower) jaws. Doc. 350 at ¶¶ 27, 32; Doc. 350-3 at 37-38.

Thomas-Boyd was a forensic scientist and serologist who in 1986 worked for the Northern Illinois Police Crime Laboratory, NIRCL's predecessor. Doc. 352 at ¶ 9. Assigned to the Starks case, Thomas-Boyd submitted four serology reports dated January 28, February 28, March 5, and April 10, 1986. *Id*. at ¶ 14; Doc. 317-2 at 44-62. Her first report requested blood, saliva, and hair samples from Starks, and a saliva sample from the victim. Doc. 317-2 at 50. Her final report concluded: "In order to make a sound scientific decision concerning the possible exclusion of the suspect, Bennie Starks, as a possible source of the foreign blood groups detected on the submitted vaginal swab … and underwear …, a semen standard from Bennie Starks is required." Doc. 317-2 at 61; Doc. 353 at ¶¶ 22-24. Accordingly, the prosecutor filed a pretrial motion to obtain a semen sample, but Starks objected and the trial judge denied the motion. Doc. 352 at ¶ 13; Doc. 317-2 at 64-66. Thomas-Boyd's final report also included a "Table of Results/Blood Genetic Marker Analysis," which showed that only H antigens had been found in the vaginal swab and semen stain on the victim's underwear. Doc. 352 at ¶ 12; Doc. 353 at ¶ 25; Doc. 317-2 at 62. The report indicated that the victim was a type O non-secretor (meaning she did not secrete blood type antigens in her bodily fluids), and that Starks was a type B secretor (meaning he secreted both B and H antigens in his bodily fluids). Doc. 352 at ¶ 12; Doc. 353 at ¶¶ 25, 31; Doc. 317-2 at 62. Although some type B secretors secrete more H than B antigens, Doc. 352 at ¶ 12, Senn opines that only five percent of secretors fall into this "aberrant secretor" category, Doc. 353 at ¶¶ 29, 31.

Thomas-Boyd did not explain this detail either in her report or at trial, where she testified simply: "I could not exclude [Starks] as a possible source of the semen. That means that I have to include him." Doc. 313-5 at 22-23. DNA testing in 2000 and 2005 conclusively showed that Starks was not the source of the semen. *Starks II*, 850 N.E.2d at 215; Doc. 360 at ¶ 37; Doc. 378 at ¶ 37; Doc. 353-3 at 10, 46; *see also People v. Starks*, 966 N.E.2d 347, 350 (Ill. App. 2012) ("*Starks III*") ("the DNA test results exclud[ed] defendant as the source of the semen").

The jury convicted Starks of "two counts of aggravated criminal sexual assault, one count of attempted aggravated criminal sexual assault, one count of aggravated battery, and one count of unlawful restraint." *Starks III*, 966 N.E.2d at 350 (citations omitted). The trial court vacated the unlawful restraint conviction as a lesser included offense, *ibid.*, and in 1988 the state appellate court on direct appeal vacated one of the aggravated sexual assault convictions, *Starks I*, slip op. at 26 (Doc. 360-2 at 108). Starks ultimately was sentenced to 60 years' imprisonment on the remaining aggravated sexual assault conviction, to be served concurrently with a 15-year sentence for the attempted aggravated sexual assault and a 5-year sentence for the aggravated battery. *Starks II*, 850 N.E.2d at 210-11.

In March 2002, armed with DNA testing results, Starks filed a post-conviction petition for a new trial on the sexual assault and attempted sexual assault charges, which the Appellate Court of Illinois granted in 2006. *Id*. at 211, 214-15. Having spent the past twenty years behind bars, Starks was released on bond in October 2006. *People v. Starks*, 975 N.E.2d 71, 74 (Ill. App. 2012) ("*Starks IV*"). Starks then filed a supplemental post-conviction petition in 2007 asking for a new trial on the aggravated battery count, too. *Ibid*.

Starks filed this suit in January 2009. Doc. 1. This court stayed the suit pending the resolution of Starks's state court criminal proceedings. 2010 WL 481290 (N.D. Ill. Feb. 4, 2010)

(Coar, J.).  After the Lake County State's Attorney agreed to vacate the aggravated battery

conviction and dismiss that charge *nolle prosequi* in January 2013, this court lifted the stay and

allowed Starks to file an amended complaint.  Doc. 94.  Motion practice ensued, and the court

ultimately denied Defendants' motions to dismiss.  Docs. 117-118, 146-147, 187-188 (reported

at 946 F. Supp. 2d 780 (N.D. Ill. 2013); 2013 WL 5874563 (N.D. Ill. Oct. 31, 2013)).

Starks's fourth amended complaint has twelve counts (two of them labeled Count 9,

which the court will call "9a" and "9b"), as summarized by this table:

| | City of Waukegan | Biang, Deprez, & Juarez | Schneider & Hagstrom | Thomas-Boyd | NIRCL |
|---|---|---|---|---|---|
| **1**: § 1983 due process | | X | X | X | |
| **2**: § 1983 failure to intervene | | X | | | |
| **3**: § 1983 civil conspiracy | | X | X | X | |
| **4**: § 1983 *Monell* liability | X | | | | |
| **5**: Illinois malicious prosecution | | X | X | X | |
| **6**: Illinois IIED | | X | X | X | |
| **7**: Illinois civil conspiracy | | X | X | X | |
| **8**: *Respondeat superior* liability for police officers | X | | | | |
| **9a**: Liability under 745 ILCS 10/9-102 for police officers | X | | | | |
| **10**: *Respondeat superior* liability for Thomas-Boyd | | | | | X |
| **9b**: Liability under 745 ILCS 10/9-102 for Thomas-Boyd | | | | | X |
| **11**: Implied indemnity liability for Thomas-Boyd | X | | | | |

Doc. 259.  The court has original jurisdiction over the § 1983 claims under 28 U.S.C. § 1331 and

supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367(a).

### Discussion

## I.  Section 1983 Due Process Claims

Count 1 of the complaint alleges that the individual defendants violated Starks's

Fourteenth Amendment due process rights by suppressing favorable evidence and/or by

fabricating unfavorable evidence. Doc. 259 at ¶¶ 63-70. "[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *see also Armstrong v. Daily*, 786 F.3d 529, 550 (7th Cir. 2015) (referencing *Brady*'s "familiar holding that suppression of material exculpatory evidence violates due process") (emphasis removed). In addition, "a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012).

### A.    Waukegan Defendants

Starks alleges that Juarez, Duprez, and Biang—the three Waukegan police officers— deprived him of due process by suppressing favorable evidence and/or by fabricating unfavorable evidence against him. Specifically, he alleges that Juarez deliberately doctored the photo array that he showed the victim at the hospital, causing her to falsely identify him as the attacker. Starks also alleges that on January 22, 1986, he told Deprez that he had been scratched during the robbery; Deprez's report, by contrast, states that Starks could not explain the scratches and offered only the feeble excuse that he "must've fell somewhere." Doc. 360 at ¶ 19; *compare* Doc. 360-1 at 33-35 (Starks's deposition testimony) *with id.* at 214-215 (Deprez's report). Finally, Starks alleges that on January 21, 1986, he told Biang that he had been robbed of the red bag containing the sweater; Biang's report and subsequent testimony, by contrast, stated that Starks claimed that he had earlier left the red bag at his mother's apartment. Doc. 360 at ¶ 7; *compare* Doc. 360-1 at 25-26, 28-29 (Starks's deposition testimony) *with id.* at 136-138 (Biang's report); Doc. 313-5 at 84-85 (Biang's trial testimony). Waukegan Defendants do not argue that they are entitled to qualified immunity for these alleged misdeeds, so the only question is

whether, on the summary judgment record, a reasonable jury could find for Starks on his due process claim against the officers.

None of Starks's allegations would permit a reasonable jury to find that Waukegan Defendants suppressed favorable evidence in violation of *Brady*. "Evidence is 'suppressed' when (1) the prosecution failed to disclose the evidence in time for the defendant to make use of it, and (2) the evidence *was not otherwise available* to the defendant through the exercise of reasonable diligence." *Carvajal v. Dominguez*, 542 F.3d 561, 567 (7th Cir. 2008) (emphasis added); *see also Petty v. City of Chicago*, 754 F.3d 416, 423 (7th Cir. 2014) (same). Starks's being scratched during the robbery and the red bag's being stolen were both known to him; after all, they formed part of his alibi. Deprez and Biang therefore could not have "suppressed" this evidence within the meaning of *Brady*. *See Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007) ("The fact that Harris had an alibi for the Mexico City Café shooting was 'otherwise available' to Harris."); *United States v. Lee*, 399 F.3d 864, 865 (7th Cir. 2005) ("*Brady* … deals with the concealment of exculpatory evidence unknown to the defendant. Lee was aware of his own pants."). Like the plaintiff in *Harris*, Starks "essentially seeks an extension of *Brady* to provide relief if a police officer makes a false statement to a prosecutor by arguing that an officer is 'suppressing' evidence of the truth by making the false statement. [The Seventh Circuit] has already foreclosed this extension." 486 F.3d at 1017; *see also Saunders-El v. Rohde*, 778 F.3d 556, 562 (7th Cir. 2015) (same). Accordingly, Biang and Deprez did not "suppress" Starks's alibi by failing to mention it—or to admit their own alleged fabrications—to prosecutors.

The same holds for Juarez's allegedly flawed photo array procedures, as explained by *Petty*:

> Petty alleges that CPD officers coerced Tarver into giving false evidence by threatening him with jail time if he did not cooperate, holding him against his

will in a locked room without food or water for over 13 hours, badgering him, and pressuring him to identify Petty as one of the assailants. …

Petty not only knew of Tarver's treatment before his trial began, he had the opportunity to explore this topic at trial and could have subpoenaed the CPD officers to compel their testimony to cast doubt on Tarver's identification. Because Petty knew of Tarver's alleged coerced identification before his trial started and had sufficient time to use that information at his trial, summary judgment was appropriate on the *Brady* claim.

754 F.3d at 423-24. Likewise, Starks knew about Juarez's having shown the victim a photo array, and he indisputably "had the opportunity to explore this topic at trial"—in fact, it was *Starks* who called Juarez as a witness. When examining Juarez, Starks's attorney attempted to undermine the victim's in-court identification:

Q     Okay. And did you have occasion to speak to [the victim] concerning a description of the alleged offender?

A.     Yes, I did.

Q.     And did she tell you, officer, that the alleged offender had no facial hair?

A.     Yes, she did.

Q.     Did she also tell you that the alleged offender was approximately 18 to 19 years of age?

A.     Yes, she did.

Doc. 313-5 at 86-87 (Juarez's trial testimony). Given the circumstances, Juarez did not "suppress" evidence in violation of *Brady*.

Although Starks has no *Brady* claim against Waukegan Defendants, they might still have violated due process by fabricating inculpatory evidence. As noted above, "a police officer who manufactures false evidence against a criminal defendant violates due process *if that evidence is later used to deprive the defendant of her liberty* in some way." *Whitlock*, 682 F.3d at 580 (emphasis added). The italicized phrase is the key one—to violate due process, the falsified evidence must have "involved not merely the fabrication, but the introduction of the fabricated

evidence at the criminal defendant's trial. For if the evidence hadn't been used against the defendant, he would not have been harmed by it, and without a harm there is, as we noted earlier, no tort." *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014); *see also Saunders-El*, 778 F.3d at 560 ("[A] police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of [his] liberty in some way.") (internal quotation marks omitted).

Deprez's report was not introduced into evidence at trial or offered to the grand jury, and he did not testify about its contents. Deprez's trial testimony was limited to stating that he obtained a *Miranda* waiver from Starks before Biang's January 21 interview. Doc. 313-5 at 50-54, 56. Accordingly, Deprez's alleged fabrications about what Starks said about his scratches could not have violated his due process rights. *See Armstrong*, 786 F.3d at 553 ("We have observed, for example, that an accused has no claim against an officer who fabricates evidence and puts the evidence in a drawer, never to be used."); *Fields*, 740 F.3d at 1114 (as quoted in the paragraph immediately above); *Whitlock*, 682 F.3d at 582 ("[I]f an officer (or investigating prosecutor) fabricates evidence and puts that fabricated evidence in a drawer, making no further use of it, then the officer has not violated due process; the action did not cause an infringement of anyone's liberty interest.").

Likewise, Juarez's allegedly doctored photo array was never introduced into evidence at trial, thereby absolving Juarez of any potential liability. In *Alexander v. City of South Bend*, 433 F.3d 550 (7th Cir. 2006), the Seventh Circuit held: "The Constitution does not require that police lineups, photo arrays, and witness interviews meet a particular standard of quality. It does, however, guarantee the right to a fair trial—in this context, via the due process clause of the Fourteenth Amendment—and that right is violated if unduly suggestive identification techniques

are allowed to taint the trial." *Id.* at 555 (citation omitted). So even if Juarez's photo array was suggestive, it did not "taint the trial" because neither it nor testimony about it was offered or admitted at trial. *See ibid.* ("[F]lawed identification procedures are not themselves constitutional violations; plaintiffs must show *how* those flawed procedures compromised the constitutional right to a fair trial.").

Juarez did testify before the *grand jury* that the victim with "[n]o hesitation" identified Starks's picture from the photo array. Doc. 360-1 at 186, 188 (Juarez's grand jury testimony). (The photo array itself was not shown to the grand jury.) But lying to a grand jury, if that is what Juarez did, is not actionable as a constitutional tort under § 1983, for "a grand jury witness has absolute immunity from any § 1983 claim based on the witness' testimony." *Rehberg v. Paulk*, 132 S. Ct. 1497, 1506 (2012). "[T]his rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution. Were it otherwise, a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Ibid.* (quotation marks omitted); *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("For if the constitutional entitlement is a right to prevent use of the [false] confession … before the grand jury[], then absolute immunity under *Imbler* defeats Buckley's claim."). *Rehberg* acknowledged that "law enforcement officials who falsify affidavits … [or] fabricate evidence concerning an unsolved crime" *outside* of the grand jury context are not absolutely immune from § 1983 liability, 132 S. Ct. at 1507 n.1, but Starks has not adduced evidence suggesting that Juarez did either of those things.

Even if Juarez were not protected by absolute immunity for his testimony before the grand jury, Starks has not identified—and the court's own research has not revealed—any Seventh Circuit or Supreme Court case recognizing a due process (as opposed to malicious prosecution) claim based on false evidence or testimony that was presented to a grand jury but never introduced at trial.  *Cf. Saunders-El*, 778 F.3d at 561 ("Nor does the burden of appearing in court and attending trial, in and of itself, constitute a deprivation of liberty.").  Moreover, in the specific context of flawed or overly suggestive identification techniques, the Seventh Circuit in *Alexander* squarely held that the due process right is limited to the right to a fair *trial*: "Grounded in due process, the constitutional interest implicated in challenges to police identification procedures is *evidentiary* in nature. … Accordingly, South Bend cannot be liable under § 1983 unless Alexander shows how the flaws in South Bend's identification techniques made his trial unfair."  433 F.3d at 555.  So even if as a general matter, and notwithstanding *Rehberg*, presenting certain kinds of false evidence to a grand jury were somehow actionable as a constitutional tort, *Alexander* holds that presenting the results of an overly suggestive lineup or photo array is not.

*Fields*'s remarking "the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him," 740 F.3d at 1112, does not establish that a plaintiff can maintain a § 1983 suit based solely on the use of fabricated evidence or testimony to procure an indictment.  That passage in *Fields*, which did not cite *Rehberg*, explicitly relied on *Julian v. Hanna*, 732 F.3d 842, 846-47 (7th Cir. 2013), which involved a malicious prosecution claim—a *federal* malicious prosecution claim, which was allowed because Indiana law was found not to provide an adequate remedy under the circumstances of that case.  *See Bianchi v. McQueen*, 2014 WL 700628, at *11 (N.D. Ill. Feb. 24, 2014) (making the same point about

*Fields* and *Julian*), *on appeal*, No. 14-1635 (argued Apr. 16, 2015). And malicious prosecution, of course, is all about the baseless *initiation* of criminal proceedings—unlike the due process clause. *See Albright v. Oliver*, 510 U.S. 266, 283 (1994) (Kennedy, J., concurring in the judgment) ("the due process requirements for criminal proceedings do not include a standard for the initiation of a criminal prosecution"). Furthermore, that passage from *Fields* appears in a hypothetical in which a prosecutor, acting in an investigative capacity, fabricates evidence that a second prosecutor then uses to obtain a conviction. 740 F.3d at 1112. The hypothetical thus explicitly involved the introduction of fabricated evidence *at trial*; the question was whether the first prosecutor—the one who fabricated the evidence but then dropped out of the case—could be held liable for the fabrication. *Fields* answered "yes." *Ibid*. But nowhere did *Fields* question the requirement that the fabricated evidence must be introduced at trial; to the contrary, it reaffirmed that requirement. *Id*. at 1114 (requiring "the introduction of the fabricated evidence at the criminal defendant's trial" as an element of the *Whitlock* fabrication tort).

Likewise, citing that passage from *Fields*, *Armstrong* reasoned that an eventually acquitted defendant is still deprived of his liberty if he is imprisoned awaiting trial, and therefore that if police irretrievably destroy (as opposed to merely suppress) exculpatory evidence, the defendant may have a viable *Brady* claim. 786 F.3d at 551-52 ("Destruction is not easy to remedy. Deliberate destruction of evidence with potential or apparent exculpatory value can make it impossible for the accused to receive due process of law, regardless of the procedural posture of the criminal case at the time of the destruction."). This passage from *Armstrong* is inapposite, for it involved the destruction of evidence and not fabricated grand jury testimony. Moreover, *Armstrong* reaffirmed that a viable *Whitlock* claim requires the fabricated evidence to

have been introduced at trial: "[A]n accused has no claim against an officer who fabricates evidence and puts the evidence in a drawer, never to be used." 786 F.3d at 553.

In any event, because the Seventh Circuit has not circulated to the full court under Circuit Rule 40(e) the question whether *Alexander* should be overruled, it cannot be understood in *Fields* or *Armstrong* to have silently overruled the requirement that a faulty photo array must taint the trial in order for it to give rise to a due process violation. *See Iqbal v. Patel*, 780 F.3d 728, 729 (7th Cir. 2015) ("Iqbal maintains, however, that we abandoned *Kelley* in *Johnson v. Pushpin Holdings, LLC*, 748 F.3d 769 (7th Cir. 2014), without so much as citing it. That's not how precedent works. In this circuit it takes a circulation to the full court under Circuit Rule 40(e) for one panel to overrule another."); *Brooks v. Walls*, 279 F.3d 518, 522 (7th Cir. 2002) (same). For these reasons, Starks cannot maintain his § 1983 claim against Juarez based on his grand jury testimony about the victim's photo identification.

That leaves Biang's alleged fabrications. Biang's report, which stated that Starks claimed to have dropped off the red bag before he was robbed, was not admitted into evidence or offered to the grand jury, and so for the reasons discussed above it could not have violated Starks's due process rights. *See Armstrong*, 786 F.3d at 553; *Fields*, 740 F.3d at 1114; *Whitlock*, 682 F.3d at 582. Biang did, however, testify to the same effect at the trial. The detail about the red bag was not a trifle. Affirming Starks's conviction on direct review, the Appellate Court of Illinois noted:

> [T]he complainant testified her assailant fled the scene carrying a red bag. According to defendant's statement, he had dropped this red bag off at his mother's house *before* he was robbed. Thus, defendant's statement to the police [about having been robbed] has little, if any, exculpatory value.

*Starks I*, slip op. at 19 (Doc. 360-2 at 101). Yet there is no federal due process remedy when a police officer perjures himself on the stand because police officers, like other witnesses who testify in a criminal proceeding, have absolute immunity for the content of their testimony. *See*

*Briscoe v. LaHue*, 460 U.S. 325, 345 (1983); *Khorrami v. Rolince*, 539 F.3d 782, 789 (7th Cir. 2008). Immunity aside, moreover, "[t]he Constitution does not require that police testify *truthfully*; rather 'the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies.'" *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006) (quoting *Buie v. McAdory*, 341 F.3d 623, 625-26 (7th Cir. 2003)). *Sornberger* involved a *Brady* claim, but the language quoted above indicates that its holding is broader ("the *Constitution* does not require"), resulting in the conclusion that because Starks had the opportunity to challenge Biang's false testimony in front of the jury, he received all the constitutional process he was due.

There admittedly is tension between *Sornberger* and *Whitlock*. If, as *Whitlock* holds, a police officer violates due process by fabricating testimony for *other* witnesses to deliver in court, why should the officer escape liability if he gives the false testimony himself? Either way, the defendant suffers the same harm. But the same tension exists in the grand jury context, where the Supreme Court—recognizing that, as here, absolute immunity does not "extend[] to *all* activity that a witness conducts outside of the grand jury room"—has nonetheless held that immunity "may not be circumvented by … refram[ing] a claim to attack the preparation instead of the absolutely immune actions themselves." *Rehberg*, 132 S. Ct. at 1506-07 & n.1. And there may be good reason to treat the two situations differently; perhaps the officer's potential exposure to a perjury prosecution or other sanction is thought to be enough of a deterrent so as to satisfy due process. *Cf. ibid.* ("law enforcement witnesses face the possibility of sanctions not applicable to lay witnesses, namely, loss of their jobs and other employment-related sanctions").

The important point, however, is that *Whitlock* did not purport to overrule *Sorenberger*, which remains good law in the Seventh Circuit and, being squarely on point ("The Constitution

does not require that police testify *truthfully*," 434 F.3d at 1029), decides the issue here. *See Iqbal*, 780 F.3d at 729; *Brooks*, 279 F.3d at 522. Therefore, Biang's allegedly false recounting of his own conversation with Starks cannot, under governing Seventh Circuit precedent, serve as the basis for a due process claim under § 1983. Nor can his allegedly false report, since it was never used against Starks during the criminal proceedings. Waukegan Defendants are therefore entitled to summary judgment on Starks's federal due process claim.

### B.     Dentist Defendants

The court will treat Dentist Defendants' together, given that they co-authored the expert reports in Starks's prosecution, Doc. 350 at ¶¶ 25, 34, 35, and testified to similar effect at his criminal trial, Doc. 313-4 at 256 (Schneider testifying: "My opinion is that Mr. Starks bit [the victim] in the shoulder."); *id*. at 295 (Hagstrom: "It is my opinion that Bennie Starks inflicted the bite on [the victim]."); Doc. 313-5 at 2, 5 (Hagstrom testifying that he and Schneider arrived at their respective opinions "at the same time" because they "conducted [their] examinations and tests simultaneously"); Doc. 350-3 at 27 (Schneider and Hagstrom's jointly signed May 13, 1986 letter to the prosecutor stating: "It is our conclusion that the bites on [the victim] were made by Benny [sic] Starks Jr."); Doc. 350-3 at 29 (same, in a July 1, 1986 letter to the prosecutor). Represented by the same lawyers, they have filed virtually identical briefs in this case. *Compare* Docs. 311, 375 (Schneider's briefs) *with* Docs. 314, 384 (Hagstrom's briefs).

Based on their analysis of the bite mark on the victim's shoulder, Dentist Defendants opined that Starks was the biter. The court previously held that Dentist Defendants are absolutely immune for their trial testimony, 946 F. Supp. 2d at 788-89, 799, and Dentist Defendants continue to press both absolute and (unlike Waukegan Defendants) qualified immunity for their other alleged misdeeds, Doc. 311 at 7-9, 23-26. Their absolute immunity argument is really just an argument on the merits, *id*. at 7-9, and it is questionable whether

private dentists are even entitled to assert qualified immunity under § 1983. *See Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (finding "persuasive" the Sixth Circuit's holding in *McCullum v. Tepe*, 693 F.3d 696 (6th Cir. 2012), that a private doctor providing services to state prison inmates is ineligible for qualified immunity); *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 n.3 (7th Cir. 2014) (same); *compare Filarsky v. Delia*, 132 S. Ct. 1657, 1665, 1668 (2012) (holding that a private lawyer retained by the city is entitled to assert a qualified immunity defense because "immunity under § 1983 should not vary depending on whether an individual working for the government does so as a full-time employee, or on some other basis"), *with Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (holding that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case"). Dentist Defendants also argue that they are not "state actors" for purposes of § 1983. Doc. 351 at 10-13; *but see Burke v. Town of Walpole*, 405 F.3d 66, 88 (1st Cir. 2005) (holding that a forensic odontologist was a state actor because he "rendered a bite mark opinion only because the Norfolk District Attorney's Office, at the recommendation of the state's own forensic odontologist, sought his assistance with the analysis of forensic evidence in a criminal investigation"). The court need not resolve these issues, as Dentist Defendants prevail on the merits of Starks's due process claim.

Supported by the opinion of Senn, his retained expert in this case, Starks argues that Dentist Defendants' opinion at his trial that he bit the victim was riddled with so many errors as to amount to a due process violation. In 2009, the National Academy of Sciences released a report on the use of forensic science in the courtroom. National Academy of Sciences, "Strengthening Forensic Science in the United States" (2009), www.nap.edu/catalog/12589/ strengthening-forensic-science-in-the-united-states-a-path-forward. The report noted that

"[f]orensic odontology, the application of the science of dentistry to the field of law, includes

several distinct areas of focus: the identification of unknown remains, bite mark comparison, the

interpretation of oral injury, and dental malpractice." *Id*. at 173.  The report's evaluation of bite

mark matching, "the most controversial of the four areas just mentioned," *ibid*., is devastating:

> Although the majority of forensic odontologists are satisfied that bite marks
> can demonstrate sufficient detail for positive identification, *no scientific
> studies support this assessment*, and no large population studies have been
> conducted.  In numerous instances, experts diverge widely in their evaluations
> of the same bite mark evidence, which has led to questioning of the value and
> scientific objectivity of such evidence.

*Id*. at 176 (emphasis added, footnotes omitted); *see also* Brandon L. Garrett & Peter J. Neufeld,

"Invalid Forensic Science Testimony and Wrongful Convictions," 95 *Va. L. Rev.* 1, 67-71

(2009).  The report explains:

> Some of the basic problems inherent in bite mark analysis and interpretation
> are as follows:
>
> (1)  The uniqueness of the human dentition has not been scientifically
> established.
>
> (2)  The ability of the dentition, if unique, to transfer a unique pattern to
> human skin and the ability of the skin to maintain that uniqueness has not
> been scientifically established.
>
> > i.  The ability to analyze and interpret the scope or extent of distortion of
> > bite mark patterns on human skin has not been demonstrated.
> >
> > ii.  The effect of distortion on different comparison techniques is not fully
> > understood and therefore has not been quantified.
>
> (3)  A standard for the type, quality, and number of individual
> characteristics required to indicate that a bite mark has reached a threshold
> of evidentiary value has not been established.

National Academy of Sciences, *supra*, at 175-76 (footnotes omitted).

There appears to be little, if any, scientifically valid data to support the accuracy of bite

mark comparison, and the data that does exist is damning.  A 2011 peer-reviewed article found

that because skin easily distorts, it is a poor medium for bite marks; the article described an experiment in which a single "dentition" was used to produce nearly a hundred bite marks in both skin and wax, and the resulting skin marks not only failed to match the dentition that created them, but were often closer matches to *other* dentitions (those that did not create the marks). Mary A. Bush, Peter J. Bush, & H. David Sheets, "A Study of Multiple Bitemarks Inflicted in Human Skin by a Single Dentition Using Geometric Morphometric Analysis," 211 *Forensic Sci. Int'l* 1, 1-8 (Sept. 2011); *see also* National Academy of Sciences, *supra*, at 174 ("Unfortunately, bite marks on the skin will change over time and can be distorted by the elasticity of the skin, the unevenness of the surface bite, and swelling and healing. These features may severely limit the validity of forensic odontology."). A 2006 peer-reviewed article lamented the "disturbingly high false-positive error rate" of bite mark matching, as evidenced in part by a 1999 workshop conducted by the American Board of Forensic Odontology, in which experts who "attempted to match four bitemarks to seven dental models found 63.5% false positives." C. Michael Bowers, "Problem-Based Analysis of Bitemark Misidentifications," 159S *Forensic Sci. Int'l* S104, S106-S107 (2006). Sixty-three percent! The article also describes other studies with similarly alarming findings. *Id.* at S106.

It is therefore doubtful that "expert" bite mark analysis would pass muster under Federal Rule of Evidence 702 in a case tried in federal court. *See* Fed. R. Evid. 702(c) (requiring that expert testimony be "the product of reliable principles and methods"); D. Michael Risinger, "Navigating Expert Reliability: Are Criminal Standards of Certainty Being Left on the Dock?," 64 *Albany L. Rev.* 99, 142 (2000) ("[B]ite mark identification has little published data from studies showing that forensic odontologists can identify the origin of a bite mark under non-ideal conditions, or how various non-ideal conditions affect individual and group performance. There

have been proficiency studies, but the results have never been made public. … So bite mark experts have benefited from their ability (up to now) to do few proficiency studies and to keep secret the results of such proficiency studies as have been done; isn't this backward?"); *see also Ege v. Yukins*, 485 F.3d 364, 376 (6th Cir. 2007) (opining that "[b]ite mark evidence may by its very nature be overly prejudicial and unreliable," and granting habeas relief because trial counsel was ineffective for not objecting under *Frye* to such evidence).  Yet state courts have regularly accepted bite mark evidence—including in all three States in the Seventh Circuit.  *See State v. Stinson*, 397 N.W.2d 136, 137-40 (Wis. App. 1986); *Niehaus v. State*, 359 N.E.2d 513, 516 (Ind. 1977); *People v. Milone*, 356 N.E.2d 1350, 1360 (Ill. App. 1976); *see also People v. Wright*, 1999 WL 33446496, at *2 (Mich. App. Apr. 23, 1999) ("Bite mark comparison evidence is currently admissible in at least thirty-five states."); Erica Beecher-Monas, "Reality Bites: The Illusion of Science in Bite-Mark Evidence," 30 *Cardozo L. Rev.* 1369, 1395 (2009) (same, and further noting that "[b]y far the most widely used gate-keeping avoidance technique that judges employ is admitting bite-mark evidence because other courts have done so").  In approving the admission of bite mark evidence, *Stinson* concluded:

> [B]ite mark identification evidence presented by an expert witness can be a valuable aid to a jury in understanding and interpreting evidence in a criminal trial.  The bite mark evidence presented in the case enabled the jury to see the comparisons being made by the experts.  By looking directly at the physical evidence used, the models and the photos, the jury was able to judge for itself whether Stinson's teeth did in fact match the bite marks found on the victim's body.

397 N.W.2d at 140.  The defendant in *Stinson* ultimately was exonerated on the basis of DNA evidence and released from prison after spending 23 years behind bars.  *See Stinson v. City of Milwaukee*, 2013 WL 5447916, at *1, 11 (E.D. Wis. Sept. 30, 2013).

Starks argues that Dentist Defendants' bite mark "analysis" was so far outside the norms of bite mark matching, such as they were in 1986, that it violated due process.  For this assertion,

Starks relies on the opinion of Senn, a forensic odontologist himself who has testified as a bite mark expert in many criminal cases. Doc. 313-20 at 48-50 (Senn's CV). Eighty years ago, Upton Sinclair observed: "It is difficult to get a man to understand something, when his salary depends upon his not understanding it!" Upton Sinclair, *I, Candidate for Governor: And How I Got Licked* 109 (Univ. of Calif. Press 1994) (1935). Illustrating Sinclair's point, Senn opines not that bite mark matching is inherently unreliable, but only that Dentist Defendants made analytical errors and overstated their conclusions in Starks's criminal case. Doc. 350 at ¶¶ 25, 27, 32, 34; Doc. 350-3 at 31-38 (Senn's May 10, 2010 report); *id.* at 59-64 (Senn's Nov. 25, 2014 report); *see also* Risinger, *supra*, at 142 ("[W]hile forensic odontologists are not loathe to testify against each other before a jury as a matter of 'opinion,' they have not apparently been breaking down any doors to testify to the rational limits of their own expertise."). Here is Starks's recitation of Dentist Defendants' alleged misfeasance:

> [Dentist Defendants] had a pre-existing relationship with the Waukegan Police Department and at some point Dr. Schneider was Sgt. Biang's personal dentist; were initially requested "to identify the bite marks and match them with the person that we had in custody"; failed to follow basic odontological procedures in recording their evidence gathering; recklessly proceeded with comparing the bite mark to Starks when it turned out that the photograph of the mark was so poor that the scale was out of focus; failed to examine other photographs that were taken of the bite mark on January 19, 22 and 29; failed to preserve the photograph of the bite mark that they used to compare the mark to Starks' dentition; matched the maxillary portion of Starks' dentition to the mandibular portion of the bite mark because this was the only way it would fit; issued opinions that stated that Starks definitely made the bite mark even though this level of certainty violated odontological guidelines; stated to Biang that Starks made the bite mark beyond any question; used an experimental chart to assert to the prosecutor and the jury that there were 62 points of similarity between the photo of the bite mark and Starks' dentition but failed to reveal that the chart was experimental and not generally accepted in the odontological community; failed to have their work reviewed by an experienced odontologist with whom Dr. Schneider had a close relationship, even though this was the first real case in which they were comparing a bite mark to a model, other than in classes; and stated that Starks definitely made the bite mark even though in fact that was not their opinion and their real

opinion was that Starks could have made the bite mark but so could another person.

Doc. 351 at 9-10.

None of these allegations amount to due process violations. The only one that even comes close is that Dentist Defendants "failed to preserve the photograph of the bite mark that they used to compare the mark to Starks' dentition." *Id*. at 9. But this allegation is highly misleading; in support, Starks cites Schneider's deposition testimony, Doc. 350 at ¶ 32 (citing Doc. 350-2 at 114-118), which states that Dentist Defendants produced at trial a slide containing *both* the photo *and* the comparison model together, instead of each one individually. In any event, even if Starks's assertion had record support, nowhere does he allege that Dentist Defendants' failure to keep that particular photo was in bad faith or a deliberate attempt to hide favorable evidence. Absent such an allegation, supported by the evidence, the mere failure to preserve the photograph is not a due process violation. *See Armstrong*, 786 F.3d at 552 (holding that "*bad-faith* destruction of exculpatory evidence" or "[*d*]*eliberate* destruction of evidence with potential or apparent exculpatory value" is a due process violation) (emphases added).

Starks's remaining allegations ultimately boil down to a complaint that Dentist Defendants' report and testimony were incompetent and wrong, maybe grossly so, even by the standards of bite mark matching in 1986. This claim faces an insurmountable obstacle in *Buie v. McAdory*, which explained:

> No decision of the Supreme Court "clearly establishes" that experts (or any other witnesses) must be *right*; the constitutional rule is that the defendant is entitled to a trial that will enable jurors to determine where the truth lies. That a witness may give false or mistaken testimony therefore is not an independent constitutional violation. What the Constitution provides is assurance that evidence may be tested by cross-examination and by contrary proofs. Whether a given expert witness overstated her conclusion is mete for cross-examination, and no one impaired Buie's ability to elicit from her just how likely (or unlikely) a "reasonable degree of scientific certainty" was in her vocabulary.

341 F.3d at 625 (citation omitted); *see also Sornberger*, 434 F.3d at 1029 (same). *Buie* added:

"Informants may be lying, eyewitnesses may be tricked by their own memories, and experts may produce flawed analyses. The tools of the adversary process supply the means to expose these testimonial shortcomings." 341 F.3d at 625.

*Buie* was a habeas case, but its holding about what due process requires applies with equal force to a § 1983 constitutional tort action. *See Sornberger*, 434 F.3d at 1029 (relying on *Buie* to defeat a § 1983 due process claim). Accordingly, that Dentist Defendants may have "give[n] false or mistaken testimony" or "overstated [their] conclusion" does not amount to a due process violation—at least not when Starks had a reasonable opportunity to cross-examine them at the criminal trial, which he did. In short, "[n]either shopping for a favorable witness nor hiring a practitioner of junk science is actionable, although it may lead to devastating cross-examination if the judge permits the witness to testify." *Buckley*, 20 F.3d at 796.

Nor has Starks adduced any evidence tending to show that Dentist Defendants deliberately falsified their analysis or hid exculpatory results. *Cf. Jones v. City of Chicago*, 856 F.2d 985, 991 (7th Cir. 1988) (holding that a lab technician violated due process by failing to include in her report her discovery that the criminal defendant "had different semen and blood types from the types found in [the victim's] vagina" and by placing an exculpatory forensic analysis of hair found on the victim's pantyhose in a different crime file). On this point, Senn at his deposition essentially exonerated Dentist Defendants: "[W]e … almost instantly found problems with [Dentist Defendants'] analysis, but we agreed … that *in 1986 the standards and the guidelines were different* than they are at the time that we were doing the reevaluation …. I mean, you know, *we believed that they did what they did in 1986 in good faith*." Doc. 349 at ¶ 83 (quoting Doc. 310-22 at 22) (emphases added).

To be sure, Starks asserts in his Local Rule 56.1(b)(3)(C) statement:

> [Dentist Defendants] determined that Stark[s]'s mandibular dentition did not make the mandibular portion of the bite mark on [the victim], but they did not report this to the prosecutor.  Exhibit 21, Hagstrom 97; Exhibit 17, Schneider 173.

Doc. 350 at ¶ 28.  But the cited record material does not support this assertion; at the very least, it renders the assertion highly misleading.  For what Dentist Defendants actually said was that they *did* match the mark to Starks's dentition, and that they continue to believe they did so correctly.  Doc. 350-2 at 134-136 (Schneider's testimony); Doc. 350-3 at 14 (Hagstrom's).  So an accurate statement of fact would be: "Dentist Defendants determined that Starks's mandibular dentition did not make what *they thought* was the maxillary portion of the bite mark on the victim, but which according to Senn was in fact the mandibular portion of the mark."  Accurately stated, the assertion could not lead a reasonable jury to find that Dentist Defendants knowingly and deliberately suppressed favorable evidence.  The cited record material actually says the opposite: that Dentist Defendants oriented the bite mark the way they did precisely *because* it resulted in both the mandibular and maxillary portions' matching the bite mark, in their opinion.  That is the very essence of bite mark matching—and neatly illustrates why the entire endeavor is so unreliable.

Indeed, the very unreliability of bite mark identification works against Starks's claim, for given such a high false-positive rate, who can say that *any* bite mark analysis has been "falsified," let alone deliberately?  It would be akin to saying that an astrologer "falsified" his conclusion that, because the planets are in a particular alignment, the defendant must have committed the crime, or to complaining that a palm reader grossly deviated from professional standards by mistaking the heart line for the head line.  But the court need not go this far; it is enough that Starks has failed to adduce admissible evidence that Dentist Defendants deliberately

falsified their opinions, as opposed to merely forming them incompetently. That distinguishes this case from *Stinson*, where the odontologists "altered the identification of the missing tooth following discussion with [police officers] on November 15, 1984, *after* they interviewed Stinson." 2013 WL 5447916, at *18. (*Stinson*'s denial of qualified immunity to the odontologists is on interlocutory appeal to the Seventh Circuit in *Stinson v. Gauger*, Nos. 13-3343, 13-3346, & 13-3347 (argued June 6, 2014).)

Starks relies on *Brown v. Miller*, 519 F.3d 231 (5th Cir. 2008), and *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004), to support his position that an expert's providing a false or misleading *opinion* (as opposed to false or misleading *facts*) is actionable under the due process clause. *Brown* held that "the deliberate or knowing creation of a misleading and scientifically inaccurate serology report amounts to a violation of a defendant's due process rights." 519 F.3d at 237. Of course, as noted above, Starks has not adduced evidence—beyond mere say-so and conjecture—showing that Dentist Defendants *deliberately* or *knowingly* falsified their reports. Even putting that aside, *Brown*'s context is important, for the plaintiff's allegations there went beyond and were much more serious than merely overstating scientific conclusions:

> Brown alleges that at this point Miller [the expert] either intentionally and in bad faith failed to conduct additional, commonly used tests ("Rh tests" and "enzyme tests") that would have made the identification more specific and accurate, and likely excluded Brown as the donor, or, in the alternative, that Miller did conduct those tests, that those tests were conclusively exculpatory, and that Miller concealed the exculpatory results.

> Brown specifically alleges that these other tests were commonly used in the same lab at the time, that Miller knew about and used those other tests in the same year, that Miller was unable to draw conclusions in similar identification cases without performing those more specific tests, and that Miller could have performed those tests in Brown's case. Miller argues that these facts support an inference either that Miller actually did conduct the tests in this case or that he knew he should have reported that his results were inconclusive without further testing.

*Id.* at 235 (paragraph break added).  As this passage indicates, the *Brown* plaintiff specifically alleged that the defendant had concealed exculpatory test results.  It also bears mention that *Brown* was decided on a motion to dismiss, and thus took the plaintiff's allegations as true without the benefit of a record.

Senn charges that Dentist Defendants made mistakes in their analysis (*e.g.*, reversing the mandibular and maxillary jaws, and using an out-of-focus image, Doc. 350 at ¶¶ 25-27, 34; Doc. 350-3 at 31-38) and then compounded their errors by overstating their (erroneous) conclusions by saying that Starks *was* the biter instead of that Starks *could not be excluded* as the biter.  Senn does not, however, opine that Dentist Defendants performed additional routine tests but suppressed the results.  To the contrary, as noted above, Senn opined "that in 1986 the standards and the guidelines were different than they are at the time that we were doing the reevaluation ….  I mean, you know, we believed that [Dentist Defendants] did what they did in 1986 in good faith."  Doc. 349 at ¶ 83 (quoting Doc. 310-22 at 22).  Senn cannot testify as to Dentist Defendants' state of mind, but the only reasonable inference that can be drawn from his opinion removes this case from *Brown*'s ambit—and Starks has offered no other evidence to put it back in.

*Pierce* is similarly unhelpful to Starks, as this passage demonstrates:

> Mr. Pierce claims that after his arrest, he was assured that he would be released if a comparison of his hair samples did not match those found at the crime scene.  Ms. Gilchrist falsely reported that the hairs were consistent; had she truthfully reported that they were not consistent, Mr. Pierce would have been released within hours of his arrest, and never tried.  This was aggravated by Ms. Gilchrist's failure to deliver the hair samples for review by an independent forensic examiner hired by the defense, as required by law.

> Moreover, as alleged in the amended complaint, when preparing her forensic report on the case, Ms. Gilchrist performed an enzyme test that conclusively demonstrated that Mr. Pierce could not have been the source of the semen found on the rape victim, but Ms. Gilchrist disregarded and disputed the significance of this evidence in her report.

359 F.3d at 1291 (paragraph break added). Like *Brown*, *Pierce* was decided on a motion to dismiss. Also like *Brown*, the plaintiff in *Pierce* specifically alleged that the defendant performed a particular test, obtained exculpatory results, and then deliberately suppressed them. *Ibid*. Starks has not adduced admissible evidence to suggest that Dentist Defendants did anything of the sort.

Therefore, and in accord with binding precedents *Buie* ("[w]hether a given expert witness overstated her conclusion is mete for cross-examination," 341 F.3d at 625) and *Sornberger* (same), Dentist Defendants are entitled to summary judgment on Starks's due process claim.

## C. Thomas-Boyd

The same result holds for Thomas-Boyd. Although Starks dutifully incants the magic phrases—"she fabricated reports and concealed exculpatory evidence," Doc. 354 at 5—his substantive allegations boil down to, and the record evidence can support only, a complaint that Thomas-Boyd's expert serology opinion was wrong:

> [Thomas-Boyd] issu[ed] conclusions in reports that stated that she could not exclude Starks as a source of the semen and so advising the prosecutor, when in fact she could exclude him and should have done so. Additionally, her recognition that there was a 95% possibility that Starks was excluded as the source of the semen was exculpatory evidence that she had a duty to report, but she failed to do so.

> Her failure to explain to the prosecutor what she now claims was the basis for the request for the semen sample and her failure to be forthright in the meaning of her results shows a witness who was going to great lengths to conceal the real meaning of her test results, and who wanted to avoid at all costs providing the scientific evidentiary conclusions that were mandated by the results she had obtained and which would have excluded Starks as the attacker.

Doc. 354 at 5-6 (paragraph break added). For the reasons given above, none of these are *Brady* violations, for the only thing Thomas-Boyd allegedly "suppressed" was the fact that her conclusion (that Starks could not be excluded) relied on an improbable assumption (that Starks

was an aberrant secretor). That is not a suppression of evidence, but merely an unreliable expert opinion that "[t]he tools of the adversary process supply the means to expose." *Buie*, 341 F.3d at 625. Nor is this a fabrication case like *Whitlock* or *Fields*. For example, nowhere does Starks allege that Thomas-Boyd performed and then concealed the exculpatory results of any additional test. To the contrary, she tried to run more tests but was stymied by Starks's refusal to provide a semen sample.

More to the point, Thomas-Boyd turned over all of her serology reports to Starks and the prosecutor, and none of them contain falsehoods or fabrications. Her final report plainly indicates that Starks is a type B secretor, that the victim was a type O non-secretor, and that only H antigens were present in the samples. Doc. 352 at ¶ 12; Doc. 317-2 at 62 (Thomas-Boyd's blood genetic marker analysis of the victim's blood, saliva, and vaginal standards; Starks's blood and saliva standards; a vaginal swab from the victim; and the semen stain on the underwear). Thomas-Boyd's sole conclusion in that report was:

> In order to make a sound scientific decision concerning the possible exclusion of the suspect, Bennie Starks, as a possible source of the foreign blood groups detected on the submitted vaginal swab (item 01-01) and underwear (item 07-01), a semen standard from Bennie Starks is required.

Doc. 317-2 at 61. That's it—and it is not false, for if there remained (as Starks concedes) even just a five percent chance that he was the source of the semen, then it was entirely accurate for Thomas-Boyd to conclude that he could not yet be "excluded," which would require a *zero* percent chance. Nor did Thomas-Boyd "overstate" her results beyond the bounds of forensic science; to the contrary, she accurately said that she could not definitively exclude Starks.

Starks complains that Thomas-Boyd's trial testimony was misleading because it left the impression that he was among the 14% of the population who could have been the source of the semen, when in fact there was at least a 95% chance that he was not. Doc. 354 at 7. But

Thomas-Boyd is absolutely immune for her trial testimony.  *See Briscoe*, 460 U.S. at 345

(holding that witnesses are absolutely immune from civil liability for their trial testimony);

*Polzin v. Gage*, 636 F.3d 834, 838 (7th Cir. 2011) (same).  And the misimpressions of which

Starks complains appear nowhere in her serology reports.  Doc. 317-2 at 44-62.

Moreover, any confusion at trial was probably created by Starks's lawyer, not Thomas-

Boyd.  Leaving aside chain-of-custody and methodology testimony, here was the full extent of

Thomas-Boyd's testimony on direct examination regarding her serology testing:

> Q.    Now, based on the tests that you conducted on all those exhibits on this, did you form an opinion within a reasonable degree of scientific certainty what the source of the sperm was that you located on the underwear and this vaginal swab?
>
> A.    With comparison with the standards that I received from Bennie Starks, I could not exclude him as a possible source of the semen.  That means I have to include him.

Doc. 313-5 at 22-23.  That testimony exactly matches the conclusion in her report.  On cross-

examination, Starks's lawyer attempted to expose the testimony's scant probative value:

> Q.    Okay.  Now, you have used the words eliminated and included.
>
> A.    Yes. …
>
> Q.    Okay.  That's because you cannot say definitely whether or not it was this person's blood, this person's hair, or this person's seminal fluid?
>
> A.    That is correct.
>
> Q.    Okay.  You do the seminal fluid and the blood groupings just as you stated, that is, people have A, B, AB, and all the mixtures, am I correct?
>
> A.    Yes, that's correct.
>
> Q.    Okay.  You determined that the defendant's blood type was B?
>
> A.    That is correct, yes.
>
> Q.    It is a fact, is it not, that 14 per cent of the population of this United States has B type blood?

A.    That is correct.

Doc. 313-5 at 30-31.  So it was *Starks's* lawyer who injected the "14%" into the record, probably

in an attempt to minimize the importance of Thomas-Boyd's conclusion that she could not

"exclude" Starks as the source of the semen.

Later in cross-examination, Starks's lawyer successfully moved for judicial notice of the

fact that in 1980 the population of Lake County was more than 450,000.  *Id*. at 33.  Starks's

lawyer then posed a hypothetical:

Q.    So, when you say that—Let me go back.  If I have B type blood, okay?

A.    Uh-huh.

Q.    And I am a secretor, as you have indicated that the defendant is, *and you find B type of, whatever you call it, stuff in the seminal fluids—*

A.    Yes.

Q.    —you would have to include me?

A.    Right.

Q.    Within that group?

A.    Yes.

Q.    So, if any of the jurors, the judge, anybody else in here had B type, you would have to include them?

A.    Right.

*Id*. at 31 (emphasis added).  Thus, what happened at trial is that Thomas-Boyd responded to a

hypothetical, posed by Starks's own lawyer, in which "you find B type [antigens] in the seminal

fluids."  *Ibid*.  Given this hypothetical, Thomas-Boyd truthfully answered that she would not be

able to exclude anybody with B type blood.  Answering hypotheticals is what experts do.  *See*

*Williams v. Illinois*, 132 S. Ct. 2221, 2233-35 (2012) (plurality opinion) (discussing the history

and evolution of expert testimony based on hypotheticals).  That Starks's lawyer posed a

hypothetical ("you find B type [antigens] in the seminal fluids") that did not match the actual situation (only H antigens found in the vaginal swab and semen stain) can hardly be attributed to Thomas-Boyd or be evidence of her "bad faith," Doc. 354 at 7, as Starks asserts.

In sum, Thomas-Boyd is absolutely immune for her trial testimony, none of her reports were false or fabricated, and, for the reasons described above regarding Dentist Defendants, her allegedly incompetent or mistaken expert opinion did not violate due process. *See Sornberger*, 434 F.3d at 1029; *Buie*, 341 F.3d at 625. Accordingly, Thomas-Boyd is entitled to summary judgment on Count 1. This disposition makes it unnecessary to reach her other contentions, including that she has absolute and qualified immunity.

## II.     Section 1983 Conspiracy Claim

Count 3 of the complaint alleges that Defendants conspired to violate Starks's federal constitutional rights. Doc. 259 at ¶¶ 75-81. But "conspiracy is not an independent basis of liability in § 1983 actions," *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008), and therefore "an actual denial of a civil right is necessary before a cause of action [for conspiracy] arises," *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982). *See Vaden v. Vill. of Maywood*, 809 F.2d 361, 366 (7th Cir. 1987) ("To state a claim for relief under 42 U.S.C. § 1983, Vaden must allege not only that the defendants conspired under color of state law to deprive her of her constitutional rights, but also that she was in fact deprived of those rights."). Because Starks no longer has a triable federal due process claim, his federal conspiracy claim necessarily fails.

## III.     State Law Malicious Prosecution Claim

Count 5 of the complaint alleges that Defendants maliciously prosecuted Starks in violation of Illinois common law. Doc. 259 at ¶¶ 95-98. Malicious prosecution has five elements:

> (1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff. The absence of any one of these elements bars a plaintiff from pursuing the claim.

*Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996) (internal quotation marks and citations omitted); *see also Saunders-El*, 778 F.3d at 561 (same). Each defendant or set of defendants raises slightly different arguments, which will be addressed in turn.

### A.      Waukegan Defendants

Waukegan Defendants argue that Starks's criminal proceedings were not terminated in his favor. Doc. 321 at 7-9. To be favorable, a termination must have been "indicative of the innocence of the accused." *Swick*, 662 N.E.2d at 1242. Starks's case ended not in an acquittal, but in a *nolle prosequi*. *See People v. Watson*, 68 N.E. 265, 266 (Ill. 1946) ("A nolle prosequi is not a final disposition of the case, and will not bar another prosecution for the same offense. It is not an acquittal, but it is like a nonsuit or discontinuance in a civil suit, and leaves the matter in the same condition in which it was before the commencement of the prosecution. Again, it has been said that the ordinary effect of a nolle prosequi is to terminate the charge to which it is entered and to permit the defendant to go wherever he pleases, without entering into a recognizance to appear at any other time. If it is entered before jeopardy has attached, it does not operate as an acquittal, so as to prevent a subsequent prosecution for the same offense.") (internal quotation marks and citation omitted). A *nolle prosequi* "is not indicative of the innocence of the accused when [it] is the result of an agreement or compromise with the accused, misconduct on the part of the accused for the purpose of preventing trial, mercy requested or accepted by the accused, the institution of new criminal proceedings, or the impossibility or impracticability of bringing the accused to trial." *Swick*, 662 N.E.2d at 1243.

Waukegan Defendants argue that a new trial was impossible or impracticable not due to a lack of reasonable grounds to prosecute Starks, but because the victim had died. Accordingly, Waukegan Defendants contend, "not only was the victim unavailable for retrial, but her prior testimony could not have been used because her cross examination had been impermissibly limited" by the trial judge's incorrectly preventing Starks from cross-examining her on certain topics. Doc. 321 at 8; *see also Starks III*, 966 N.E.2d at 354 (affirming the trial court's excluding the victim's prior testimony because Starks had been "denied adequate cross-examination at the time of the initial proceeding"). In a collateral suit regarding the City of Waukegan's insurance coverage, the Seventh Circuit remarked in dicta that "if the prosecutors dropped Starks's case for some reason not indicative of innocence—*such as the unavailability of a key witness*—then the *nolle prosequi* order would not have terminated the prosecution in Starks's favor." *Northfield Ins. Co. v. City of Waukegan*, 701 F.3d 1124, 1132 (7th Cir. 2012) (emphasis added). The victim, say Waukegan Defendants, is just such a "key witness."

Starks responds that the Circuit Court of Lake County issued him a Certificate of Innocence, which is indicative of his, well, innocence. Doc. 359 at 17; Doc. 360 at ¶ 39; Doc. 360-3 at 129-130 ("The Petitioner was innocent of all offenses for which he was incarcerated on in this captioned case … and is therefore granted a Certificate of Innocence."). Waukegan Defendants object to the admissibility of the Certificate, and Thomas-Boyd has filed motions arguing that admitting the Certificate as evidence in this case would violate *her* federal due process rights. Docs. 386, 396, 405.

The court need not resolve that evidentiary issue right now because Starks has adduced other evidence sufficient to show that the criminal proceedings were terminated in a manner indicative of his innocence—namely, the DNA testing, which eliminated him as the source of the

semen.  Doc. 360 at ¶ 37; Doc. 378 at ¶ 37; *see Starks III*, 966 N.E.2d at 350 ("the DNA test

results exclud[ed] defendant as the source of the semen").  A reasonable jury could conclude that

this evidence "compel[s] an inference that there existed a lack of reasonable grounds to pursue

the criminal prosecution," and that therefore the criminal proceedings terminated in Starks's

favor.  *Swick*, 662 N.E.2d at 1243.  Strictly speaking, the DNA evidence undermines only the

sexual assault charge, not the other charges.  But "[m]alicious prosecution is offense-specific,"

*Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013) (Illinois law); *see also Holmes v.*

*Vill. of Hoffman Estates*, 511 F.3d 673, 683 (7th Cir. 2007) (Illinois law) (same); *March v.*

*Cacioppo*, 185 N.E.2d 397, 402 (Ill. App. 1962) (same), so Starks need only show that the

prosecution of one of his charges was terminated in his favor to maintain his malicious

prosecution claim.  This he has done.  Moreover, the evidence suggests that the victim was

attacked by only one person, which means that the exclusion of Starks as the rapist suggests that

he is innocent of the other charges as well.  Or so, at least, a reasonable jury could conclude.

Waukegan Defendants make only one other perfunctory argument on the malicious

prosecution claim, the entirety of which is:

> Plaintiff's expert, Clark, concedes that the police officers had probable cause
> to arrest Bennie Starks.  ([Doc. 320 at] ¶ 29.)  The police also had items of
> Starks' clothing at the scene of the crime as well as a positive identification of
> the victim.

Doc. 321 at 7.  This argument is multiply flawed.  First of all, Clark did *not* "concede" that the

police had probable cause to arrest Starks; rather, he testified that a proper photo array should

include only one picture of the suspect, that it should include several other pictures of similar

looking individuals, and that all of the pictures should be of a similar size and format.  Doc. 320-

9 at 1-2 (cited in Doc. 320 at ¶ 29).  Clark then said that because the photo array was no longer

available, he could not say whether it met those standards. *Ibid.* Nowhere did Clark opine on whether the officers had probable cause to arrest Starks.

In any event, "[l]iability for malicious prosecution can be imposed when an active part is taken in continuing *or* procuring the continuation of criminal proceedings." *Adams v. Sussman & Hertzberg, Ltd.*, 684 N.E.2d 935, 945 (Ill. App. 1997) (emphasis added). So even if Waukegan Defendants had probable cause to *arrest* Starks, they still can be liable for malicious prosecution if they "t[ook] an active part in the[] prosecution *after* learning that there [wa]s no probable cause for believing the accused guilty." *Ibid.* (emphasis added) (quoting *Restatement (Second) of Torts* § 655, cmt. c (1977)); *see also Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011) (Illinois law) ("the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest"); *Gauger v. Hendle*, 954 N.E.2d 307, 330 (Ill. App. 2011) (distinguishing between "probable cause to arrest" and "probable cause to prosecute" for a malicious prosecution claim); *cf. Wallace v. Kato*, 549 U.S. 384, 389-90 (2007) ("Reflective of the fact that false [arrest] consists of detention without legal process, a false [arrest] ends once the victim becomes held *pursuant to such process*— when, for example, he is bound over by a magistrate or arraigned on charges. Thereafter, unlawful detention forms part of the damages for the 'entirely distinct' tort of malicious prosecution, which remedies detention accompanied, not by absence of legal process, but by *wrongful institution* of legal process.") (citations omitted); *Julian*, 732 F.3d at 846-47 (same).

Waukegan Defendants could have argued that probable cause existed not only to arrest but also to indict Starks, and that probable cause continued to exist throughout his prosecution. They did not, however, so the argument is forfeited for purposes of summary judgment. *See Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 833 (7th Cir. 2014) ("[A]s the district court

found, the musical diversity argument was forfeited because it was perfunctory and underdeveloped."); *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) ("We have repeatedly held that a party waives an argument by failing to make it before the district court. That is true whether it is an affirmative argument in support of a motion to dismiss or an argument establishing that dismissal is inappropriate.") (citations omitted); *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 386 (7th Cir. 2012) ("[T]he forfeiture doctrine applies not only to a litigant's failure to raise a general argument … but also to a litigant's failure to advance a specific point in support of a general argument."); *Judge v. Quinn*, 612 F.3d 537, 557 (7th Cir. 2010) ("We have made clear in the past that it is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and we have warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and alterations omitted).

Waukegan Defendants make no other arguments challenging the malicious prosecution claim. Accordingly, they are not entitled to summary judgment on Count 5.

### B. Dentist Defendants

Like Waukegan Defendants, Dentist Defendants argue that Starks's prosecution did not terminate in his favor. As shown above, this argument is unavailing. But Dentist Defendants also argue that they neither commenced nor continued the criminal proceedings against Starks. Doc. 311 at 28-30. Dentist Defendants were not the complaining witnesses, and they were not contacted until after Starks had been arrested. Doc. 349 at ¶¶ 34, 36. And *Adams v. Sussman & Hertzberg, Ltd.* sets a high bar for holding private individuals culpable under Illinois law for continuing a criminal prosecution:

The defendant must take an active part in the[] prosecution after learning that there is no probable cause for believing the accused guilty. It is not enough that he appears as a witness and thereby aids in the prosecution of the charges which he knows to be groundless. His share in continuing the prosecution must be active, as by insisting upon or urging further prosecution. The fact that he initiated the proceedings does not make him liable merely because he intentionally refrains from informing a public prosecutor, into whose control the prosecution has passed, of subsequently discovered facts that clearly indicate the innocence of the accused.

684 N.E.2d at 945-46 (internal quotation and alteration marks omitted) (quoting *Restatement (Second) of Torts* § 655, cmt. c); *see also Szczesniak v. CJC Auto Parts, Inc.*, 21 N.E.3d 486, 491 (Ill. App. 2014) ("[A] plaintiff must supply evidence showing that the defendant continued the proceeding by actively encouraging the prosecution despite knowing that no probable cause existed."); *Denton v. Allstate Ins. Co.*, 504 N.E.2d 756, 760 (Ill. App. 1986) ("Illinois law provides that, in order to be liable for malicious prosecution, a defendant either must have initiated a criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation.").

Starks maintains that Dentist Defendants "did actively seek the continuation of the prosecution, meeting with Biang and urging him that Starks, beyond any doubt, was the person who bit [the victim], and reporting to the prosecutor that Starks definitely made the bite mark." Doc. 351 at 19. But *Adams* holds that "[i]t is not enough that [a defendant] appears as a witness and thereby aids in the prosecution of the charges which he knows to be groundless." 684 N.E.2d at 945. Indeed, it is not even enough to "intentionally refrain[] from informing a public prosecutor … of subsequently discovered facts that clearly indicate the innocence of the accused." *Id*. at 946. Starks has not presented evidence showing that Dentist Defendants played an *active* role in urging the prosecution; all he can point to is their flawed bite mark "analysis" and expert opinions. While Dentist Defendants' allegedly mistaken conclusion about Starks's having bitten the victim may have influenced the prosecutor's decision to continue the

proceedings against Starks, it is not evidence that Dentist Defendants "actively encourag[ed]" or "insist[ed] upon" his continued prosecution. It follows that Dentist Defendants cannot be held liable for malicious prosecution for providing allegedly flawed expert opinions, and therefore that they are entitled to summary judgment on the malicious prosecution claim. *See Williams*, 733 F.3d at 759 ("It is the state of mind of the person commencing the prosecution that is at issue—not the actual facts of the case or the guilt or innocence of the accused.") (internal quotation marks omitted); *Gauger*, 954 N.E.2d at 330 (same).

### C.      Thomas-Boyd

Thomas-Boyd likewise argues that she neither commenced nor continued the prosecution against Starks. Starks agrees that she did not commence the prosecution, but contends that she continued it because "if Thomas-Boyd had revealed her exculpatory information this would likely have led to the abandonment of the rape prosecution, and, assuming good faith in the prosecutor, of the other charges also." Doc. 354 at 13-14 & n.5. Again, Starks's argument is incompatible with *Adams*, which makes clear that Thomas-Boyd cannot be held "liable merely because [s]he intentionally refrain[ed] from informing a public prosecutor … of subsequently discovered facts that clearly indicate[d] the innocence of the accused." 684 N.E.2d at 946. So even if Thomas-Boyd *knew* that Starks had been categorically excluded by her serology tests— and Starks has adduced evidence showing only that her contrary conclusion was improbable, not false, let alone knowingly false—she cannot, for the same reason as Dentist Defendants, be held liable for malicious prosecution under Illinois law, at least not without some evidence that she actively insisted on Starks's continued prosecution. *See ibid.*; *Williams*, 733 F.3d at 759; *Gauger*, 954 N.E.2d at 330.

Starks has presented no such evidence. Accordingly, Thomas-Boyd is entitled to summary judgment on the malicious prosecution claim as well. It is therefore unnecessary to

reach her argument that she is entitled to absolute immunity on the improbable ground that she was providing a "police *protection* service" to Starks, 745 ILCS 10/4-102 (emphasis added). Doc. 316 at 12-13.

## IV. State Law Intentional Infliction of Emotional Distress Claim

Count 6 of the complaint alleges that Defendants intentionally inflicted emotional distress on Starks, in violation of Illinois common law. Doc. 259 at ¶¶ 99-100. An intentional infliction of emotional distress ("IIED") claim has three elements: "First, the conduct involved must be truly extreme and outrageous. Second, the actor must either *intend* that his conduct inflict severe emotional distress, or know that there is at least a high probability that his conduct will cause severe emotional distress. Third, the conduct must in fact cause *severe* emotional distress." *McGrath v. Fahey*, 533 N.E.2d 806, 809 (Ill. 1988); *see also Lopez v. City of Chicago*, 464 F.3d 711, 720 (7th Cir. 2006) (Illinois law) (same). "[T]he nature of the defendant's conduct must be so extreme as to go beyond all possible bounds of decency and to be regarded as intolerable in a civilized community." *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80-81 (Ill. 2003); *see also Lewis v. Sch. Dist. #70*, 523 F.3d 730, 747 (7th Cir. 2008) (Illinois law) (same).

The first element is relatively easy to analyze, for under Illinois law, the hurdle for an IIED claim is even higher than for a malicious prosecution claim, at least where the same offending conduct forms the basis of both claims. *See Lundy v. City of Calumet City*, 567 N.E.2d 1101, 1103 (Ill. App. 1991) ("It is not enough that … [the defendant's] conduct can be characterized by malice.") (quoting *Restatement (Second) of Torts* § 46, cmt. d (1965)); *Robinson v. Econ-O-Corp., Inc.*, 379 N.E.2d 923, 925-26 (Ill. App. 1978) (reversing summary judgment for the defendant as to the malicious prosecution claim but affirming as to the IIED claim); *March*, 185 N.E.2d at 400-03 (same, on a motion to dismiss). Because Starks has failed

to identify evidence sufficient to maintain his malicious prosecution claim against Dentist Defendants and Thomas-Boyd, it follows that he cannot maintain his IIED claim against those defendants. *See Robinson*, 379 N.E.2d at 925-26; *March*, 185 N.E.2d at 400-03.

Waukegan Defendants, by contrast, failed in their initial brief to present any argument on the IIED claim, Doc. 321, resulting in a forfeiture for purposes of summary judgment. *See Batson*, 746 F.3d at 833; *G & S Holdings*, 697 F.3d at 538; *Milligan*, 686 F.3d at 386; *Judge*, 612 F.3d at 557. In an attempt to rescue themselves, Waukegan Defendants contend in their reply brief that the "arguments advanced in [their opening brief] apply equally to Plaintiff's claim of intentional infliction of emotional distress, although not separately designated." Doc. 377 at 8. But an argument—assuming the just-quoted sentence qualifies as one—advanced for the first time in a reply brief remains forfeited. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) ("[T]he district court is entitled to find that an argument raised for the first time in a reply brief is forfeited."); *Cromeens, Holloman, Sibert, Inc. v. AB Volvo*, 349 F.3d 376, 389 (7th Cir. 2003) ("Because Volvo raised the applicability of the Maine statute in its reply brief, the district court was entitled to find that Volvo waived the issue.").

In sum, Starks's IIED claim against Waukegan Defendants will be tried, while Dentist Defendants and Thomas-Boyd are entitled to summary judgment.

## V.     State Law Civil Conspiracy Claim

Count 7 of the complaint alleges that Defendants committed state law civil conspiracy. Doc. 259 at ¶¶ 101-105. Under Illinois law, "[c]ivil conspiracy is defined as a combination of two or more persons for the purpose of accomplishing by concerted action either an unlawful purpose or a lawful purpose by unlawful means." *McClure v. Owens Corning Fiberglas Corp.*, 720 N.E.2d 242, 258 (Ill. 1999) (quotation marks omitted); *see also Indep. Trust Corp. v. Stewart*

*Info. Servs. Corp.*, 665 F.3d 930, 938-39 (7th Cir. 2012) (Illinois law) (same); *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (same). As with § 1983 conspiracy claims, "a plaintiff must allege an agreement *and* a tortious act committed in furtherance of that agreement." *McClure*, 720 N.E.2d at 258 (emphasis added); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) (Illinois law) (same). "While the agreement is a necessary and important element of a cause of action for civil conspiracy, it does not assume the same importance as in a criminal action. An agreement to commit a wrongful act is not a tort, even if it might be a crime. A cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) (internal citations omitted); *see also Indep. Trust Corp.*, 665 F.3d at 939 (same).

As explained above, Starks has viable state law tort claims against only Waukegan Defendants, so to maintain his state law conspiracy claim against Dentist Defendants or Thomas-Boyd, he must adduce evidence showing an agreement between them *and* at least one Waukegan Defendant. (If Dentist Defendants conspired, they likely conspired with each other, but since neither of them committed a tortious act, that is not enough to establish civil conspiracy liability.) This Starks has not done. True enough, "to prove the existence of a civil conspiracy, a plaintiff is not required to provide direct evidence of the agreement between the conspirators; circumstantial evidence may provide adequate proof of conspiracy." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979) (quotation marks and brackets omitted), *rev'd in part on other grounds*, 446 U.S. 754 (1980); *see also McClure*, 720 N.E.2d at 258 (same). "If a civil conspiracy is shown by circumstantial evidence, however, that evidence must be clear and

convincing." *McClure*, 720 N.E.2d at 258. In particular, "mere parallel conduct" is insufficient as a matter of law to prove a conspiracy. *Ibid*.

Starks lays out a series of allegations in his briefs. Doc. 351 at 12-13; Doc. 354 at 10-13. With two exceptions, they merely repeat his allegations of what Dentist Defendants and Thomas-Boyd did by themselves (in parallel with Waukegan Defendants) in the Starks investigation, and do not suggest an "agreement" or "meeting of the minds" between Dentist Defendants or Thomas-Boyd, on the one hand, and any of the Waukegan Defendants, on the other. The two exceptions are: (1) Schneider "had a pre-existing relation with the [Waukegan Police Department] and was at one point Biang's personal dentist," Doc. 351 at 12; and (2) "Thomas-Boyd clearly had undisclosed contact with law enforcement personnel, since she learned information—in particular the identity of Bennie Starks, initially misspelling his name and subsequently correcting this—that is not included in the materials that are extant in the crime lab files," Doc. 354 at 11.

Neither of these tidbits nudge Starks's evidence from merely speculative to the point where a reasonable jury could find "clear and convincing" evidence of an agreement. *McClure*, 720 N.E.2d at 258. For one thing, the "pre-existing relationship" was that another police officer knew Schneider's phone number (and, presumably, also knew that Schneider was a forensic odontologist). Doc. 350 at ¶ 20. But *most* forensic odontologists who work on a criminal investigation will have *some* sort of "pre-existing relationship" with investigators; after all, that is how they are contacted and become involved in the first place. And despite confused testimony on the point, it is clear in context that Biang became Schneider's patient *after* the Starks trial. Doc. 310-9 at 20-21 (Schneider's deposition).

But even if Biang were Schneider's patient beforehand, that does not make it any more likely that they agreed to *wrongfully frame Starks*. *See Williams v. Seniff*, 342 F.3d 774, 786 (7th Cir. 2003) ("This vacillating testimony only confirms that Mr. Toth was involved in the events surrounding Mr. Williams' termination …. We cannot say, however, that this testimony constitutes evidence from which a conspiracy may be inferred."). Nor is the bare fact that Dentist Defendants communicated with Waukegan Defendants during the investigation enough to infer a conspiracy, for "[t]his is the type of behavior that will be present in every criminal prosecution—valid pursuit of a conviction." *Beaman v. Freesmeyer*, 776 F.3d 500, 512 (7th Cir. 2015); *see also Williams*, 342 F.3d at 786; *Goetzke v. Ferro Corp.*, 280 F.3d 766, 778 (7th Cir. 2002) (holding that "numerous calls … over a nine-month period" proved only that the defendants "remained in contact," and to "assert that the calls are evidence of a conspiracy is simply speculation"). (Because Illinois and federal civil conspiracy law are substantively similar, *see McClure*, 720 N.E.2d at 260 (favorably comparing Illinois civil conspiracy to § 1983 conspiracy); *Kinney v. City of Waukegan*, 2015 WL 996611, at *4 (N.D. Ill. Mar. 3, 2015) (same), the court seeks guidance from the Seventh Circuit's federal civil conspiracy decisions.)

Starks's evidence regarding Thomas-Boyd is similarly infirm. Starks asserts in his Local Rule 56.1(b)(3)(C) statement: "In the course of her testing of the evidence in [his criminal] case, Thomas-Boyd learned information about the case from law enforcement that is not reflected in the written files preserved by the NIPCL or its successor organization, NIRCL. Exhibit 9, Thomas-Boyd 87." Doc. 353 at ¶ 16. But page 87 of Thomas-Boyd's deposition transcript does not support this assertion, as viewing the entire page demonstrates:

> Q. And it notes that microscopic analysis of the underwear revealed the presence of spermatozoa cells?
>
> A. That's correct.

Q.  So, again, it appears that in terms of testing for semen or spermatozoa, it was a microscopic analysis as opposed to a chemical analysis; is that correct?

A.  I don't remember everything we did—

Q.  If you had—

A.  —to prove it was semen.

Q.  I'm sorry.  If you had done a chemical analysis for the presence of semen, you would have noted that?

A.  Yes.

Q.  Then if you go to the end of this document—

A.  Page 7?

Q.  Yes.  So the portion that says "Tests and Conclusions," you note in that that a whole blood and dried saliva standard is being requested from the suspect, Bennie Starks, to help determine the possible source of spermatozoa cells.  Do—

A.  That's correct.

Doc. 353-1 at 129.  What this has to do with Thomas-Boyd's "learn[ing] information about the case from law enforcement that is not reflected in the written files" is unexplained and probably unexplainable.

"A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity."  *Ammons v. Aramark Unif. Servs., Inc.*, 368 F.3d 809, 818 (7th Cir. 2004); *see also Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obliged in our adversary system to scour the record looking for factual disputes.").  "[J]udges are not like pigs, hunting for truffles buried in [the record]."  *Friend v. Valley View Cmty. Unit Sch. Dist. 365U*, __ F.3d __, 2015 WL 3644015, at *3 (7th Cir. June 12, 2015) (second set of brackets in original).  Nevertheless, playing the pig, the court surmises that Starks intended to cite Thomas-Boyd's January 28, 1986 report referring to "the suspect, Benni [*sic*] Starks."  Doc. 317-2 at 50.  But why is this improper?  Why should Thomas-

Boyd not have known Starks's name, given that he had already been arrested and she needed to test his saliva and blood? Starks offers no argument, let alone evidence, that Thomas-Boyd's knowing his name at that point in time was improper. At most it shows simply that Thomas-Boyd was in contact with prosecutors, Doc. 352 at ¶ 9—and, as with Dentist Defendants, contact or communication alone is insufficient to prove a civil conspiracy. *See Beaman*, 776 F.3d at 512; *Williams*, 342 F.3d at 786; *Goetzke*, 280 F.3d at 778; *Ill. Non-Profit Risk Mgmt. Ass'n v. Human Serv. Ctr. of S. Metro-E.*, 884 N.E.2d 700, 711 (Ill. App. 2008) ("The sole allegation of conspiracy against RMA and Murray is that they agreed and conspired with Ernst & Young to prepare inaccurate, untruthful, and deceptive audit reports. This allegation is nothing more than a conclusion that a conspiracy existed and fails to satisfy the pleading requirements to state a cause of action for civil conspiracy.").

Starks's only argument to the contrary is that Waukegan Defendants, Dentist Defendants, and Thomas-Boyd must have been working together, for how else to explain the fact that Dentist Defendants and Thomas-Boyd each arrived at incorrect expert conclusions that just happened to inculpate Starks? As Starks puts it, either he "is the unluckiest person in the history of mankind and several different persons independently made innocent mistakes which just happened to coincide and cause his conviction," or the defendants must have conspired together. Doc. 359 at 11. To support his position, Starks relies on *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), which reversed dismissal of a federal conspiracy claim alleging that the plaintiff's having received twenty-four "bogus parking tickets" over a fourteen-month period was the product of a conspiracy. As the Seventh Circuit explained: "While the complaint makes only rather conclusory direct allegations of conspiracy, the complaint also alleges a pattern of harassment by

several officers over a period of months.  It is a challenge to imagine a scenario in which that harassment would not have been the product of a conspiracy."  *Id.* at 749.

But *Geinosky* was decided on a motion to dismiss, and the Seventh Circuit noted that "[u]nder *Twombly,* all plaintiff needed to allege was a plausible account of a conspiracy."  *Ibid.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "If several members of the same police unit allegedly acted *in the same inexplicable way* against a plaintiff on many different occasions, we will not dismiss a complaint for failure to recite language explicitly linking these factual details to their obvious suggestion of collusion."  *Ibid.* (emphasis added).  Starks is not opposing a motion to dismiss, however; he is opposing a summary judgment motion, which means that he must adduce admissible evidence that would allow a reasonable jury to find that there was, in fact, an agreement to injure him.  Yet he has nothing more than his bare allegation that Dentist Defendants, Thomas-Boyd, and Waukegan Defendants all happened to testify against him at his criminal trial—in other words, not an ounce more information than he had in his original complaint, filed back in 2009.  Simply insisting that all of them must be lying, while perhaps enough to overcome a motion to dismiss, is not sufficient to defeat summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("The parents' argument in opposition to summary judgment boils down to an allegation that defense witnesses are lying and the stated reasons for the school's actions are phony. … The parents correctly note that evaluations of witness credibility are inappropriate at the summary judgment stage.  However, when challenges to witness' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper.") (citation omitted).

The analysis could end here, but it bears mention that *Geinosky* involved what the Seventh Circuit termed "inexplicable" behavior on the officers' part. It is hardly "inexplicable" that Dentist Defendants and Thomas-Boyd would bungle their respective analyses, as the phenomenon of motivated cognition suggests that their inculpatory findings were the natural outcomes of a criminal investigation. *See* National Academy of Sciences, *supra*, at 123 (noting that motivated reasoning can affect forensic analysts "if, for example, they are asked to compare two particular hairs, shoeprints, fingerprints—one from the crime scene and one from a suspect—rather than comparing the crime scene exemplar with a pool of counterparts."); *ibid.* (describing a study "in which experienced fingerprint examiners were asked to analyze fingerprints that, unknown to them, they had analyzed previously in their careers"; the study found that, when the prints were accompanied by contextual biasing information ("such as the 'suspect confessed to the crime'"), 25% of the "experienced" examiners "reached conclusions that were consistent with the biasing information and different from the results they had reached when examining the same prints in their daily work") (citing Itiel E. Dror & David Charlton, "Why Experts Make Errors," 56 *J. Forensic Identification* 600, 610 (2006)); Roger Koppl & Meghan Sacks, "The Criminal Justice System Creates Incentives for False Convictions," 32 *Crim. Just. Ethics* 126, 147 (2013) ("Illinois crime labs receive fees upon *convictions* for sex offenses, controlled substance offenses, and those involving driving under the influence.") (emphasis added); Barbara O'Brien, "Prime Suspect: An Examination of Factors That Aggravate and Counteract Confirmation Bias in Criminal Investigations," 15 *Psychol. Pub. Pol'y & L.* 315, 318 (2009) ("Pre-existing beliefs can influence even ostensibly scientific judgments: [a 2006 study] found that fingerprint experts were less likely to find a match when facts provided about the case made a match seem less probable."). In other words, Dentist Defendants' matching

Starks's dentition to the bite mark and Thomas-Boyd's refusing to exclude Starks as the source of the semen are not unexpected, improbable, or inexplicable events—they are entirely predictable occurrences, without Dentist Defendants or Thomas-Boyd's ever needing to reach an agreement, implicit or otherwise, with the police and prosecutors.

In any event, even putting motivated cognition to the side, to find on this record a conspiracy would amount to "mere speculation, and it is well-settled that 'conjecture alone cannot defeat a summary judgment motion.'" *Lewis v. Mills*, 677 F.3d 324, 331 (7th Cir. 2012) (quoting *Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011)). Accordingly, Dentist Defendants and Thomas-Boyd are entitled to summary judgment on the civil conspiracy claim. Waukegan Defendants, by contrast, have made only a perfunctory, one-paragraph argument as to conspiracy (and only the federal conspiracy claim at that), Doc. 321 at 6, and thus have forfeited any argument in favor of summary judgment on Count 7. *See Batson*, 746 F.3d at 833; *G & S Holdings*, 697 F.3d at 538; *Milligan*, 686 F.3d at 386; *Judge*, 612 F.3d at 557.

## VI.     Remaining Claims and Issues

Counts 9b, 10, and 11 of the complaint, as well as Thomas-Boyd's cross-complaint, seek to hold the City of Waukegan and/or NIRCL vicariously liable and financially responsible for any judgment Starks obtains against Thomas-Boyd. Doc. 259 at ¶¶ 113-144; Doc. 230. Because Thomas-Boyd is entitled to summary judgment on all of Starks's claims against her, Waukegan and NIRCL are entitled to summary judgment on these counts, and Thomas-Boyd's motion for summary judgment on her cross-claim against Waukegan is accordingly denied as moot. This disposition makes it unnecessary to reach NIRCL's immunity arguments. Doc. 330 at 3-7. The City of Waukegan sought summary judgment on Counts 8 and 9a, which seek to hold it vicariously liable and financially responsible for the police officers' alleged misconduct, Doc.

319, but it presented no argument on those counts other than that the officers are entitled to judgment on the claims against them, so summary judgment is denied on Counts 8 and 9a.

Starks has abandoned his failure-to-intervene claim (Count 2) against Waukegan Defendants and his *Monell* claim (Count 4) against the City of Waukegan. Doc. 359 at 1, 21. Accordingly, Waukegan Defendants are entitled to summary judgment on those counts. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Finally, Thomas-Boyd has moved to declare Illinois's certificate of innocence statute, 735 ILCS 5/2-702, unconstitutional. Docs. 386, 396. Her motion, however, appears to be an evidentiary motion *in limine* masquerading as an as-applied constitutional challenge. *See Kluppelberg v. Burge*, __ F. Supp. 3d __, 2015 WL 1396509, at *5 (N.D. Ill. Mar. 24, 2015) (denying a similar motion *in limine* regarding a Certificate of Innocence). Regardless, in light of the disposition of Thomas-Boyd's summary judgment motion, her motion is denied as moot.

\*    \*    \*

The criminal justice system occasionally delivers injustice, and Starks appears to have been the victim of "experts" peddling junk science to credulous judges and jurors. It is easy to sympathize with Starks's plight. *See* Dan Hinkel & Sarah Freistat, "Another Lake County Murder Case Collapses; Freed Inmate Now the 6th Cleared of Major Felony Since 2010," *Chicago Tribune*, May 29, 2015, p. C1 ("The case is the latest to crumble in a county renowned for disastrous prosecutions. Strong is the sixth inmate cleared of a major felony in Lake County since 2010. Most of the six men—who spent a total of 95 years behind bars before being cleared—were prosecuted under Michael Waller, who was state's attorney for 22 years before

retiring in 2012.").  On the summary judgment record and under binding precedent, however, Starks has no federal or state tort remedy against Dentist Defendants.  He also has no federal or state tort remedy against Thomas-Boyd, and no federal remedy against Waukegan Defendants.

Starks's state law claims against the Waukegan police officers will proceed to trial. Because all federal claims have been dismissed, and because the parties are not of diverse citizenship, the court has the discretion under 28 U.S.C. § 1367(c)(3) to relinquish jurisdiction over those state law claims.  However, because the "court and the parties in this case have already expended substantial judicial resources … and the parties have completed discovery," because trial has been set for next month, because Illinois law governing the surviving claims is not complex or unsettled, and because the state law claims are as central to this case as were the now-dismissed federal claims, the court will retain jurisdiction over the suit and see it through to judgment.  *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008); *see also Doe-2 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 593 F.3d 507, 513 (7th Cir. 2010) (affirming the district court's exercise of supplemental jurisdiction where "the factual basis for Doe-2's state-law claims was indistinguishable from the asserted basis for her federal claim, and the district judge had devoted substantial court time and resources to analyzing the complaint's factual allegations before addressing the state-law theories"); *cf. Howlett v. Hack*, __ F.3d __, 2015 WL 4433218, at *5 (7th Cir. July 21, 2015) (holding that the district court should have relinquished jurisdiction over the remaining state law claims where the federal claims had been dismissed, the state law claims were not "the focus of the litigation," and the district court "offered no reason for declining to dismiss the remaining supplemental claims").

**Conclusion**

Schneider's, Russell's, and NIRCL's summary judgment motions, Docs. 309, 312, 329, are granted. Thomas-Boyd's summary judgment motion, Doc. 316, is granted as to Starks's claims against her and denied as moot as to her cross-claim against Waukegan. The court previously granted partial summary judgment to Thomas-Boyd on her cross-claim against NIRCL as to her defense costs, Doc. 229; NIRCL is entitled to summary judgment on the remainder of her cross-claim for indemnity. Schneider, Russell, Thomas-Boyd, and NIRCL will be terminated as parties. Thomas-Boyd's motion to declare 735 ILCS 5/2-702 unconstitutional, Doc. 386, is denied as moot. Waukegan Defendants' summary judgment motion, Doc. 319, is granted as to Starks's federal due process, federal conspiracy, federal failure-to-intervene, *Monell*, and implied indemnity claims (Counts 1, 2, 3, 4, and 11), but denied as to his state law malicious prosecution, IIED, civil conspiracy, and derivative liability claims (Counts 5, 6, 7, 8, and 9a). The City of Waukegan's summary judgment motion on Thomas-Boyd's cross-claim, Doc. 325, is granted.

July 24, 2015

_____
United States District Judge